# ATTACHMENT 2

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

_______________________________

| | | |
|---|---|---|
| FIONA TORRES, | ) | |
| Plaintiff, | ) | |
| v. | ) | 1:25-cv-2360 (PTG/WBP) |
| SOCIETY FOR HUMAN RESOURCE | ) | |
| MANAGEMENT, | ) | |
| Defendant. | ) | |
| _______________________________ | ) | |

Rule 30(b)(1) Deposition of JIMMY RAY LINK

McLean, Virginia

Monday, May 11, 2026

9:03 a.m.

Job No.: 632710

Pages: 1 - 249

Transcribed by: Jerome E. Harris, Stenographer.

this deposition?
A I --
MS. BRIDENBAUGH: Go ahead.
A I did.
Q When did you review them?
A Within the last week.
Q Do you recall which documents you reviewed?
MS. BRIDENBAUGH: I'm gonna object. Attorney-client privilege as to which documents you reviewed. Whether you recall which documents you reviewed imply a yes or no answer, but -
A Yes.
Q You -- do you recall how many documents there were?
A No.
Q Would you say, if I gave you a number, could you -- well, do you recall whether it was more than five documents?
A Yes.
Q Was it more than five documents?
A Yes.
Q Do you recall whether it was more than ten

documents?

A I don't recall.

Q And the five documents -- or do you recall what the five documents were?

MS. BRIDENBAUGH: Again, I'm gonna object based on attorney-client privilege. You can answer whether you recall but not what documents they were.

A Yes.

Q I'm going to ask you now what documents those were?

MS. BRIDENBAUGH: Objection. Attorney-client privilege. I'll direct the witness not to answer the question.

Q You've just been directed not to answer the question, okay. Are you going to -- well, follow that instruction?

A I am.

MR. RUIZ: Just to make sure I am, the objection -- I'm sorry to this line. The objection is that he's not allowed, he -- is the objection is providing the identification of the documents that he reviewed. Is that correct?

MS. BRIDENBAUGH: I'm objecting based on attorney-client privilege to your question.

Q Mr. Link, when you reviewed the documents, were -- did you review them as hard copy versions?

A No.

Q Were they electronic versions?

A Yes.

Q When you reviewed the documents, where were you?

A In my office.

Q Did you review them independently or with someone else?

MS. BRIDENBAUGH: Objection to the extent the answer would involve attorney-client privileged communications.

Q Did -- did you review them independently?

A Yes.

Q And do you still have access to those documents?

A Yes.

Q Mr. Link, did you make any notes in conjunction with your review of those documents?

MS. BRIDENBAUGH: Same objection. Asked and answered.

A When Sheri determines that the accommodation is easily addressable by the organization, she has authority to ensure that happens for that person requesting the accommodation.

Q Have you ever spoken with Ms. Martel about the types of requested workplace accommodations for disabilities that she should seek further guidance about?

MS. BRIDENBAUGH: Objection. Vague. And to the extent the answer would involve communications with counsel, I would direct the witness not to answer. Otherwise, you can answer.

A No.

Q No. Mr. Link, have you ever expressed an opinion to anyone other than counsel at SHRM or external counsel whether a request to have a service dog in the workplace for purposes of a disability is -- or let me explain -- let me back up. It's a bad question.

Have you ever expressed to someone at SHRM or other than internal counsel or to external counsel, your

an accommodation in the form of her service dog?

MS. BRIDENBAUGH: Objection. And to the extent these Interrogatory Responses were prepared by counsel and do not necessarily include the exact language that he would choose to use as reflected in the responses, you can answer.

A In collaboration and cooperation with internal and external counsel, I acted as described in the words I read.

Q Okay. Mr. Link, were you the person that made the decision that Ms. Torres did not require an accommodation in the form of her service dog?

A I am.

Q You are the person that made the decision?

A I am the person that made the decision in collaboration and cooperation with internal and external counsel regarding that.

Q Did you make that decision independently in any respect?

MS. BRIDENBAUGH: Objection. Form. Vague.

A No.

Q And did you identify and decide the

A Yes.

Q The accommodations that were identified, did -- did you -- were these your ideas?

MS. BRIDENBAUGH: Objection to the extent the answer would get into attorney-client privileged communications, I would direct the witness not to answer. Otherwise, you can answer.

A I don't -- will not answer that question.

Q Is it because counsel just instructed you not to answer if the answer involved attorney-client communications?

A It is.

Q Okay. Is there any information that you have that is responsive to that question that does not fall into the category of information your attorney instructed you not to answer about?

MS. BRIDENBAUGH: Objection. Vague. Calls for a legal conclusion. Same instruction.

A No.

Q So you did no independent work with respect to identifying accommodations to offer Ms. Torres?

MS. BRIDENBAUGH: Objection. Vague.

A I did no independent work. All the work regarding this matter was done in collaboration and cooperation with internal and external counsel.

Q When you say all of the work, what are you referring to?

A The deliberative process to accommodate Ms. Torres' request.

Q What do you mean by the deliberative process?

MS. BRIDENBAUGH: Objection. Form. Asked and answered.

A These decisions regarding Ms. Torres and her request for accommodation were made with the assistance of internal and external counsel.

Q Did you take any independent steps with respect to the evaluation of Ms. Torres' request to have her service dog allowed at work with her?

MS. BRIDENBAUGH: Objection. Asked and answered. Vague.

A No.

Q Okay. What external counsel did you consult with?

MS. BRIDENBAUGH: Objection. Attorney-client

able to meet her request. Okay, why would SHRM not be able to meet her request?

MS. BRIDENBAUGH: Objection. Argumentative, badgering, asked and answered, vague, calls for legal conclusion. He's answered the question. That you don't like the answer to the question is not a reason to keep asking it over and over again.

You can answer if anything has changed, and then, we're done.

A Nothing has changed.

Q Was there anything about her request that fell outside of SHRM's ability to accommodate?

MS. BRIDENBAUGH: Objection. Vague. Asked and answered. Calls for a legal conclusion. Argumentative. Badgering. He's answered the question.

If anything has changed, you can answer it.

A Nothing has changed.

Q Were there any particular facility issues raised that would have prevented SHRM from accommodating her request to bring her service dog to work?

MS. BRIDENBAUGH: I'm gonna object to the extent the answer would involve attorney-client privileged

communication, I would direct you not to answer. Otherwise, you can answer. Also vague, asked and answered.

A I will not answer that.

Q Are you not answering it based on your attorney's instruction?

A Yes.

Q Is there any information that you have responsive to my request other than information that falls within the category of attorney private -- attorney-client communications?

MS. BRIDENBAUGH: Objection. Calls for legal conclusion.

A None of which I'm aware.

Q Did you conduct any independent analysis of why there was a facility based reason why SHRM could not accommodate Ms. Torres' request to allow her service dog with her at work?

MS. BRIDENBAUGH: Objection. Asked and answered. And to the extent the answer would involve attorney-client privileged communications, I would direct the witness not to answer. Otherwise, you can

answer.

A No.

Q Okay. Mr. Link, as part of the evaluation of Ms. Torres' request, was there any effort to contact those at SHRM responsible for different facilities that would be impacted by accommodating --

MS. BRIDENBAUGH: Object --

Q -- Ms. Torres's request?

MS. BRIDENBAUGH: Objection. Vague. Asked and answered, attorney-client privileged communication. To the extent the answer would involve privileged communication, I would direct the witness not to answer. Otherwise, you can answer.

A I won't answer that.

Q Are you not answering based on your attorney's instruction?

A Yes.

Q Okay. Do you have any independent knowledge whether there was -- whether in the process of evaluating Ms. Torres' request for accommodation, whether anyone was consulted within SHRM who was responsible for different facilities?

MS. BRIDENBAUGH: Objection. Vague. Calls for speculation. Same instruction as to privilege.
A Yeah, I will not answer that question.
MS. BRIDENBAUGH: Can we take a break now, please? I need too use the bathroom.
MR. RUIZ: Yes, absolutely.
THE COURT REPORTER: Stand by, Counsel. One moment. We're going off the record.
(Lunch was taken.)
THE COURT REPORTER: We are back on the record.
MR. RUIZ: Thank you so much.
BY MR. RUIZ:
Q Mr. Link, we're back from lunch. Do you understand you're still under oath?
A I do.
Q Thank you so much.
Mr. Link, before we -- before we broke for lunch, we were discussing Exhibit 2. Okay. And before I move on to the next exhibit, I want to ask you, as part of your evaluation of Mrs. Torres' accommodation request, did you inquire with any SHRM employee as to whether they would be impacted by Ms. Torres being

granted the accommodation she requested?

MS. BRIDENBAUGH: Objection. Vague. And to the extent the answer would invade attorney-client privileged communications, I'll direct the witness not to answer. Otherwise, you can answer.

A It would invade attorney-client privilege.

Q So did you independently speak with any employee regarding whether or not they would be impacted by SHRM granting Ms. Torres' requested accommodation?

MS. BRIDENBAUGH: Same objection.

A No.

Q Sir, with respect to my question regarding whether you independently asked any employee whether they would be impacted by SHRM granting Ms. Torres' requested accommodation, do you know if Ms. Belyna -- Belyna --

A Belyna.

Q -- Belyna asked any SHRM employee whether they would be impacted by SHRM granting Ms. Torres' requested accommodation?

A I don't know.

MS. BRIDENBAUGH: Same.

Q Aside from any involvement by external or internal counsel, do you know of any independent efforts to ask SHRM employees whether they would have been impacted by SHRM granting Ms. Torres her requested accommodation?

MS. BRIDENBAUGH: Objection. Vague. Calls for speculation. You can answer if you can.

A No.

Q Meaning you are not aware?

A I am not aware.

Q I'm handing you -- well, what will be handed to you will be Plaintiff's Link Exhibit 3.

(Plaintiff's Link Exhibit 3, SHRM Policies and Procedures, was marked for identification and is attached to the transcript.)

Q It is Bates stamped SHRM_Torres_0000005. The top of the document reads Society for Human Resource --

MS. BRIDENBAUGH: He hasn't been handed the document yet, so can we --

MR. RUIZ: Oh. I'm just describing it.

Q The top of the document reads Society for Human Resource Management Policies and Procedures, includes

question. We reach reasonable accommodations because that's the intent of our policy and that's the intent of the practice of providing accommodations to employees. We want to accommodate.

Q When you were evaluating Mrs. Torres' complaint, did you approach the complaint as wanting to accommodate her request?

MS. BRIDENBAUGH: Objection. Vague as to the use of the word, complaint. Calls for speculation.

MR. RUIZ: I'm sorry, let me -- that was a really horrible question. Let me go ahead and rephrase it.

When you were evaluating Ms. Torres' accommodation request, did you approach the accommodation or evaluation of her request as wanting to accommodate that request?

MS. BRIDENBAUGH: Objection. Vague.

A Yes.

Q Did you at all independently decide whether SHRM could accommodate her request?

MS. BRIDENBAUGH: Objection. Asked and answered. To the extent the answer would invade

attorney-client privileged communications, then I'll direct the witness not to answer; otherwise, you can answer if your answer has changed.

A I won't respond to that.

Q Are you not responding based on your attorney's instruction?

A Yes.

Q So did you not have formed any independent basis or any independent thought as to whether SHRM could accommodate Ms. Torres' request for accommodation?

MS. BRIDENBAUGH: Objection. Calls for speculation, calls for legal conclusion, asked and answered, vague, and the same instruction to the extent it calls --

A I'm not going to answer that question.

Q Let me make sure I understand -- make sure you understand what I'm asking. I'm not asking for any internal like private conversation or conversation between you and counsel. I'm asking if you had any independent like thought on whether SHRM could accommodate Ms. Torres' request?

MS. BRIDENBAUGH: Objection. Asked and

had that, we had started by this point in time to engage in those discussions with internal and external counsel to ensure that we were asking all the right questions, securing all the information we could secure, engaging in an interactive, iterative process with Ms. Torres in an attempt to reach a reasonable accommodation.

Q Sir, I asked going back what happened after, what was the next steps after you received the fact file. I want to know after you received the fact file, did you have -- did you have your own independent understanding of what Ms. Torres' accommodation request was?

MS. BRIDENBAUGH: Objection. Asked and answered several times.

A No.

Q No. Did you ever develop your own independent understanding of what Mrs. Torres' accommodation -- request for workplace accommodation was?

MS. BRIDENBAUGH: You can answer so long as you don't discuss attorney-client privileged communications.

A No.

Q Mr. Link, I want to refer you back to Exhibit 1

reviewed was?

MS. BRIDENBAUGH: Objection. Attorney-client privilege. I'll direct the witness not to answer as to anything he reviewed in consultation with counsel.

A I won't answer.

Q I'm not asking what it was. I'm asking if you remember what it was?

MS. BRIDENBAUGH: You can answer whether you remember what it was.

A Yes.

Q Okay. Now, I do have to ask this. What was that information that you reviewed?

MS. BRIDENBAUGH: Objection. Attorney-client privilege. I'll direct the witness not to answer as to any document he reviewed in consultation with counsel.

A I won't answer.

Q And you're not answering pursuant to instruction by counsel?

A That is correct.

MR. RUIZ: I'm about to take a -- you know, I'm at a good stopping point right now just --

MS. BRIDENBAUGH: We can a break if that's what

Ms. Torres. And each and every one of these documents and requests were an attempt to aid in that process.

Q So the -- going back to page 561, sir. 000561.

A I'm there.

Q Is it your understanding that Ms. Torres responded with the updated medical documentation that was requested?

MS. BRIDENBAUGH: Objection. Calls for speculation.

A Yes.

Q Was there any concerns with the updated medical documentation that she provided?

MS. BRIDENBAUGH: Objection. Vague as to concerns. And to the extent the answer would invade attorney-client privileged communication, I would direct the witness not to answer. Otherwise, you can answer if you are able to.

A I'm sorry, can you repeat that question.

Q Yeah. Was there any concern with the updated medical information that Ms. Torres provided?

MS. BRIDENBAUGH: Same objection, same instruction.

A No.

Q In evaluating Ms. Torres' request for accommodation, once Dr. -- she had provided the June 19, 2024 note from Dr. Joshi, okay, was -- did SHRM have any other need for additional medical support for her request?

MS. BRIDENBAUGH: Objection. Vague.

A No.

Q So as far as you recall, with respect to medical documentation, was the June 19 th, 2024 letter from Dr. Joshi sufficient to support her request for accommodation?

MS. BRIDENBAUGH: Objection. Calls for legal conclusion. Vague. Calls for speculation. And to the extent the answer would invade attorney-client privileged conversations, I would instruct the witness not to answer, but you can answer if you can do so without disclosing privileged communication with counsel.

A It was one of many documents that we considered as we thought about how to best accommodate Ms. Torres.

Q Thanks so much.

Was -- as part of when you looked at the June 19th, 2024 letter from Dr. Joshi, okay, in your view, okay, was this sufficient to support -- was this portion -- was this sufficient medical documentation to support her request for an accommodation in the form of a service dog?

MS. BRIDENBAUGH: Objection. Calls for legal conclusion, vague to the extent the answered would invade attorney-client privileged communications. I'll direct the witness not to answer unless you can answer without disclosing privileged communications with counsel.

A It was one of the many documents that we considered as part of the accommodation request process for Ms. Torres.

Q I understand, but did you -- did you look at this review the medical documentation submitted on June 19, 2024 yourself? Did you form any ideas about it on your own?

MS. BRIDENBAUGH: Objection. Compound, vague. Same instruction as to attorney-client privileged communications. Asked and answered.

A No.

MR. RUIZ: Okay. I'm sorry. She is right. I need to break that down.

Q When you answered no, are you answering no to that you did not form any -- you did not look at this on your own?

MS. BRIDENBAUGH: Objection. Vague. And to the extent, the answer would invade attorney-client privileged communication, I would direct you not to answer unless you can answer without disclosing privileged communications with counsel.

A No.

Q Sir, were you satisfied with the medical documentation that she provided?

MS. BRIDENBAUGH: Objection. Vague as to satisfied accomm -- objection, vague as to satisfied. Asked and answered. Attorney-client privilege. But you can answer to the extent you can do so without disclosing privileged communication with counsel.

A It was one of the many documents that we reviewed as we thought about how to best accommodate Ms. Torres.

Q I understand it was many -- one of many documents. I'm asking if you personally was satisfied with the medical documentation that she provided?

MS. BRIDENBAUGH: Same objection. Asked and answered, badgering. You can answer if your answer has changed.

A My answer has not changed.

Q Just to be clear, I'm not asking about any communications that were held between you and external and internal counsel. I'm asking if you personally were satisfied with the medical documentation that was provided by Ms. Torres?

MS. BRIDENBAUGH: Objection. Vague as to satisfied and medical documentation. Asked and answered several times. Badgering. You can answer if you have anything else to add beyond what you've already answered.

A I have nothing else to add.

Q And you have nothing else to add because you are following the instruction of your attorney not to answer my last question?

MS. BRIDENBAUGH: I did not instruct him not to

A I did not.
Q Do you know if anyone from SHRM made contact with Dr. Joshi?
MS. BRIDENBAUGH: Objection. Calls for speculation.
A I do not know.
Q Do you know if anyone was assigned to make contact with Dr. Joshi?
MS. BRIDENBAUGH: Objection. Calls for speculation.
A I do not know.
Q Was any medical professional contacted about Ms. Torres' requested accommodation?
MS. BRIDENBAUGH: Objection. Vague, calls for speculation.
A In the course of discussing with internal and external counsel, there were many considerations given as to what information to seek and what information to have at our disposal as we looked to make the best decision related to this.
Q Did you have any questions that you would have liked to have answered from Dr. Joshi?

MS. BRIDENBAUGH: Objection. Vague.
Q I asked if any medical professionals had been contacted in connection with Ms. Torres' request for an accommodation. Were there?
MS. BRIDENBAUGH: Objection. Vague. Asked and answered. And to the extent it would invade attorney-client privileged communication, I would ask you not to answer. You can otherwise answer without disclosing attorney-client privileged communications.
A I will not answer.
Q I'm asking about communications with other medical professionals, not about communications with attorneys. I'm asking if other medical professionals were contacted about Ms. Torres' request. Do you understand what I'm asking?
A I do.
Q Okay. With that clarification, were there any medical professionals that were contacted about Ms. Torres' request?
MS. BRIDENBAUGH: Objection. Vague. Asked and answered. Same instruction as to privilege.
A I'm going to rely on the privilege and not

answer that question.

Q So is there you have -- you're not answering it at the direction of counsel; is that correct?

A Correct.

Q And you understand the question to be whether or not contacts were made as to with respect to or whether other medical -- whether any other medical professionals were contacted? You understand that the question -- that to be the question?

MS. BRIDENBAUGH: If I can consult with the privilege question with him for a second to understand whether the answer is privileged, that might be help.

MR. RUIZ: Absolutely.

Off the record.

THE COURT REPORTER: One moment please. Stand by. We're going off the record.

(A discussion was held off the record.)

THE COURT REPORTER: We are back on the record.

A To answer your question, I am unaware of other medical professionals being contacted.

BY MR. RUIZ:

Q Thank you.

employer and the employee.
Q So is that a yes, you did consider it?
MS. BRIDENBAUGH: Objection. Asked and answered.
A Yes.
Q Thank you. Now, other than counsel, did you receive input from any person in identifying accommodation -- identifying accommodations to offer Ms. Torres?
MS. BRIDENBAUGH: Objection. Vague. To the extent input was provided by someone other than counsel, in conversations with counsel, or communications with counsel, I would direct the witness not to answer. But you can answer it to the extent you can do so without disclosing attorney-client privileged communication.
A I cannot answer without disclosing attorney-client privileged communications.
Q Okay. Just to be clear, any conversations you had with any person regarding identifying accommodations would have been with counsel or in the presence of counsel?
A That is correct.

attorney-client privileged communications.
A The attorney would involve attorney-client privileged communication .
Q Did you see this, the content of this email before it was sent?
MS. BRIDENBAUGH: Objection. To the extent the answer would at involve attorney-client privileged communications, I would direct you not to answer. You can answer so long as you can do without disclosing attorney-client privileged communication.
A Yes.
Q When you viewed the information, did you understand its contents?
MS. BRIDENBAUGH: Objection. Vague.
A Clearly, yes.
Q Clearly. Okay.
Did you understand what the email to Ms. Torres was intended to convey?
MS. BRIDENBAUGH: Objection. Vague.
A Yes.
Q I'm gonna direct your or your attention to the sentence that reads, Unfortunately, it does not appear

**SOCIETY FOR HUMAN RESOURCE MANAGEMENT**

**POLICIES AND PROCEDURES**

| | | |
|---|---|---|
| DISTRIBUTION: All Staff | | SUBJECT: RECRUITMENT AND SELECTION |
| EFFECTIVE DATE: 2/3/2014 | PAGE NO. 1 OF 1 PAGES | FILE UNDER SECTION 1 NO. 033 |
| REVISION DATE: | APPROVED BY: President/CEO | |

1. POLICY:

SHRM and SHRM's subsidiaries and affiliates are committed to employing the best candidates for approved positions, engaging in effective recruitment and selection practices in compliance with all applicable employment laws, SHRM policies, and within budget limitations. We provide equal employment opportunity to all applicants and employees. SHRM, its subsidiaries and affiliate are Equal Opportunity employers; SHRM is also an Affirmative Action employer (M/F/Disabled/Veteran).

Approval of the division head is required to initiate a requisition for a regular open position. Offers of employment are made in writing by the CHRO (or his/her designee), the Vice President, Human Resources (or his/her designee), or by the President of SHRM. No verbal or written offers made in any other manner are permitted and any such offers will be rescinded.

This policy works in conjunction with SHRM's Employee Code of Conduct and several other policies, including but not limited to, SHRM's policies on Employee Referral, Employment of Relatives, Staff Promotions, Background and Credit Checks, Staff Transfers, Equal Employment Opportunity, Affirmative Action, etc.

EXHIBIT 5/16/26 SAP
Plaintiff
Link 3
Planet Depos, LLC

2. PROCEDURES:

**Recruitment Procedure**

Note: The following recruitment procedures apply to hiring for positions below the level of Senior Vice President. Recruitment for Senior Vice President-level and above are generally handled through an outside executive search firm.

Unbudgeted jobs are not accepted for recruitment. An unbudgeted job *may* become approved when the SVP of the hiring Division presents the job to the Senior Management Team (Division Heads), and they move to approve it.

Budgeted jobs may be put on hold by the hiring manager while the division makes decisions on how best to fill the position, changes the job description, obtains new pricing, etc. The time limit for keeping positions on hold is 6 months. At six months,

the recruiter will contact the hiring manager to discuss the position, and the division has 30 days to decide to post it or not. If not posted, the Leadership Team will decide where it is most needed and may elect to move the open position to another division.

The recruitment process begins when the Hiring Manager submits a job description for a budgeted position to the Manager, Compensation & Benefits, for pricing and FLSA status determination. Once pricing is established, the Hiring Manager submits the requisition to the recruiting system. Approval of the requisition by the Senior Vice President of the hiring division is then required.

Human Resources will contact the Hiring Manager to determine the most cost and time-effective method of recruitment and selection, and to ascertain that the requirements and qualifications are appropriate to the level and skills of the position.

Human Resources advertises, sources candidates, collects resumes, and phone screens candidates whose resumes indicate that they are qualified for the position. Candidates who do not meet the minimum qualifications established for the posted position are not selected for further consideration. When recruiting for available positions below the SVP level SHRM shall first seek internal candidates from within, and such candidates will be considered on the basis of individual qualifications, and potential and prior job performance. Current employees on a Performance Improvement Plan are not eligible for open positions. There is an active employee referral process for sharing job openings with family and friends, and HR is tasked to ensure that all hiring practices are completed openly and fairly without preference for unqualified candidates. Hiring Managers are discouraged from bringing forward family and friends as candidates for positions in their own division, as it may create a conflict of interest, and in no case is it permitted for family members to work in the same department or in any capacity where the relative could be perceived as under the influence of another relative. See the Employee Referral Policy and Employment of Relatives Policy for more information.

**Selection Procedure**

Hiring Managers are responsible for conducting timely, effective interviews of qualified candidates for the position. Human Resources provides behavioral interviewing questions, and is available to advise on interview techniques and final candidate selection. Candidates are ideally interviewed in person no more than twice – once for the hiring manager and/or interviewing panel, and once for an interview with the hiring manager's supervisor. The Hiring Manager shall promptly submit all interview questions asked and interview notes taken by the Hiring Manager to Human Resources following the interview. Human Resources cannot make an offer of employment until all interview questions and notes are received from the Hiring Manager.

Employment reference checks and background checks are conducted by Human Resources for the two or three selected final candidates. Candidates that do not meet the background check standards are eliminated from further consideration. SHRM uses a third-party background check provider to conduct such reference and

background checks, and all aspects of such checks are handled in accordance with applicable law such as the Fair Credit Reporting Act. SHRM shall not utilize any type of social media to perform any sort of background check on candidates (unless the candidate has specifically requested SHRM's review of a social media profile/portfolio for work-related purposes).

Upon determination of the final candidate, the Hiring Manager and Human Resources collaborate on the offer of employment (including start date and any other details).

The Vice President, HR (or his/her designee), the CHRO (or his/her designee), or the President/CEO makes a written offer of employment to the candidate.

Upon receiving a candidate's signed offer of acceptance, the position is considered closed. On the first day of employment for the new employee, Human Resources completes the final close of the requisition.

**Responsibility**

Human Resources is responsible for the overall management of the recruitment and selection processes including employment-related agency relationships, agency contract negotiations and maintenance, compensation decisions, the processing of new requisitions, keeping applicants apprised of their status, reference and background checks, employment offers, and new employee paperwork.

Hiring Managers are responsible for timely coordination with Human Resources of schedules for interviewing, discussing resumes, and informing internal applicants of their status. If Hiring Managers are not available to participate in the hiring process, HR will not post the job until the Hiring Managers can be available. Timely, decisive and effective action is critical for finding and hiring the best candidates in the market. Hiring Managers make the final selection on the candidates, with the advice and concurrence of the Recruiter. Hiring Managers are further responsible for onboarding activities that are specified by Human Resources for successful startup of the new employment relationship.

Both Human Resources and Hiring Managers are responsible for ensuring compliance with all laws, regulations, and affirmative action requirements (if applicable) relating to hiring and employment. If at any time during the recruitment or selection process a candidate expresses the need for a reasonable accommodation based on a disability, the Hiring Manager must immediately refer the candidate to Human Resources for assistance. Human Resources will then work with the candidate to identify a reasonable accommodation(s).