UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

**FIONA TORRES,** :
:
**Plaintiff,** :
:
**v.** : Civil Action
: No. 1:25-cv-02360-PTG-WBP
**SOCIETY FOR HUMAN RESOURCE** :
**MANAGEMENT,** :
: June 5, 2026
: (10:54 a.m. - 11:30 a.m.)
:
**Defendant.** :
:
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . :

**TRANSCRIPT OF MOTION HEARING PROCEEDINGS**
**BEFORE THE HONORABLE WILLIAM B. PORTER,**
**UNITED STATES DISTRICT COURT MAGISTRATE JUDGE**

APPEARANCES:

For the Plaintiff:

**Stephen Barkai Pershing, Esq.**
KALIJARVI, CHUZI, NEWMAN & FITCH
818 Connecticut Avenue, N.W.
Suite 1000
Washington, DC 20036
202-331-9260
Fax: 866-452-5789
Email: Spershing@kcnlaw.com

For the Defendant:

**Lauren Marie Bridenbaugh, Esq.**
LITTLER MENDELSON
1800 Tysons Boulevard
Suite 500
Tysons Corner, VA 22102
703-286-3142
Fax: 703-991-5601
Email: Lbridenbaugh@littler.com

APPEARANCES: (Cont.)

For the Defendant: **Tanja L Darrow, Esq.**
LITTLER MENDELSON
633 West 5th Street
63rd Floor
Los Angeles, CA 90071
213-443-4300
Fax: 213-443-4299
Email: Tdarrow@littler.com

Court Reporter: **Scott L. Wallace, RDR, RMR, CRR**
Official Court Reporter
United States District Court
401 Courthouse Square
Alexandria, VA 22314-5798
Cell: 443-584-6558
Email: Scottwallace.edva@gmail.com

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

**MORNING SESSION, JUNE 5, 2026**

(10:54 a.m.)

THE COURTROOM CLERK: Recalling Civil Action Number 25-cr-2360, *Torres versus Society For Human Resource Management. Parties*, please state your names for the record.

MR. PERSHING: Good morning, Your Honor, Steve --

THE COURT: To the podium, if you could. We're a court of record by recording, so I need you in front of that mic.

MR. PERSHING: Good morning. May it please the Court, Steve Perishing representing the plaintiff, Fiona Torres.

THE COURT: Good morning. Unless you have been excused, I encourage you to stay in the courtroom until your case has been called. Understood?

MR. PERSHING: Yes, sir.

THE COURT: All right.

MS. BRIDENBAUGH: Good morning, Your Honor. Again, Lauren Bridenbaugh for Defendant SHRM, with my colleague Tanja Darrow.

THE COURT: Good morning to you both.

All right. There are two motions on the docket today in this case. I want to talk about the joint motion for a protective order first, because I'm going to address that in somewhat of a summary fashion.

You all have submitted competing protective orders, which is very difficult for the Court to resolve. I'll just tell you that we tried to run and compare documents for these things, and

it is overwhelming.

Most of these are minor nitpick-type issues that I'm not going to resolve. These are things that you all need to work out. You need to submit a joint protective order. And if you have disagreements within that protective order, you can identify them within the body of the document, and I'll address them. The main one here appears to be the attorneys' eyes only issue; is that right?

MR. PERSHING: Yes, Your Honor. And it may be moot now because the main issue that they -- that the defendant was citing there was that they wanted to protect other applicants or employees' private medical information.

Discovery has now shown that there were no such other employees or applicants, and so the need for AEO designations has disappeared, as far as I know.

THE COURT: All right. Well, let me hear from Ms. Bridenbaugh about that.

Do you agree that that is no longer an issue in the case?

MS. BRIDENBAUGH: I think it's most likely no longer an issue in the case pending the other motion and how that plays out potentially. But I do agree that was an issue back in January when we first sent opposing counsel a draft protective order, and I do think there is another issue in that my understanding is that plaintiff's counsel has repeatedly not wanted to agree to a limitation on any materials produced in discovery being used for

purposes outside of this litigation.

Um, we have a concern about that. We obviously don't care if Ms. Torres wants to use her own production or medical records, résumé or things like that. I think that's, perhaps, a little bit too detailed, but that is the only other issue that I am aware of.

THE COURT: All right. On that issue, the way that those issues are typically handled is, in a protective order, it says that, notwithstanding any parties' designation of a document as confidential, all parties are free to use any documents that they originated in any way that they see fit.

MS. BRIDENBAUGH: Yeah. And I haven't looked at the original protective order -- we sent them a while ago -- but that's generally the protective order that I look to have entered in this court.

THE COURT: Do either of you disagree with that concept?

MS. BRIDENBAUGH: I don't.

MR. PERSHING: No, Your Honor. And we actually added a passage as section -- I think it's 1G -- that specifically says that and should have obviated this.

THE COURT: That, to me, is a simple issue, and we'll resolve it that way when you submit your revised protective order.

On the attorneys' eyes only issue, I think that these third parties do have the right to protect their information.

The way that I typically see that handled, or the way that I used to handle it is the two of you can come up with a list of employees who are going to be used, come up with an anonymous way to identify them, Employee 1, 2, 3, whatever the case may be, and then their personal information is redacted, to the extent it needs to be protected, to protect their identities. Is there any issue with handling it that way?

MS. BRIDENBAUGH: No, Your Honor. And I neglected to confirm when I was up here before that Mr. Perishing is correct, that there have been no comparators with the same accommodation requests in this matter. At the time, back in January, February, I didn't have that information.

So I think that issue is moot. My only concern on the AEO designation at this point is if, pending the other motion, there is a disclosure of privileged communications in some sense. Then I may have a concern there, depending on what that is.

THE COURT: All right. Well, I'm going to deny the joint motion for a protective order without prejudice, and ask you all to file a singular protective order that doesn't require me to make calls as to whether, say, for example, a comma should be in one place or another. Come on, people.

MS. BRIDENBAUGH: I apologize for -- I'll apologize for that. I think that was -- and I think Mr. Perishing would agree -- that was not intentional. There were at least ten drafts exchanged with plaintiff's counsel, and I think, by the

time we got to, okay, this is -- we haven't reached an agreement on these issues, there were some things that got changed that weren't intentional.

THE COURT: So, reach agreement on as many as you can, and then identify any issues that remain in dispute, and we can resolve them, but I can't deal with what you gave me.

MS. BRIDENBAUGH: Absolutely. Understood.

THE COURT: All right.

MR. PERSHING: Just one point on that that the Court may see when we try to submit a joint -- they asked for protection against a risk of embarrassment. That was an unattainable position to us. They want to overread *Seattle Times v. Rhinehart*, and we had to make a statement about that. We couldn't accept the principal that that would set.

THE COURT: Well, I think there's a different standard for common law and First Amendment, and those get handled differently. So I'm not going to provide any additional commentary on that.

Let's address the plaintiff's motion to compel. Mr. Perishing.

Let me ask you this: Have you taken a 30(b)(6) deposition?

MR. PERSHING: We did, Your Honor -- or we started with the deposition schedule, but it was constrained by defendants. We did take a 30(b)(1) for about --

THE COURT: I want to know about your 30(b)(6).

MR. PERSHING: 30(b)(6), we began, same witness.

THE COURT: Which witness?

MR. PERSHING: I'm sorry, Your Honor?

THE COURT: Which witness?

MR. PERSHING: His name is Jim Link.

THE COURT: Okay. Jimmy Ray. He's identified in the deposition as Jimmy Ray.

MR. PERSHING: Jimmy Ray. Yes, Your Honor. It's the same person.

THE COURT: Yeah.

MR. PERSHING: What would the Court would like to know about the 30(b)(6)?

THE COURT: Have you finished it?

MR. PERSHING: Well, the answer to that is that the discovery schedule permitted only about 45 minutes of 30(b)(6) questioning, and we have not been able to, what we would have considered, finishing the 30(b)(6).

THE COURT: I'm sorry, I don't understand that. Why did you only get 45 minutes for a 30(b)(6) deposition?

MR. PERSHING: There was a dispute with the defendant about how much time we would get -- I'm sorry, whether we would get time for 30(b)(6) and a 30(b)(1), and they tried to keep it to seven hours total for both. We had one day, and that's all they would give us.

THE COURT: Well, you get seven hours for each. You get seven hours for every witness. You also get seven hours for a 30(b)(6).

MR. PERSHING: Yes, Your Honor. That was our position.

THE COURT: Right.

MR. PERSHING: And there was a dispute, and we had to let the witness go at a certain point because of a hard stop by the defendants. There was a dispute about that. It will be apparent in the transcript. And so we were only able to ask for about 45 minutes worth of 30(b)(6) questions of this witness.

THE COURT: Do you have a follow-up 30(b)(6) deposition scheduled with topics identified?

MR. PERSHING: Your Honor, the answer is we were unable to do a topic -- had been identified, and there was a dispute about that. But the answer is that we were unable to schedule another 30(b)(6) because of the imminent close of discovery.

THE COURT: Well, you're running out of time, and I -- I -- it strikes me that -- I have some broad comments for this situation.

Let me just hear quickly from Ms. Bridenbaugh about the 30(b)(6) witness, so I can make sure I have context.

MS. BRIDENBAUGH: Your Honor, the last time we were here there was a discussion about the 30(b)(6) because plaintiff's counsel, Ms. Kisch, who has since withdrawn from this matter, was intending to take Mr. Link's deposition as a fact witness and

then separately take it as a 30(b)(6) on another day.

And Your Honor indicated, because of the narrow issue of this case, it wasn't clear why both could not be done within, you know, one day, within about seven hours.

Plaintiff took, then canceled one of the dates for Mr. Link's two depositions and took his 30(b)(1) deposition for about six-and-a-half hours. A number of the questions, to me, seems like 30(b)(6) topics.

And again, we asked for clarification at one point.

THE COURT: Did you try and designate during the course of his individual deposition that some of his testimony would be 30(b)(6) testimony?

MS. BRIDENBAUGH: I asked at one point, Are you still asking him as a fact witness, because it sounded like 30(b)(6) questions. They said, Yes, this is still a fact witness.

THE COURT: All right. Well, he gets seven hours for a witness, and he gets seven hours for a 30(b)(6) in whatever combination that looks like.

Now, if the issue was you were at the end of a seen-hour day and you didn't want to go another six-and-a-half hours, I understand that, but he -- we still need to make available to the plaintiff another, sounds like, six hours and fifteen minutes of 30(b)(6) testimony.

MS. BRIDENBAUGH: I think they then did the 30(b)(6) deposition after that. I believe we got to about

seven-and-a-half -- potentially a little bit more -- mark. I'd have to check the transcript.

THE COURT: It is what it is.

MS. BRIDENBAUGH: We have not been approached since then about another 30(b)(6) deposition.

THE COURT: All right. Your discovery cutoff is next Friday; is that right?

MS. BRIDENBAUGH: Yes.

THE COURT: It needs to take place next week.

MS. BRIDENBAUGH: Okay.

THE COURT: Mr. Perishing, I see you shaking your head, but we need to come up with a date, and you need to get it on the calendar, and you need to address these topics there because -- So, back to my general comments.

I'm going to start with general comments about the depositions first, all right. And, first of all, these depositions were all taken about a month ago. Why are we here now on the eve of the close of discovery, literally asking me, dumping on me, both sides, over 300 pages, I think close to 400 pages of material, and essentially asking me to call balls and strikes on a question-by-question basis without really identifying those issues for me? Why are we here so late?

MR. PERSHING: Well, Your Honor, we're moving in limine to exclude or to compel answers, but the difficulty is that we had to take all of the depositions and read the transcripts in order

to see just how egregious it was and, in our view, overbroad the privilege designations were.

THE COURT: Well, then, you need to deal with it immediately. If you took these depositions and thought that there were some inappropriate attorney-client communication objections -- and I suspect that there were, and maybe we'll talk about a few of those -- then you need to address the issue promptly. It's unfair to the other side. It's unfair to the Court to literally come to the Court at the last minute, dump a bunch of papers in front of the Court, and say, We want something done about this.

The discovery window is the discovery window, and as part of the relief that you're seeking here is to take new depositions of other people. When did you think that was going to happen?

MR. PERSHING: Well, our difficulty is the same as the Court's. We don't --

THE COURT: No, no, no. You could have gotten expedited transcripts. You could have raised -- did you meet and confer at all with the defendants about any of this motion?

MR. PERSHING: Well, absolutely.

THE COURT: I could not tell. There's no certification. You understand that a certification is required in this court?

MR. PERSHING: Yes, Your Honor.

THE COURT: And can you show me where your 7.1 certification is?

MR. PERSHING: Of course, Your Honor. I thought we supplied that. I'm sorry.

THE COURT: Well -- and the defendants said, in response, that they first heard about any of these issues from you the night before you filed your motion.

What did the meet and confer look like to you?

MR. PERSHING: Well, Your Honor, this case has been full of disputes between --

THE COURT: I'm talking about the meet and confer for this motion. What did it involve?

MR. PERSHING: Well, first of all, you have to do it either in person or by telephone.

THE COURT: Tell me what it looked like.

MR. PERSHING: And you have to discuss whether there's a chance to narrow the issues for the filing of the motion.

THE COURT: Did you look at my 16(b) order?

MR. PERSHING: Of course, Your Honor.

THE COURT: Did you see my footnote?

MR. PERSHING: I can't recall it.

THE COURT: Well, it should stick out in your mind because it particularly relates to this issue, and that good cause is required before you file a motion to compel.

MR. PERSHING: And it says we have to deal with the other side about whether we can reduce the issue or narrow them for filing.

THE COURT: What did you do to do that?

MR. PERSHING: Well, we determined that there was just no way to narrow the dispute.

THE COURT: So you didn't meet and confer?

MR. PERSHING: I'm sorry, Your Honor?

THE COURT: I'm asking you what steps -- give me the actual steps you took to meet and confer in this case.

MR. PERSHING: I called the other side and -- actually, what we did first was -- there was an e-mail asking for a time when they would be willing to meet and confer, and that does sometimes create frictions, but we tried to do it.

THE COURT: Did you do it here?

MR. PERSHING: Yes, Your Honor, of course.

THE COURT: Okay. And did you talk to them on the phone?

MR. PERSHING: Yes. We had that call.

THE COURT: How long did that call last?

MR. PERSHING: I can't remember. I don't think we've ever had a call longer than an hour, but at least, at least half an hour on this issue. But forgive me, Your Honor. I did not bring my time records and --

THE COURT: -- well --

MR. PERSHING: -- and notes on them.

THE COURT: Mr. Pershing, I'm just looking at this motion, and it struck me that there wasn't an attempt to meet and confer. But maybe there was, and I just missed it. But you certainly

weren't able to narrow any of the issues, as far as I could tell. But -- so I've raised my concerns with you. The concerns are that you waited too long; that you didn't meet and confer.

We shouldn't be doing this with -- at the eve of trial or at least the eve of the close of discovery.

So, what else do you want to tell me?

MR. PERSHING: Well, Your Honor, the problem with the overbreadth of the designations is that we just can't get any other mode of evidence.

THE COURT: The overbreadth of the designations. What are you talking about?

MR. PERSHING: The issues of privilege. I'm sorry, Your Honor. The invocations of privilege in the depositions. "Why did you write this?" we asked Ms. Belyna.

THE COURT: I don't want to do anecdotal descriptions of testimony. What I was planning to do was to have you point out to me -- because I'll look at a sample of things, but I'm not going to look through 300 pages of deposition transcripts and try and divine what your intent or where your argument is for each one. If you want to give me your three or five greatest hits, I'm happy to look at them.

MR. PERSHING: All right. Well, Your Honor, all of them are in attachment 7 to our original motion to compel or exclude, and that is a table which we compiled with some effort to do exactly what I believe the Court is looking for, which is the

reason why we believe each invocation of privilege at each witness's deposition was overbroad or improper.

The difficulty, again, is that we were unable to see motive evidence. So, for example, when Ms. Belyna was asked, "Did you write the rescission letter?" She says, "Yes" -- but this is the part -- "Did you write the accommodation letter?" She said, "Yes." And we said, "Why? Well, what's it mean?" "I can't tell you that; it's privileged." When we asked Jim Link, "Well, did you approve that letter?" "Yes." "Can you tell us what it means?" "Oh, that's privileged."

The problem that we've got is that either we have to see what the thought process actually was, which requires some piercing of the privilege, or we have to exclude from introduction either at summary judgment or at trial on any motive evidence that hasn't been disclosed, which it seems is pretty much everything. They just don't have a basis for the decision. They've hidden it behind privilege. That's our problem, and we're trying to present that to the Court as clearly and thoroughly here as we could in our table as attachment 7.

THE COURT: Okay. What else would you like to tell me?

MR. PERSHING: Well, the privilege log, of course, is further proof that the designations are overbroad, but we thought that, in order for the Court to engage in any in-camera review, we needed to meet that standard that they refer to that says you have to have some good faith factual predicate or a good faith

basis to suppose that the privilege designations and the privilege log --

THE COURT: Well, similar to the depositions, you would like me to look at all of the privilege documents to see if what they say in their privilege log is accurate?

MR. PERSHING: Well, there are 42 of them.

THE COURT: Okay.

MR. PERSHING: Slightly more now.

THE COURT: Okay.

MR. PERSHING: With the addition of a few that are not in dispute.

THE COURT: Which ones on here do you think are inappropriate?

MR. PERSHING: Well, Your Honor, we know that nine should be released because they were plaintiff's documents. There are at least 28, if I'm not mistaken, that just simply say, It's privilege because we say so.

THE COURT: No, that's not what it says. Can you show me where it says that on the privilege log? I think you're overstating it.

MR. PERSHING: I don't mean to be.

THE COURT: It's not helpful.

MR. PERSHING: What it says is communication with counsel --

THE COURT: Yeah. It says, "Communication with counsel

about the purpose for the purpose of obtaining legal advice regarding the applicant's request for accommodation."

MR. PERSHING: Right.

THE COURT: And that strikes me as a privileged communication.

MR. PERSHING: Except that they recite it 28 times or for 28 different documents of different types.

THE COURT: So they had communications with their lawyers. I -- I get your point that you take issue that you think they consulted with counsel throughout the course of this process, which is their right, but I don't see how these -- if you want to point me to a description in this privilege log that you think is inadequate, I'm happy to review it.

MR. PERSHING: Well, the problem is we haven't seen them, and we don't know.

THE COURT: Well, you don't get to see them.

MR. PERSHING: It's a pig in a poke.

THE COURT: Okay.

MR. PERSHING: All we have is the facial description.

THE COURT: All right. What else?

MR. PERSHING: On the motive --

THE COURT: Just on that privilege log, you've had that privilege log since April 8th.

MR. PERSHING: Yeah, and we're trying to --

THE COURT: -- two months.

MR. PERSHING: The main issue for us with the privilege log is that it shows just how thoroughly the basis for their decisions has been hidden behind privilege. So, the Court is supposed to look at these privilege implications and determine whether we have at least a good-faith basis for asking for an in-camera review of these things. And our position is that the entire array of privilege concealments should arouse reasonable suspicion that the designations and invocations are overbroad.

We think the only alternative to doing that is to issue clear rulings, excluding a basis for decision evidence, from summary judgment and trial. We recognize that trial is a little ways out, but they're trying to say that we decided this because we decided this.

And, in any ordinary case, we would be entitled to examine the motives of the decision-makers. And what they're doing is concealing those motives completely from us, and that's why we're here.

THE COURT: All right. Anything else you would like me to know?

MR. PERSHING: In the interest of brevity, I'll have a seat.

THE COURT: All right. Thank you, sir. Ms. Bridenbaugh.

MS. BRIDENBAUGH: First, on the meet and confer, I was out of the country. Ms. Darrow was on that meet and confer. My understanding from her is that it only lasted about 20 minutes.

Plaintiff's counsel only raised the privilege log during that meet and confer and not the deposition testimony.

So, I don't think we had notice of the deposition testimony being an issue.

On the documents on the log, the nine or so documents plaintiff's counsel referred to, those were already produced, if they existed, in nonprivileged --

THE COURT: Are you talking about the family --

MS. BRIDENBAUGH: -- family members.

THE COURT: Okay. So, my question for you on that is, have you produced every document that is -- every nonprivileged document in some other way that was identified as being privileged and connected with the family?

MS. BRIDENBAUGH: Yes. There was one that is --

THE COURT: Your papers suggested eight of nine.

MS. BRIDENBAUGH: Eight of nine. Yes. There was one that, when I checked, it did not come out in -- as separate. I'm happy to produce it. I have no problem producing it.

THE COURT: Well, I think you're obligated to produce it.

MS. BRIDENBAUGH: All of the other documents have been produced several times over because -- Ms. Torres produced them. We produced them in various forms. And the specific Bates numbers are cited in our briefing.

THE COURT: All right.

MS. BRIDENBAUGH: So we can -- I'm happy to produce the

eighth document -- or the ninth document. Um, on the testimony, the assertion that, um, we have hidden why decisions were made or the motivations for them, Mr. Link, who was the decision-maker, testified extensively at his deposition.

I can point to specific citations, although we did also talk about them in our briefing. We talked about what he considered. He talked about what he -- why he made the decision to deny the deferred accommodation; why he decided to offer alternative accommodations, and what those were.

THE COURT: All right. I've reviewed a lot of this testimony, more of this testimony that I was -- that I would have liked to have reviewed, and my takeaways from it generally are a couple of things: One, I think, in some instances, questions could have been phrased better. In other instances, I, candidly, don't understand the basis for your privilege. I'm going to ask you to take a look at Document 45-2. That's attachment 2 to the plaintiff's motion.

MS. BRIDENBAUGH: Yes, Your Honor. Is there a specific --

THE COURT: Yes, page 12 of 32.

MS. BRIDENBAUGH: Is it 1232?

THE COURT: 12 of 32. I do it by the ECF numbers, because I find that's the one thing that's uniform.

MS. BRIDENBAUGH: Okay. Thank you. Okay. I'm there.

THE COURT: "Question: Mr. Link, as part of the evaluation of Mrs. Torres's request, was there any effort to

contact those at SHRM responsible for the different facilities that would be impacted by accommodating --

"Objection."

And then you go on to assert, among other things, attorney-client privilege, and the deponent refuses to answer.

MS. BRIDENBAUGH: Your Honor, that question was answered as to whether Mr. Link --

THE COURT: What's the attorney-client privilege objection basis for that question?

MS. BRIDENBAUGH: To the extent that that was discussed with counsel, or there was advice relating to whether to contact certain employees who were impacted.

THE COURT: That's a fact question. A fact question is, was there any effort to contact those at SHRM responsible for the different facilities that would be impacted? That's a fact question. How is that legal advice?

MS. BRIDENBAUGH: In my opinion, it was -- it could implicate legal advice.

THE COURT: How?

MS. BRIDENBAUGH: Because -- if he answered and disclosed communications with counsel.

THE COURT: It didn't ask about communications with counsel.

MS. BRIDENBAUGH: I understand that.

THE COURT: It asked, Was there any effort to contact

those people?

MS. BRIDENBAUGH: I understand, Your Honor. It was a good-faith objection, but he did answer that question later in the transcript or in a different part of the transcript.

THE COURT: Okay. Well, these are the questions that have been highlighted for me. It goes on.

On line 18: "Do you have any independent knowledge whether there were -- whether there was, whether in the process of valuating Ms. Torres's request for an accommodation, whether anyone was consulted within SHRM who is responsible for different facilities?" "Privilege. Refusal to answer."

MS. BRIDENBAUGH: I instructed him, to the extent he -- that he -- it would implicate privileged communications --

THE COURT: What's the privileged communication about whether or not he knows whether anyone was consulted?

MS. BRIDENBAUGH: In my -- I think, at the time, it would implicate privilege, but I would also state that, in reviewing the transcript, that same question was asked, and he answered that he did not have any -- do any independent analysis as to why there was a facility-based reason. And he also answered that was not a basis for his decisions.

THE COURT: I'm seeing just the pieces of the record that are before me, and I don't understand those privilege objections. And there are other ones that I could go through and identify as well. I think the attorney-client privilege objection was

overused in this deposition.

MS. BRIDENBAUGH: I -- what I will say is every privilege objection I made in those depositions was with a good faith belief that the question directly or could implicate attorney-client privilege communications, and we put --

THE COURT: -- but that --

MS. BRIDENBAUGH: -- other --

THE COURT: Here's the problem, right? I understand that your client had lawyers help him make those decisions, and there's nothing wrong with that. But, to the extent that the lawyers are telling the client what to do, it changes from an attorney-client communication with provision of legal advice to decision-making. It becomes the decision-making. I'm not saying that's what happened here, but if you -- if I, when I read through this transcript -- like I said, there were a number of times where I think the question could have been clearer, but there were also plenty of times where I thought that there was an objection based on privilege that asked factual questions, and an answer to a factual question like the two I've just identified are yes or no. We haven't even gotten to the point of whether or not there's any privilege advice that's been conveyed.

But to the extent that your client made decisions, one, to hire this person, and then to revoke that hiring decision, someone had to have made that decision.

And what the plaintiffs tell me -- and I know you want to

speak, and I will give you a chance. What the plaintiffs tell me is that they deposed a decision-maker, the decision-maker, and the best that they got out of this was any decision, anything relating to a communication or relating to the written material, relating to what steps were taken to try to determine whether or not the accommodation could be granted, were met with a privilege objection.

Now, again, to the extent that attorneys are involved and attorneys say, Hey, listen, here's the legal advice about the steps you should take to do these things, that's fine. But what the client ultimately ends up doing is the factual part of the question that needs to be answered.

So, how can a plaintiff know, really, what the decision was, who made the decision, what the basis for the decision was, all things that may come into your part of the burden in the case if they get shut down on privilege grounds?

MS. BRIDENBAUGH: I understand that, Your Honor. But, respectfully, Mr. Link did answer those questions as to who made the decision; that he did. He was asked that repeatedly for the various decisions at issue. He answered the basis for those decisions. He answered what he considered in making those decisions.

As to the specific examples you cited on this page, he was asked at 99:15 to 102, "Did you conduct any independent analysis of why there was a facility-based reason why SHRM could not

accommodate Ms. Torres's request to allow for certain accommodations at work?" And he answered, "No."

When he was asked about whether he spoke with any employees or had any knowledge of any employees who were spoken with, whether they were impacted by granting her request, he answered, "No."

THE COURT: Well, I don't have the ability to go through all of these deposition transcripts and see where he was instructed not to answer in one place, and he later answered in the deposition.

My issue remains valid, which is that the questions that I just went through, I didn't see any privileged information, and there was an instruction not to answer.

MS. BRIDENBAUGH: Respectfully, I think most of these questions -- most of the time, I did not instruct him not to answer. I instructed him he could answer so long as he could do so without disclosing attorney-client privileged communication.

THE COURT: Well, that invites to a client the opportunity not to answer a question.

MS. BRIDENBAUGH: At one point, we consulted because he wasn't sure if privilege applied.

THE COURT: I understand that. I saw that on the record.

MS. BRIDENBAUGH: I -- I do not think that he ever withheld information based on privilege. He answered most of the questions. I'm not aware of anything he did not disclose that

was nonprivileged.

THE COURT: Well, I have a problem with a number of the objections throughout here, all right? And I think that the privilege objections were interposed when they shouldn't have been. You're telling me in other places in the transcript he answered these questions. Maybe he did; maybe he didn't.

Here's what I'm going to do: There's 30(b)(6) time still left, and that needs to take place this next coming week before the close of discovery.

Mr. Perishing will have the opportunity, from a 30(b)(6) witness, to ask any questions that he thinks remain unresolved. That's the purpose of a 30(b)(6).

To the extent that some witnesses don't have a full amount of information on a 30(b)(1), you have the option to take a 30(b)(6) to get the corporation to answer to those, and he still has the ability to solve some of those problems.

But, to the extent that any of these witnesses -- this is Belyna -- B-E-L-Y-N-A -- Link, or Zoerkler have not answered a question, they are not permitted to later propose, either at summary judgment or otherwise, testimony that's inconsistent with the responses that they've given.

Now, if you tell me that there are other places in the record where they answer the question, then so be it; we don't have any issues. But, to the extent that a privilege was asserted and the witness decided to stand on that objection and

not answer the question, they individually -- not as a 30(b)(6), because I think you can get this information, Mr. Perishing can get this information from a 30(b)(6) -- they're not allowed -- they're not going to be allowed to testify inconsistent with what they've already said.

MS. BRIDENBAUGH: Absolutely not, Your Honor. There was no intention they would, and I never had that occur.

THE COURT: All right. So that's my ruling on the depositions.

On the privilege log, I don't see any basis to review the documents in-camera.

Ms. Perishing, it sounds like your argument was more of a cumulative one, because you wanted to make the point that you thought information was being withheld.

As far as the designations on the privilege log, they don't seem inappropriate to me. They describe the people involved, the topic of the communication, and it looks on its face to be privileged.

And I'm not going to go behind that, because I don't think there's a good basis. At least I haven't seen that at this point.

On some of the other deposition objections, Mr. Perishing -- for example, I don't think it's improper to instruct a witness not to answer a question that involves what documents they looked at in preparation for the deposition, if

counsel was involved.

That, to me, is purely work product information. It's the information that the lawyer thought was important for the witness to review before they testified, so long as all of those documents were otherwise produced in the document production at large, the only purpose of asking that question is to try and find out what documents the attorney thought were important. And I think those objections were proper.

Let me see if I've hit all the topics that you've raised.

The non -- you made an argument about nonprivileged information about deliberations. I candidly did not understand that. What was that?

MR. PERSHING: Pardon me?

THE COURT: One of your arguments was that -- you were seeking production of nonprivileged information about deliberations.

MR. PERSHING: When we say "deliberations," of course we're talking about discussions among the nonlawyers about their motives and intentions.

THE COURT: Okay. But to the extent that they're discussing privileged information, they need to produce it. If it wasn't privileged, if it was just employees talking on their own, then they needed to answer those questions, and my ruling stands on that, meaning that, if they testify -- that they may not testify later inconsistent with their current deposition

testimony.

This is all subject to your ability to get these issues resolved in the 30(b)(6), and it strikes me that that's the place to get the information that you're looking for. You agree?

MR. PERSHING: It's possible, Your Honor, of course. It's the steps that they took, the individual people took. It may be excluded from 30(b)(6), for all I know. She may be -- the other side may tend to bar those questions because, Your Honor, they're about 30(b)(1) matters. I don't know what kind of disputes we're going to have. I approach this with optimism certainly, Your Honor.

THE COURT: Excellent.

MR. PERSHING: Let me just raise one other point. We asked about whether searches were done for documents, and they kept saying those -- that what we searched for was privileged. Nicole Belyna was asked, "Did you look -- did you look at your voicemails?"

"Sorry, privileged."

"Did you look at your e-mails, check your e-mails to see what you needed to preserve?"

"Sorry, privileged."

Those privileged -- their positions are incomprehensible to us. But the real concern is that we can't tell whether the discovery production that was integrated was complete.

THE COURT: Well, I want to hear from Ms. Bridenbaugh as

to why, as to that information, she believes was privileged.

But, at the same time, I think that's something you can cure under 30(b)(6). Why would the search for documents be privileged?

MS. BRIDENBAUGH: It was at the direction of counsel.

THE COURT: That doesn't matter.

MS. BRIDENBAUGH: Okay.

THE COURT: How is that privileged?

MS. BRIDENBAUGH: If we were directing witnesses to search for documents or specific types of documents --

THE COURT: It's the lawyer's job to get a discovery request, interpret what it means, and tell the client where to look for that information.

MS. BRIDENBAUGH: Right, and that's what we did.

THE COURT: Right. But that doesn't mean that it's privileged. How could that -- did you check your e-mails? Objection, privilege?

MS. BRIDENBAUGH: Again, I interpreted the question and entered a good-faith objection during the deposition. I felt it was implicating privileged communications.

THE COURT: Okay. Well, I think you need to go back and revisit your decisions to make privilege objections and revisit what's appropriate and what's not, because it's perfectly fair for an adversary to ask someone what they did to look for responsive documents. That's the only way you can test to

determine whether or not they have done what they should have done. We don't allow parties to depose lawyers about what they did to look for documents. It's expected that that's going to be done by the client. And if the lawyers did it, that's fine, but they still need to disclose what they did to search for material.

MS. BRIDENBAUGH: If I could just add one point, Your Honor. We have disclosed to them the full list of all custodians who either manually or through ESI looked for documents, all of the repositories of documents that were searched manually or through ESI, all the search terms that were run through ESI, and we still have not been notified of any deficiency in our document production at any point.

THE COURT: Well, that very well may be the case, but to the extent that an objection was made on the grounds -- to the question, Did you look for voicemails? Objection, privilege. I don't find that to be a valid objection.

MS. BRIDENBAUGH: I don't have the citation in front of me. I believe that was only asked of Ms. Zoerkler, and I believe she answered the question. She did not.

THE COURT: Mr. Perishing, I think you can resolve most of these issues with the remaining time in the 30(b)(6), but my ruling stands with respect to the witnesses who have testified in their individual capacity.

To the extent that they would like to propose testimony that's different than they've given in their depositions, they're

restricted from doing so. All right. Anything further?

MR. PERSHING: Your Honor, I just want to clarify that the Court's ruling extends to anything on summary judgment that they might put before the Court.

THE COURT: My ruling is my ruling. All right. Have you all talked settlement?

MS. BRIDENBAUGH: The last time we were here, you asked us this question.

THE COURT: I'm going to ask you every time you're here.

MS. BRIDENBAUGH: I know you will. I advised at that time that we did not have a settlement demand from plaintiff, we still do not and have not since we were last here.

THE COURT: Mr. Perishing, do you intend to issue a demand to the defendants?

MR. PERSHING: I'm sorry, Your Honor. I thought that was done long ago.

THE COURT: All right. This furthers my suspicion that you're actually talking to one another.

MR. PERSHING: Your Honor, point taken. Of course, I'm not the only lawyer in the case. In fact, I'm not actually running it at all; Lori Kisch is.

THE COURT: Thank goodness you're here.

MR. PERSHING: I'm sorry, Your Honor?

THE COURT: I said, thank goodness you're here then.

MR. PERSHING: Well, I personally believe that settlement

should always be on the table.

THE COURT: All right. Well, that's not what I'm looking for.

MS. BRIDENBAUGH: To clarify, there was a settlement demand pre-litigation before Lori's involvement.

Ms. Kisch, who has since withdrawn from this case, withdrew that offer early in discovery. So we have no other --

THE COURT: All right. Well, I would encourage the parties not to stand on the formality of who has made an offer and who has not.

But, it certainly strikes me that there's been a significant amount of discovery in this case, and discovery closes next week.

So, to the extent that the parties are interested in trying to resolve this short of spending the time and money on summary judgment motions and trial, to the extent it survives summary judgment, I remain open and willing to meet with you at any time. Understood? Thank you, all.

(Proceedings adjourned at 11:30 a.m.)

**C E R T I F I C A T E**

I, Scott L. Wallace, RDR-CRR, certify that the foregoing transcript of proceedings was prepared from an FTR Gold audio recording of proceedings in the above-entitled matter and was produced to the best of my ability. Indiscernible indications in the transcript indicate that the audio captured was not clear enough to attest to its accuracy.

/s/ Scott L. Wallace 06/10/2026

---------------------------- ----------------

**Scott L. Wallace, RDR, CRR** **Date**

**Official Court Reporter**