**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

**FIONA TORRES,**

**Plaintiff,**

**v.**

**SOCIETY FOR HUMAN RESOURCE MANAGEMENT,**

**Defendant.**

**Civil Action No. 1:25-CV-02360**

# MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Dated: July 15, 2026

Respectfully submitted,

*/s/ Lauren M. Bridenbaugh*

Lauren M. Bridenbaugh, Bar No. 90586
Tiffany din Fagel Tse, Bar No. 92958
Leslie P. Currie, Bar No. 101060
LITTLER MENDELSON, P.C.
1800 Tysons Boulevard, Suite 500
Tysons Corner, Virginia 22102
Telephone: 703.442.8425
Facsimile: 703.662.6178
lbridenbaugh@littler.com
ttse@littler.com
lcurrie@littler.com

Tanja L. Darrow (admitted *pro hac vice)*
LITTLER MENDELSON, P.C.
633 West 5th Street, 63rd Floor
Los Angeles, California 90071
Telephone: 213.443.4300
Facsimile: 800.715.1330
tdarrow@littler.com

*Counsel for Defendant Society for Human Resource Management*

## I. INTRODUCTION

Plaintiff Fiona Torres' ("Ms. Torres") claims of disability discrimination and failure to accommodate under the Americans with Disabilities Act ("ADA") and the Virginia Human Rights Act ("VHRA") fail for the simple fact that Ms. Torres rejected Defendant Society for Human Resource Management's ("SHRM") offer of reasonable, alternative accommodations to manage her diabetes. While Ms. Torres' request to have her dog present while working in SHRM's Alexandria, Virginia office was her preference, it was not required to allow her to perform the essential functions of the position. Indeed, Ms. Torres admitted that she routinely manages her diabetes without her dog while working, traveling for personal and professional reasons, including taking extended European vacations, attending concerts and performances, and engaging in countless other daily activities. By her own admission, Ms. Torres can be separated from her dog for at least eleven days and can adequately manage her diabetes through the use of a continuous glucose monitor ("CGM"), insulin pump, and blood glucose meter, and by paying extra attention to her body and symptoms – the very accommodations SHRM offered to her. Even Ms. Torres' own treating physician confirmed she is a "straightforward patient" with "very well controlled" diabetes. Ms. Torres also admitted no healthcare provider has ever prescribed or recommended she obtain a dog as part of her treatment, either before or after she independently obtained one. Nor can Ms. Torres identify a single essential function of the role she was offered that required her dog in the workplace. In fact, she conceded she could travel for SHRM business and perform her job duties while off-site without her dog. Ms. Torres' requested accommodation therefore bears no connection to, and is not necessary for, the performance of the position's essential functions.

As discussed in further detail below, the undisputed record shows that SHRM fulfilled every obligation imposed by the ADA and the VHRA by reviewing the information and

documentation provided by Ms. Torres, requesting additional information, engaging in the interactive process, and offering multiple alternative accommodations designed to address Ms. Torres' stated needs. Rather than engaging in that process, Ms. Torres rejected every accommodation SHRM offered her and insisted she would only perform the job with her preferred accommodation.

Ms. Torres' disparate treatment claims fare no batter. SHRM's actions are wholly inconsistent with any inference of disability discrimination. Rather, after learning of Ms. Torres' diabetes diagnosis from her own application for employment, SHRM interviewed her, selected her for the role to which she applied, extended her an offer of employment, and repeatedly expressed its desire that she join the team. SHRM's offer was ultimately rescinded not because of Ms. Torres' diabetes, but because she refused to accept any accommodation other than the one ***she*** wanted, which SHRM reasonably concluded was unsupported by the information she provided. No reasonable jury could find otherwise.

Accordingly, because Ms. Torres cannot establish that SHRM failed to provide her a reasonable accommodation or discriminated against her based on any disability, summary judgment should be granted.

## II. STATEMENT OF UNDISPUTED MATERIAL FACTS[1]

### A. SHRM is an Equal Opportunity Employer

1. SHRM is a nonprofit professional association headquartered in Virginia. Stipulation of Uncontested Facts ("SUF") ¶ 1, Dkt. No. 58.

[1] SHRM's Statement of Undisputed Material Facts is offered for the purposes of this Motion, without prejudice to its rights should this case proceed to trial. Each numbered paragraph hereafter is referenced as "SUMF ¶ __."

2. SHRM has an Equal Employment Opportunity Policy ("EEO Policy") describing, in relevant part, its commitment to selecting applicants for employment without regard to any protected category, including "physical or mental disability[.]" **Ex. 1:** EEO Policy; **Ex. 2**: Employee Code of Conduct Relevant Excerpts.

3. SHRM's Code of Conduct requires all employees to "[t]reat everyone with respect, dignity, fairness and mutual consideration[,]" [r]efrain from . . . derogatory comments, or threatening or intimidating others[,]" and to comply with its EEO Policy as well as all applicable laws and regulations. Ex. 2 at SHRM_Torres 98-100.

4. If, in relevant part, a job candidate indicates a need for a reasonable accommodation based on a disability, the candidate is referred to SHRM's Human Resources ("HR") Department, who works with the candidate to identify a reasonable accommodation(s). **Ex. 3**: Recruitment and Selection Policy. SHRM also maintains a Procedure for Requesting an Accommodation, which sets forth the general processes SHRM follows when an employee or applicant requests an accommodation based on a purported disability. **Ex. 4**: Procedure for Requesting an Accommodation; *see also* **Ex. 5**: ADA Reasonable Accommodation Request Form.

5. A member of SHRM's HR Department, Sheri Martel, generally is the first point of contact for employees requesting an accommodation. **Ex. 6**: Deposition of Jimmy Ray Link ("Link Tr.") 43:5-45:6. If an accommodation request is easily handled, Ms. Martel manages the accommodation process. *Id*. at 46:5-8. If the accommodation request is something that SHRM does not have experience with or elicits further questions, HR involves Jim Link, SHRM's Chief Human Resources Officer ("CHRO"), and consults with legal counsel. *Id*. at 46:9-12, 133:1-10.

**B. Ms. Torres' Relevant Health History**

6. Ms. Torres was diagnosed with type 1 diabetes as a child. SUF ¶ 2; **Ex. 7**: Deposition of Fiona Torres ("Torres Tr.") 101:6-8.

7. In May 2017, Ms. Torres obtained a dog that had purportedly been trained as a diabetic alert dog ("DAD"). Compl. ¶ 22, Dkt. No. 1; SUF ¶ 3. No healthcare provider prescribed or recommended that Ms. Torres obtain a DAD. Torres Tr. 144:13-18.

8. On October 26, 2017, Ms. Torres "did not eat dinner after taking insulin and forgot to check her blood sugar before driving which she is supposed to do." **Ex. 8**: Inova Loudoun Hospital Oct. 26, 2017 Inpatient Record at SHRM_Torres 2060; *see also* **Ex. 9**: VA Endocrinology Nov. 20, 2017 Note at Confidential Torres 688 ("Did not have test strips on her and drove on October 24th [sic], got into a MVA."). Ms. Torres had her dog at the time of the accident. Torres Tr. 102:2-8, 167:14-16.

9. Following the 2017 car accident, Ms. Torres' endocrinologist recommended she begin using a Dexcom CGM and an Omnipod insulin pump. *Id.* at 118:11-119:8, 157:7-14; Ex. 9 at Confidential Torres 689 ("we discussed her Omnipod and Dexcom [sic]"). Ms. Torres began using a Dexcom CGM in December 2017. Torres Tr. 104:4-5, 117:22-118:15.

10. A CGM monitors an individual's blood glucose levels on a continuous basis which Ms. Torres can review at any point on her cell phone. *Id.* at 119:4-8. Ms. Torres can also set the application to alert her if her glucose levels become too high, too low, ultra-high, ultra-low, and other categories. **Ex. 10**: Deposition of Silpa P.K. Joshi ("Joshi Tr.") 57:10-20; **Ex. 11**: Northern Virginia Endocrinologists Records at SHRM_Torres 1447, 1450. However, Ms. Torres' Dexcom phone application settings between October 2023 and November 2024 were not set to alert her except if her blood sugar was "urgent[ly] low" during daytime hours. *See* Ex. 11.

11. Ms. Torres' CGM also communicates with her Omnipod insulin pump to allow the pump to deliver insulin based on blood sugar changes detected by the CGM. Torres Tr. 120:3-5; Joshi Tr. 53:5-15. If Ms. Torres feels that her CGM is not giving her a reliable reading, she can also manually check her glucose levels by doing a finger prick test using her blood glucose meter. Torres 113:14-114:21.

12. Ms. Torres has not been hospitalized, lost consciousness, or been in a car accident since she began using her CGM after the 2017 car accident. *Id*. at 103:8-12, 152:16-19, 168:18-20; Joshi Tr. 83:14-17, 101:2-6, 102:4-18, 138:4-139:13. Indeed, her diabetes is "very well controlled" and her check-ups with her endocrinologist are "not to say boring, but more standard[.]" Joshi Tr. 75:22-78:3, 95:21-96:14, 114:3-14 ("Fiona was truthfully a very – not to say straightforward patient, but, I mean, a lot of it was just routine management, which is why I only saw her every six months.").

13. Ms. Torres decides not to bring her dog with her when she chooses to go somewhere that she feels: (1) is unsafe for her dog; (2) is uncomfortable for her dog; (3) transportation would be difficult if she brought her dog; (4) the environment is loud; (5) the environment is crowded or dark; (6) her dog would be unwelcome; or (7) her dog's attendance "might be an issue[.]" Torres Tr. 168:21-169:12. Environments where Ms. Torres has not brought her dog with her include concerts, plays, other shows and performances, the movies, the pool, exercise classes, running errands, visiting certain friends, and walking or dog sitting other dogs. *Id*. at 176:3-177:20 (dog not welcome), 198:15-199:15, 200:19-201:7 (choral performances), 203:5-205:3, 206:9-207:17, 210:16-227:11 (concerts and shows), 286:9-22 (dog sitting); **Ex. 12**: Deposition of Carmen Torres ("C. Torres Tr.") 36:1-25 (dog walking), 135:7-136:5 (movies and exercise); **Ex. 13**: Deposition

of Joseph Cabrera ("Cabrera Tr.") 43:24-44:23 (movies, pool, and errands), 52:20-25 (exercise); **Ex. 14**: Deposition of Tatiana Messinger ("Messinger Tr.") 79:3-80:4 (exercise and shows).

14. Ms. Torres has been without her dog while traveling for work, when she is in a long meeting, when she attends work events where she deems the environment too loud or too crowded to have her dog present, and when she has otherwise chosen not to bring him with her while working. Torres Tr. 76:1-5, 285:5-286:8; SUMF ¶¶ 16, 25, 32, *infra.*

15. Ms. Torres has also at least considered not bringing her dog with her to therapy sessions because "[h]e is reactive to certain sounds, but if he can't keep it together I may not bring him." **Ex. 15**: Behavioral Health and Wellness Associates of Northern Virginia Feb. 7, 2025 Note at SHRM_Torres 1170.

16. Between 2021 and 2025, Ms. Torres has traveled to Europe four times, for nine to eleven days at a time, without her dog. Torres Tr. 182:9-183:1, 185:19-186:17, 190:4-13, 192:4-22. Ms. Torres has also traveled to Las Vegas for four days without her dog while working for a prior employer. *Id*. at 194:8-195:18.

17. When she is without her dog, Ms. Torres checks her CGM and pays attention to how her body feels. *Id*. at 184:11-16, 188:7-9, 191:9-13, 194:3-196:3, 203:5-205:3, 206:9-207:17, 210:16-227:11. She has not lost consciousness or been hospitalized when she has been without her dog in any of these circumstances. *See* SUMF ¶ 12, *supra*.

**C. Ms. Torres' Application for Employment with SHRM**

18. On April 20, 2024, Ms. Torres applied for the position of Senior Specialist, Product Management, a new position SHRM created in an effort to expand business. SUF ¶ 4; Compl. ¶ 25; Link Tr. 222:15-223:11; **Ex. 16**: Job Offer Approval Email at SHRM_Torres 418-419.

19. The Senior Specialist position would be responsible for "supporting the product team" through data analysis, processes and tracking, project management, and conference planning. Ex. 16 at SHRM_Torres 418-419; Link Tr. 219:7-220:14; **Ex. 17**: Deposition of Jim Link, Corporate Designee ("Corporate Tr.") 33:5-34:9. The position required travel up to 10% of the time. Ex. 16 at SHRM_Torres 418-419; Corporate Tr. 73:6-17.

20. On the resume Ms. Torres submitted with her application, she stated she had been living with type 1 diabetes for 30 years. SUF ¶ 5; Ex. 16 at SHRM_Torres 417. As such, SHRM was aware of her condition prior to extending her an offer of employment. Link Tr. 229:18-230:4.

21. Between April 24 and May 31, 2024, Ms. Torres interviewed for the position with various SHRM officials. SUF ¶¶ 7-8; Torres Tr. 231:13-233:11. Following these interviews, SHRM decided to extend a conditional offer of employment to Ms. Torres on June 3, 2024, which was approved by various HR and business officials, including CHRO Mr. Link. Ex. 16; **Ex. 18**: Job Offer Approval Emails.

22. That same day, Deborah Zoerkler, Senior Specialist, Talent Acquisition, verbally extended the conditional offer of employment to Ms. Torres, which Ms. Torres accepted. SUF ¶ 11; Torres Tr. 235:5-21. During their phone call, Ms. Torres advised Ms. Zoerkler she was requesting an accommodation to have her dog with her when working at SHRM's office in Virginia. SUF ¶ 12, Torres Tr. 236:11-14. At this time, Ms. Torres advised Ms. Zoerkler that she did not intend to bring her dog with her on her first day of work at SHRM's office. **Ex. 19**: June 16 to July 15, 2024 Emails at SHRM_Torres 613 ("When I spoke with Debbie [Zoerkler] on the phone, I mentioned I may not bring my service dog on the first day at the SHRM office . . . ."). Ms. Torres reiterated this point in subsequent communications with SHRM. *See id.*

**D. SHRM Engages in the Interactive Process with Ms. Torres**

23. Since Ms. Zoerkler did not process accommodation requests, she notified her supervisor, Nicole Belyna, of Ms. Torres' request. SUF ¶¶ 13-14; **Ex. 20**: Deposition of Deborah Zoerkler ("Zoerkler Tr.") 15:13-18. Since Ms. Belyna also did not process accommodation requests, she notified her supervisor, Mr. Link, of Ms. Torres' request. SUF ¶¶ 15-16; **Ex. 21**: Deposition of Nicole Belyna ("Belyna Tr.") 162:5-12, 163:6-15. In a later phone call the same day, Ms. Belyna informed Mr. Link that Ms. Torres' accommodation request specifically related to bringing a dog to the office. Link Tr. 157:3-5. As Ms. Torres' request was the only request to bring a dog to work that SHRM had encountered and the only request for accommodation by an applicant that SHRM had experienced, Mr. Link determined "[t]hose two unique circumstances alone required us to be acutely aware of our duty to ensure that we handled this particular accommodation request appropriately[,]" and subsequently engaged with legal counsel to ensure that it was. *Id.* at 76:4-11, 93:8-16.

24. On June 4, 2024, Ms. Torres emailed Ms. Zoerkler a note, stating it was from her doctor, Dr. Armellini, along with a one-sentence explanation of what she used her dog for. **Ex. 22**: June 4, 2024, Email 1. The note was dated November 6, 2019, and stated that Ms. Torres' dog "has been of help to alert the owner of low or high glucose readings . . . ." *Id.* at SHRM_Torres 1029. Ms. Torres previously obtained the note from Dr. Armellini for the purpose of bringing her dog to a church for her choir's rehearsals. Torres Tr. 246:17-247:9.

25. Later that same day, and after speaking with Mr. Link and SHRM's in-house counsel, Ms. Belyna spoke with Ms. Torres to obtain additional information about her accommodation request. *Id.* at 254:21-255:2; Belyna Tr. 167:10-22. During their call, Ms. Belyna asked Ms. Torres for more information on how her dog assisted her, if there were any financial

needs the dog may have, and if she would be able to fulfill the travel requirement for the role. Torres Tr. 238:18-240:2; Belyna Tr. 168:1-13. Ms. Torres stated that she could fulfill the role's travel requirement and shared that she did not plan to bring her dog with her when traveling for SHRM business. *Id*.

26. After her call with Ms. Belyna, Ms. Torres emailed Ms. Zoerkler paperwork regarding her dog. **Ex. 23**: June 4, 2024, Email 2. Ms. Zoerkler sent Ms. Torres' emails and documents to Ms. Belyna, who shared the same with Mr. Link. Zoerkler Tr. 153:9-14; Belyna Tr. 174:6-22.

27. In the meantime, despite not yet hearing SHRM's initial decision regarding her accommodation request, Ms. Torres advised an acquaintance on June 16, "my job offer from SHRM. [T]hey're basically just being twats about [her dog]." **Ex. 24**: Message with C. Perna.

28. Mr. Link reviewed the documents and information provided by Ms. Torres, as well as background information on the position's job description and hiring process, and consulted with legal counsel regarding Ms. Torres' accommodation request. Link Tr. 167:5-21, 169:22-170:6, 171:9-172:22. Mr. Link concluded that Ms. Torres could perform the essential functions of the job without the presence of her dog. *Id*. at 127:14-128:19.

29. On June 17, Ms. Belyna advised Ms. Torres of SHRM's decision to deny her request for accommodation. Ex. 19 at SHRM_Torres 615. Ms. Belyna informed Ms. Torres that SHRM would consider any additional information Ms. Torres believed would be relevant. *Id*. In response, Ms. Torres described prior instances between 2014 and 2017 when she lost consciousness or had a car accident due to hypoglycemic episodes and further stated she had one episode since obtaining her dog that required the assistance of medics. *Id*. at SHRM_Torres 614-615.

30. Ms. Belyna then asked Ms. Torres for additional information, including whether she used her dog personally and professionally, and if there were circumstances where Ms. Torres did not have her dog with her. *Id*. at SHRM_Torres 613-614. Ms. Belyna also asked Ms. Torres to provide current medical documentation. *Id*.; Corporate Tr. 89:9-14.

31. Contemporaneous to her email exchange with Ms. Belyna on June 17, Ms. Torres exchanged messages with a friend stating, in reference to Ms. Belyna: "I genuinely hope her child or grandchild gets type 1 [diabetes] [s]o she can see what the fuck it is like[.]" **Ex. 25**: Messages with J. Cabrera. After receiving Ms. Belyna's response requesting an updated medical note and additional information from Ms. Torres, Ms. Torres said in reference to Ms. Belyna: "[l]ike please just kill yourself." *Id*. at Torres 280.

32. In response to Ms. Belyna's email, on June 19, Ms. Torres stated she "rel[ies] on [her] medical alert dog at all times (24/7)." Ex. 19 at SHRM_Torres 612. However, Ms. Torres then explained she goes without her dog when he is being groomed, when she "feel[s] an environment is physically unsafe for him to be in, such as an extremely loud environment," reiterated she would not bring her dog the first day at the SHRM office and volunteered that at her prior employer, she would be without her dog if she were in a long meeting or attending loud or crowded work events. *Id*. at SHRM_Torres 612-613.

33. The same day, Ms. Torres messaged her endocrinologist, Silpa P.K. Joshi, MD, to request a note regarding her dog and requested that Dr. Joshi include specific language in the note. **Ex. 26**: June 19 Portal Messages. Dr. Joshi wrote the note without evaluating the necessity of Ms. Torres' dog and wrote it based exclusively on the information Ms. Torres provided in her message that day. Joshi Tr. 73:5-74:21, 121:7-122:4, 137:9-16, 145:21-146:2, 147:14-148:8. Indeed, Dr.

Joshi never recommended Ms. Torres obtain a DAD. *Id.* at 158:7-11. Ms. Torres transmitted Dr. Joshi's note to SHRM. Ex. 19 at SHRM_Torres 610-611, 617.

34. Also on June 19, Ms. Torres messaged a friend and referred to Ms. Belyna as "the stupid SHRM bitch . . . hopefully I can shut her the fuck up once I send this 'updated' letter." **Ex. 27**: June 19 Messages with P. Anderson; Torres Tr. 320:2-321:5. She also exchanged messages with another friend and referred to SHRM as the "anti service dog twats . . . ." **Ex. 28**: June 19 Messages with E. Broetzmann at Torres 214; Torres Tr. 300:21-301:7.

35. Mr. Link reviewed the additional information and documentation Ms. Torres provided. Link Tr. 171:9-172:22, 178:22-182:2, 183:9-21. Based on everything she provided, Mr. Link determined that Ms. Torres had not shown that she required her dog to perform the essential duties of the position. *Id.* at 96:16-20, 128:2-19. Specifically, Mr. Link noted that Ms. Torres alleged she required her dog with her "24/7" but also stated she only needed her dog with her while working from SHRM's Alexandria office, but not while traveling for SHRM business up to 10% of, or 208 hours per year, of her time. Corporate Tr. 72:2-74:17, 78:1-79:10, 91:4-12. Mr. Link also noted that Ms. Torres had relied on alternative accommodations in her own life when, by her own statements, she found it inconvenient or unnecessary to have her dog with her. *Id.*; Link Tr: 191:11-192:22, 194:19-195:18. Specifically, Ms. Torres relied on her CGM when she chose not to have her dog with her, which SHRM was willing to accommodate. Corporate Tr. 81:2-11, 86:3-21. Working with legal counsel, Mr. Link identified and decided alternative accommodations to offer Ms. Torres, with the aim of continuing to engage in the interactive process. *Id.* at 72:7-16, 93:19-95:1.

36. On July 3, Ms. Belyna emailed Ms. Torres to notify her of SHRM's decision and to offer her alternative accommodations, which "include but are not limited to[:]" (1) facilitating

the use of Ms. Torres' CGM while at work; (2) providing her additional breaks to check her blood sugar levels; (3) noting SHRM's flexible open leave program; and (4) use of her insulin pump and placement of food or drink at her workstation. Ex. 19 at SHRM_Torres 609-610. Ms. Belyna made clear that these were suggestions, and SHRM remained "open to continue conducting this interactive process" to identify other accommodations and was still "very interested" in Ms. Torres joining SHRM. *Id.*; Link Tr. 203:17-206:15. Indeed, the proposed alternative accommodations "were meant to be one of the many tools that we proposed to Ms. Torres . . . . [SHRM] likewise requested from Ms. Torres . . . to also provide us with alternatives that could be considered . . . ." Corporate Tr. 23:18-24:8. Although SHRM requested that Ms. Torres speak with her doctor regarding its proposals, Ms. Torres did not do so. Ex. 19 at SHRM_Torres 609-610; Torres Tr. 274:3-16; Joshi Tr. 127:11-14.

37. After receiving Ms. Belyna's email, Ms. Torres exchanged messages with her friend on July 4, stating in reference to Ms. Belyna, "[w]ish I knew where she lived though hahaha[.] Would love to key her car[.] Like a handful of months later so it's a lil less obvious[.]" **Ex. 29**: July 4 Messages with E. Kostyu at Torres 244, 250-251; Torres Tr. 315:15-316:15. Ms. Torres also advised her friend that she no longer intended to work for "these ignorant and self-serving idiots[.]" Ex. 29 at Torres 244.

38. On July 6, Ms. Torres rejected SHRM's offer of alternative accommodations. Ex. 19 at SHRM_Torres 609. However, she only addressed various ways she claimed the CGM was insufficient, without explaining why it was sufficient on the occasions when she is without her dog. *Id*. Ms. Torres refused to accept the job without being permitted to have her dog present on-site at SHRM's Alexandria office. *See id*; Link Tr. 211:4-212:13.

39. While SHRM's HR Department tried to work with Ms. Torres as part of the interactive process, the business was anxious for Ms. Torres to start because it was "desperately in need of support for both areas." **Ex. 30**: July 2-17, 2024 Emails at SHRM_Torres 1765; *see also* **Ex. 31**: Deposition of Katharine Panessidi ("Panessidi Tr.") 57:15-58:16 ("I recall being frustrated at how long . . . the hiring process was taking."). While the business was anxious to repost the role, Ms. Zoerkler declined to do so because SHRM was still engaged with Ms. Torres. **Ex. 32**: July 2-10, 2024 Emails at SHRM_Torres 1768.

40. After reviewing the additional information Ms. Torres provided, Mr. Link decided to rescind the job offer to Ms. Torres. Link Tr. 77:20-78:3, 221:2-21; Corporate Tr. 108:1-109:2, 110:7-111:17. Mr. Link decided to rescind the job offer made to Ms. Torres based on inconsistencies in her representations to SHRM regarding her purported need to have her dog with her at SHRM's office, the availability of her CGM as an alternative to the dog, and her refusal to consider any alternative accommodations. Link Tr. 221:2-14; Corporate Tr. 101:16-103:14, 108:1-109:2, 111:2-112:12, 116:1-117:2. Mr. Link also considered Ms. Torres' admission that she was willing to perform the essential functions of the position, including hundreds of hours of business travel, without her dog, together with the business's need to fill the role. *Id.*

41. On July 15, Ms. Belyna informed Ms. Torres of the decision to rescind the employment offer. Ex. 19 at SHRM_Torres 608; Link Tr. 212:9-13; Belyna Tr. 211:3-212:18. However, SHRM remained open to continuing their discussion "[s]hould anything change regarding potential alternative accommodations that would allow [Ms. Torres] to perform the essential functions of the role." Ex. 19 at SHRM_Torres 608; Corporate Tr. 104:16-106:14.

42. SHRM did not repost the Senior Specialist position until after Ms. Belyna's email to Ms. Torres. *See* Ex. 30 at SHRM_Torres 1764. The position remained unfilled due to a

reorganization and layoffs in fall 2024. Belyna Tr. 274:8-275:9; Link Tr. 221:14-223:11; Panessidi Tr. 65:5-67:4; **Ex. 33**: Deposition of Kristen Howe ("Howe Tr.") 65:14-21, 82:14-84:16.

43. Had Mr. Link been aware of Ms. Torres' exchanges with her friends during SHRM's consideration of her accommodation request in which she referred to Ms. Belyna as a "bitch[,]" called SHRM as "twats" and "idiots[,]" hoped Ms. Belyna's child or grandchild got type 1 diabetes, and threatened to key Ms. Belyna's car, Mr. Link would have immediately rescinded the offer of employment to Ms. Torres as violations of SHRM's Code of Conduct. Link Tr. 243:18-244:6; *see* Exs. 2, 24-25, 27-29.

## III. LEGAL STANDARD

Courts have an affirmative obligation to prevent factually unsupported claims from proceeding to trial. *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993); *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987). To that end, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

In deciding a motion for summary judgment, a court must construe the facts in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247-48 (emphasis in original). A fact is only material if it might affect the outcome of the claim under governing law. *Id.* at 249.

Once the moving party has shown that no genuine issue of material fact exists, the non-moving party (here, Plaintiff) must go beyond the pleadings and come forth with sufficient proof to establish the elements of her claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). A plaintiff must do more than demonstrate there is some "metaphysical doubt as to the material

facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Anderson*, 477 U.S. at 247-48. "The nonmoving party [also] cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985) (citing *Barwick v. Celotex Corp.*, 736 F.2d 946, 963 (4th Cir. 1984)).

## IV. ARGUMENT

### A. Ms. Torres Was Not Entitled to an Accommodation in the Form of Her Dog

To establish a disability failure to accommodate claim, Ms. Torres must show: (1) she has a disability within the meaning of the statute; (2) SHRM had notice of her disability; (3) with a reasonable accommodation she could perform the essential functions of the position to which she applied; and (4) that SHRM refused to make such accommodation. *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013) (quoting *Rhoads v. Fed. Deposit Ins. Corp.*, 257 F.3d 373, 387 n.11 (4th Cir. 2001)).[2]

Importantly, "[n]ot every job-related request by a disabled [applicant] that is denied by her employer will subject the employer to liability for failure to provide a reasonable accommodation." *Fierce v. Burwell*, 101 F. Supp. 3d 543, 550 (D. Md. 2015). Instead, "[e]mployers are only required to provide accommodations that enable disabled individuals to perform the essential functions of their position." *Kelley v. Mayorkas*, 694 F. Supp. 3d 715, 727 (E.D. Va. 2023) (citing *Myers v. Hose*, 50 F.3d 278, 283 (4th Cir. 1995)). Thus, "the denial of a request by a disabled [applicant] c[an] only subject the employer to liability if there is 'a causal relationship between the disability and the request for accommodation,' or, in other words, if 'the requested accommodation was *necessary* in order for [her] to perform the essential functions of [her] job[.]'" *Fierce*, 101 F.

[2] Claims under the VHRA are assessed under the same standard as the ADA. *Washington v. Offender Aid & Restoration of Charlottesville-Albemarle, Inc.*, 677 F. Supp. 3d 383, 396 (W.D. Va. 2023).

Supp. 3d at 550 (quoting *Gaines v. Runyon*, 107 F.3d 1171, 1175 (6th Cir. 1997)) (emphasis in *Fierce*); *Terry v. Perdue*, No. 1:18cv31, 2018 WL 4494883, at *7 (D. Md. Sept. 19, 2018) (same), *aff'd*, No. 20-2016, 2021 WL 3418124 (4th Cir. Aug. 5, 2021); *Hamel v. Bd. of Educ. of Harford Cty*., JKB-16-2876, 2018 WL 1453335, at *12 (D. Md. Mar. 23, 2018) ("[A]n accommodation must be sought as a means to alleviate disability-induced limitations that impact an employee's job-related activities."). In other words, if other accommodations would enable the applicant to perform the essential functions of the job, the applicant is not entitled to their preferred accommodation. *Tartaro-McGowan v. Inova Home Health, LLC*, 91 F.4th 158, 167 (4th Cir. 2024) ("[W]here 'an employee may be accommodated through a variety of measures, the employer, exercising sound judgment, possesses the ultimate discretion over these alternatives.'") (quoting *Elledge v. Lowe's Home Centers, LLC*, 979 F.3d 1004, 1011 (4th Cir. 2020)).

### 1. Ms. Torres Cannot Establish Her Dog was the Only Accommodation that Allowed Her to Perform the Essential Functions of the Position

Even assuming Ms. Torres can show she required ***some*** accommodation to perform the essential functions of the position at SHRM, she cannot show that the presence of her dog while working from SHRM's Alexandria office was the only accommodation that would suffice. *Tartaro-McGowan*, 91 F.4th at 167 (quoting *Reyazuddin v. Montgomery Cty.*, 789 F.3d 407, 415 (4th Cir. 2015)) ("[A]n employer is not necessarily required to 'provid[e] the exact accommodation that the employee requested.'"). Ms. Torres herself admitted to SHRM that she could perform the travel requirements of the Senior Specialist position and the particular job duties she would be performing while traveling for SHRM business, without her dog. SUMF ¶¶ 25, 32; *see also id.* ¶¶ 13-17. Nevertheless, Ms. Torres provided no explanation as to why her dog was the only acceptable accommodation and why reliance on her CGM, insulin pump, blood glucose meter, or

other accommodations was unacceptable while working from SHRM's office, but acceptable when traveling outside the area. *See generally id*.

Moreover, Ms. Torres advised SHRM that this representation was not entirely accurate because she did not intend to bring her dog with her on her first day of work at SHRM. SUMF ¶¶ 22, 25, 32. She further acknowledged that, while employed by a prior employer, she had gone without her dog during lengthy meetings and when attending work events she deemed too crowded or too loud. *Id.* Additionally, Ms. Torres advised SHRM that she generally went without her dog for hours at a time when her dog was being groomed or if she chose to go somewhere that was too crowded or too loud for her dog. *Id*. Indeed, going without her dog is a regular occurrence for Ms. Torres, including when exercising, walking or dog-sitting other dogs, attending shows and concerts, and taking domestic and international trips for extended periods. *Id*. at ¶¶ 13-17, 25, 32. Ms. Torres cannot even identify a single essential job function she was incapable of performing without the presence of her dog. *See Lashley v. Spartanburg Methodist Coll.*, 66 F. 4th 168, 179 (4th Cir. 2023) (holding the plaintiff's conduct leaving her employer "guessing[,]" in part, as to how her diagnosis limited her ability to work did not constitute a failure to accommodate); *Howard v. City of Sedalia*, 103 F. 4th 536, 541-542 (8th Cir. 2024) (holding, because the plaintiff had not identified any benefit or privilege of employment her proposed accommodation would enable her to access the district court erred). While it is clear that Ms. Torres' ***preference*** was to work at SHRM's office with the presence of her dog, it was not a requirement for her to be able to perform the essential functions of the job at SHRM. *See Fink v. Richmond*, 405 F. App'x 719, 723 (4th Cir. 2010) ("[T]he ADA . . . [does] not require that an employer provide a disabled employee with a perfect accommodation or an accommodation most preferable to the employee.").

Ms. Torres further refused to even attempt the job at SHRM with the use of her CGM, insulin pump, and other alternative accommodations, which she had already relied upon when without her dog and without ***any*** adverse impact. *See* SUMF ¶¶ 12-17, 25, 32, 37-38; *see also Tartaro-McGowan*, 91 F.4th at 171 ("The ADA requires reasonableness, not perfection. Reasonableness does not demand that an accommodation have an airtight solution to every contingency conceivable . . . Perhaps [Ms. Torres] would have a stronger argument had she actually given [SHRM's] proposed accommodation[s] a chance . . . . But having never tried to perform [the job] using an accommodation made available to her, [Ms. Torres] can offer only vague conjecture that [SHRM's] proposed solution was not viable."). While Ms. Torres claimed she had lost consciousness, in whole or in part, as a result of her diabetes, all of the instances she reported to SHRM had occurred ***before*** she obtained her CGM and insulin pump (including one incident ***after*** she obtained her dog). SUMF ¶¶ 8, 9, 12, 17, 29. As such, Ms. Torres' assertion that she could not perform any of the essential functions of the position without her dog was, at best, "unsupported conjecture." *See Graves v. Lioi*, 930 F.3d 307, 324 (4th Cir. 2019). In fact, because Ms. Torres had performed work and engaged in a variety of personal and professional activities without her dog while relying on her CGM, she had already "tried" the accommodation SHRM offered to her and had done so without any adverse impact on her health. *See* SUMF ¶¶ 12-17, 25, 32.

Drs. Armellini and Joshi's notes are also insufficient to raise a genuine issue of fact as to Ms. Torres' purported need for her dog as an accommodation. To start, Dr. Armellini's note was five years old when it was presented to SHRM, did not address any alleged need for a dog in the workplace, and merely stated that Ms. Torres' dog "has been of help" to her. *Id.* ¶ 24; *Kelley*, 694 F. Supp. 3d at 726 (quoting *Schack v. Parallon Enters., LLC*, No. 7:19-cv-767, 2021 WL 424428,

at *7 (W.D. Va. Feb. 8, 2021), *aff'd*, No. 21-1201, 2023 WL 4146238 (4th Cir. June 23, 2023)) ("[W]here an employee's need for an accommodation is not obvious, an employer may require that the employee provide documentation of their need for an accommodation."). Dr. Armellini's note was also not tied to a workplace accommodation request generally, let alone the Senior Specialist position specifically, and it was unclear how the dog had "been of help" for Ms. Torres or in what context. SUMF ¶ 24; *Kelley*, 694 F. Supp. 3d at 728, n.8 (noting medical notes were "silent on the issue of specific accommodation" and did not appear "to have been prepared for the express purpose for which the [p]laintiff submitted the opinions to [his employer] – explaining why his accommodation was necessary"); *Tarquinio v. Johns Hopkins Univ. Applied Physics Lab*, 141 F.4th 568, 574-75 (4th Cir. 2025) (quoting *EEOC v. Prevo's Fam. Mkt., Inc.*, 135 F.3d 1089, 1094 (6th Cir. 1998)) ("Employers 'need not take the employee's word for it that the employee has [a disability] that may require special accommodation.' Rather, they have the right 'to confirm whether a need for . . . accommodation exists.'"), *cert. denied sub nom. Tarquinio v. Johns Hopkins Univ. Applied Physics Lab*., 146 S. Ct. 367 (Nov. 10, 2025).

And because Dr. Joshi's note "fails to tie any of [Ms. Torres'] symptoms to the essential functions of [the Senior Specialist] position, it fails to establish 'the need for accommodation.'" *Kelley*, 694 F. Supp. 3d at 727. Dr. Joshi's note is also inconsistent with the information Ms. Torres herself provided to SHRM (which she apparently did not provide to Dr. Joshi) and is wholly divorced from both the actual job Ms. Torres would be performing at SHRM, along with Dr. Joshi's own medical records and experience treating Ms. Torres. SUMF ¶ 33; *EEOC. v. Newport News Shipbuilding & Drydock Co.*, 949 F. Supp. 403, 407-08 (E.D. Va. 1996) (quoting *Harmer v. Virginia Elec. And Power Co.*, 831 F. Supp. 1300, 1307 (E.D. Va. 1993)) (finding, plaintiff's submitted doctor's letter was "'insufficient to raise a genuine issue of fact given the doctor's lack

of knowledge of [plaintiff's] duties and his working conditions'"). Therefore, Dr. Joshi's note has no practical relevance to Ms. Torres' request for an accommodation.

As Ms. Torres failed to demonstrate a need for an accommodation in the form of the presence of her dog at the workplace, her failure to accommodate claims fail as a matter of law.

**2. Ms. Torres Caused a Breakdown in the Interactive Process**

Ms. Torres cannot show that SHRM refused to accommodate her because she caused a breakdown in the interactive process by refusing to even consider alternative accommodations offered by SHRM.

"The requirement that the employer and employee engage in a good faith, interactive process to identify a reasonable accommodation is 'implicit in the fourth element' of a plaintiff's *prima facie* case for failure to accommodate." *Maubach v. City of Fairfax*, 1:17-CV-921, 2018 WL 2018552, at *5 (E.D. Va. Apr. 30, 2018) (quoting *Haneke v. Mid-Atlantic Capital Mgmt.*, 131 Fed. Appx. 399, 400 (4th Cir. 2005)). "During the interactive process 'neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability.'" *Id.* (quoting *Crabill v. Charlotte Mecklenburg Bd. of Educ.*, 423 Fed. App'x 314, 323 (4th Cir. 2011) (internal citation in *Crabill* omitted)). Rather, courts "are required to 'look for signs of failure to participate in good faith[,]'" and "it is clear that where a 'party [] obstructs or delays the interactive process' that party is not acting in good faith." *Id.* (quoting *Crabill*, 424 Fed. App'x at 323). Indeed, "an *employer* may not be held liable for failing to provide a reasonable accommodation where the *employee* refused to engage in or caused the breakdown of the interactive process." *Tarquinio v. Johns Hopkins Univ. Applied Physics Lab*, RDB-23-0727, 2024 WL 1604493, at *4 (D. Md. Apr. 11, 2024), *aff'd*, 141 F.4th 568 (4th Cir. 2025), *cert. denied sub nom. Tarquinio*, 146 S. Ct. 367 (emphasis in original); *see also Robinson v. Mountaire Farms of N.C., Corp.*, 815 F. Supp. 3d 417, 428-29 (E.D.N.C. Nov. 4, 2024) (same and collecting cases). Moreover, "withholding information

can be considered to obstruct the interactive process and thus cause the breakdown where the missing information can only be provided by the party who is withholding it." *Tarquinio*, 2024 WL 1604493, at *4 (internal citations omitted).

Here, the record is clear that, after offering Ms. Torres alternative accommodations, SHRM was "open to continue conducting the interactive process" and intended the proposed alternative accommodations to be a mere starting point in its discussions with Ms. Torres. SUMF ¶¶ 35-36, 40-41. SHRM continued to be open to discussions with Ms. Torres even after she refused to engage with SHRM over its proposed accommodations. *Id*. at ¶¶ 40-41. While Ms. Torres responded to one of SHRM's proposed accommodations – facilitating the use of her CGM while at work – her protestations as to why one of the multiple proposed accommodations was not enough and was inconsistent with the information she had previously communicated to SHRM (*i.e.*, she relied on her CGM, without experiencing any adverse event, on numerous occasions without the presence of her dog). SUMF ¶¶ 12-17, 25, 32, 38, 40-41. The record is also clear that Ms. Torres did not even attempt to respond to SHRM's other proposed alternative accommodations or suggest other options, nor did she speak with her doctor regarding SHRM's proposals. *Id*. at ¶¶ 36-38. Rather, she doubled down, refusing to consider ***any*** accommodation other than her dog while simultaneously advising one of her friends that she had no intention of working at SHRM. *Id*. at ¶¶ 37-38. And where "an employee causes the interactive process to break down by insisting on a particular accommodation, an employer cannot be held liable under the ADA. As such, plaintiff's reasonable accommodation claim fails as a matter of law." *Maubach*, 2018 WL 2018552, at *6; *see also Lashley*, 66 F.4th at 179 (finding, employee-caused "communication breakdown" led their accommodation claim to fail); *EEOC v. Kohl's Dept. Stores, Inc.*, 774 F.3d 127, 132 (1st Cir. 2014) ("If an employer engages in an interactive process with the employee, in good faith, for the

purpose of discussing alternative reasonable accommodations, but the employee fails to cooperate in the process, then the employer cannot be held liable under the ADA for a failure to provide reasonable accommodations.”).

At bottom, Ms. Torres not only rejected SHRM’s proposed alternative accommodations without adequate justification or explanation, but she was also so “entrenched” in her insistence that her dog be allowed in the workplace that she refused to engage substantively with SHRM regarding its proposed alternatives or to consult with Dr. Joshi to determine whether those alternatives were feasible. SUMF ¶¶ 36-38, 40-41. As such, SHRM “cannot be held liable for denying [Ms. Torres] the only accommodation she was willing to accept[,]” which is “especially true considering [Ms. Torres] caused the breakdown in the interactive process.” *Tarquinio*, 2024 WL 1604493, at *4; *Tartaro-McGowan*, 91 F.4th at 164 (affirming summary judgment grant in favor of employer, who repeatedly engaged with the plaintiff on alternative accommodations after offering her a reasonable accommodation, which she refused and proposed no alternatives in response); *Hannah P. v. Coats*, 916 F.3d 327, 337 (4th Cir. 2019) (holding the employer “has the ultimate discretion to choose between effective accommodations.”); *Adams v. Anne Arundel Cty. Pub. Schs.*, 789 F.3d 422, 433 (4th Cir. 2015) (holding the ADA “requires a ‘reasonable’ accommodation, not a perfect one”); *Hamel*, 2018 WL 1453335, at *11, n.12 (“Plaintiff’s refusal to accept *any* accommodation is the most compelling evidence imaginable that the interactive process would not have produced a *reasonable* accommodation.”) (emphasis in original).

As Ms. Tores cannot show that SHRM refused to accommodate her in violation of the ADA and/or the VHRA, her failure to accommodate claims fail as a matter of law.

### B. Ms. Torres Cannot Show SHRM Discriminated Against Her Based on Disability

To avoid summary judgment on a disability disparate treatment claim under the ADA and/or the VHRA, absent direct evidence, Ms. Torres must first establish a *prima facie* case under the *McDonnell Douglas* framework by showing she "(1) has a disability; (2) is otherwise qualified for the employment; and (3) was excluded from that employment due to discrimination ***solely*** on the basis of her disability." *Reyazuddin*, 789 F.3d at 418 (citing *Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1264-65 (4th Cir. 1995) (emphasis added)).

If successful, the burden shifts to SHRM to show a legitimate, non-discriminatory reason for its actions. *Anderson v. Diamondback Inv. Grp., LLC*, 117 F.4th 165, 174-75 (4th Cir. 2024). Once SHRM has done so, Ms. Torres must show pretext to move forward. *Id*. Ultimately Ms. Torres must establish disability was the "but-for" cause of SHRM's decision to rescind its job offer. *Gentry v. East West Partners Club Mgmt. Co. Inc.*, 816 F.3d 228, 235-236 (4th Cir. 2016); *see also Davis v. W. Carolina Univ.*, 695 Fed. Appx. 686, 688 (4th Cir. 2017) ("In other words, causation requires disability to be more than *a* motivating factor: it must be *the only* motivating factor.") (internal citation omitted) (emphasis in original). At all times, "[t]he ultimate burden of persuading the trier of fact that the [employer] intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Diamondback*, 117 F.4th at 175 (quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)).

Even assuming Ms. Torres can show that her type 1 diabetes diagnosis rises to the level of a disability under the ADA and/or the VHRA, she cannot show that she was qualified for the position or that SHRM rescinded its job offer solely because of her alleged disability.

### 1. Ms. Torres Cannot Establish She Was a Qualified Individual

"'No matter the type of discrimination alleged,' the [applicant] must show first that she is a 'qualified individual.'" *Hall Haggins v. Wilson Air Ctr., LLC*, 163 F.4th 872, 877 (4th Cir. 2026) (quoting *Sieberns v. Wal-Mart Stores, Inc.*, 125 F.3d 1019, 1022 (7th Cir. 1997)). "[I]mpli[cit] in the definition of a 'qualified individual' is a reciprocal obligation between the employee and employer to engage in a good faith, collaborative search for a reasonable accommodation." *Id*. at 878 (citing *Diamondback*, 117 F.4th at 181). "[I]f the individual declines to engage in this cooperative bargaining, she cannot then cry foul at the employer." *Id*. (citing *Elledge*, 979 F.3d at 1013); *see also Tartaro-McGowan v. Inova Home Health, LLC,* 1:21-cv-298 (RDA/TCB), 2022 WL 2232190, at *7 (E.D. Va. June 21, 2022) (quoting *Andrews v. Commonwealth of Virginia*, 232 F.3d 886 (4th Cir. 2000) ("When an employee rejects a reasonable accommodation, she can no longer be considered a 'qualified individual with a disability.'")), *aff'd*, 91 F.4th 158 (4th Cir. 2024); 29 C.F.R. § 1630.9(d) ("[I]f [a disabled applicant] rejects a reasonable accommodation . . . the individual will not be considered qualified.").

As set forth *supra* in Section IV(A)(1), Ms. Torres relies on her CGM and how her body feels whenever she chooses to be without her dog. SUMF ¶¶ 12-17, 25, 32. However, she failed to explain to SHRM (and indeed still has not explained) why it ***was reasonable*** for her to rely on her CGM and how she feels whenever she chooses, such as on her first day of work at SHRM or when she would be traveling for SHRM business, but was ***not reasonable*** when working in SHRM's office. *Id*. at ¶¶ 12-17, 25, 32, 35-36, 38, 40-41. Moreover, when SHRM offered her these very accommodations (and more), Ms. Torres rejected them. *Id.* at ¶¶ 38-39. And, even if SHRM had then offered her the position with the presence of her dog in the workplace, Ms. Torres had already decided she would not work for SHRM anyway. *Id.* at ¶ 37. Overall, Ms. Torres

rejected reasonable accommodations that would have allowed her to perform the essential functions of the job, and refused SHRM's offer to discuss alternate accommodations or propose her own. She further decided to forego employment with SHRM even while it was still trying to engage in the interactive process with her.

Ms. Torres was further not a "qualified individual" because her unprofessional and threatening contemporaneous communications disqualified her from employment at SHRM. *See Anthony v. Trax Int'l Corp.*, 955 F.3d 1123, 1132-33 (9th Cir. 2020) (collecting cases that after-acquired evidence may be used to show a plaintiff is not a "qualified individual" under the ADA at summary judgment). Here, after-acquired evidence shows that Ms. Torres was not a "qualified individual" for employment at SHRM because her own words and conduct were inappropriate, unprofessional, and threatening and, therefore, in violation of SHRM's Code of Conduct. SUMF ¶¶ 3, 43. Had SHRM known in 2024 that Ms. Torres was hoping a SHRM HR employee tasked with collecting and transmitting information between Mr. Link and Ms. Torres would kill herself, that her children or grandchildren would be diagnosed with diabetes, and threatening to key this employee's car, there is no question that SHRM would have immediately rescinded the offer of employment. *Id*. at ¶ 43. Moreover, based on Ms. Torres' direct threat of violence, SHRM would have further notified the authorities. *Id*. As such, Ms. Torres was plainly not qualified to be employed at SHRM.

Ms. Torres' refusal to engage in the interactive process with SHRM, coupled with her inappropriate and violent rhetoric, rendered her no longer qualified for the position. Accordingly, her disability discrimination claims fail as a matter of law.

### 2. Ms. Torres Cannot Show Her Disability Was the But-For Cause of SHRM's Decision to Rescind Her Job Offer

Assuming *arguendo* that, Plaintiff can establish that she is a qualified individual (she cannot), she further cannot demonstrate that SHRM rescinded her employment offer because of her disability.

Here, the record shows that SHRM first became aware of Ms. Torres' diabetes when she applied for employment. SUMF ¶ 20. SHRM, nonetheless, interviewed Ms. Torres and subsequently extended her an offer of employment. *Id*. at ¶¶ 20-22; *see Fierce*, 101 F. Supp. 3d at 552 ("Plaintiff claims her relationship with [her supervisor] was fine for months until a sudden change, even though [her supervisor] was aware Plaintiff had a disability, undermining any claim that adverse employment actions were taken because of Plaintiff's disability."). The record further shows that SHRM engaged in the interactive process with Ms. Torres and wanted to continue to do so until ***Ms. Torres*** refused to discuss any alternative accommodation and the business needed to move forward with finding a qualified candidate who would actually perform the role. SUMF ¶¶ 38-42; *see Hall Haggins*, 163 F.4th at 880 ("To hold the employer liable for disability discrimination, after all these commendable efforts at bilateral cooperation, would do a disservice to [the employer] and the ADA alike."). The undisputed facts show SHRM made repeated efforts to work with Ms. Torres to identify reasonable accommodations to address her medical needs. SUMF ¶¶ 22-42. However, Ms. Torres would not even consider the very alternative arrangements she utilized in her professional and personal life whenever it suited her. *Id*. at ¶¶ 12-17, 25, 32, 35-36, 38; *see also Elledge*, 979 F.3d at 1013 (holding employer made "reasonable, sensitive attempts" to accommodate an employee who refused to accept an offered accommodation).

There is simply no evidence, let alone sufficient evidence, to support a reasonable inference of unlawful discrimination. As such, SHRM is entitled to summary judgment as a matter of law.

**3. SHRM Has Legitimate Non-Discriminatory Reasons for Its Actions, Which Ms. Torres Cannot Rebut**

Even if Ms. Torres can establish a *prima facie* case of disability discrimination (she cannot), the undisputed facts show SHRM's actions were motivated by legitimate non-discriminatory reasons, which Ms. Torres cannot show were pretextual.

To successfully demonstrate pretext, Ms. Torres must provide "both that the reason advanced [by SHRM] was a sham *and* that the true reason was an impermissible one under the [ADA]." *Russell v. Microdyne Corp.*, 65 F.3d 1229, 1235 (4th Cir. 1995) (emphasis in original). Ms. Torres must "'prove' that [SHRM's] 'asserted justification[s]' are pretextual, meaning they are 'post hoc rationalizations invented for the purposes of litigation.'" *Vega v. Amurcon Realty Co.*, 2025 WL 3243838, at *4 (W.D. Va. Nov. 20, 2025) (quoting *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 575-76 (4th Cir. 2015)). Ms. Torres must further allege sufficient facts to show that her alleged disability was the but-for cause of SHRM's decision to rescind the offer of employment. *Id.* (citing *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 252 (4th Cir. 2015)).

Here, SHRM made the decision to deny Ms. Torres' request to bring her dog to the office because, based on her own assertions, SHRM determined the dog was not needed for her to perform the Senior Specialist role's essential functions. *See* Section IV(A)(1), *supra*. Indeed, the record does not support Plaintiff's claim that SHRM rescinded its offer to her as a pretext for disability discrimination or that SHRM harbored any discriminatory motive when rescinding her offer. To the contrary, the record demonstrates that, after Ms. Torres submitted her accommodation request, Ms. Belyna and Ms. Zoerkler consulted with Mr. Link, who also involved legal counsel, to ensure Ms. Torres' request was handled correctly. SUMF ¶¶ 23, 25, 28. The record is also clear that SHRM attempted time and again to work with Ms. Torres during the interactive process by continuing to express their excitement for her to join the team, asking her to consult with her doctor

as to the alternative accommodations, and requesting she share any additional information for their consideration since Ms. Torres' own representations had shown that she could adequately work at SHRM's office without her dog being present. *Id.* at ¶¶ 23-41. In fact, while SHRM was busy bending over backwards to understand and work with Ms. Torres to successfully start her employment at SHRM, Ms. Torres made aggressive and unprofessional comments about SHRM officials to friends and acquaintances, hoping Ms. Belyna's children or grandchildren would be diagnosed with the very condition Ms. Torres was living with, and threatening Ms. Belyna by wishing she could key her car. *Id.* at ¶¶ 27, 31, 34, 37. SHRM only moved on from Ms. Torres' job offer when she was facially unwilling to work with SHRM, as demonstrated by her contemporaneous communications with friends and acquaintances, and the business had an urgent need to move forward. *Id.* at ¶¶ 37-42; *Tartaro-McGowan*, 91 F.4th at 172 ("Considering our holding that Defendants offered [the plaintiff] a reasonable accommodation, which she refused, we readily dispose of her remaining discrimination . . . claims."). In light of the foregoing, Ms. Torres cannot establish pretext.

Accordingly, Ms. Torres' disability disparate treatment claims fail as a matter of law.

## V. CONCLUSION

For the foregoing reasons, SHRM respectfully requests that the Court grant its Motion for Summary Judgment and dismiss this case in its entirety, with prejudice.

**CERTIFICATE OF SERVICE**

I hereby certify that, on the 15th day of July, 2026, a true and correct copy of the foregoing **Defendant's Memorandum of Points and Authorities in Support of its Motion for Summary Judgment** was served via the Court's Electronic Case Filing (ECF) system on the following counsel of record:

Stephen B. Pershing (VSB No. 31012)
Mary E. Kuntz (VSB No. 76947)
Anna Kathryn Barnes Barry (admitted *pro hac vice*)
KALIJARVI, CHUZI, NEWMAN & FITCH, P.C.
818 Connecticut Ave. NW, Suite 1000
Washington, DC 20006
Telephone: 202.331.9260
spershing@kcnlaw.com
mkuntz@kcnlaw.com
akbarry@kcnlaw.com

*Counsel for Plaintiff*

*/s/ Lauren M.. Bridenbaugh*
Lauren M. Bridenbaugh