# Exhibit 6

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| FIONA TORRES, | ) |
| Plaintiff, | ) |
| v. | ) 1:25-cv-2360 (PTG/WBP) |
| SOCIETY FOR HUMAN RESOURCE | ) |
| MANAGEMENT, | ) |
| Defendant. | ) |

Rule 30(b)(1) Deposition of JIMMY RAY LINK

McLean, Virginia

Monday, May 11, 2026

9:03 a.m.

Job No.: 632710

Pages: 1 - 249

Transcribed by: Jerome E. Harris, Stenographer.

Rule 30(b)(1) Deposition of JIMMY RAY LINK, held at the offices of:

SOCIETY FOR HUMAN RESOURCE MANAGEMENT
1800 Duke Street
Suite 500
Alexandria, Virginia 22314
(703) 535-6047

Pursuant to notice, before Samuel Pachon, Notary Public in and for the Commonwealth of Virginia.

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:

HECTOR F. RUIZ, JR., ESQUIRE
ANNA KATHRYN BARRY, ESQUIRE
KALIJARVI, CHUZI, NEWMAN & FITCH, P.C.
818 Connecticut Avenue, NW
Suite 1000
Washington, D.C. 20006
(202) 331-9260

ON BEHALF OF THE DEFENDANT:

LAUREN M. BRIDENBAUGH, ESQUIRE
LESLIE P. CURRIE, ESQUIRE
TIFFANY DIN FAGEL TSE, ESQUIRE (ZOOM)
LITTLER MENDELSON, P.C.
1800 Tysons Boulevard
Suite 500
Tysons Corner, Virginia 22102
(703) 286-3142

TANJA L. DARROW, ESQUIRE (pro hac vice)
LITTLER MENDELSON, P.C.
633 West 5th Street
63rd Floor
Los Angeles, California 90071
(213) 443-4300

HANTON WALTERS, ESQUIRE
SOCIETY FOR HUMAN RESOURCE MANAGEMENT (SHRM)
1800 Duke Street
Suite 500
Alexandria, Virginia 22314
(703) 535-6047

P R O C E E D I N G S

Whereupon,

JIMMY RAY LINK,

being first duly sworn or affirmed to testify to the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

THE COURT REPORTER: Counsel, you may proceed.

MR. RUIZ: Thank you so much.

EXAMINATION BY COUNSEL FOR THE PLAINTIFF:

BY MR. RUIZ:

Q Good morning, Mr. Link. My name is Hector Ruiz, I represent Fiona Torres, the Plaintiff, in Fiona Torres vs. Society for Human Resource Management, which is pending in the Eastern District of Virginia. The docket number for that case is 1:25-cv-2360, and we're here today for your deposition. Do you understand that?

A Yes, sir.

Q Would you please state your full name.

A My full name is Jimmy Ray Link.

Q Jimmy Ray Link.

Mr. Link, what is your business address? Your business address?

workplace accommodation, do you remember the steps you took with respect to your involvement in her request?

MS. BRIDENBAUGH: Objection. Vague, compound.

A I do.

Q Do you know who Sheri Martel is?

A I do.

Q Who is Sheri Martel?

A Sheri is a member of the human resources team.

Q Do you work with her, sir?

MS. BRIDENBAUGH: Objection. Vague.

A Yes.

Q How do you work with her?

MS. BRIDENBAUGH: Objection. Vague.

A She is a member of the team over which I have responsibility.

Q Which team is that, sir?

MS. BRIDENBAUGH: Objection. Asked and answered.

A The human resources team.

Q Okay. So when you say a team, you mean the entire human resources team?

MS. BRIDENBAUGH: Objection. Asked and

answered.
A Yes.
Q How large is that team, sir?
A Nine people.
Q What is Ms. Martel's role as part of the human resources team?
MS. BRIDENBAUGH: Objection. Vague.
A She has two primary duties. Duty 1 is payroll administration, duty 2 is leaves and accommodations.
Q When you a duty 2 is leaves and accommodations, when you say accommodations, are you referring to accommodation -- workplace accommodations for disabilities?
MS. BRIDENBAUGH: Objection. Counsel is testifying. Vague. You can answer.
A Generally, yes.
Q What other types of accommodations are you -- is she responsible for?
A There are accommodations which aren't necessarily due to ADA or other type of requests. So she would also handle those as well for our organization.

Q Does she handle accommodation requests for workplace accommodation requests for disabilities?
MS. BRIDENBAUGH: Objection. Vague.
A She is the person for whom the first line of questions or employee comments would come to. That would be her.
Q When you say the first line of questioning would come to her, what questions are you referring to?
A Any question a employee -- an employee might have about the need for an accommodation, there are two ways they would approach that. One is they would utilize an online accessible form requesting accommodation, or they would quite simply reach out to the Sheri with the questions about a particular accommodation request.
Q Are you familiar with any process that Ms. Martel takes when she does receive questions regarding a workplace accommodation for disability?
MS. BRIDENBAUGH: Objection. Vague.
A Not directly, no.
Q Is -- you said she would be in charge of first -- a first line of questions. You know, is there

someone else other than Ms. Martel that also has responsibilities to addressing workplace accommodations for disabilities?

MS. BRIDENBAUGH: Objection. Vague.

A In matters of workplace accommodation, we would -- Sheri would do an intake of the information or specific accommodations request. Assuming that it was something easily handled, we would manage that. Assuming that it was something for which we did not have the proper amounts of experience or had further questions, we would at that point in time involve legal counsel.

Q You stated that Sheri would do the intake and assuming it was easily handled, you referenced we would address it. Who are you referring to when you say we?

A The organization.

Q And what did you mean by address it?

A We would address the accommodations request.

Q And how? Who in the organization would address the accommodation request?

MS. BRIDENBAUGH: Objection. Vague.

A It would depend upon the specific need as

disability?

MS. BRIDENBAUGH: Objection. Asked and answered. Vague.

A I was notified of the request for accommodation Nicole Belyna, who is director of talent at SHRM. After that notification, I immediately engaged internal and external counsel in the determinations for her request for accommodation. This was the first time that we had an applicant request a accommodation, and it was my job as the Chief Human Resources Officer to ensure we conducted that accommodation request appropriately.

Q Referring back to Exhibit 1, sir. The description of your knowledge also states, After Ms. Torres rejected those accommodations and ceased engagement in the interactive process with SHRM, Mr. Link decided to rescind SHRM's conditional job offer to Ms. Torres.

Do you see that, sir?

A I do.

Q Okay. Did you decide to rescind SHRM's conditional job offer to Ms. Torres?

A In collaboration with internal and external

counsel, the answer to that question is yes.
Q Was that decision yours?
A That decision was made in collaboration and cooperation with internal and external counsel. I was the one who communicated to Nicole Belyna that she needed to rescind the offer to Ms. Torres.
Q Could anyone else have decided to rescind the offer --
MS. BRIDENBAUGH: Objection.
Q -- at SHRM but you?
MS. BRIDENBAUGH: Objection. Calls for speculation, hypothetical, vague. You can answer.
A Yes.
Q Who else could have decided to rescind the offer?
MS. BRIDENBAUGH: Same objection.
A The hiring manager or the executive in charge of that particular area where that Ms. Torres would have been employed.
Q Recognizing that you consulted with counsel, was the ultimate decision to rescind the offer extended to Ms. Torres your decision?

MS. BRIDENBAUGH: Objection. Asked and answered.
A Yes.
Q Finally, referring back to the description on Exhibit 1, description states that you have knowledge of SHRM's workplace policies including relating to requests for accommodations.
A I do.
Q Okay. Do you have knowledge of SHRM's policies relating to employee request for workplace accommodations for disability?
MS. BRIDENBAUGH: Objection. Asked and answered.
A I do.
Q Do you have knowledge of SHRM's policies relating to applicant request for workplace accommodations for disability?
A I do.
Q Sir, the paget -- the -- I'm sorry, the passage mentions service dog request.
MS. BRIDENBAUGH: Which passage?
Q I'm sorry, the description that we've been

the testimony, vague. You can answer.
A Yes.
Q Why did Mrs. -- Ms. Torres' request for accommodation require variance from the procedures set forth in Exhibit 2?
MS. BRIDENBAUGH: Objection. Mischaracterizes the testimony, vague.
A It required special attention and care for two primary reasons. First, it was the first time that we at SHRM had a request for a service dog in the workplace. And number 2, it was the first time, at least during my tenure at SHRM, at which we had had a request for an applicant for an accommodation. Those two unique circumstances alone required us to be acutely aware of our duty to ensure that we handled this particular accommodation request appropriately.
Q Was there any other reason that -- okay. So would you state that Ms. Torres' request fell under the area of being nontraditional?
MS. BRIDENBAUGH: Objection. Vague.
A It was both. It was nontraditional. It was the first time that we had experienced it, and it

Belyna, and the written explanation said that we would not be able to meet her request for the service dog to be -- to be accompanying her in the workplace.

Ms. Torres then gave us in writing via email numerous reasons why we should reconsider that request, which we dutifully did.

And then, Ms. Torres was notified that we would not be able to meet her preferred accommodation of the service dog in the workplace.

Q You state that you informed her that SHRM would not be able to meet her preferred accommodation. What prevented SHRM from being able to meet her requested accommodation?

MS. BRIDENBAUGH: Objection. Calls for speculation, vague.

A In collaboration with internal and external counsel, the determination was made that Ms. Torres' request for the service dog was not required because she could perform the essential duties of the position without the accommodation of the service dog.

Q Now, you just told me it was determined that her accommodation request was not required, but I'm

and any such offer will be rescinded.

We've been talking about verbal offers today. Would you -- is the last sentence not the practice today at SHRM?

MS. BRIDENBAUGH: Objection. Vague.

A That sentence is intended to disallow people who are outside of the process that I just described for you from making an illegitimate offer to come to work at SHRM either verbally or in writing. And it -- the purpose of that paragraph is to ensure that there's order and process in who can make offers in the organization.

Q So the verbal offer that was extended to Ms. Torres, that verbal offer did not violate this particular policy?

A It did not, and it is part of our normal protocol to ensure that we have everything aligned in the form of going to a job candidate, making a verbal offer before the written offer is made.

Q Thank you so much.

Sir, have you -- have you seen an electronic version of this document recently?

MS. BRIDENBAUGH: Objection to the extent the answer would get into attorney-client privileged communications, I would direct the witness not to answer. Otherwise, you can answer.

A Yes.

Q Yes. Okay. There is a vertical hash -- hashmark on the left side of the page. The -- do you know if this document has been going through an editing procedure?

MS. BRIDENBAUGH: Objection. Calls for speculation. Vague.

A I do not.

Q Okay. Thank you so much.

Sir, would you please look at the section number 2 titled Procedures, and I want you to specifically look at the like subsection titled Selection Procedure on page 00006. I'm going to ask about the last full paragraph on 006 and going to the paragraph on 007. So please review those paragraphs and let me know when you're ready for me to ask you questions about them.

A I'm ready.

Q Okay. It states, Employment reference -- I'm sorry, the second -- the last paragraph on SHRM_Torres_000006 has a paragraph that begins with the word Employment. And it reads, Employment reference checks and background checks are conducted by human resources for two or three selected final candidates.

Do you see that, sir?

A I do.

Q Okay. The two or three selected final candidates, if they are -- if a background check is being conducted for those candidates, has it determined that those two to three candidates are qualified for the position?

MS. BRIDENBAUGH: Objection. Calls for speculation. The document speaks for itself.

A Generally, yes.

Q On the next page, sir, the first full paragraph, it reads, Upon determination of the final candidate, the hiring manager and human resources -- the hiring manager and human resources collaborate on the offer of employment, including start date and any other details.

Do you see that, sir?
A I do.
Q Do you know what Other Details mean with respect to this sentence?
MS. BRIDENBAUGH: Objection. Calls for speculation. Vague.
A Generally, the things that are included would be the start date, the hiring manager, the work schedule or work location, the pay, an overview of benefits. And if any particular specifics related to the nature of that job itself would be required. For example, if that person needed to show up at a particular time because of where they were located in the building or those type of thing to make it easy for the first day or two in the job.
Q Thank you, sir.
Sir, further down the page about mid-page, there is a section that begins or that is titled, Responsibilities. Do you see that?
A I do.
Q And you're SHRM_Torres_000007.
A We are.

A Correct.
Q Did you conclude that the essential functions of the job could be performed by Ms. Torres' -- by Ms. Torres without the presence of her service dog?
A We did, and notified her of the same.
Q Sir, did you make that conclusion?
MS. BRIDENBAUGH: Objection. Asked and answered.
A That conclusion was made as part of an active process involving internal and external counsel, of which I summarized and communicated that to Nicole Belyna, who then shared that information with Ms. Torres.
Q Sir, did you -- do you believe that the essential functions of he job could be completed without -- could be completed by Ms. Torres without the presence of her service dog?
MS. BRIDENBAUGH: Objection. Asked and answered.
A Yes.
Q What makes you believe that the essential functions of the job can be completed by Ms. Torres

without the presence of her service dog?

A There are several reasons why I believe that the essential functions of this function can be completed without the service dog. First and foremost, Ms. Torres does not always have the service dog in her presence when she's working. We know from Mrs. Torres' own declarations to us as part of this interactive ongoing process of accommodation that the dog is not with her when the dog is being groomed, that the dog is not with her when she's on personal business trips. She told us that she was not going to bring the dog with her on the first day of work at SHRM. And we have subsequently learned that Ms. Torres continues to take extended personal trips overseas for multiple days consecutively where the service dog is not with her.

So I believed then and have even had that confirmed more strongly now that indeed the essential functions of this role could be completed by Ms. Torres without the service dog.

Q Are there any other reasons you believe that the essential functions of the job could be completed by Ms. Torres without the presence of her service dog?

A As -- as the head of human resources, whenever a request accommodation arose, which was different than one we had dealt with in the past, I was then brought into that particular process. I'm not normally involved in accommodation processes within our organization, but because of the unique nature of this one, and the fact that it was the first time we had a candidate request an accommodation, I considered it the responsibility of my team to ensure that I was aware of that particular set of circumstances.

Q How many other situations involving accommodation requests for disabilities had you been brought into at SHRM?

MS. BRIDENBAUGH: Objection. Calls for speculation.

A One or two.

Q One or two. Do you recall what those situations -- situation or situations involved?

MS. BRIDENBAUGH: Objection. Form.

A I do.

Q Okay. Would you describe -- would you describe the situation or situations?

MS. BRIDENBAUGH: Objection. Asked and answered several times.
A I was informed by Nicole by this point in time in two different phone calls that we had a request for a candidate to bring a service dog to SHRM.
Q Did you understand that Ms. Torres owned a service dog?
MS. BRIDENBAUGH: Objection. Calls for speculation, vague.
A I did not.
Q Did you ever come to learn that Ms. Torres owned a service dog?
MS. BRIDENBAUGH: Objection. Vague.
A I came to learn she had one. The concept of ownership I never inquired or that didn't matter to me. I was aware that she had requested the use of a service dog in at SHRM as a reasonable accommodation, but that the fact of ownership was not something I ever questioned.
Q Did you believe that Ms. Torres was requesting that SHRM obtain a service dog for her to use?
MS. BRIDENBAUGH: Objection. Calls for

recall if that was an attachment or a link?
A It was also a link.
Q Okay. Did you access that link?
A I did.
Q Okay. Do you recall the contents of or the information that was accessible through that link?
A It was what is listed here. There was a doctor's note, there was identification identifying paperwork indicating the service dog. And I think there was another piece of information which basically said that this dog was certified to provide services to Ms. Torres.
Q Do you recall reviewing those materials?
A I did look at them, yes.
Q Okay. Can you tell me why you reviewed those materials?
MS. BRIDENBAUGH: Objection. Vague.
A In an effort to ensure I had all of the information and knowledge which was available to us at that particular point in time, yes, that's why I looked at it.
Q Like in reviewing those materials, was part of

next step with respect to the evaluation of Mrs. Torres' accommodation request?

A The next step would have involved ensuring we understood Ms. Torres' request, which she had provided to us already. By notifying us that she needed an accommodation to perform the essential duties of the job. And by this point, we had --Nicole had talked to her to ensure that she understood -- she being Nicole, understood the -- the candidate, Ms. Torres' request and that we had every bit of information from Ms. Torres at that point in time that we could have.

Q At some point or as part of this next step, did you develop your own understanding of what Mrs. Torres' request was?

MS. BRIDENBAUGH: Objection. Asked and answered.

A No.

Q Did you -- what efforts did you take to understand what Mrs. Torres' accommodation request was?

MS. BRIDENBAUGH: Objection. Asked and answered.

A I had this fact file in front of me, and once I

had that, we had started by this point in time to engage in those discussions with internal and external counsel to ensure that we were asking all the right questions, securing all the information we could secure, engaging in an interactive, iterative process with Ms. Torres in an attempt to reach a reasonable accommodation.

Q Sir, I asked going back what happened after, what was the next steps after you received the fact file. I want to know after you received the fact file, did you have -- did you have your own independent understanding of what Ms. Torres' accommodation request was?

MS. BRIDENBAUGH: Objection. Asked and answered several times.

A No.

Q No. Did you ever develop your own independent understanding of what Mrs. Torres' accommodation -- request for workplace accommodation was?

MS. BRIDENBAUGH: You can answer so long as you don't discuss attorney-client privileged communications.

A No.

Q Mr. Link, I want to refer you back to Exhibit 1

if you have it still, sir.
A I do.
Q And I want to refer you back to the description of your -- your -- your knowledge that is provided in Response to Interrogatory number 1, and again, it has your name inside, Jim Link, and description of your knowledge. You see that, sir?
A I do.
Q It states that you reviewed the information and documentation provided to Ms. Torres as regards to her request for accommodation. Do you see that, sir?
A I do.
Q Why is it that you reviewed that documentation?
MS. BRIDENBAUGH: Objection. Vague. Asked and answered.
A In an attempt to understand the accommodation request from Ms. Torres.
Q And would you please describe to me what information and documentation from Ms. Torres that you reviewed?
MS. BRIDENBAUGH: Objection. Asked and answered several times.

A There were emails exchanged with Ms. Belyna regarding Ms. Torres' request for an accommodation. It was those materials from Ms. Torres that I reviewed in an attempt to understand her request for accommodation at SHRM.

Q You said there were emails Ms. Torres exchanged with Ms. Belyna; is that correct?

A Correct.

Q Is there anything, any other information or materials from Ms. Torres that you reviewed?

MS. BRIDENBAUGH: Objection. Asked and answered several times.

A No.

Q Did the emails you reviewed from Ms. Torres include medical documentation submitted by Ms. Torres?

MS. BRIDENBAUGH: Objection. Vague as to medical documentation.

A I saw the attached attachment that Ms. Torres had sent via email to Nicole, and in that document was the items we were referencing earlier, which was the original note from the doctor, and a certification of the service dog as a -- as a detector of glucose.

from Ms. Torres --
A Um-hum.
Q -- does Exhibit 6 reflect that information material that you reviewed?
A It does. Although I'm looking for the medical certification that was attached, and I don't see that produced here. But other than that, yes.
Q Thank you so much, sir.
Would you please turn to the page Bates marked 0000556. It should be the first page.
A It is.
Q Okay. Now, earlier, we were talking about a history of hypoglycemic events that had been described by Ms. Torres. Do you recall that part of our conversation today?
A I do.
Q Okay. Now, did -- when I asked if you had reviewed a history of hypoglycemic events, and you confirmed you had, were referring to the email from Ms. Torres to Ms. Belyna on June 17, 2024 at 1:35 p.m.?
A Yes.
Q Sir, in Exhibit -- with respect to Exhibit 6,

did the history that Ms. Torres set out for Ms. Belyna with respect to her hypoglycemic events factor into the decision whether to grant Ms. Torres' request to have her service dog present with her at work?

MS. BRIDENBAUGH: Objection. Vague as to factored into.

A It was one of the many documents that we reviewed, yes.

Q Sir, among the many documents that were reviewed, what weight was given to the history of hypoglycemic events that Ms. Torres provided to Ms. Belyna?

MS. BRIDENBAUGH: Objection. Assumes facts not in evidence as to history of hypoglycemia events, vague as to weight.

A I don't recall.

Q Did the history of hypoglycemic events that Ms. Torres set out for Ms. Belyna, did it factor into your evaluation of whether SHRM should provide or grant Ms. Bel -- Ms. Torres' request for accommodation?

MS. BRIDENBAUGH: Objection. Assumes facts not in evidence as to history of hypoglycemic events, vague

as to factored into, asked and answered.

A It was one of many documents that were considered as part of the accommodation request.

Q In your own evaluation, or did you conduct any evaluation of your own with respect to Ms. Torres' accommodation request?

MS. BRIDENBAUGH: Objection. Vague as to your own, asked and answered at least half a dozen times at this point.

A No.

Q Sir, would you please turn to the pages Bates marked 560 and 561.

Sir, on document with Bates number 561, it's a -- it appears to be a note from Dr. Joshi regarding Ms. Torres. Do you see that, sir?

A I do.

Q Did you consider this document in the evaluation of Ms. Torres' request for a workplace accommodation?

MS. BRIDENBAUGH: Objection. Vague.

A All of the documents Ms. Torres provided, as well as the email exchanges we see here were considered

as part of the accommodation request process.

Q Do you know whether Ms. Torr -- well, would you please turn to the document Bates stamped 000563. Looking toward the bottom, it states, Ms. Nicole Belyna wrote Fiona.

Do you see that section, sir?

A I do.

Q The bottom paragraph states, Finally, it appears that the physician's note referring to your service dog is from 2019. Can you please provide any current medical documentation you have supporting your current need for your service dog and any exceptions to use of the service dog.

Do you see that, sir?

A I do.

Q Okay. Why was -- do you know why Ms. Torres was asked to provide that information?

A As part of the iterative exchange of information to achieve an accommodation, all -- this is why all of these documents were produced at least from us on the SHRM side. We were part of an interactive, iterative process to try to find an accommodation for

Ms. Torres. And each and every one of these documents and requests were an attempt to aid in that process.

Q So the -- going back to page 561, sir. 000561.

A I'm there.

Q Is it your understanding that Ms. Torres responded with the updated medical documentation that was requested?

MS. BRIDENBAUGH: Objection. Calls for speculation.

A Yes.

Q Was there any concerns with the updated medical documentation that she provided?

MS. BRIDENBAUGH: Objection. Vague as to concerns. And to the extent the answer would invade attorney-client privileged communication, I would direct the witness not to answer. Otherwise, you can answer if you are able to.

A I'm sorry, can you repeat that question.

Q Yeah. Was there any concern with the updated medical information that Ms. Torres provided?

MS. BRIDENBAUGH: Same objection, same instruction.

A No.

Q In evaluating Ms. Torres' request for accommodation, once Dr. -- she had provided the June 19, 2024 note from Dr. Joshi, okay, was -- did SHRM have any other need for additional medical support for her request?

MS. BRIDENBAUGH: Objection. Vague.

A No.

Q So as far as you recall, with respect to medical documentation, was the June 19 th, 2024 letter from Dr. Joshi sufficient to support her request for accommodation?

MS. BRIDENBAUGH: Objection. Calls for legal conclusion. Vague. Calls for speculation. And to the extent the answer would invade attorney-client privileged conversations, I would instruct the witness not to answer, but you can answer if you can do so without disclosing privileged communication with counsel.

A It was one of many documents that we considered as we thought about how to best accommodate Ms. Torres.

Q Thanks so much.

Mr. Link, Exhibit 1 states that you decided that Ms. Torres did not require an accommodation in the form of her service dog.

A That is a correct conclusion.

Q How did you arrive at that decision?

MS. BRIDENBAUGH: Objection. To the extent the answer would involve disclosing attorney-client privileged communications, I would direct you not to answer, but you can answer without disclosing attorney-client privileged communications.

A There was a conflict between Ms. Torres' statements regarding the medical necessity of the dog and her lived experience of requiring the dog to be with her at all times.

She said in to Nicole on June 19th, I rely on my medical alert dog at all times.

That is not the case. She relayed to us in that same email --

Q I'm sorry, sir, are you referring to an Exhibit?

A Exhibit number 6, page 562.

Q Continue, sir.

A She said in Exhibit 562 on June 19th from Fiona, Ms. Torres, to Nicole, I rely on my medical alert dog at all times.

However, in subsequent paragraphs, she goes on to say that there are regularly occurring circumstances where the service dog is temporarily without me when he is taken for grooming.

She goes on to say that in her personal life, if she feels an environment is physically unsafe for him to be in, such as an extraordinarily loud environment, I may choose to not have him with me to protect his physical safety.

She also mentions that she would not bring her service dog with her on the first day at SHRM to ensure she could better evaluate the situation.

And subsequently, since then, as I testified this morning, we have learned that there are multiple times, including concerts and overseas travel involving consecutive days of -- of that travel without the dog being present.

There's an incongruence in what she stated and the lived experience as she also stated.

produced here.
Q Which is Exhibit 6?
A Exhibit 6, pages 562 and 563.
Q Thank you. And but just to be clear, you also mentioned information that you have since learned.
A Correct.
Q But that the information you have since learned did not factor into your decision?
A It did not.
Q Thank you so much.
A However, it confirmed that we made the right decision.
Q Other than what you've just described to me about there being a conflict between the statement she made to Ms. Belyna -- I'm sorry, what was -- what was the conflict?
MS. BRIDENBAUGH: Objection. Asked and answered.
A The conflict was in her own statement, she said that the dog is a medical necessity with her at all times 24-7 in parentheses. Yet, she goes on to describe instances, multiple instances in which that is not the

case.

Q Okay. Is that the only conflict that you see?

MS. BRIDENBAUGH: Objection. Asked and answered. Vague.

A There are circumstances that Ms. Torres describes to us in that email which we considered as part of the decisioning process to make the determination as to if or if not the dog needed to be there for her to perform the essential functions of the job.

The determination that we made based on this email, and the totality of the factors, and in consulted -- consultation with internal and external counsel, I made the decision that it was not necessary for us to accommodate her service dog request. However, we continued to remain open to any iterative ongoing communication and/or accommodation request that she might provide to us.

Q Were you at all concerned that Ms. Torres' requested accommodation would disrupt SHRM's operations in some way?

MS. BRIDENBAUGH: Objection. Vague.

accommodation that we would support.
Q Can a person or an employee at SHRM use a CGM without requesting an accommodation for it?
MS. BRIDENBAUGH: Objection. Calls for speculation.
A I don't know.
Q Would it violate a like a SHRM policy if somebody used a CGM without requesting approval to use it?
MS. BRIDENBAUGH: Objection. Hypothetical. Calls for speculation.
A I don't know.
MS. BRIDENBAUGH: Assumes facts not in evidence.
Q What exactly would SHRM be doing to facilitate the use of the Continuous Glucose Monitoring system?
MS. BRIDENBAUGH: Objection. Vague.
A In the event that the employee needed a Continuous Glucose Monitoring system, in this case because it was offered as a reasonable accommodation, we would ensure that the employee had access to his or her Continuous Glucose Monitoring system; that the employee was permitted and even encouraged to ensure that the

Continuous Glucose Monitoring system was working effectively. And anything else that the employee needed that was deemed to be reasonable in the use of the Continuous Glucose Monitoring system.

Q Another accommodation offered is breaks as you may need to check your blood sugar level.

Do you see that, sir?

A I do.

Q Do SHRM employees, are they allowed to take breaks as they need, typically?

MS. BRIDENBAUGH: Objection. Calls for speculation. Vague.

A Yes.

Q So was this offering something that she didn't already have as a regular benefit as a SHRM employee?

A I think we wanted to ensure that if she felt the need to step away from one break to immediately go to another break to check her blood sugar level, that she felt that that was an accommodation that we would absolutely support.

Q Next aspect of the alternative accommodations that were offered was a flexible open leave program to

take off when needed to manage your condition.
Yo see that, sir?
A I do.
Q Is there a flexible open leave system that's available to all SHRM employees?
A There is.
This was written to ensure that she understood, because she was an applicant, and might not have been aware of our flexible leave open program, that she was aware that such thing -- a thing could help to accommodate her request to manage her condition.
Q And this last one is a bit compound. Placement of your insulin pump or any food or drink you may require near your workstation.
Do you see that, sir?
A I do.
Q Would an employee at SHRM who needed an insulin pump need to have an approved accommodation to have their insulin pump at their workstation?
MS. BRIDENBAUGH: Objection. Hypothetical. Calls for speculation.
A Not necessarily. However, they might,

depending upon where they worked in our building, need to have approval to have open containers of food and drink at their desk or in immediate proximity to them.

So yes, we would ensure that this -- remember, this is not an employee. This is someone who has been offered a conditional offer of employment in our organization verbally and is not yet on board. So she is likely not aware of the rules and regulations of how we operate within our facility. So again, making sure she understood that having that available food and drink and/or insulin pump near her is something we would reasonably accommodate.

And again, the way we ended that is to ensure that she knew that to help us identify any other reasonable accommodations that we could provide.

Q If the position that she was offered, Senior Specialist Product Management, would she have been allowed to have food and drink at her workstation?

A I don't know.

Q Once these alternative accommodations were identified, did you speak with anyone other than counsel regarding the likely effectiveness of these

to tell us the time frames and the reasoning why her Continuous Glucose Monitoring doesn't work satisfactorily for her.

And she also then says, During the events above, there's no accommodation that could be made to prevent me from the life-threatening events my service dog is trained to protect me from.

I'm not sure how much more clear Ms. Torres can be in saying that she is done talking to us.

So Nicole responds on Sunday, July 7, Thank you. I'll be out of the office this week, I'll be checking my email periodically.

A week later, eight days later, we have no further additional communication from Ms. Torres until Nicole responds to her and says, It does not appear there are any reasonable accommodations that will allow you to perform the essential functions of the role. We're unable to grant your request to have a service dog in the workplace. Should anything change regarding potential alternative accommodations that would allow you to perform the essential functions of the role, we remain open to having those discussions. At this stage

and based on the foregoing, we will need to rescind the offer.

Then, the only response we get back is the same day, 24 -- looks like 24 minutes after Nicole sends her email, Ms. Torres describes -- tells us that she's filed a complaint with the EEOC and will continue to check their availability.

Q Thank you.

A We assumed that the -- our instructions were clear that we intended to continue this iterative process, and we rescind -- because we did not get a response from her in that time frame, we rescinded the offer.

Q Understood. Sir, you read email the from July 6th, 2024 from Ms. Torres to Ms. Belyna, to Nicole?

A Yes.

Q And that that email is dely -- is delayed -- dated July 6, 2024. Well, that comes three days after Ms. Torres was offered those alternative accommodations that we discussed earlier; is that correct?

A Yes, and with the invitation to continue in the interactive, iterative process.

change regarding a potential alternative accommodations that would allow you to perform the essential functions of the role, we remain open ti having these -- those discussions.

Do you see that?

A I do.

Q Do you know what essential functions of the role are being referred to here?

A I do.

Q Which ones?

A The essential functions of the role are listed in the role document description which has been produced as evidence for this matter. And the categories of the essential functions fell into four broad areas with descriptions below those of what those specific broader areas entailed.

The top and first was familiarization of program management of matters related to the events for Linkage, which was the area of the company that which he was applying for and subsequently offered the position.

The second part dealt with data analytics and all things related to understanding the client and the

customer, which was the Linkage buyer for those goods and services.

The third was experience with our learning managed -- Learning Experience Systems.

So in this matter, there were three primary things that were done in Linkage. They were a learning program called Inclusive Leadership; a second program called Purposeful Leadership; and a third program called the Women's Institute for Leadership, also known as WIL at that time.

The fourth category was to identify then for conference programing and events how we could maximize attendance to those events and particularly to WIL, the Women's Institute -- Women's Leadership Institute.

Q Thank you, sir.

A You're welcome.

Q Okay. And then, the last sentence is, At this stage and based on the foregoing, we will need to rescind the offer.

You see that, sir?

A I do.

Q What does the word, stage, mean at that point

in this sentence?
A At this point in the interactive, iterative process, there appears to be no solution to Ms. Torres' reasonable request for -- request for accommodation and anything other than the service dog as she had communicated to us. We remained open, as the previous sentence said, to continue to have those discussions. And so at this stage is simply at this moment in time and based on the facts and time that we've had involved in this process, we would rescind the offer.
Secondarily, there was also the need to get the job filled. And because of that need to get the job filled to meet the business requirements, we attempted to continue to fill the job. Unfortunately, we never filled the position in the organization, and it's likely a good thing that we didn't fill it, because in November of that year, or the following February, the work that was surrounding Linkage related to filling up those programs was restructured out of our organization. That means Ms. Torres likely would have been laid off in the event that we would have hired her.
Q You said the job went unfilled. Can you tell

me why the job went unfilled?

A The role was what we call expansion role, and what that means is we were attempting to hire this person to grow the business, but because we didn't have a person in this role, the business for that and other reasons did not grow at the rate that we anticipated. So the business didn't grow; therefore, we didn't have a need for the person. If the person would have been in the job, we would have hoped that the business would have grown. As it turned out, it did not do that, and as a result of that, we had to make decisions several months later to downsize, or restructure is the term that we used, that particular business line in our company.

Q Had no one -- had no one held that position -- I'm sorry. Was the position that was offered to Ms. Torres a brand new position?

A It was ane expansion role. So there had been other people who had done bits and pieces of that job, but because the business was attempting to grow, we had consolidated that work into one place and gone to market to find someone like Ms. Torres to do the work.

Q So there was not -- and I'm trying to understand. So being there was an expansion role, was there no previous employee that held the duties that Ms. Torres was expected to or would have filled had she started that position?

MS. BRIDENBAUGH: Objection. Asked and answered.

A Many employees did pieces of those roles in throughout SHRM Linkage, but no one employee did that work consolidated in order to really focus on it and expand the business.

Q Thank you so much.

At some point during the interactive process, and I know it's stated with respect to Exhibit 6. And go ahead and you know, for this question, sir, I'm gonna ask you not to refer to any exhibits.

A Oh.

Q Thank you very much.

At some point during the interactive process, did you become aware what Ms. Torres contacted the EEOC to file a discrimination claim?

A Yes.

that need to be accommodated?

A Yes.

Q Because employees cannot be on their personal phones whenever they wish, correct?

MR. RUIZ: Object to form.

A Correct.

Q Can SHRM employees take as many breaks as they want for as long as they want?

A No.

Q If an employee needed to take more frequent or longer breaks for medical reasons, that would be an accommodation, correct?

MR. RUIZ: Object to form.

A Correct.

Q Do SHRM employees have to have their leave request under the open leave policy approved?

A They do.

Q Did you know that Ms. Torres -- or I'm sorry, did SHRM know that Ms. Torres had type 1 diabetes prior to SHRM extending her an offer of employment?

A Yes.

Q And how did you know that?

A She disclosed that as a line on her r�sum�.
Q The r�sum� she submitted to SHRM AS part of her application?
A Correct.
MR. RUIZ: Object to form.
MS. BRIDENBAUGH: I'll introduce as Exhibit 8. We can pass this over to him first.
(Plaintiff's Link Exhibit 8, SHRM Employee Code of Conduct, was marked for identification and is attached to the transcript.)
THE WITNESS: Thank you.
Q Mr. Link, the court reporter has handed you what's been marked as Exhibit 8, which is SHRM_Torres_94 through 119. What is this document Exhibit 9? Exhibit 8, I'm sorry?
A Exhibit 8 is an Employee Code of Conduct required for all employees at SHRM to understand and abide by.
Q I'd like to the direct your attention to SHRM_Torres_98.
A I'm there.
Q Okay. And at the bottom of the page, there's a

context of its Code of Conduct?

A As direct, multiple repeat violations of our Code of Conduct.

Q And all of these messages that we discussed at Exhibits 9 through 13, you understand based on the date and timestamp on the messages to have been sent during the time frame that SHRM was communicating with Ms. Torres regarding --

MR. RUIZ: Object to form.

Q -- her request for accommodation; is that correct?

I'll rephrase.

During what time frame were Exhibits 9 through 13 appear to have been sent by Ms. Torres?

A During the active interactive process where we were attempting to accommodate Ms. Torres into our workforce.

Q Had you known about these messages during the time frame that they were sent, what, if anything, would have been your response?

A I would have immediately rescinded the offer.

Q The offer of employment to Ms. Torres?

A Correct.
Q And on what basis would you have rescinded the offer of employment to Ms. Torres?
A That the willful violations of our Code of Conduct were not in line with what SHRM expects from its employees.
MS. BRIDENBAUGH: I have no further questions.
EXAMINATION BY COUNSEL FOR THE PLAINTIFF:
BY MR. RUIZ:
Q Mr. Link, with respect to the Employee Code of Conduct that was introduced as an exhibit, are you ever aware of any circumstances under which a person has been disciplined for behavior that was exhibited before they became an employee?
A No.
MS. BRIDENBAUGH: Objection. Vague.
A No.
Q Exhibits 9 through 13 were represented to you as texts made by Ms. Torres before she was a SHRM employee; is that correct?
A Yes, but also once she had been extended some of it is during the time in which she had been extended

CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC

I, Samuel Pachon, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings were fully sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

Notary Registration No.: 00278263

My Commission Expires: 02/29/2028

Samuel Pachon

SAMUEL PACHON, NOTARY PUBLIC

FOR THE COMMONWEALTH OF VIRGINIA

CERTIFICATE OF TRANSCRIBER

I, Jerome E. Harris, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding; that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; and that I am neither counsel for, related to, nor employed by any of the parties to the case and have no interest, financial or otherwise, in its outcome.

______________________________

JEROME E. HARRIS, STENOGRAPHER

MAY 14, 2026