# Exhibit 10

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| | Case No. |
| Fiona Torres, | 1:25-cv-02360-PTG-WBP |
| Plaintiff, | |
| v. | |
| Society for Human Resource Management, | |
| Defendant. | |

REMOTE DEPOSITION OF
SILPA P.K JOSHI, M.D.
May 27, 2026
10:01 a.m.

Reported by: Lindsey Russo
Job No. 8175586

Remote Deposition of Silpa P.K Joshi, M.D. held through:

Veritext Legal Solutions
1250 I Street, N.W.
Washington, D.C.

Pursuant to Notice, when were present on behalf of the respective parties:

APPEARANCES:

On behalf of the Plaintiff:

HECTOR RUIZ, ESQUIRE
KALIJARVI, CHUZI, NEWMAN & FITCH, P.C.
818 Connecticut Avenue, N.W., Suite 1000
Washington, D.C. 20006
hruiz@kcnlaw.com

On behalf of the Defendant:

TIFFANY DIN FAGEL TSE, ESQUIRE
LITTLER MENDELSON, P.C.
1800 Tysons Boulevard, Suite 500
Tysons Corner, Virginia 22102
TTse@littler.com

APPEARANCES (Continued):

On behalf of the Witness:

EDWARD BAILEY, ESQUIRE
HANCOCK DANIEL & JOHNSON, P.C.
3975 Fair Ridge Drive, Suite 475 South
Fairfax, Virginia 22033
ebailey@hancockdaniel.com

Also Present:
Hanton Walters, SHRM
Leslie Currie, Littler Mendelson, P.C.
Tanja Darrow, Littler Mendelson, P.C.

SILPA P.K JOSHI, M.D.,
being first duly sworn, to tell the truth, the whole truth, and nothing but the truth, testified as follows:

THE COURT REPORTER: Thank you.
Counsel, you can proceed.
MS. TSE: Thank you.

EXAMINATION BY COUNSEL FOR DEFENDANT

BY MS. TSE:

Q. Good morning, Dr. Joshi. As I mentioned before, my name is Tiffany Tse. I am one of the attorneys representing Society for Human Resource Management, the defendant in this lawsuit.
During this lawsuit, I'll be referring to their acronym, SHRM. So when I use the word SHRM, do you understand that I'll be referring to Society for Human Resource Management?
A. Yep.
Q. Okay. Do you mind stating your full name for the record, please?

A. Silpa Poola-Kella Joshi.
Q. And have you been deposed before?
A. No.
Q. Since you've never been deposed before, I'd like to sum and go over a few ground rules at the outset of your deposition.
So as you recall from a moment ago, the court reporter just mentioned that your testimony is to be given under oath. Do you understand that?
A. Yes.
Q. And do you understand that this is the same oath as if a judge or a jury were here with us today?
A. Yes.
Q. And, similarly, do you understand that your testimony is being given under the penalty of perjury?
A. Yes.
Q. So there is a court reporter here today, Ms. Russo, and to ensure that everyone has a clear record as possible, there are a few

Dexcom CGM, are those two different monitoring devices?
A. Yeah. The Omnipods. Sorry.
Q. Pods?
A. Omnipod is the pump.
Q. Got it.
A. It's a mobile or tubeless pump that they can just insert onto their arm or leg or wherever on their body without a tube.
And then the Dexcom CGM is a separate device that will go on their arm and communicate with the pump. As the blood sugars are changing, then they will -- the pump will then deliver the appropriate amount of insulin based on those blood sugar changes.
Q. Got it. So to monitor, it would be the Dexcom CGM, and then to kind of treat would be the Omnipod?
A. Correct.
Q. Okay. But does one -- can one work without the other?
A. They can, though, not -- well, yes.

have to take something out, wipe your finger, check the finger stick.

And you can't get that blood sugar data every five seconds with a finger stick. Usually they're only allowed six strips a day per insurance anyway. So patients would only be checking kind of, you know, a few times per day, whereas with the CGM, they're getting the data kind of all the time.

Q. Do you -- do you have to, like -- for the CGM, is it like push notifications? Do you have to, like, request it to provide data?

A. It gets set up through an app, and then they can set alert settings for when their blood sugar is going above a certain threshold or below a certain threshold, so it rings. So that way if they're going and they're asleep, it'll wake them up. Or if they're going high, you know, above a certain amount, it'll wake them up to alert them to -- to make an action.

Q. So would you consider CGMs the standard for Type 1 diabetic care?

A. So the patient told me. That -- that's what -- she had told me that was the basis of why she got the dog in the first place.

Q. And other than what Ms. Torres told you, did you see any record or note?

A. No, I don't have -- I didn't have a record of any of those accidents or et cetera, no.

Q. Okay.

A. Because she said they spanned over 25 years, and so I wouldn't have those kind of records for that timeline.

Q. And did -- during the time that you -- you've treated Ms. Torres or treating Ms. Torres, did she ever tell you that a health care provider of hers had told her that it is medically necessary for her to have a diabetic alert dog to monitor her glucose levels?

A. Not until June of 2024 when she sent me the message.

Q. Is that --

A. She would bring the dog to her appointments, so that was the -- truthfully, the only way I would've known that she had it, because the dog was always with her.

But outside of that, that was the -- that was the most I knew about the dog.

Q. I understand that the dog was with her during the appointments, but I guess I'm trying to see if whether -- other than Ms. Torres, did anyone tell you that it was medically necessary for her to have the dog?

A. No one told me that, no.

Q. And if it was medically necessary, would that have been reflected in Ms. Torres' medical records?

A. Possibly with her prior endocrinologist, but I don't have those records.

Q. And you're currently treating Ms. Torres, right?

A. Yes.

Q. Are you aware of any other health

care provider, endocrinologist that is also treating Ms. Torres for her Type 1 diabetes?

A. I am aware that after I left Northern Virginia Endocrinologists that she saw my -- or the -- the -- the partner at the practice, Suzanne Rogacz, once just kind of as an interim visit while -- after I left.

But I don't believe she's still seeing Dr. Rogacz after she came to our practice.

Q. And then other than Dr. Rogacz, anyone else that that --

A. Not that I know of, no.

Q. When was Ms. Torres first diagnosed with Type 1 diabetes?

A. I cannot tell you that one off the top of my head. I don't know the exact age.

Q. I believe she was diagnosed at around 3, 4 years old from my review of her medical records, but that's neither here nor there.

How often do you -- do you see --

did you see Ms. Torres? And I'm talking from like 2020 --

A. Yeah.

Q. -- understanding there was a gap in --

A. It was every six months usually I would see her. Usually she was seeing me every six months. Sometimes there was a little bit more of a gap, if I recall. During the pandemic, there was a lot of -- you know, and then I also went on maternity leave, so there was a gap there.

Q. Got it. When you say every six months, is that standard for diabetic --

A. Yeah. Usually those who we -- I will see a patient every six month who have -- you know, who has had pretty good control, nothing major. We're not making big, big changes to their regimen.

You know, their -- a lot of the times with Type 1 diabetics, especially those that are eventually very well controlled,

they're very in tune with how to manage themselves. And so often the visits are more just to kind of go over the trends over the last six months, make sure they have their medications, do lab work, you know, more from a chronic management standpoint.

Patients I see more frequently would be those who may have had an acute hospitalization or recently newly diagnosed as a Type 1 or Type 2 diabetic who are poorly controlled. Those patients I may see within a month or two and then kind of start spacing them out to every three months.

But in this case, yes, it would be every six unless there's a gap because of her or me being out.

Q. Right. Right. So the kind of variables that you've described to put patients in the six-month -- every-six-month category is, I think, the control, nothing major, no changes --

A. Right.

Q. -- they're aware of their symptoms.
That would be Ms. Torres?
A. Yes.
MR. RUIZ: Objection. Compound.
MR. BAILEY: And then, Dr. Joshi,
you're doing a good job, but I'd just emphasize
Ms. Tse's instructions at the beginning of the
deposition. Make sure to just let her finish
her question before --
THE WITNESS: Oh.
MR. BAILEY: -- you start responding
just for a clean record but...
THE WITNESS: Sure. Sure. Sorry.
BY MS. TSE:
Q. I feel like you know where I'm
going, so I -- I make that mistake too.
A. It's a course of habit. I -- I --
my husband tells me the same thing, so yeah.
Sorry about that.
Q. No worries. I tell my boyfriend the
same thing.
So I think you said the last time

not speaking properly.
Q. And so the reverse of that, not severe, is just responsiveness?
A. Yes. Their blood sugar is dropping. They're feeling it. They're going to grab some orange juice or some glucose tablets and pop right up.
Q. Would it be accurate to say that for nonsevere reactions it's -- it's -- the patient has control, they know what to do?
A. Yes. Yes. Absolutely. They have the time too to kind of jump in and fix the low.
Q. Since you began treating Ms. Torres, has she been hospitalized for her Type 1 diabetes condition?
A. Not that I am aware of, no.
Q. Do you know the last time she was hospitalized as a result of her diabetes?
A. No.
Q. Are you aware that Ms. Torres experienced one, I guess, significant

information?

A. Well, I would just be assessing her initially based on her current blood sugar control, based on her -- like, her CGM data or what she tells me in terms of what her glucose control is.

So, like, at that visit if she's telling me X, Y, and Z or I'm seeing that in her data, I'm basically -- and she hasn't necessarily had a hypoglycemic event or severe hypoglycemic event, I may not be documenting that at the initial visit unless the patient comes forth and states: This happened to me X, Y, and Z times, et cetera.

And I will say again I think that was made -- I was made much more aware of her prior background with the hypoglycemia when she requested this letter from me.

Q. Say that one more time. You were aware of her --

A. I was made aware by the patient of her -- all of those severe hypoglycemic events

that she had when she asked me for the letter in 2024.

Q. Okay.

A. That wasn't necessarily a topic of conversation at our visits. The majority of our visits were -- she had her Dexcom data. We'd review it. I'd ask her if she's changed any pump settings. I'd ask her if there was any severe episodes in the interim, and then we would make pump adjustments. I'd do refills, and then we'd schedule the next visit.

So from my recollection, my visits with Fiona were very -- not to say boring, but more standard so...

Q. Got it. Okay.

A. Yeah. But at her initial visit, if I had not seen that in a record or she did not come forth to tell me about that, unless I saw that in her pump data and then I was prompted to ask her: "Oh, you know, what happened with this low blood sugar?" then that's when I could've documented, oh, hypoglycemia

don't -- I'm not aware of that.

Q. Has Ms. Torres, to your knowledge or while you've been treating her, have -- had any emergency room visits due to any sort of diabetic issues?

A. Not that I'm aware of.

Q. Has she suffered from any seizures since you've been treating her?

A. Not that I'm aware of.

Q. Are you aware of any experiences where she has suffered a seizure since she was diagnosed with diabetes?

A. Not that I'm aware of.

Q. Would that have been noted in your initial visit if she had any sort of seizure -- if she suffered from seizures?

A. It would have if it was brought to my attention. It's not a standard question, if you had --

Q. What --

A. If you've had a seizure, yeah. That's not usually a standard diabetic

intake --

Q. Okay.

A. -- when we see patients initially.

Q. And are you aware of any incidents where Ms. Torres had to be -- had to call or someone else had to call for her, like EMS, emergency medical services, because of a diabetic situation?

A. During my -- under my care?

Q. Yes.

A. No.

Q. What about outside your care if that had been reported to you or you've seen records demonstrating that?

A. Only in June of 2024 when she made me aware of this letter that she -- she sent me to make me aware of all the severe hypoglycemic events she had prior to my care.

Q. Got it. Going back to, I think, Exhibit 3, it says here on 1404: "She's currently using the Omnipod insulin pump with a Dexcom."

but yes, I -- I would have to look at each encounter to see that.

Q. And do you recall any sort of remarkable findings or any change in findings when you treated her at Northern Virginia Endocrinologists?

A. No. I mean, Fiona was truthfully a very -- not to say straightforward patient, but, I mean, a lot of it was just routine management, which is why I only saw her every six months. It was a lot of -- I think she actually had more happening outside of the diabetes realm at one point, and she would update me on that.

You know, I think she had a blood clot at one point and whatnot, so unrelated to my care. Sorry. I'm just trying to confirm this. At least what I'm looking at, at least through 2022 it was E10.9. I'm trying to see. So 2021 was that way too. Sorry. These printed back and forth or front and back.

I think it was E10.9 from all of my

vehicles with severe hypoglycemic events," and then she says she shared that with the employer, and then she requested Dr. Joshi write a letter specifying the medical necessity of my service dog at all times, 24/7. Please call if needed.

Q. I guess my question is is that you made no record or you didn't make any sort of observation as to the usefulness of Ms. Torres' diabetic alert dog?

A. No. Yeah, I did not because there was -- I -- there would have been no -- unless there was an event during my care where she talked about that, I would not have documented in her interim time where that would've had -- you know, had been documented or had happened.

Q. And are you aware, other than that -- the -- the letter we're talking about, the -- Dr. Denise's, I think -- is it 2019, the date of her letter?

Other than that letter, are you aware of any other evidence from Ms. Torres'

medical records demonstrating that a diabetic alert dog can prevent any sort of adverse diabetes reaction?

A. No.

Q. From the times that you were treating Ms. Torres -- I guess this would be in person -- have there been any visits when she did not bring her diabetic alert dog? Do you recall?

A. No, I don't recall that.

Q. So for each visit, she had her diabetic alert dog present?

A. Yes.

Q. Are you aware of any occasion where Ms. Torres did not have her -- her service dog or diabetic alert dog with her?

A. Not that I recall.

MR. BAILEY: So, Tiffany, we've been going another hour now. I wonder if there's another natural breaking point coming up soon for a short comfort break.

MS. TSE: We can break now. That's

Ms. Torres' accommodation request?
A. June 19, 2024.
Q. In that same communication that was on the portal?
A. Yes.
Q. Okay. And, again, other than that communication that Ms. Torres sent you on the portal, do you have any other knowledge about her accommodation request?
A. No.
Q. Are you aware that SHRM had offered Ms. Torres alternative accommodations for her to monitor her glucose levels at work?
A. No.
Q. Okay. We might come back to that, but first, I want to bring up your note here. Let me know when you see my screen.
A. Yep, I see it.
Q. Okay. So do you recognize this document?
A. Yes.
Q. What is it?

Q. So looking -- taking a look at your June 19, 2024 note -- and let me know if you need me to, like, zoom in or whatnot -- it says here: "She," as in Ms. Torres, the second line, "has a history of severe hypoglycemic reactions resulting in her passing out, leading to more dangerous situations, such as car accidents, in the past."

What medical evidence do you have to support this conclusion?

A. What Ms. Torres told me under Dr. Armellini's care.

Q. Other than what Ms. Torres told you, is there anything else that you can cite to to support this conclusion?

A. No.

Q. And then we already went over some of her medical records at Northern Virginia Endocrinologists, and there was nothing there that Ms. Torres had passed out because of a history of severe hypoglycemic reactions. Would that be accurate to say?

A. Yes.
Q. And then we also went over -- well, let me back up for one second.
Are you aware of any other occasions -- of any occasion where she did pass out due to a hypoglycemic event or reaction?
A. Not under my care.
Q. And then that same sentence, it says: "Such as car accidents in the past."
Where in Ms. Torres' medical records with Northern Virginia Endocrinologists does it show that she was involved in one car accident due to a severe hypoglycemic reaction?
A. It would only be in that patient case that she sent me.
Q. So you're talking about the June 19, 2024 communication through the portal?
A. Correct.
Q. But during your treatment of Ms. Torres or any of your visits, she had never mentioned that she was involved in one or more car accidents due to --

A. No. No.
Q. Okay. It also says: "In her passing out, leading to more dangerous situations."
What -- what dangerous situations are you referring to per your treatment of her?
A. Like a severe hypoglycemic episode, so that can result in a car accident.
Q. Are you aware of any dangerous situations that Ms. Torres experienced while you were treating her?
A. Not while I was treating her. I was commenting on prior to me seeing her.
Q. So to clarify, the only support that you have for dangerous situations come -- came from -- directly from Ms. Torres?
A. Yes.
Q. The third sentence here, it says: "It is imperative out of medical necessity she has her service dog at all times for safety in light of her Type 1 diabetes" histories -- "history with labile blood sugars."

MR. BAILEY: Objection. Calls for speculation.
THE WITNESS: Yeah, I don't think I can make that comparison because their -- their measurements are so different.
BY MS. TSE:
Q. What does the diabetic alert dog measure?
A. Well, that part, I can't comment on per se, but they have some sensing mechanism to note that a blood sugar is low, whether it's some scent or byproduct that they're sensing, whereas a CGM is giving you quantitative data and giving you a number.
So I don't think you can -- I think that would be comparing apples to oranges in terms of how they work, but they both can work for the same purpose. So that part, I can say that, that much. But I don't think I can compare both.
Q. You've never had to evaluate the effectiveness of Ms. Torres' diabetic alert

dog; is that correct?
A. Never. No.
Q. And as a physician, do you base your treatment decisions on measurable data?
A. Yes, I do, and symptoms.
Q. What do you mean by that?
A. We have measurable data, and we have clinical symptoms. So symptoms may not always correlate with numbers, if that makes sense. I'll give an example.
So a patient may be very hyperglycemic. They come to me with their A1C being over 12, so that's someone who's very poorly controlled. And, you know, I see them for their follow-up. Their blood sugars have improved. There may be -- their blood sugars may be fairly controlled now, rather than poorly controlled. But they don't feel well. They're not feeling well now. They're feeling hypoglycemic, and the reason being is their blood sugars -- they were used to that hot feeling of being so high, so their body has not

adjusted to it yet.

So I still have to take that into account. I see the quantitative data, but then I say, well, I can't be this aggressive in changing their blood sugars because they are starting to feel like they're dropping. So that can happen too.

So I think, as a clinician, we evaluate quantitative data, but we also have to assess the patient and their symptoms and their physical exams and all of that to put it all together. So -- but yes, that's part of the evaluation, absolutely.

Q. So going back to like you're saying, nonquantitative data or, like, symptoms, what -- what nonquantitative data have you observed on behalf of Ms. Torres in relation to her -- her diabetic alert dog?

A. Nothing. I've never evaluated her diabetic alert dog, so I can't comment on that.

Q. So when you're saying it's out of medical necessity, that was just based on

Ms. Torres' portal communication to you in June?

A. And her -- yes, her reported history with her prior endocrinologist where she had multiple severe hypoglycemic events, one of which resulted in a motor vehicle accident. So I was basing that -- that sentence off of what she reported to me.

Q. I'm going to pull up real quick -- let me see here -- the note from Dr. Armellini. Let me know when you can see my screen.

A. Yes.

Q. Okay. So I'm going to go to the top of this document, which is marked CONFIDENTIAL TORRES 465, and it goes through 465, 466, and 467. Let me know if you want me to slow down or scroll to a certain page.

(Exhibit 5 was marked for identification.)

BY MS. TSE:

Q. Oops. Okay.

Do you recognize this document, Dr.

A. Right.
Q. Okay. Did Ms. Torres ever report to you that her diabetic service alert dog had alerted her of any sort of adverse reaction -- diabetic reaction before her CGM did?
A. No.
Q. And before you had drafted this June 2024 note, did you ever recommend to Ms. Torres that she use a diabetic alert dog to monitor her glucose levels?
A. No.
Q. And going back to -- I think it was Exhibit 5 -- the portal communications between you and Ms. Torres, other than these one, two, and, I think, three -- third message, did you have any other communications with Ms. Torres related to her accommodation request with SHRM?
A. Not that I recall.
Q. And since you started treating Ms. Torres, you're not aware of any severe hypoglycemic events that she experienced?
A. No.

CERTIFICATE OF NOTARY PUBLIC

I, LINDSEY RUSSO, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me in shorthand and thereafter reduced to computerized transcription under my direction; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.



Notary Public in and for
the District of Columbia

My Commission expires: February 28, 2029