# Exhibit 17

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

______________________________

FIONA TORRES, )
Plaintiff, )
v. ) 1:25-cv-2360 (PTG/WBP)
SOCIETY FOR HUMAN RESOURCE )
MANAGEMENT, )
Defendant. )
______________________________)

Rule 30(b)(6) Deposition of SOCIETY FOR HUMAN RESOURCE MANAGEMENT, by JIMMY RAY LINK

McLean, Virginia

Monday, May 11, 2026

5:09 p.m.

Job No.: 632710

Pages: 1 - 46

Transcribed by: Jerome E. Harris, Stenographer.

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:

HECTOR F. RUIZ, JR., ESQUIRE
ANNA KATHRYN BARRY, ESQUIRE
KALIJARVI, CHUZI, NEWMAN & FITCH, P.C.
818 Connecticut Avenue, NW
Suite 1000
Washington, D.C. 20006
(202) 331-9260

ON BEHALF OF THE DEFENDANT:

LAUREN M. BRIDENBAUGH, ESQUIRE
LESLIE P. CURRIE, ESQUIRE
TIFFANY DIN FAGEL TSE, ESQUIRE (ZOOM)
LITTLER MENDELSON, P.C.
1800 Tysons Boulevard
Suite 500
Tysons Corner, Virginia 22102
(703) 286-3142

TANJA L. DARROW, ESQUIRE (pro hac vice)
LITTLER MENDELSON, P.C.
633 West 5th Street
63rd Floor
Los Angeles, California 90071
(213) 443-4300

HANTON WALTERS, ESQUIRE
SOCIETY FOR HUMAN RESOURCE MANAGEMENT (SHRM)
1800 Duke Street
Suite 500
Alexandria, Virginia 22314
(703) 535-6047

Plaintiff, Fiona Torres, in this matter.

EXAMINATION BY COUNSEL FOR THE PLAINTIFF:

BY MR. RUIZ:

Q Sir, would you please spell and -- state and spell your full name.

A My name is Jimmy Ray Link, J-I-M-M-Y R-A-Y L-I-N-K.

Q Okay. Thank you so much.

Earlier today, you provided testimony in your 30(b)(1) deposition; is that correct?

A That is correct.

Q Okay. Are you represented by counsel here today?

A I am.

Q Thank you much.

Earlier today, we discussed procedures for a deposition. Do you recall those procedures?

A I do.

Q Okay. Those same procedures still apply to this deposition. Do you need me to cover those procedures again?

A I do not.

attorney-client privileged communications.

A The answer would disclose attorney-client privilege.

Q Is there any information responsive to my question that falls outside of the instruction your attorney just provided you?

A Not of which I'm aware.

Q What did SHRM do to determine whether each of the four proposed alternatives, facilitating use of CGM, allowing breaks to check blood sugar, providing for flexible leave, and allowing insulin pump placement, water and food at the person's workstation, what did SHRM do to determine if any of those would effectively manage Ms. Torres' type 1 diabetes in the workplace?

MS. BRIDENBAUGH: I'm just gonna object to the extent the question mischaracterizes the alternative accommodations offered.

A The alternative accommodations that were provided to Ms. Torres were meant to be one of the many tools that we proposed to Ms. Torres to provide a reasonable accommodation request.

We likewise requested from Ms. Torres as part

of this interactive, iterative process for her to also provide us with alternatives that could be considered as part of this ongoing determination of what could best be served in the workplace.

Ms. Torres continued to reply that the only thing, the only tool that would be appropriate for her to reasonably to do the essential functions of the job would be the accompaniment of the service dog.

Q My question is what SHRM did to determine whether the proposed alternatives would effectively manage Ms. Torres' type 1 diabetes?

MS. BRIDENBAUGH: Objection. Mischaracterizes the document. As he has already testified, the alternative accommodations were offered to her as part of the interactive process with an expectation that she would engage with them further.

You can answer to the degree you have anything else to add?

A I have nothing else to add.

MR. RUIZ: I'm gonna go ahead and ask that we talk -- why don't we go off the record and talk.

THE COURT REPORTER: Stand by. Going off the

A Yes.
Q Okay. Would you take a moment to review the position description?
A I've seen this document before.
Q Okay. Sir, does the position description at 418 through 419 represent the full job duties and responsibilities of the Senior Specialist Product Management position for which Torres -- or Ms. Torres received a conditional offer?
A Yes.
Q Can you point out which functions in the position description SHRM contends are essential functions?
A SHRM contends all of the listed items are essential functions.
Q Earlier during your deposition your 30(b)(1) testimony, you identified, I believe, four different functions; is that correct?
A In my 30(b)(1), I identified four broad areas of responsibility, and I suggested to you in my response that those were Product Planning and Management, Data Analysis and Reporting, Learning Experience Systems, and

Conference Planning and Project Management. I did not go into the bullets that are underneath each one of those broad areas.

Q Okay. Looking at this -- at this position description, when you said that SHRM considers all of the functions to be essential, which are you referring to, sir?

A I'm referring to the category in each bullet under those categories as essential job functions.

Q Okay. I'm gonna direct your attention to products planning and management, okay. Are you considering that an essential function of the job?

A Yes.

Q What is product planning and management?

A Product planning and management in this case deals with three specific products which were offered by Linkage. SHRM Linkage is the specific entity into which Ms. Torres was offered a position as a senior specialist of product management. Those three positions you can see at the top are for the products are advancing them in latest, purposeful leadership, and inclusive leadership. And those were the three that I shared with

CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC

I, Samuel Pachon, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings were fully sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

Notary Registration No.: 00278263

My Commission Expires: 02/29/2028

Samuel Pachon

________________________________

SAMUEL PACHON, NOTARY PUBLIC

FOR THE COMMONWEALTH OF VIRGINIA

CERTIFICATE OF TRANSCRIBER

I, Jerome E. Harris, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding; that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; and that I am neither counsel for, related to, nor employed by any of the parties to the case and have no interest, financial or otherwise, in its outcome.



______________________________

JEROME E. HARRIS, STENOGRAPHER

MAY 14, 2026

V I R G I N I A:

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

ALEXANDRIA DIVISION

---------------------------x

FIONA TORRES, :

Plaintiff, :

vs. : Case No.:

SOCIETY FOR HUMAN RESOURCE : 1:25-CV-2360 (PTG/WBP)

MANAGEMENT, :

Defendant. :

---------------------------x

DEPOSITION OF JIM LINK 30(B)(6)

McLean, Virginia

Friday, June 12, 2026

9:20 a.m.

Job No.: 637566

Pages: 47 - 123

Recorded By: Samuel Pachon

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:

HECTOR F. RUIZ, ESQUIRE
ANNA KATHRYN BARRY, ESQUIRE
KALIJARVI, CHUZI, NEWMAN & FITCH, P.C.
818 Connecticut Avenue N.W., Suite 1000
Washington, DC 20006
202.331.9260

ON BEHALF OF THE DEFENDANT:

TANJA L. DARROW, ESQUIRE
LAUREN M. BRIDENBAUGH, ESQUIRE
LESLIE P. CURRIE, ESQUIRE
TIFFANY DIN FAGEL TSE, ESQUIRE
LITTLER MENDELSON, P.C.
633 West 5th Street, 63rd Floor
Los Angeles, California 90071
213.443.4300

HANTON WALTERS, ESQUIRE
SOCIETY FOR HUMAN RESOURCE MANAGEMENT
1800 Duke Street
Alexandria, Virginia 22314
703.535.6047

A I do.

Q Okay. What facts were gathered by SHRM before SHRM declined Ms. Torres's accommodation request to have her service dog with her at work?

A There were numerous facts that were obtained by SHRM. Those facts were primarily presented by Ms. Torres and has been presented as evidence in this particular case. It includes much of the email documentation which you have presented as part of this evidence pack here. And we also, at that point in time, had met in the collaborative process involving internal and external counsel, and myself in order to make the determination that the preferred accommodation request to have the service dog on site would be disallowed.

That decision was made because of the information that we received from Ms. Torres, which was inconsistent with what we knew to be the -- her -- her request at that time. She had requested to have the service dog on site with her. She had communicated to us at that time that the service dog was required to be with her 24/7, when, in

fact, according to her own testimony -- I'm sorry -- her own information presented here, that was not the case.

Q So when you're saying here, you mean Exhibit 5?

A Correct. In that case, that inconsistency and the fact that this position required travel of up to 10 percent of the time where that Ms. Torres had already reported to us, the service dog would not be accompanying her, that time amounted to 208 hours per year, assuming a 2080-hour work year cycle. In no circumstance whatsoever was it was it necessary for us to accommodate a service -- her preferred service request whenever she had already admitted to us that for at least 208 hours, assuming she traveled up to 10 percent of the time, the service dog would not be accompanying her.

In our offices, we work Tuesday, Wednesday and Thursday in the office. That is, obviously -- 24 hours a week in the office times four in a normal month, that's 96 hours. So, alone, when we look at the amount of time that Ms. Torres

would already be out of the office, we're looking at more than two months of time. It's not practical, nor did we deem it necessary for her preferred accommodation request to be met when she already was using alternative accommodation requests in her own life, whenever she found it inconvenient to have the dog with her, or unnecessary to have the dog with her for whatever reason she chose. And she reported to us already that she was utilizing her continuous glucose monitor in those situations, both when the dog was present and when the dog was not present.

Those were the facts that led to the determination to deny the preferred accommodation request, and led us on a journey to begin discussing with her alternative accommodation requests.

Q Thank you, Mr. Link. You started out by saying what she -- what Ms. Torres presented was primarily the evidence that was relied upon. Is that correct?

A It was one of many factors that we

Q Among the -- the factors that you did consider, what factors weighed against granting Ms. Torres's request for accommodation?

MS. BRIDENBAUGH: Objection asked and answered.

A There were three primary categories of consideration. Category 1 was the clear inconsistency which existed between Ms. Torres's stated need for a service dog to accompany her 24/7 and the fact that she admitted to us in writing that, in fact, she did not need the service dog 24/7. Her statements to us were contradictory. They misrepresented, according to her own things in writing, what was the lived experience she had with the service dog.

For example, she did not take the service dog with her when she traveled. She told us she would not take the service dog with her on business trips, which I've already testified would be up to 10 percent of the time that she was working in our organization. She testified that there were other circumstances where that she did not have the

service dog with her.

She stated, I need the service dog 24/7. She also stated that she did not have the service dog with her whenever she did not want the service dog with her. So at best, her statements to us misrepresented her request and could potentially just be an outright reason to compel us to make a decision to bring a service dog into the workplace, which was not necessary and certainly not a preferred accommodation.

Q You started by saying there were three.

A That was just the first part.

Q That was Category 1?

A Category 2 is related to the use of the of the continuous glucose monitor. Ms. Torres told us -- and the email is in the exhibit, Counselor, that you provided to me, Exhibit, I believe it's, Number 5.

Q Sir, what page are you referring to in Exhibit 5?

A 609 in this case, second paragraph. It begins, There are countless recurring time frames

in the workplace.

So this became a part of a personal management expectation where that if we were able to accommodate this either as a preferred request or as an alternative request for accommodation, we could meet that, but I did -- but her responses to when she would use this and how she would use this made me think that this capability that she had to use a continuous glucose monitor was certainly an alternative to her preferred request of utilizing the service dog.

And the third category was her entrenchment, her sheer entrenchment, regarding the fact that despite the things that she had told me and told us in writing about the use of the service dog, when she used it, and when she did not use it, she would accept no other alternative, and refused to further engage with us when we provided those alternative suggestions, as to why we denied her request.

Q Sir, I believe you said that she had informed SHRM of her reliance on a CGM. Is that

if it had been a reasonable accommodation request, in your view, what made this not reasonable?
A The three reasons I just shared with you. One, hugely inconsistent in what she was telling us she needed and her lived experience to the point that it misrepresented facts; number two, the use of the continuous glucose monitor as an alternative, particularly along with others. But the continuous glucose monitor; and number three, her sheer entrenchment over the fact that nothing else would work.
She maintained that she could not perform the essential duties of this position without the use of a service dog, yet, she was willing to accept a job that involved at least up to 10 percent travel, where she told us, of her own use, she would not have the service dog accompanying her. That's inconsistent -- and there's -- and that compelled me to make a decision regarding this matter in considering those three categories in our response.
Q Other than those three categories, was

p.m. The paragraph at the bottom reads, Finally, it appears that the physician's note referencing your service dog is from 2019. Can you please provide any current medical documentation that you have supporting your current need for your service dog and any exceptions to use of the service dog? Do you see that, sir?

A I do.

Q Okay. Why was an updated doctor's note requested from Ms. Torres?

A As part of the evaluative process, five years is a long time, and we wanted to have the most recent and current information as part of the proper consideration of Ms. Torres's request.

Q And Ms. Torres provided that updated note, as requested, did she not?

A She did.

Q Okay. Was there -- how did the -- sir, would you please turn to the last page of Exhibit 5? It's 000618.

A Yes, sir. I'm there.

Q Okay. Do you recognize this as the

this documentation that was provided by Ms. Torres, did you find it insufficient to support her, her requested accommodation?

A I found it inaccurate in the fact that the physician stated -- and I'm reading from the document -- It is imperative, out of medical necessity, she has her service dog at all times for her safety in light of her type one diabetes history. And it goes on. That is not the case. She herself reported to us that there are numerous circumstances where the service dog is not with her. So in this case, Counsel, it appears she's not following the advice of her own medical counselor in -- in -- at least as to what's written here and as to my interpretation.

Q Thank you sir. Sir, I want to turn your attention to Topic 13. Topic 13 is identity and roles of all individuals involved in developing, recommending, and offering the alternative accommodations presented to Ms. Torres in response to her service dog accommodation request. Do you see that, sir?

A So I heard that. Will you ask me the question once more just, now, I -- since I heard that?

Q Yes. Did anyone recommend any of the alternative accommodations to offer to Ms. Torres?

MS. BRIDENBAUGH: Same objection.

A From the group I just described to you, yes.

Q Without going into legal advice, okay, I want to know the actual accommodations that were recommended.

A I can't answer that without going into legal advice. The accommodations that were presented and were communicated in writing to her was the outcome of that collaborative process with internal counsel, external counsel, and myself. Who specifically provided which piece of information, I don't recall.

Q Did you consider -- other than what was presented to Ms. Torres, did you consider any other possible accommodations to offer her?

A What I was hoping would happen is that

when we presented those alternative accommodations to Ms. Torres, that she would have at least had the courtesy to ask us questions about those alternative accommodation requests. She didn't do that, and, instead, what she did was described to us all of the reasons that her continuous glucose monitor was not an alternative accommodation acceptable response for her.

I would have suspected and believed and have seen that whenever you talk to someone about an accommodation request, if they're actually considering it, they ask you questions. She did not. Instead, she told us every reason why something couldn't work rather than asking me any questions or proposing any other solution set to help me help her find an alternative accommodation that would be acceptable to both her and to us as the employer.

Q Thank you sir. My question was other than what was offered to her, did you consider any other accommodation?

A No, although I would have highly been

open to it.
Q In evaluating the accommodations to offer Ms. Torres was there any effort to ask -- on behalf of SHRM to ask Ms. Torres about any issues she's raised with the CGM?
A Not of which I'm aware, other than what has been produced as evidence here in writing.
Q Okay. I'm sorry. Let me make sure I understand. I want to know if SHRM asked Ms. Torres about the CGM issues that she's raised -- that she raised.
MS. BRIDENBAUGH: Objection. Vague.
A No.
Q Sir, would you turn to Topic 14, please? Topic 14 is the facts considered in proposing alternative accommodations, and -- I'm sorry -- it reads, The facts considered by those individuals in developing and proposing alternative accommodations, including the reasons why the specific accommodations were selected.
Okay. So when looking at Exhibit 5, sir, on Page 000612 -- I'm sorry; wrong page -- 000609,

the decision, do you see that, sir?

A I do.

Q Earlier, sir, when we were discussing the conditional offer, you testified that one condition was that a person could revoke or -- like, their status -- or the conditional offer could be revoked based on any action that any applicant would take or could take. Do you remember that?

A I do.

MS. BRIDENBAUGH: Objection. Mischaracterizes the testimony.

Q Did -- did SHRM revoke Ms. Torres's status based on any action that she took?

MS. BRIDENBAUGH: Objection. Vague.

A No.

Q Okay. What facts were considered with respect to SHRM's decision to rescind the conditional offer to Ms. Torres?

A All of the information that we've presented thus far in -- in this, including all these emails and other exhibits which have been presented, are facts that were considered in the

rescission of the offer. In this matter regarding the rescission specifically, it was clear that of the three factors I described to you earlier, the third one being entrenchment, meant that we were not going to be able to meet Ms. Torres's request to bring a service dog into the workplace. And despite our ongoing iterative interactive efforts to find an alternative accommodation that would work for Ms. Torres and with us, I decided to rescind the offer based on that series of facts.

There's a secondary series of facts, which I also considered in the decision to rescind the offer to Ms. Torres, and those were business reasons. First, I had an open position which had been open at this point in time for 45 days, and I had a business which needed the advice, capability, and essential functions and skills of the person who successfully came into the job. It appeared, at that -- by that point in time, that Ms. Torres was entrenched on bringing her service dog into the location, and, at that point in time, I had to make a decision as a chief human resources officer in

the organization.

Had I reached the end of the active interactive -- of the interactive, iterative process with Ms. Torres? The answer to that question is no. We told her that if anything changed, in the final document that we sent to her regarding this, we would consider those things. She submitted nothing, as was characteristic of providing anything other to us than excuses as to why the CGM wouldn't work or the demand for her service dog. I had to, at some point in time, make a business decision to move on from Ms. Torres, and I made that, and it was communicated to her by Nicole Belyna.

Q When Nicole Belyna communicated the decision to Ms. Torres, had you communicated to Ms. Belyna that SHRM was moving on from Ms. Torres?

MS. BRIDENBAUGH: Objection. Mischaracterizes the testimony.

A I communicated to Nicole that I had determined that we were going to be unable to reach a reasonable accommodation request with Ms. Torres,

and that we should rescind the offer.
Q Sir, would you please look at 000608? I'm looking at the email from Ms. Belyna on July 15th, 2004 to Ms. Fiona.
A I see it, Counsel.
Q Okay. It begins with the sentence, We received your communication. Do you see that?
A I do.
Q Okay. It -- it -- the second to the last paragraph states, Should anything change regarding potential alternative accommodations that would allow you to perform the essential functions of the role, remain -- we remain open to having those discussions. Do you see that, sir?
A I do.
Q Did SHRM, like -- did SHRM remain open to hiring Ms. Fiona at this point?
A Absolutely.
Q Okay.
A At any time in this active, iterative, iterative process, she could have accepted the offer. She could have said, yes, I'm willing to

start work on X date. She never did that.

Q But I'm trying to understand. You just told me that you had communicated to Ms. Belyna that moving on from Ms. Torres.

A But with the -- with the expectation that should anything change regarding potential alternative accommodations that would allow you to perform the essential functions of the role, we would remain open to having those discussions. What I hoped that this would generate, in addition to me being able to move on and start looking at other candidates for this particular job, is that Ms. Torres would come back and say, here are some other things that might work. She never said that. As a matter of fact, after this communication, to my knowledge, there was never another word from her under any -- of which I'm aware.

Q But the next -- in the next sentence, the offer for the job is rescinded, isn't it?

A It is.

Q Okay. Did you expect her to come back to you with -- after a conditional offer was

rescinded?

A This was a qualified capable candidate -- that's honestly hard to find in the marketplace today -- and who met the essential functions and -- her own experiences met the essential duties of the job. Why would I, as a business leader, want to re-recruit someone? I wanted to find someone with her skills, competencies, and capabilities who would -- who would come into the workplace and perform that job effectively to help my business grow. So the answer to the question is I wanted to accommodate her, but with alternative accommodations that were acceptable to both the employee and the -- potential employee and the employer.

Q Well, despite the difficulties finding qualified individuals, you did -- SHRM did rescind the job offer?

A We did.

MR. RUIZ: Okay. And thank you sir.

Can we take a five-minute break here? Yeah.

THE REPORTER: Stand by one moment,

Q So what actions were taken by SHRM in terms of further evaluating Mrs. Torres's requested accommodation for allowing her service dog at work after Ms. Torres set forth the situations under which she is unable to receive readings from her CGM in this email?

MS. BRIDENBAUGH: Objection. Mischaracterizes the document.

A SHRM used this information as part of its own internal deliberative process to determine if the reasonable accommodations -- I'm sorry -- the alternative accommodations that we had recommended would -- would be sufficient for Ms. Torres. The answer to that question, according to this email, was no. Therefore, the other items that we were seeking in Nicole's further conversations with her -- there weren't any further conversations other than the July 15th rescission of the offer. What we hoped would have happened in that process, instead of us -- telling us all the reasons why the CGM wouldn't work, is that Ms. Torres would have come back and said, these are the things that perhaps we

could do that would work other than provide the service dog on site. That never happened.

Q And --

A So we did not consider further, is the answer to your question.

Q I'm sorry. You did not consider further what, sir?

A The -- once we had heard this response from her, our belief at that point in time was that she didn't believe that anything that we had proposed, certainly as it relates to the CGM, was an acceptable alternative accommodation for her.

Q I'm sorry. When you said this response, you're referring to the email that Ms. Fiona Torres sent on July 6th, 2024?

A Correct.

Q So once this -- this response to Ms. Torres was sent on July 6th, 2024 -- I'm sorry. I'm trying to understand whether or not there was any further evaluation conducted by SHRM with respect to accommodating her original request.

MS. BRIDENBAUGH: Objection. Vague.

A This was an active -- this was active until it wasn't. And so, during this entire process, we are thinking, right, about what the things are that we need to do and hopeful that she's going to respond to us, and that did not happen.

Q And, Mr. Link, when -- when you -- you received this email as part of the evaluation process, is that correct? And when I say this email, I'm talking about the email Ms. Torres sent on July 6th, 2024.

A Yes.

Q Okay. Like, when you received this email, when it was forwarded to you, sir, like -- like, were there further discussions as to whether or not the accommodations that had been presented to her were actually appropriate?

A Earlier today, in my testimony, I told you of three meetings. The next one after we received this was the third. So as part of that group of people that we're describing, internal counsel, external counsel, and myself, there were

further deliberations after we received this.
Q Okay. And, sir, how did you view the information that Ms. Torres provided to Ms. Belyna on July 6th, 2024, with respect to the time frames where her CGM is unable to provide readings?
A I viewed it as another thing we needed to consider as part of this active interactive -- active iterative process to try to find a reasonable accommodation for Ms. Torres.
Q Sir, did you view this, her providing this information, as a reason why the alternative accommodations that were offered to her on July 3rd would not be effective?
MS. BRIDENBAUGH: Objection. Form.
A Not necessarily. Ms. Torres had already told us that she utilized the CGM as part of her management of her diabetic condition. The fact that one of the tools which she herself told us that she was utilizing as part of that process seemed to be insufficient, in her opinion, in -- was another piece of information that if she believed it to be insufficient, then we needed to, as part of that

alternative accommodation process, try to help her make it as efficient as it could be by considering where she would sit in the organization, by reading the -- the -- giving her the alternative accommodations to check it in the -- in the wellness room, to be available to take more time to work with her physicians, or her on break times to do the things that she needed to do. It was just a normal part of the iterative process to try and reach an accommodation. So from that perspective, sir, it was another piece of information we considered.

MR. RUIZ: Okay. All right. Thank you very much. Those are the questions I have for you today.

MS. BRIDENBAUGH: Can we take a ten-minute break --

MR. RUIZ: Sure.

MS. BRIDENBAUGH: -- to make sure if I have any questions?

MR. RUIZ: Yeah.

MS. BRIDENBAUGH: Thank you.

THE REPORTER: Stand by, Counsel. Going

Q What did you think about the CGM issues Ms. Torres raised in her July 6th, 2024, email in the context of the other information Ms. Torres provided to SHRM as to her accommodation request for her service dog?

A I thought that her response to us was not an active attempt to engage in the act -- in the iterative interactive process, simply because she gave us excuses and reasons as to why the CGM tool, which she herself had told us, as reflected in her physician's statements as well, was part of the -- of -- of her monitoring of her -- of her diabetic condition.

Q Uh-huh.

A The fact that she presented the CGM as being potentially problematic, yet she was willing to travel up to 10 percent of the time, attend these large events without the dog was meant, to me, that other -- it was concerning that those things were not congruent in my mind and provided more consistency in both the rationale and the reason to not accommodate the dog, but also what we

could possibly help her do to find an acceptable alternative accommodation in our workplace.

MS. BRIDENBAUGH: I have no other questions.

RE-EXAMINATION BY COUNSEL FOR THE PLAINTIFF

BY MR. RUIZ:

Q Mr. Link, one of the questions you were asked was -- or -- was about the workplace structure in terms of, like, the in-office requirements.

A Yes, sir.

Q Sir, would you please turn to Exhibit 4, which includes the -- the positions. And I want you to turn to SHRM_Torres000418. In summary, it reads, At Linkage, a SHRM company, our goal is to change the face of leadership and make a positive impact on the world. Do you see that, sir?

A I do.

Q Sir, do you know if the other team members at Linkage were held to that in-office three-day requirement?

MS. BRIDENBAUGH: Objection. Vague.

CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC

I, Samuel Pachon, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings were fully sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

Notary Registration No.: 00278263
My Commission Expires: 02/29/2028

Samuel Pachon
________________________________
SAMUEL PACHON, NOTARY PUBLIC
FOR THE COMMONWEALTH OF VIRGINIA
May 18, 2026

CERTIFICATE OF TRANSCRIBER

I, Karen M. Galvez, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding; that said proceedings were reduced to typewriting under my supervision; that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; and that I am neither counsel for, related to, nor employed by any of the parties to the case and have no interest, financial or otherwise, in its outcome.



______________________________

KAREN M. GALVEZ

PLANET DEPOS, LLC

June 18, 2026