**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| FIONA TORRES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SOCIETY FOR HUMAN RESOURCE MANAGEMENT, | ) | 1:25-cv-2360 (PTG/WBP) |
| | ) | |
| Agency. | ) | |
| | ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

The Society for Human Resource Management (SHRM) knew from her resume that Ms. Torres had Type 1 Diabetes; it interviewed her across five interviewers, selected her for the position, extended an offer, and set a start date. Pl. SOF ¶¶ 1–2, 34–42. The single event that intervened between the June 3 offer and its rescission six weeks later was Ms. Torres's request to keep her trained diabetic-alert dog, Meechum, with her while working in SHRM's Alexandria office. Pl. SOF ¶¶ 2, 9, 43. On this record, whether her disability and her need for accommodation drove the rescission is a question for the jury, not a matter for judgment as a matter of law.

SHRM's decisionmaker, Chief Human Resources Officer Jim Link, testified that Ms. Torres was "a qualified capable candidate" who "met all of the criteria" and whose "own experiences met the essential duties of the job"; that SHRM "did not determine that Ms. Torres was unable to perform all essential functions"; that Dr. Joshi's letter "supported [the] argument that [the service dog] was a necessary accommodation"; and that "there was no reason that

SHRM could not have accommodated" the request. Pl. SOF ¶¶ 78, 87, 112–113. SHRM conducted no undue-hardship analysis of any kind, and the only "hardship" Mr. Link could identify was the novelty of the request itself. Pl. SOF ¶¶ 81–85. Two undisputed premises therefore frame this motion — the service dog was reasonable on its face, and SHRM never carried, and affirmatively disclaimed, undue hardship, the statute's only affirmative defense — and against that backdrop each contested element of both claims is genuinely disputed and for the jury.

## II. STATEMENT OF GENUINE ISSUES NECESSARY TO BE TRIED

Viewing the record in the light most favorable to Ms. Torres, the following genuine issues — detailed in Plaintiff's Statement of Facts (Ex. 1, incorporated herein) and in Plaintiff's Response to Defendant's Statement of Undisputed Material Facts ("Def. SUMF") (*infra* Part III) — preclude summary judgment. E.D. Va. Local R. 56.

### A. The Failure-to-Accommodate Claims (Counts II and IV).

**1. Whether the service dog was necessary for Ms. Torres to perform her job three days per week, eight hours per day.** SHRM infers non-necessity from occasions when Ms. Torres was without the dog, Def. SUMF ¶¶ 13–17; Def. Mem. at 16–18, and contends her continuous glucose monitor (CGM) and other offered measures render the dog unnecessary, Def. SUMF ¶¶ 12, 35–36; Def's Mem. in Support of Def's Mot. for Summ. J., ECF No. 76 ("Def. Mem."), at 16–19. The record is otherwise: Ms. Torres has relied on the dog and CGM together since 2017 with her physicians' support, Pl. SOF ¶¶ 11–12, 17–24, 22, 49, 62, 64, 102, and both her mother's testimony and the record show the dog alerts to rapid glucose drops earlier than the CGM and during the recurring windows when the CGM fails, Pl. SOF ¶¶ 17, 20, 23–24, 101–02.

**2. Whether the four measures SHRM offered as alternate accommodations were effective.** SHRM offered four measures after rejecting the dog — facilitating CGM use, breaks to check blood sugar, a flexible open-leave program, and use of her insulin pump with food or drink at her workstation — and casts them as reasonable alternatives she refused. Def. SUMF ¶¶ 36, 38; Def. Mem. at 18–19, 21–22; Pl. SOF ¶ 94. But SHRM admits each was already available to every employee without any accommodation, Pl. SOF ¶¶ 95–99, and none supplies the early-alert function the dog provides, Pl. SOF ¶¶ 23–24, 101–02. Whether these substitutes were effective is disputed.

**3. What weight should be accorded to the treating physicians' opinions.** SHRM received two physician communications recommending reliance on both the dog and the CGM to manage Ms. Torres's Type 1 diabetes, Pl. SOF ¶¶ 49, 62, 64; Def. SUMF ¶¶ 24, 33, but contends the letters are insufficient and inconsistent, Def. Mem. at 18–20. SHRM's decisionmaker acknowledged Dr. Joshi's letter supported the dog's medical necessity, then deemed it "inaccurate" on his own lay reading, having consulted no physician or other medical professional. Pl. SOF ¶¶ 65–69, 78–79. The weight due to that medical support is disputed.

**4. Which party caused the breakdown of the interactive process.** SHRM rescinded the offer by email on July 15, 2024, Def. SUMF ¶ 41, and attributes the breakdown to Ms. Torres's asserted refusal of its alternatives, Def. Mem. at 20–22; Def. SUMF ¶¶ 38, 40. The record supports the opposite inference: SHRM handled the request outside its normal accommodation process, Pl. SOF ¶ 75, declared the dog unnecessary "based on the existing documentation" before seeking further information, *id.* ¶ 55, assembled a "fact file" on the selection process and other candidates and discussed re-sourcing the role while the request was pending, *id.* ¶¶ 71, 80,

and rescinded without engaging Ms. Torres's July 6 explanation of why the alternatives were ineffective, *id.* ¶¶ 103–05, 109.

**B. The Disability-Discrimination and Rescission Claims (Counts I and III).**

**1. Whether the rescission was based on Ms. Torres's need for the accommodation.** SHRM now asserts disability-neutral, legitimate reasons for the rescission, Def. SUMF ¶ 40; Def. Mem. at 26–28, that differ from those in its EEOC Position Paper, Pl. SOF ¶ 89, and from those in the rescission email and the decisionmaker's own account, Pl. SOF ¶¶ 78, 87, 109–10, both of which tie the decision directly to the service-dog request. The accommodation request was the only event between the offer and its rescission. Pl. SOF ¶¶ 44, 110–11.

**2. Whether Ms. Torres was a qualified individual.** SHRM now contends Ms. Torres was not qualified — because she rejected "alternative" accommodations and because private messages uncovered in discovery amount to disqualifying misconduct. Def. Mem. at 24–25. But its decisionmaker admitted she was "a qualified capable candidate" who "met all of the criteria" and that SHRM never determined she could not perform the essential functions, Pl. SOF ¶¶ 112–13, that he had no knowledge of the messages when he decided, and that the Code of Conduct does not apply to applicants. Pl. SOF ¶¶ 114–15.

**3. The materiality of the after-acquired private messages.** SHRM invokes private messages to friends and an acquaintance, obtained in discovery, as Code-of-Conduct violations disqualifying Ms. Torres. Def. SUMF ¶¶ 27, 31, 34, 37, 43; Def. Mem. at 24–25. It concedes the decisionmaker never saw the messages when he made the decisions at issue, Def. SUMF ¶ 43, that the rescission "was not based on any conduct of Ms. Torres," Pl. SOF ¶ 114, that the Code does not apply to applicants, Pl. SOF ¶ 115, and that he is unaware of any circumstance under

which a person has been disciplined for behavior exhibited before they were an employee, *id.*. Whether the messages are material is disputed.

**4. Whether SHRM's multiple, conflicting reasons for the rescission would permit the jury to find the decisionmaker not credible or the decision pretextual.** SHRM's litigation explanation differs from the categorical "not job related" position it gave the EEOC, Def. Mem. at 27–28; Def. SUMF ¶ 40; Pl. SOF ¶ 89, and both differ from the decisionmaker's testimony that the dog "was a necessary accommodation" and that there was "no reason that SHRM could not have accommodated" the request, Pl. SOF ¶¶ 78, 87. The prejudgment sequence and the lay override of the treating physician are also probative. Pl. SOF ¶¶ 55, 71, 78–80.

Each of these disputes is material, and the record would permit a reasonable jury to resolve them in Ms. Torres's favor. Summary judgment is therefore inappropriate.

## III. DISPUTES OF DEFENDANT'S STATEMENT OF MATERIAL FACTS

Plaintiff's Statement of Facts Disputed and Undisputed are attached as Exhibit, are referenced below as "Pl. SOF ¶ __", and are incorporated fully herein. Plaintiff does not dispute the following statements of fact in Defendant's Statement of Undisputed Material Facts (MSJ at 2-14): Paragraphs 1, 2, 6, 9, 13, 14, 18, 20, 26, 28.

**<u>Plaintiff disputes the following facts as stated in Defendant's Statement of Undisputed Material Facts (Def. Mem. at 2-14):</u>**

> ¶ 3 **–** SHRM's Code of Conduct requires all employees to "[t]reat everyone with respect, dignity, fairness and mutual consideration[,]" [r]efrain from . . . derogatory comments, or or intimidating others[,]" and to comply with its EEO Policy as well as all applicable laws and regulations. Ex. 2 at SHRM_Torres 98-100.

**PLAINTIFF: Disputed as incomplete and not material.** Plaintiff's disputes are incorporated in Pl. SOF ¶ 115: SHRM's Code of Conduct does not apply to people who are not yet employees.

Pl. SOF ¶ 115. Jim Link is not aware of any circumstance under which a person has been disciplined for behavior that was exhibited before they were employees. Pl. SOF ¶ 115.

> ¶ 4 – If, in relevant part, a job candidate indicates a need for a reasonable accommodation based on a disability, the candidate is referred to SHRM's Human Resources ("HR") Department, who works with the candidate to identify a reasonable accommodation(s). **Ex. 3:** Recruitment and Selection Policy. SHRM also maintains a Procedure for Requesting an Accommodation, which sets forth the general processes SHRM follows when an employee or applicant requests an accommodation based on a purported disability. **Ex. 4:** Procedure for Requesting an Accommodation; *see also* **Ex. 5:** ADA Reasonable Accommodation Request Form.

**PLAINTIFF: Disputed in part and as not material and incomplete.** Plaintiff's disputes are incorporated in Pl. SOF ¶¶ 73–76. SHRM did not follow its standard practices and procedures for Ms. Torres's accommodation request. Pl. SOF ¶ 75.

> ¶ 5 – A member of SHRM's HR Department, Sheri Martel, generally is the first point of contact for employees requesting an accommodation. **Ex. 6:** Deposition of Jimmy Ray Link ("Link Tr.") 43:5-45:6. If an accommodation request is easily handled, Ms. Martel manages the accommodation process. *Id.* at 46:5-8. If the accommodation request is something that SHRM does not have experience with or elicits further questions, HR involves Jim Link, SHRM's Chief Human Resources Officer ("CHRO"), and consults with legal counsel. *Id.* at 46:9-12, 133:1-10.

**PLAINTIFF: Disputed in part and not material and incomplete.** Plaintiff's disputes are incorporated in Pl. SOF ¶¶ 73–75: SHRM did not follow its standard practices and procedures for Ms. Torres's accommodation request. Pl. SOF ¶¶ 73–76.

> ¶ 7 – In May 2017, Ms. Torres obtained a dog that had purportedly been trained as a diabetic alert dog ("DAD"). Compl. ¶ 22, Dkt. No. 1; SUF ¶ 3. No healthcare provider prescribed or recommended that Ms. Torres obtain a DAD. Torres Tr. 144:13-18.

**PLAINTIFF: Disputed as misleading and incomplete.** Ms. Torres's DAD is certified. Pl. SOF ¶¶ 13–14. This certification was provided to SHRM as part of Ms. Torres's request for accommodation. Pl. SOF ¶¶ 13–14, 48–50. Two of Ms. Torres's doctors recommended she have the service dog with her at all times, and a third has confirmed that the service dog is an appropriate medical accommodation. Pl. SOF ¶¶ 15, 50, 65.

> ¶ 8 – On October 26, 2017, Ms. Torres "did not eat dinner after taking insulin and forgot to check her blood sugar before driving which she is supposed to do." **Ex. 8:** Inova Loudoun Hospital Oct. 26, 2017 Inpatient Record at SHRM_Torres 2060; *see also* **Ex. 9:** VA Endocrinology Nov. 20, 2017 Note at Confidential Torres 688 ("Did not have test strips on her and drove on October 24th [sic], got into a MVA."). Ms. Torres had her dog at the time of the accident. Torres Tr. 102:2-8, 167:14-16.

**PLAINTIFF: Disputed as incomplete.** Plaintiff's disputes are incorporated into Pl. SOF ¶ 10.

> ¶ 10 – A CGM monitors an individual's blood glucose levels on a continuous basis which Ms. Torres can review at any point on her cell phone. *Id.* at 119:4-8. Ms. Torres can also set the application to alert her if her glucose levels become too high, too low, ultra-high, ultra-low, and other categories. **Ex. 10:** Deposition of Silpa P.K. Joshi ("Joshi Tr.") 57:10-20; Ex. 11: Northern Virginia Endocrinologists Records at SHRM_Torres 1447, 1450. However, Ms. Torres's Dexcom phone application settings between October 2023 and November 2024 were not set to alert her except if her blood sugar was "urgent[ly] low" during daytime hours. *See* **Ex. 11.**

**PLAINTIFF: Disputed in part and as incomplete.** Plaintiff's disputes are incorporated into Pl. SOF ¶¶ 16–24. Additionally, Defendant's statement of fact mischaracterizes the document cited as Defendant's Exhibit 11. Defendant's Exhibit 11 does not support the assertion therein; Defendant's Exhibit 11 shows Ms. Torres's Dexcom phone application settings only for two fourteen-day time periods: October 4 through October 17, 2023 and October 23 through November 5, 2024. *Id.* at 1450, 1447.

> ¶ 11 – Ms. Torres's CGM also communicates with her Omnipod insulin pump to allow the pump to deliver insulin based on blood sugar changes detected by the CGM. Torres Tr. 120:3-5; Joshi Tr. 53:5-15. If Ms. Torres feels that her CGM is not giving her a reliable reading, she can also manually check her glucose levels by doing a finger prick test using her blood glucose meter. Torres 113:14-114:21.

**PLAINTIFF: Disputed in part and as incomplete.** Plaintiff's disputes are incorporated into Pl. SOF ¶¶ 17, 20, 21, 59: When Ms. Torres's CGM is delayed or inaccurate in providing glucose readings, Ms. Torres relies on her service dog's alerts to monitor her glucose. Pl. SOF ¶ 29; Torres Dep. 140:8-141:5 (testifying that she knows her CGM is delayed when her dog alerts her

before her CGM does and that determining whether her CGM makes an error without her dog is difficult), *id.* at 105:12-107:13.

> ¶ 12 – Ms. Torres has not been hospitalized, lost consciousness, or been in a car accident since she began using her CGM after the 2017 car accident. *Id.* at 103:8-12, 152:16-19, 168:18-20; Joshi Tr. 83:14-17, 101:2-6, 102:4-18, 138:4-139:13. Indeed, her diabetes is "very well controlled" and her check-ups with her endocrinologist are "not to say boring, but more standard[.]" Joshi Tr. 75:22-78:3, 95:21-96:14, 114:3-14 ("Fiona was truthfully a very – not to say straightforward patient, but, I mean, a lot of it was just routine management, which is why I only saw her every six months.").

**PLAINTIFF: Disputed in part.** Defendant's statement of fact mischaracterizes Dr. Joshi's testimony. When Dr. Joshi testified that Ms. Torres's diabetes is "very well controlled," she was referring to there not being a need for more frequent appointments to make big changes to Ms. Torres's regimen. Joshi Dep. 76:13–77:16. Dr. Joshi testified that more frequent appointments are typically for patients who need to make big changes to their regimen and those who are newly diagnosed. *Id.*

> ¶ 15 – Ms. Torres has also at least considered not bringing her dog with her to therapy sessions because "[h]e is reactive to certain sounds, but if he can't keep it together I may not bring him." **Ex. 15**: Behavioral Health and Wellness Associates of Northern Virginia Feb. 7, 2025 Note at SHRM_Torres 1170.

**PLAINTIFF: Disputed as incomplete.** Defendant's statement of fact omits part of Ms. Torres'statement in Defendant's Exhibit 15. Ms. Torres's complete statement is: "I have a medical alert dog that will be with me most sessions. He is reactive to certain sounds, but if he can't keep it together I may not bring him." ECF No. 76-15 (Defendant's Exhibit 15) at SHRM_Torres_1170.

> ¶ 16 – Between 2021 and 2025, Ms. Torres has traveled to Europe four times, for nine to eleven days at a time, without her dog. Torres Tr. 182:9-183:1, 185:19-186:17, 190:4-13, 192:422. Ms. Torres has also traveled to Las Vegas for four days without her dog while working for a prior employer. *Id.* at 194:8-195:18.

**PLAINTIFF: Disputed as incomplete.** Plaintiff's disputes are incorporated in Pl. SOF ¶¶ 92, 93.

> ¶ 17 – When she is without her dog, Ms. Torres checks her CGM and pays attention to how her body feels. *Id*. at 184:11-16, 188:7-9, 191:9-13, 194:3-196:3, 203:5-205:3, 206:9-207:17, 210:16-227:11. She has not lost consciousness or been hospitalized when she has been without her dog in any of these circumstances. *See* SUMF ¶ 12, *supra*.

**PLAINTIFF: Disputed as incomplete and misleading.** Whether she is with or without her dog, Ms. Torres checks her CGM and pays attention to how her body feels. Pl. SOF ¶¶ 11–12 (Since obtaining the CGM in December 2017, Ms. Torres's treatment plan includes her service dog, CGM, and insulin pump); *see* Pl. SOF ¶ 20 (Ms. Torres testifying that she can "sometimes feel symptoms," but it is difficult to determine whether her CGM makes an error without her dog, Torres Dep. 138:9–141:12). Without the dog she is without the early alert system her doctor believes is important to her managing her diabetes. Pl. SOF ¶¶ 11–12, 20; ¶¶ 21–22 (Dr. Joshi recommends the service dog to lower the risk of something severe happening if the CGM fails); ¶ 64 (Dr. Joshi stating that "it is imperative out of medical necessity that she has her service dog at all times").

> ¶ 19 – The Senior Specialist position would be responsible for "supporting the product team" through data analysis, processes and tracking, project management, and conference planning. **Ex. 16** at SHRM_Torres 418-419; Link Tr. 219:7-220:14; **Ex. 17**: Deposition of Jim Link, Corporate Designee ("Corporate Tr.") 33:5-34:9. The position required travel up to 10% of the time. Ex. 16 at SHRM_Torres 418-419; Corporate Tr. 73:6-17.

**PLAINTIFF: Disputed in part.** The position required occasional travel 0-10% of the time. ECF No. 76-16 (Defendant's Exhibit 16) at SHRM_Torres 418–419; Pl. SOF ¶ 33.

> ¶ 21 – Between April 24 and May 31, 2024, Ms. Torres interviewed for the position with various SHRM officials. SUF ¶¶ 7-8; Torres Tr. 231:13-233:11. Following these interviews, SHRM decided to extend a conditional offer of employment to Ms. Torres on June 3, 2024, which was approved by various HR and business officials, including CHRO Mr. Link. Ex. 16; **Ex. 18**: Job Offer Approval Emails.

**PLAINTIFF: Disputed as incomplete.** Plaintiff's disputes are incorporated in Pl. SOF ¶ 38 n.1.

> ¶ 22 – That same day, Deborah Zoerkler, Senior Specialist, Talent Acquisition, verbally extended the conditional offer of employment to Ms. Torres, which Ms. Torres accepted. SUF ¶ 11; Torres Tr. 235:5-21. During their phone call, Ms. Torres advised Ms. Zoerkler she was requesting an accommodation to have her dog with her when working at SHRM's office in Virginia. SUF ¶ 12, Torres Tr. 236:11-14. At this time, Ms. Torres advised Ms. Zoerkler that she did not intend to bring her dog with her on her first day of work at SHRM's office. Ex. 19: June 16 to July 15, 2024 Emails at SHRM_Torres 613 ("When I spoke with Debbie [Zoerkler] on the phone, I mentioned I may not bring my service dog on the first day at the SHRM office . . . ."). Ms. Torres reiterated this point in subsequent communications with SHRM. *See id.*

**PLAINTIFF: Disputed in part and as incomplete.** Defendant's statement of fact mischaracterizes the document cited as Defendant's Exhibit 19. Ms. Torres did not state that she "did not intend to bring her dog with her on her first day of work at SHRM's office." In fact, Ms. Torres informed Ms. Zoerkler that she "*may* not bring [her] service dog on the first day at the SHRM office to ensure [she] could better evaluate the seating layout to ensure [she] was better prepared for what [she would need] to bring for his set up." ECF No. 76-19 (Defendant's Exhibit 19) at SHRM_Torres_613 (emphasis added). Moreover, Ms. Torres did not "reiterate this point in subsequent communications with SHRM," as Defendant states. Alternatively, she verbally stated this to Ms. Zoerkler once and, in the document cited by Defendant as Exhibit 19, Ms. Torres informed Ms. Belyna that she had previously stated this to Ms. Zoerkler. *Id.*

> ¶ 23 – Since Ms. Zoerkler did not process accommodation requests, she notified her supervisor, Nicole Belyna, of Ms. Torres's request. SUF ¶¶ 13-14; Ex. 20: Deposition of Deborah Zoerkler ("Zoerkler Tr.") 15:13-18. Since Ms. Belyna also did not process accommodation requests, she notified her supervisor, Mr. Link, of Ms. Torres's request. SUF ¶¶ 15-16; Ex. 21: Deposition of Nicole Belyna ("Belyna Tr.") 162:5-12, 163:6-15. In a later phone call the same day, Ms. Belyna informed Mr. Link that Ms. Torres's accommodation request specifically related to bringing a dog to the office. Link Tr. 157:3-5. As Ms. Torres's request was the only request to bring a dog to work that SHRM had encountered and the only request for accommodation by an applicant that SHRM had experienced, Mr. Link determined "[t]hose two unique circumstances alone required us to be acutely aware of our duty to ensure that we handled this particular accommodation request appropriately[,]" and subsequently engaged with legal counsel to ensure that it was. *Id.* at 76:4-11, 93:8-16.

**PLAINTIFF: Disputed as incomplete.** Plaintiff's disputes are incorporated in Pl. SOF ¶ 74 (Other than Ms. Torres's request, Mr. Link had only ever been involved in one other accommodation request); ¶ 75 (SHRM did not follow its standard procedures for Ms. Torres's request); ¶¶ 72–73, 76 (Although Sheri Martel was SHRM's point of contact for employee accommodation requests, she was not consulted by Mr. Link regarding Ms. Torres's request); *see* ¶ 70–71, 77–79.

> ¶ 24 – On June 4, 2024, Ms. Torres emailed Ms. Zoerkler a note, stating it was from her doctor, Dr. Armellini, along with a one-sentence explanation of what she used her dog for. **Ex. 22**: June 4, 2024, Email 1. The note was dated November 6, 2019, and stated that Ms. Torres's dog "has been of help to alert the owner of low or high glucose readings . . . ." *Id.* at SHRM_Torres 1029. Ms. Torres previously obtained the note from Dr. Armellini for the purpose of bringing her dog to a church for her choir's rehearsals. Torres Tr. 246:17-247:9.

**PLAINTIFF: Disputed as incomplete.** Dr. Armellini's letter states, in full: "To Whom It May Concern: This letter is on behalf of patient Fiona Torres, [DOB] who allowed me to disclose part of her medical information for the purpose of the letter. She has been diagnosed with DMT1 and is currently on insulin pump and a continuous glucose monitor. She also has a service dog, which has been of help to alert the owner of low or high glucose readings in the event this could be life threatening for the patient. I recommended that she bring the service dog with her at all times." ECF No. 76–22 (Defendant's Exhibit 22) at SHRM_Torres_1029.

> ¶ 25 – Later that same day, and after speaking with Mr. Link and SHRM's in-house counsel, Ms. Belyna spoke with Ms. Torres to obtain additional information about her accommodation request. *Id.* at 254:21-255:2; Belyna Tr. 167:10-22. During their call, Ms. Belyna asked Ms. Torres for more information on how her dog assisted her, if there were any financial needs the dog may have, and if she would be able to fulfill the travel requirement for the role. Torres Tr. 238:18-240:2; Belyna Tr. 168:1-13. Ms. Torres stated that she could fulfill the role's travel requirement and shared that she did not plan to bring her dog with her when traveling for SHRM business. *Id.*

**PLAINTIFF: Disputed.** Defendant's statement of fact mischaracterizes the cited testimony of both Ms. Belyna and Ms. Torres. In fact, Ms. Belyna's testimony recounts the phone call as

follows: "I had asked her, you know, I had shared that there was, you know, some travel required for the role. Would she be able to fulfill the travel requirement." Belyna Dep. 168:4–8. Ms. Belyna testified that Ms. Torres responded: "[S]he could. She shared that she *doesn't always* bring the dog with her when she travels." *Id.* at 168:10–13 (emphasis added). The testimony cited by Defendant from Ms. Torres's deposition does not address whether Ms. Torres "plan[ned] to bring her dog with her when traveling for SHRM business." Torres Dep. 238:18–240:2. In fact, the cited portion of Ms. Torres's testimony relating to SHRM business travel only pertains to Ms. Belyna asking her if there were any "monetary needs that [the dog] would need in order for him to come along with [Ms. Torres] for something work related," to which Ms. Torres responded that there were not. Torres Dep. 239:6–12. None of the testimony cited by Defendant supports Defendant's assertion that "Ms. Torres…shared that she did not plan to bring her dog with her when traveling for SHRM business." *See* Def. SUMF ¶ 25.

> ¶ 27 – In the meantime, despite not yet hearing SHRM's initial decision regarding her accommodation request, Ms. Torres advised an acquaintance on June 16, "my job offer from SHRM. [T]hey're basically just being twats about [her dog]." **Ex. 24:** Message with C. Perna.

**PLAINTIFF:** ***Objection:*** The fact is immaterial and irrelevant to the claims or defenses at issue in this action. Plaintiff's private text messages, which Defendant admits it had no knowledge of at the time it denied her requested accommodation and rescinded her job offer, *supra* Part II(A)(7), have no bearing on the elements of a failure to accommodate or disability discrimination claim. It does not tend to prove or disprove any material element of the pending motion. Moreover, to the extent that Defendant seeks to use Def. SUMF ¶ 25 for the purpose of determining liability under the ADA or VHRA, it is inadmissible in evidence under Fed. R. Evid. 401 and 402, or, in the alternative, unduly prejudicial under Fed. R. Evid. 403. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (holding that a party may object to the use of

evidence at summary judgment if that evidence would likely not be admissible in evidence at trial); *Sakaria v. Trans World Airlines*, F.3d 164, 171 (4th Cir. 1993).

> ¶ 29 – On June 17, Ms. Belyna advised Ms. Torres of SHRM's decision to deny her request for accommodation. Ex. 19 at SHRM_Torres 615. Ms. Belyna informed Ms. Torres that SHRM would consider any additional information Ms. Torres believed would be relevant. *Id*. In response, Ms. Torres described prior instances between 2014 and 2017 when she lost consciousness or had a car accident due to hypoglycemic episodes and further stated she had one episode since obtaining her dog that required the assistance of medics. *Id*. at SHRM_Torres 614-615.

**PLAINTIFF: Disputed as incomplete.** Plaintiff's disputes are incorporated in Pl. SOF ¶¶ 53–59.

> ¶ 30 – Ms. Belyna then asked Ms. Torres for additional information, including whether she used her dog personally and professionally, and if there were circumstances where Ms. Torres did not have her dog with her. *Id*. at SHRM_Torres 613-614. Ms. Belyna also asked Ms. Torres to provide current medical documentation. *Id*.; Corporate Tr. 89:9-14.

**PLAINTIFF: Disputed as incomplete.** Plaintiff's disputes are incorporated in Pl. SOF ¶¶ 60–64.

> ¶ 31 – Contemporaneous to her email exchange with Ms. Belyna on June 17, Ms. Torres exchanged messages with a friend stating, in reference to Ms. Belyna: "I genuinely hope her child or grandchild gets type 1 [diabetes] [s]o she can see what the fuck it is like[.]" **Ex. 25**: Messages with J. Cabrera. After receiving Ms. Belyna's response requesting an updated medical note and additional information from Ms. Torres, Ms. Torres said in reference to Ms. Belyna: "[l]ike please just kill yourself." *Id*. at Torres 280.

**PLAINTIFF: *Objection:*** The fact is immaterial and irrelevant to the claims or defenses at issue in this action. Plaintiff's private text messages, which Defendant admits it had no knowledge of at the time it denied her requested accommodation and rescinded her job offer, *supra* Part II(A)(7), have no bearing on the elements of a failure to accommodate or disability discrimination claim. It does not tend to prove or disprove any material element of the pending motion. Moreover, to the extent that Defendant seeks to use Def. SUMF ¶ 25 for the purpose of determining liability under the ADA or VHRA, it is inadmissible in evidence under Fed. R. Evid.

401 and 402, or, in the alternative, unduly prejudicial under Fed. R. Evid. 403. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252 (1986) (holding that a party may object to the use of evidence at summary judgment if that evidence would likely not be admissible in evidence at trial); *Sakaria v. Trans World Airlines*, F.3d 164, 171 (4th Cir. 1993).

> ¶ 32 – In response to Ms. Belyna's email, on June 19, Ms. Torres stated she "rel[ies] on [her] medical alert dog at all times (24/7)." Ex. 19 at SHRM_Torres 612. However, Ms. Torres then explained she goes without her dog when he is being groomed, when she "feel[s] an environment is physically unsafe for him to be in, such as an extremely loud environment," reiterated she would not bring her dog the first day at the SHRM office and volunteered that at her prior employer, she would be without her dog if she were in a long meeting or attending loud or crowded work events. *Id*. at SHRM_Torres 612-613.

**PLAINTIFF: Disputed in part as incomplete.** Defendant's statement of fact mischaracterizes the document cited as Defendant's Exhibit 19. Ms. Torres did not state that she "did not intend to bring her dog with her on her first day of work at SHRM's office." In fact, Ms. Torres's email to Ms. Belyna states that Ms. Torres informed Ms. Zoerkler that she "*may* not bring [her] service dog on the first day at the SHRM office to ensure [she] could better evaluate the seating layout to ensure [she] was better prepared for what [she would need] to bring for his set up." ECF No. 76-19 (Defendant's Exhibit 19) at SHRM_Torres_613 (emphasis added). Plaintiff's additional disputes are incorporated in Pl. SOF ¶¶ 61, 93.

> ¶ 33 – The same day, Ms. Torres messaged her endocrinologist, Silpa P.K. Joshi, MD, to request a note regarding her dog and requested that Dr. Joshi include specific language in the note. **Ex. 26**: June 19 Portal Messages. Dr. Joshi wrote the note without evaluating the necessity of Ms. Torres's dog and wrote it based exclusively on the information Ms. Torres provided in her message that day. Joshi Tr. 73:5-74:21, 121:7-122:4, 137:9-16, 145:21-146:2, 147:14-148:8. Indeed, Dr. Joshi never recommended Ms. Torres obtain a DAD. *Id.* at 158:7-11. Ms. Torres transmitted Dr. Joshi's note to SHRM. Ex. 19 at SHRM_Torres 610-611, 617.

**PLAINTIFF: Disputed.** Defendant's statement of fact mischaracterizes the document cited as Defendant's Exhibit 26. Ms. Torres did not "request[] that Dr. Joshi include specific language in the note." In fact, Ms. Torres requested that Dr. Joshi "write a letter specifying the medical

necessity of my service dog at all times (24/7)." ECF No. 76–26. Ms. Torres did not instruct Dr. Joshi on what "specific language" to include. *Id.* Moreover, Dr. Joshi testified that she formulated the wording of her letter herself. Joshi Dep. 151:10–17. Dr. Joshi did not "[write] the note without evaluating the necessity of Ms. Torres's dog." Joshi Dep. 139:18–148:8, 149:15–150:17, 151:18–153:13.

> ¶ 34 – Also on June 19, Ms. Torres messaged a friend and referred to Ms. Belyna as "the stupid SHRM bitch . . . hopefully I can shut her the fuck up once I send this 'updated' letter." **Ex. 27**: June 19 Messages with P. Anderson; Torres Tr. 320:2-321:5. She also exchanged messages with another friend and referred to SHRM as the "anti service dog twats . . . ." **Ex. 28**: June 19 Messages with E. Broetzmann at Torres 214; Torres Tr. 300:21-301:7.

**PLAINTIFF:** ***Objection:*** The fact is immaterial and irrelevant to the claims or defenses at issue in this action. Plaintiff's private text messages, which Defendant admits it had no knowledge of at the time it denied her requested accommodation and rescinded her job offer, *supra* Part II(A)(7), have no bearing on the elements of a failure to accommodate or disability discrimination claim. It does not tend to prove or disprove any material element of the pending motion. Moreover, to the extent that Defendant seeks to use Def. SUMF ¶ 25 for the purpose of determining liability under the ADA or VHRA, it is inadmissible in evidence under Fed. R. Evid. 401 and 402, or, in the alternative, unduly prejudicial under Fed. R. Evid. 403. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252 (1986) (holding that a party may object to the use of evidence at summary judgment if that evidence would likely not be admissible in evidence at trial); *Sakaria v. Trans World Airlines*, F.3d 164, 171 (4th Cir. 1993).

> ¶ 35 – Mr. Link reviewed the additional information and documentation Ms. Torres provided. Link Tr. 171:9-172:22, 178:22-182:2, 183:9-21. Based on everything she provided, Mr. Link determined that Ms. Torres had not shown that she required her dog to perform the essential duties of the position. *Id*. at 96:16-20, 128:2-19. Specifically, Mr. Link noted that Ms. Torres alleged she required her dog with her "24/7" but also stated she only needed her dog with her while working from SHRM's Alexandria office, but not while traveling for SHRM business up to 10% of, or 208 hours per year, of her time.

> Corporate Tr. 72:2-74:17, 78:1-79:10, 91:4-12. Mr. Link also noted that Ms. Torres had relied on alternative accommodations in her own life when, by her own statements, she found it inconvenient or unnecessary to have her dog with her. *Id*.; Link Tr: 191:11-192:22, 194:19-195:18. Specifically, Ms. Torres relied on her CGM when she chose not to have her dog with her, which SHRM was willing to accommodate. Corporate Tr. 81:2-11, 86:321. Working with legal counsel, Mr. Link identified and decided alternative accommodations to offer Ms. Torres, with the aim of continuing to engage in the interactive process. *Id*. at 72:7-16, 93:19-95:1.

**PLAINTIFF: Disputed in part as incomplete and as misleading.** Mr. Link's testimony mischaracterizes the facts and is misleading. Specifically, Ms. Torres did not state that "she only needed the dog with her while working from SHRM's Alexandria office, but not while traveling for SHRM business[.]" *Supra* Plaintiff's Dispute of Def. SUMF ¶ 25; Pl. SOF ¶¶ 46–47. Additionally, Ms. Torres testified that it was difficult to determine if her CGM is making an error without her service dog. *Supra* Part II(A) ¶¶ 17, 29; *Infra* Part II(A) 36, 38; Pl. ¶¶ 14, 17-26, 88-105, 110.

> ¶ 36 – Ms. Belyna emailed Ms. Torres to notify her of SHRM's decision and to offer her alternative accommodations, which "include but are not limited to[:]" (1) facilitating the use of Ms. Torres's CGM while at work; (2) providing her additional breaks to check her blood sugar levels; (3) noting SHRM's flexible open leave program; and (4) use of her insulin pump and placement of food or drink at her workstation. Ex. 19 at SHRM_Torres 609-610. Ms. Belyna made clear that these were suggestions, and SHRM remained "open to continue conducting this interactive process" to identify other accommodations and was still "very interested" in Ms. Torres joining SHRM. *Id*.; Link Tr. 203:17-206:15. Indeed, the proposed alternative accommodations "were meant to be one of the many tools that we proposed to Ms. Torres . . . . [SHRM] likewise requested from Ms. Torres . . . to also provide us with alternatives that could be considered . . . ." Corporate Tr. 23:18-24:8. Although SHRM requested that Ms. Torres speak with her doctor regarding its proposals, Ms. Torres did not do so. Ex. 19 at SHRM_Torres 609-610; Torres Tr. 274:3-16; Joshi Tr. 127:11-14.

**PLAINTIFF: Disputed in part and as incomplete.** Plaintiff's disputes are incorporated in Pl. SOF ¶¶ 88–105, 110. The "alternative" accommodations did not address the early alert function performed by the service dog and SHRM made no effort to discuss with Ms. Torres her concerns with the "alternatives." Pl. SOF ¶¶ 100–105.

> ¶ 37 – After receiving Ms. Belyna's email, Ms. Torres exchanged messages with her friend on July 4, stating in reference to Ms. Belyna, "[w]ish I knew where she lived though hahaha[.] Would love to key her car[.] Like a handful of months later so it's a lil less obvious[.]" **Ex. 29**: July 4 Messages with E. Kostyu at Torres 244, 250-251; Torres Tr. 315:15-316:15. Ms. Torres also advised her friend that she no longer intended to work for "these ignorant and self-serving idiots[.]" Ex. 29 at Torres 244.

**PLAINTIFF: *Objection:*** The fact is immaterial and irrelevant to the claims or defenses at issue in this action. Plaintiff's private text messages, which Defendant admits it had no knowledge of at the time it denied her requested accommodation and rescinded her job offer, *supra* Part II(A)(7), have no bearing on the elements of a failure to accommodate or disability discrimination claim. It does not tend to prove or disprove any material element of the pending motion. Moreover, to the extent that Defendant seeks to use Def. SUMF ¶ 25 for the purpose of determining liability under the ADA or VHRA, it is inadmissible in evidence under Fed. R. Evid. 401 and 402, or, in the alternative, unduly prejudicial under Fed. R. Evid. 403. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252 (1986) (holding that a party may object to the use of evidence at summary judgment if that evidence would likely not be admissible in evidence at trial); *Sakaria v. Trans World Airlines*, F.3d 164, 171 (4th Cir. 1993).

> ¶ 38 – On July 6, Torres rejected SHRM's offer of alternative accommodations. Ex. 19 at SHRM_Torres 609. However, she only addressed various ways she claimed the CGM was insufficient, without explaining why it was sufficient on the occasions when she is without her dog. *Id*. Ms. Torres refused to accept the job without being permitted to have her dog present on-site at SHRM's Alexandria office. *See id*; Link Tr. 211:4-212:13.

**PLAINTIFF: Disputed.** At no time did Ms. Torres "refuse to accept the job," and SHRM's cited exhibits do not support the assertion that she did. Plaintiff's additional disputes are incorporated into Pl. SOF ¶ 61 (Ms. Torres never stated that the CGM was "sufficient on the occasions when she is without her dog"; in fact, she stated that when her service dog is not with her, it is a medical risk), ¶¶ 100–105 (Ms. Torres explaining why the "proposed alternatives" were not effective).

> ¶ 39 – While SHRM's HR Department tried to work with Ms. Torres as part of the interactive process, the business was anxious for Ms. Torres to start because it was "desperately in need of support for both areas." **Ex. 30:** July 2-17, 2024 Emails at SHRM_Torres 1765; *see also* Ex. 31: Deposition of Katharine Panessidi ("Panessidi Tr.") 57:15-58:16 ("I recall being frustrated at how long . . . the hiring process was taking."). While the business was anxious to repost the role, Ms. Zoerkler declined to do so because SHRM was still engaged with Ms. Torres. **Ex. 32:** July 2¬10, 2024 Emails at SHRM_Torres 1768.

**PLAINTIFF: Disputed as incomplete**: SHRM made no claim of undue hardship, claiming harm to business such as would justify an early termination of the interactive process. Pl. SOF ¶¶ 80–87.

> ¶ 40 – After reviewing the additional information Ms. Torres provided, Mr. Link decided to rescind the job offer to Ms. Torres. Link Tr. 77:20-78:3, 221:2-21; Corporate Tr. 108:1-109:2, 110:7-111:17. Mr. Link decided to rescind the job offer made to Ms. Torres based on inconsistencies in her representations to SHRM regarding her purported need to have her dog with her at SHRM's office, the availability of her CGM as an alternative to the dog, and her refusal to consider any alternative accommodations. Link Tr. 221:2-14; Corporate Tr. 101:16-103:14, 108:1-109:2, 111:2-112:12, 116:1-117:2. Mr. Link also considered Ms. Torres's admission that she was willing to perform the essential functions of the position, including hundreds of hours of business travel, without her dog, together with the business's need to fill the role. *Id.*

**PLAINTIFF: Disputed in part and as incomplete.** Mr. Link's recounting of Ms. Torres'statements are inaccurate and misleading. Ms. Torres did not admit that she was "willing to perform…hundreds of hours of business travel…without her dog." Def. SUMF ¶ 40. In fact, Ms. Torres informed Ms. Belyna that she does not always bring her service dog with her when she travels. Pl. SOF ¶ 47. Moreover, Mr. Link's calculations of purported time Ms. Torres would not need the dog due to business travel are misleading. In fact, position included occasional business travel of 0% to 10% of the time. Pl. SOF ¶ 33. Plaintiff's additional disputes are incorporated in Pl. SOF ¶¶ 88–91, 109–114. SHRM made no claim of undue hardship, claiming harm to business such as would justify an early termination of the interactive process. Pl. SOF ¶¶ 80–87.

> ¶ 41 – On July 15, Ms. Belyna informed Ms. Torres of the decision to rescind the employment offer. Ex. 19 at SHRM_Torres 608; Link Tr. 212:9-13; Belyna Tr. 211:3-212:18. However, SHRM remained open to continuing their discussion "[s]hould anything change regarding potential alternative accommodations that would allow [Ms. Torres] to perform the essential functions of the role." Ex. 19 at SHRM_Torres 608; Corporate Tr. 104:16-106:14.

**PLAINTIFF: Disputed as incomplete.** Plaintiff's disputes are incorporated in Pl. SOF ¶¶ 108–110; SHRM began discussing repositing the position as early as July 17, making the offer of "remaining open to continuing their discussions" evident pretense. Pl. SOF ¶ 80. Moreover, SHRM was unwilling to engage with Ms. Torres regarding her concerns with SHRM's proposed "alternatives." Pl. SOF ¶ 102–105.

> ¶ 43 – Mr. Link been aware of Ms. Torres's exchanges with her friends during SHRM's consideration of her accommodation request in which she referred to Ms. Belyna as a "bitch[,]" called SHRM as "twats" and "idiots[,]" hoped Ms. Belyna's child or grandchild got type 1 diabetes, and threatened to key Ms. Belyna's car, Mr. Link would have immediately rescinded the offer of employment to Ms. Torres as violations of SHRM's Code of Conduct. Link Tr. 243:18-244:6; *see* Exs. 2, 24-25, 27-29.

**PLAINTIFF: *Objection:*** The fact is immaterial and irrelevant to the claims or defenses at issue in this action. Plaintiff's private text messages, which Defendant admits it had no knowledge of at the time it denied her requested accommodation and rescinded her job offer, *supra* Part II(A)(7), have no bearing on the elements of a failure to accommodate or disability discrimination claim. It does not tend to prove or disprove any material element of the pending motion. Moreover, to the extent that Defendant seeks to use Def. SUMF ¶ 25 for the purpose of determining liability under the ADA or VHRA, it is inadmissible in evidence under Fed. R. Evid. 401 and 402, or, in the alternative, unduly prejudicial under Fed. R. Evid. 403. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (holding that a party may object to the use of evidence at summary judgment if that evidence would likely not be admissible in evidence at trial); *Sakaria v. Trans World Airlines*, F.3d 164, 171 (4th Cir. 1993).

## IV. LEGAL STANDARD

Summary judgment is proper only where there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court views the record in the light most favorable to Ms. Torres and draws all reasonable inferences in her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Credibility determinations and the weighing of evidence are jury functions, not the Court's. *Id.* at 255.

### A. <u>The ADA claims: failure to accommodate, and denial of employment based on the need to accommodate.</u>

Ms. Torres asserts two ADA theories. To establish a failure to accommodate, she must show (1) that she has a disability; (2) that SHRM had notice of it; (3) that with a reasonable accommodation she could perform the essential functions of the position; and (4) that SHRM refused to make the accommodation. *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013); *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 579 (4th Cir. 2015). An accommodation that is reasonable on its face shifts the burden to the employer to demonstrate undue hardship, *US Airways, Inc. v. Barnett*, 535 U.S. 391, 401–02 (2002); *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 464 (4th Cir. 2012), and no proof of discriminatory intent is required, *Perdue v. Sanofi-Aventis U.S., LLC*, 999 F.3d 954, 959 (4th Cir. 2021).

Independently, the ADA prohibits denying employment because of the need to accommodate. Section 12112(b)(5)(B) defines discrimination to include "denying employment opportunities to a job applicant … who is an otherwise qualified individual with a disability, if such denial is based on the need … to make reasonable accommodation." 42 U.S.C. § 12112(b)(5)(B). On that theory the plaintiff need not prove that her requested accommodation was the only one that would suffice, that the interactive process broke down, or who caused any breakdown; she need show only that the denial was based on her need to accommodate. *See*

*Searls v. Johns Hopkins Hosp.*, 158 F. Supp. 3d 427, 440 (D. Md. 2016); *Tyndall v. Nat'l Educ. Ctrs., Inc.*, 31 F.3d 209 (4th Cir. 1994); *Shin v. University of Maryland Medical System Corp., 369 Fed.Appx.472, 479 (4th Cir 2010)*. Neither the § 12112(b)(5)(B) theory nor the failure-to-accommodate theory proceeds under *McDonnell Douglas* or requires proof of intent. *Perdue*, 999 F.3d at 959.

**B. <u>The VHRA claims are governed by the same standards as the ADA, except as to causation and damages.</u>**

Virginia analyzes VHRA disability claims under the same substantive standards as the ADA, and Ms. Torres's VHRA counts therefore rise or fall with her ADA counts on every element of liability and accommodation. *Washington v. Offender Aid & Restoration of Charlottesville-Albemarle, Inc.*, 677 F. Supp. 3d 383, 396 (W.D. Va. 2023); *see* Va. Code § 2.2-3905.1 (VHRA reasonable-accommodation provisions). SHRM invokes that congruence, Def. Mem. at 15 n.2, and Plaintiff does not dispute it — subject to two exceptions that *Washington* did not address and that the VHRA supplies by statute.

*First, causation.* The VHRA employs a motivating-factor standard rather than the ADA's but-for standard; a VHRA plaintiff prevails by showing that her disability, or her need for an accommodation, was a motivating factor in the challenged decision. Va. Code § 2.2-3905(B)(6). SHRM's but-for authorities — that disability must be "the only motivating factor," *Gentry v. East West Partners Club Mgmt. Co.*, 816 F.3d 228, 235–36 (4th Cir. 2016); *Davis v. W. Carolina Univ.*, 695 F. App'x 686, 688 (4th Cir. 2017) — are ADA cases and do not govern the VHRA. *Washington* equated the two statutes' liability elements; it did not reach, and did not displace, the VHRA's causation standard.

*Second, damages.* Unlike the ADA, which caps compensatory and punitive damages by employer size, 42 U.S.C. § 1981a(b)(3), the VHRA does not cap a prevailing plaintiff's

compensatory damages. Va. Code § 2.2-3908. The VHRA claims thus afford relief the ADA claims do not and cannot be dismissed as merely duplicative of the federal claims.

## V. ARGUMENT

Two undisputed premises frame the Opposition. The service dog was reasonable on its face, which shifted the burden to SHRM; and SHRM conducted no undue-hardship analysis and disclaims any hardship, conceding away the statute's sole affirmative defense. Against that backdrop, eight genuinely disputed issues remain, each for the jury: on the failure-to-accommodate claims — whether the dog was necessary (Issue 1), whether SHRM's four substitutes were effective (Issue 2), the weight of the treating physicians' opinions (Issue 3), and who caused the breakdown of the interactive process (Issue 4); and on the discrimination claims — whether the rescission was based on the need to accommodate (Issue 5), whether Ms. Torres was a qualified individual (Issue 6), the materiality of the after-acquired messages (Issue 7), and whether SHRM's shifting reasons show pretext (Issue 8).

### i. PRELIMINARY: TWO UNDISPUTED PREMISES FRAME THE MOTION

#### A. The service dog was a reasonable accommodation on its face, which shifted the burden to SHRM.

A plaintiff need only show that an accommodation "seems reasonable on its face, i.e., ordinarily or in the run of cases," to shift the burden to the employer to show undue hardship. *US Airways*, 535 U.S. at 401–02 (2002); *Halpern*, 669 F.3d at 464. A trained diabetic-alert dog performs a specific, medically recognized task related to the disability; permitting it involves no cost and at most a modification of a "no-animals" policy — a form of accommodation the EEOC recognizes, and the analogue of the guide-dog example in the Appendix to 29 C.F.R. Part 1630. EEOC Enforcement Guidance, 1999 WL 33305876; 29 C.F.R. Pt. 1630, App.; *see Theresa E.*, EEOC Doc. 0120182764, 2021 WL 3109659 (June 23, 2021) (reversing summary judgment for

the agency that had sought to substitute a cardiac monitor for a preferred accommodation of a cardiac alert dog). SHRM's contrary authorities do not aid it: an employer need provide only a reasonable, not a perfect, accommodation, but the choice runs only among *effective* ones. *Fink v. Richmond*, 405 F. App'x 719, 723 (4th Cir. 2010). Whether SHRM's substitutes were effective is precisely what is disputed. *Supra* Part II(A)(1-2); *see supra* Part III.

The undisputed record easily clears this threshold: Meechum is a certified, registered diabetic-alert dog, trained to alert to dangerous glucose levels, and not an emotional-support animal, Pl. SOF ¶¶ 9, 13–14. Ms. Torres's prior employer, Cvent, approved the identical accommodation for an office setting, and her then-treating endocrinologist confirmed it appropriate, Pl. SOF ¶¶ 15, 18. The role at SHRM required in-office presence only three days a week on a product team that itself worked almost entirely remotely, Pl. SOF ¶¶ 32, 36–37. SHRM's reliance on *Maubach v. City of Fairfax*, 2018 WL 2018552 (E.D. Va. 2018), is misplaced: there the animal was an untrained emotional-support dog brought into an enclosed 911 dispatch center where a coworker was allergic. While the employer – and the court – found the service animal reasonable as an accommodation, the particular animal plaintiff relied on caused allergies in coworkers. Here, the animal proposed is a trained service animal, and no analysis of possible hardship has been performed.

**B. SHRM conducted no undue-hardship analysis and affirmatively disclaims any hardship.**

Once an accommodation is reasonable on its face, the ADA makes an employer's refusal unlawful "unless [it] can demonstrate that the accommodation would impose an undue hardship" -- an individualized showing of significant difficulty or expense. 42 U.S.C. §§ 12112(b)(5)(A), 12111(10); Va. Code § 2.2-3905.1(B)(1); *Bryant v. Better Bus. Bureau of Greater Md.*, 923 F. Supp. 720, 735-36 (D. Md. 1996). SHRM made no such showing, and it is undisputed that it

never tried. SHRM conducted no analysis of operational impact, Pl. SOF ¶ 81, no analysis of cost, Pl. SOF ¶ 82, and no analysis of any danger to employees, Pl. SOF ¶ 83; Mr. Link did not know what workforce impact, if any, would result and undertook no analysis of it, Pl. SOF ¶ 84. The only "hardship" he could identify was the novelty of the request itself, Pl. SOF ¶ 85; he testified that when an accommodation is "something that SHRM can do," it is granted, Pl. SOF ¶ 86; and he admitted "there was no reason that SHRM could not have accommodated" Ms. Torres's request, Pl. SOF ¶ 87. Indeed, SHRM admits that no accommodation was even required for the very measures it later offered as "alternatives" — CGM use, breaks, food and drink at the workstation, and open leave. Pl. SOF ¶¶ 95–99.

Because facial reasonableness is established and undue hardship is undisputedly absent, SHRM's refusal is unlawful unless it can prove the dog was neither a necessary nor an effective accommodation — the essential-functions theory it advanced without ever conducting the hardship analysis the statute requires. Every disputed issue below is litigated against a record in which SHRM has already conceded away its only affirmative defense.

## ii. GENUINE DISPUTES PRECLUDE SUMMARY JUDGMENT ON THE FAILURE-TO-ACCOMMODATE CLAIMS (COUNTS II AND IV).

SHRM does not dispute that Ms. Torres has a disability, that it had notice, or that it refused the requested accommodation; and its designee conceded Ms. Torres could perform the essential functions. Pl. SOF ¶¶ 112–113. What remains — necessity, effectiveness, the weight of the medical evidence, and who caused the breakdown — is disputed, and each is for the jury.

### A. Whether the service dog was necessary is a question for the jury.

SHRM infers that the dog was unnecessary from occasions when Ms. Torres is without it, Def. SUMF ¶¶ 13–17; Def. Mem. at 16–18, and from her statement that she "may not bring [her] service dog . . . on the first day," Pl. SOF ¶ 61; *supra* Part III (Plaintiff's disputes to Def. SUMF

¶¶ 22, 32. SHRM's conclusion from occasional absences is not the only possible, or even the most reasonable, conclusion and, moreover, asks the wrong question. The ADA accommodates "limitations, not disabilities," so necessity turns on the limitation the accommodation addresses — here, the risk of rapid-onset, undetected hypoglycemia — not on whether Ms. Torres ever functions without the dog. *Long v. Howard Univ.*, 439 F. Supp. 2d 68, 78 (D.D.C. 2006); *accord Hamel*; *Reyazuddin v. Montgomery Cnty.*, 789 F.3d 407, 415 (4th Cir. 2015).

On this record a jury could readily find the dog necessary. The alert-dog and CGM, jointly, have supported Ms. Torres's management of her T1D since 2017. Pl. SOF ¶¶ 11–12. Her physicians support her reliance on both the alert dog and CGM together. Pl. SOF ¶¶ 15, 21–22, 49, 62–64. And, while the dog's ability to alert to glucose changes significantly earlier than the CGM is important in the normal course of Ms. Torres's management of her T1D, Pl. SOF ¶¶ 21–26, the dog becomes crucial at those times when the CGM is, for one reason or another, non-functional. Pl. SOF ¶¶ 21–26, 56–58, 61, 100–102. The CGM has documented failure windows — a two-hour warm-up every ten days, shipment and insurance delays, malfunctions, and inaccurate or delayed readings — during which the dog is Fiona Torres's only alert system, Pl. SOF ¶¶ 17–20. As Dr. Joshi explained, blood sugar can "drop faster than a CGM can report"; CGM readings can be off by "20 to 40 points"; and "CGMs fail," so a trained dog is a necessary backup. Pl. SOF ¶¶ 21–22. Meechum alerts faster than the CGM and catches drops it misses. Pl. SOF ¶¶ 21–24. Before the dog, Ms. Torres blacked out at least ten times a year and required almost monthly emergency glucagon; since the dog-and-CGM regimen, she has not lost consciousness. Pl. SOF ¶¶ 25–26. Ms. Torres's reliance on the alert dog as part of her management of her life-threatening disease is doctor-approved and has been tested over many years. Ms. Torres's account is thus not the "unsupported conjecture" SHRM invokes (citing

*Graves v. Lioi*, 930 F.3d 307, 324 (4th Cir. 2019) (holding that inference unsupported by evidence is insufficient to defeat summary judgment)). Her experience in managing, with the help of her endocrinologist, her own medical condition over more than three decades is a relevant record that informed her request and provides evidence of the necessity of the service animal.

SHRM's reliance on the fact that Ms. Torres is occasionally without the alert dog is without justification or basis. Although Ms. Torres's endocrinologist Dr. Joshi, wrote in support of Ms. Torres's reliance on the alert dog at work, saying that it was "imperative out of medical necessity she has her service dog at all times for her safety in light of her type 1 diabetes history with labile blood sugars," Pl. SOF ¶ 64, SHRM's decisionmaker, the Director of HR, without seeking additional or other medical information, Pl. SOF ¶¶ 65–69, decided for himself that Dr. Joshi's medical letter was "inaccurate." Pl. SOF ¶ 79. His reason for doing so was that Ms. Torres reported to SHRM "numerous circumstances where the service dog is not with her." *Id.* SHRM appears to have given no consideration to the significance of the difference between working in an office for eight hours at a stretch, three times per week – as Ms. Torres anticipated doing at SHRM – and the brief occasions on which her service dog is groomed or when he parts from her during long work meetings when the service dog needs to relieve itself that SHRM uses to deny Ms. Torres's preferred accommodation. As Ms. Torres made clear when she allowed that she may not bring her service dog with her on first day of work at SHRM to ensure she could evaluate the seating layout, Pl. SOF ¶ 61, being apart from her dog when necessary or advisable for the dog's well-being or hers, was a real medical risk, Pl. SOF ¶ 61, but sometimes necessary. *Id.* Her cataloged absences are brief and hedged — grooming, rare long meetings, unsafe or loud environments, and, prospectively, the first day of work at SHRM, Pl. SOF ¶ 61. Her overseas

trips, which SHRM's decisionmaker was unaware of at the time he denied her accommodation and rescinded her offer, Pl. SOF ¶ 91, were taken with her mother, who administers emergency glucagon to Ms. Torres. Pl. SOF ¶ 25, 92. The one dog-free work trip in fact produced a dangerous low. Pl. SOF ¶¶ 91–93. Being compelled to take that risk every day, all day, when she worked in SHRM's offices, denied an accommodation without any showing of hardship from the company, is very different than making a choice to attend a concert for a few hours occasionally, or even to undertake a multi-day Europe trip with her mother. The position required in-office presence three days a week with occasional travel and a largely remote team, Pl. SOF ¶¶ 32–33, 36–37: the accommodation sought was limited and reasonable. SHRM, without in any way seeking to understand the careful balancing made necessary for Ms. Torres by the disease she has lived with most of her life, sought to impose on Ms. Torres, without a showing of undue hardship, a new, less protective, and less effective regime. *See* Pl. SOF ¶¶ 1, 3–12, 14, 17–26. Ms. Torres's regular, successful and doctor-sanctioned management of her diabetes requires her use of *both* the body-worn personal use CGM *together with* her diabetes alert dog. Pl. SOF ¶¶ 11–12, 15, 17–26, 49, 58, 62–64, That satisfies the causal nexus SHRM's own authorities require — that the accommodation be "necessary in order for [her] to perform the essential functions of [her] job." *Fierce v. Burwell*, 101 F. Supp. 3d 543, 549–550 (D. Md. 2015); *Terry v. Perdue*, 2018 WL 4494883, *2 (D. Md. Sept. 19, 2018). The dog is necessary to precisely that end: safe performance of in-office work during the CGM's failure windows. Necessity is for the jury.

**B. Whether SHRM's four substitutes were effective accommodations is a question for the jury.**

SHRM characterizes the four measures it offered — facilitating CGM use, breaks, open leave, and use of her insulin pump with food or drink at her workstation — as reasonable alternatives that Ms. Torres refused. Def. SUMF ¶¶ 36, 38; Def. Mem. at 18–19, 21–22; Pl. SOF

¶ 94. The EEOC Commission has held that an employer may not dictate the tools an employee uses to manage limitations caused by her disability. In *Theresa E., EEOC Doc. 0120182764, 2021 WL 3109659* (June 23, 2021) (reversing summary judgment: " It is not the Agency's role to dictate what sort of assistive or monitoring device/animal Complainant chooses to use or otherwise to determine how Complainant monitors her heart condition. That decision rests with Complainant." *Id.* at *14.).

While an employer may provide an alternative reasonable accommodation at its discretion, an employer's discretion runs only among *effective* accommodations. *Reyazuddin v. Montgomery County*, 789 F.3d 407, 416 (4th Cir. 2015) (employer has "ultimate discretion to choose between effective accommodations" but accommodation must provide "meaningful equal employment opportunity."); *Smith v. CSRA*, 12 F.4th 396, 414 (4th Cir. 2021). Here the "alternatives" SHRM offered were not accommodations at all: SHRM admits each was already available to every employee without any accommodation — breaks, Pl. SOF ¶ 95; food and drink at the workstation, Pl. SOF ¶ 96; open leave, Pl. SOF ¶ 97; and CGM use, Pl. SOF ¶ 99 (her CGM and insulin pump are attached to her body, Pl. SOF ¶ 98). Still more, none addresses the functional limitation for which the alert dog was proposed. Pl. SOF ¶ 100–102. None removes any barrier peculiar to Ms. Torres's disability, and, in particular, none supplies the pre-symptomatic detection the dog provides. *Id.* Ms. Torres explained precisely why the alert dog specifically was needed and could not be replaced by simply facilitating use of the CGM: The CGM alone fails during its recurring gaps and that "there is no accommodation that could be made to prevent . . . the life[-]threatening events my service dog is trained to protect me from." Pl. SOF ¶¶ 101–102. This defines the particular accommodation that Ms. Torres's facts make

necessary. Whether measures proposed by SHRM, available to everyone, supplying none of the dog's protection, are "effective" is a paradigmatic jury question.

**C. The weight of the treating physicians' opinions — and whether a lay decisionmaker could override them — is for the jury.**

SHRM contends the physicians' letters are insufficient and inconsistent. Def. Mem. at 19–20; Def. SUMF ¶¶ 24, 33. It is true that an employer is not bound to accept the opinion of a treating physician where the proposed accommodation is otherwise unreasonable under the circumstances. *Tartaro-McGowan v. Inova Home Health, LLC.*, 91 F.4th 158, 166–67 (4th Cir. 2024); *but see Taylor v. Principal Financial Group, Inc.*, 93 F.3d 155, 165 (5th Cir. 1996) ("It simply stands to reason that the employee and his health-care provider are best positioned to know what type of accommodation is appropriate for the employee."). But that rule presupposes an employer that actually assessed reasonableness — and SHRM never did. It conducted no undue-hardship analysis, consulted no medical professional, and engaged in no good-faith interactive process before rejecting the physicians' recommendations. SHRM's conduct thus falls well short of the legitimate medical assessment the ADA's reasonable-accommodation standard contemplates.

The record confirms the omission. Dr. Armellini recommended that Ms. Torres bring the dog "at all times," Pl. SOF ¶ 49, and Dr. Joshi confirmed the dog's medical necessity "at all times," Pl. SOF ¶¶ 62, 64 — yet SHRM contacted no physician, never contacted Dr. Joshi despite her express invitation, and consulted no other medical professional. Pl. SOF ¶¶ 65–69. Instead, Mr. Link acknowledged that Dr. Joshi's letter "supported [the] argument that [the dog]

was a necessary accommodation" before deeming it "inaccurate" on his own lay reading. Pl. SOF ¶¶ 78–79.

That is what distinguishes this case from *Tartaro-McGo*wan. There, the court held the accommodation reasonable because it "directly addressed the specific physical limitations identified by Tartaro-McGowan's doctor." *Id.* at 171. Here, SHRM never engaged the medical judgment at all — it overrode Dr. Joshi on a lay reading rather than assessing the accommodation she and Dr. Armellini prescribed. Nor does Tarquinio aid SHRM. Its requirement that a physician's note tie the disability to the essential functions is satisfied: Dr. Joshi's letter ties the limitation the diabetes imposes — the risk of undetected, rapid-onset hypoglycemia — to the essential function of safely performing in-office work. *Tarquinio v. Johns Hopkins University Applied Physics Laboratory*, 141 F.4th 568, 574–75 (4th Cir. 2025). Whether it does so adequately is a question of weight, not a basis for summary judgment. The credibility and weight of the physicians' opinions, and the reasonableness of a lay decisionmaker's override of medical judgment, are therefore for the jury.

**D. A jury could find that SHRM — not Ms. Torres — caused the breakdown of the interactive process.**

SHRM attributes the breakdown to Ms. Torres's asserted refusal to consider its alternatives and her "entrenchment." Def. Mem. at 20–22; Def. SUMF ¶¶ 38, 40. The ADA imposes a good-faith, interactive-process duty, and the party that causes the breakdown cannot then blame the other. *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 581 (4th Cir. 2015); *Crabill*; *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 346–47 (4th Cir. 2013). The record permits a jury to find the opposite of SHRM's account. SHRM prejudged the dog "not . . . necessary" "based on the existing documentation" before it even asked its three clarifying questions, Pl. SOF ¶¶ 55, 60; it handled the request outside its ordinary process, withheld its ADA

accommodation form, and sidelined its designated accommodations lead, Pl. SOF ¶¶ 71–76; it urgently assembled a hiring "fact file," Pl. SOF ¶ 71, and directed its recruiter to resume sourcing the role while the request was pending, Pl. SOF ¶ 80; and it engaged none of Ms. Torres's July 6 explanation, asked no questions, and proposed nothing further before rescinding on July 15, Pl. SOF ¶¶ 103–105. Unlike the employee in *Tarquinio v. Johns Hopkins University Applied Physics Lab,* 141 F. 4th 568, 576 (4th Cir. 2025) (Tarquinio prevented the lab from learning why her condition required the accommodations that she asked for, she can't show that the lab had a duty to accommodate) or *Fierce v. Burwell*, 101 F. Supp. 3d 543, 552 (D. Md. 2015), Ms. Torres left SHRM guessing about nothing. She responded to all questions quickly and with complete information. The question of who caused the breakdown is for the jury.

## iii. GENUINE DISPUTES PRECLUDE SUMMARY JUDGMENT ON THE DISABILITY-DISCRIMINATION AND RESCISSION CLAIMS (COUNTS I AND III).

SHRM's motion does not address 42 U.S.C. § 12112(b)(5)(B) — the provision that most directly fits these facts, under which the withdrawal of an offer because an applicant needs a reasonable accommodation is itself discrimination (*see supra* Legal Standard § A). On that theory the record is effectively unrebutted. Nor is this a new theory raised in opposition: Count II invokes § 12112(a) and (b), of which § 12112(b)(5)(B) is a part, and the rescission facts are pleaded. Compl. ¶ 78; *see Richardson v. Clarke*, 52 F.4th 614 (4th Cir. 2022).

### A. Whether the rescission was based on Ms. Torres's need for the accommodation is for the jury.

The record fits § 12112(b)(5)(B) precisely. The rescission email states that SHRM was "unable to grant your request to have a service dog in the workplace," Pl. SOF ¶ 109; Mr. Link's three stated reasons for rescinding the job offer all concern the dog, Pl. SOF ¶ 110; and the accommodation request was the only event between the offer and its rescission, Pl. SOF ¶¶ 2, 43.

Ordinary causation is triable as well. A failure-to-accommodate theory requires no proof of animus, *Perdue*, 999 F.3d at 959, and any same-actor inference SHRM might draw is rebutted where the employer's stated reason is itself the accommodation: Mr. Link both approved the offer and rescinded it. Pl. SOF ¶¶ 39, 106; *see Proud v. Stone*, 945 F.2d 796 (4th Cir. 1991); *Adams v. Greenbrier Oldsmobile/GMC/Volkswagen, Inc.*, 172 F.3d 43 (4th Cir. 1999); *Tyndall*, 31 F.3d 209. SHRM's contention that its willingness to interview and hire Ms. Torres despite knowing of her diabetes forecloses any inference of discrimination proves Plaintiff's point, not SHRM's. *See Fierce v. Burwell*, 101 F. Supp. 3d 543, 552 (D. Md. 2015). Unlike the *Fierce* plaintiff, who relied on the sequence of events alone to argue that adverse action was taken because of her disability, Ms. Torres relies on SHRM's own words: SHRM was content with her diabetes until she needed an accommodation for it, and its stated reason for the rescission *was* that accommodation need. Pl. SOF ¶¶ 109–110. An employer's comfort with a disability in the abstract does not license refusing the accommodation the disability requires. And as the Legal Standard explains, the VHRA claims independently survive on a motivating-factor showing — that the disability or the accommodation need was a motivating factor — which SHRM never addresses (*see supra* Part IV(B)). SHRM's contrary "disability-neutral" reasons, Def. SUMF ¶ 40; Def. Mem. at 26–28, at most create a dispute for trial.

**B. Whether Ms. Torres was a qualified individual is for the jury.**

SHRM contends Ms. Torres was not a qualified individual, arguing both that she rejected an accommodation and that her private messages, uncovered in discovery, are disqualifying misconduct. Def. Mem. at 24–25. Neither argument is persuasive. Rejecting an accommodation defeats qualification only if the rejected accommodation was *effective* — and whether SHRM's substitutes were effective is genuinely disputed (see Issue II(2), above). 29 C.F.R. § 1630.9(d);

*Elledge v. Lowe's Home Ctrs., LLC, 979 F.3d 1004, 1013 (4th Cir 2020);* see *Hall Haggins v. Wilson Air Ctr., LLC*, 163 F.4th 872, 877-78 (4th Cir. 2026). *Tartaro-McGowan* is inapposite because Ms. Torres never refused an accommodation shown to be effective. The "reciprocal obligation" SHRM invokes, *Anderson v. Diamondback Inv. Grp., LLC*, 117 F.4th 165, 181 (4th Cir. 2024), runs only to a good-faith search for an *effective* accommodation; an applicant does not forfeit qualified-individual status by declining substitutes a jury could find ineffective, and here it was SHRM — not Ms. Torres — that disengaged (see Issue II(4), above).

And after-acquired evidence of misconduct does not bear on qualification (see Issue II(3), below). On SHRM's own admissions Ms. Torres was qualified: Mr. Link testified she was "a qualified capable candidate" who "met all of the criteria" and whose "own experiences met the essential duties of the job," and SHRM "did not determine that Ms. Torres was unable to perform all essential functions." Pl. SOF ¶¶ 112–113. Mr. Link's only basis for concluding the dog was "not . . . necessary" was his own — admittedly uninformed — view of Ms. Torres's absences. Pl. SOF ¶¶ 90–91. Qualification is established, or, at the least, disputed, on SHRM's own record.

**C. The after-acquired private messages are immaterial to liability.**

SHRM invokes private messages obtained in discovery to disqualify Ms. Torres claiming violations of its Code of Conduct. Def. SUMF ¶¶ 27, 31, 34, 37, 43; Def. Mem. at 24–25. Settled law forecloses that use. After-acquired evidence of employee wrongdoing may limit remedies; it does not bar liability. *McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 356–63 (1995); *Russell v. Microdyne Corp.*, 65 F.3d 1229, 1240–41 (4th Cir. 1995); *Garrett v. Langley Fed. Credit Union*, 121 F. Supp. 2d 887, 904 (E.D. Va. 2000). SHRM's decisionmaker never saw the messages when he decided, and SHRM concedes that the rescission "was not based on any

conduct of Ms. Torres"; Mr. Link is aware of no instance in which anyone was disciplined for conduct predating employment, and the Code did not reach applicants. Pl. SOF ¶¶ 114–115. SHRM's sole authority, *Anthony v. Trax Int'l Corp.*, 955 F.3d 1123 (9th Cir. 2020), is non-binding and distinguishable: it concerned an objective, pre-existing qualification the plaintiff lacked at hiring, not post-hoc-discovered misconduct — the classic *McKennon* scenario.

Evidence that played no role in the July 2024 decision cannot supply, at summary judgment, a lawful reason for the decisionmaker's decision to rescind. At most it raises a remedies question for another day.

**D. SHRM's multiple, conflicting reasons permit a jury to find pretext and to disbelieve its decisionmaker.**

An employer's shifting, inconsistent justifications for an adverse decision are themselves probative of pretext and defeat summary judgment. *EEOC v. Sears Roebuck & Co.*, 243 F.3d 846, 852–53 (4th Cir. 2001). SHRM's litigation theory — that the dog was not needed for the essential functions — differs from the categorical "not job related" position it gave the EEOC, and both diverge from Mr. Link's own testimony that the dog "was a necessary accommodation" and that "there was no reason that SHRM could not have accommodated" the request. Pl. SOF ¶¶ 78, 87. A jury could also weigh SHRM's prejudgment of the request "based on the existing documentation," Pl. SOF ¶ 55, its urgent hiring "fact file," Pl. SOF ¶ 71, and its decision to resume sourcing the role while the request was pending, Pl. SOF ¶ 80; the three shifting reasons Mr. Link ultimately gave, Pl. SOF ¶ 110; his lay override of Dr. Joshi, Pl. SOF ¶¶ 78–79; and his admission that when SHRM "can do" an accommodation, it grants it, Pl. SOF ¶ 86. Credibility and pretext are quintessential jury questions, and they cannot be resolved for SHRM on this record.

## CONCLUSION

The two undisputed premises — the dog's facial reasonableness and SHRM's concededly absent undue-hardship defense — mean SHRM's refusal is unlawful unless it prevails on necessity and effectiveness. Those questions, and every other contested element of both claims, are genuinely disputed and for the jury. For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant's Motion for Summary Judgment in its entirety.

Dated: July 27, 2026

Respectfully submitted,

Fiona Torres

By counsel:

/s/ *Mary E. Kuntz*

Mary E. Kuntz (VSB No. 76947)
Stephen B. Pershing (VSB No. 31012)
Anna Kathryn Barnes Barry (DC Bar 1719493), *pro hac vice*
KALIJARVI, CHUZI, NEWMAN & FITCH, P.C.
818 Connecticut Ave. NW, Suite 1000
Washington, DC 20006
Telephone: 202.331.9260
mkuntz@kcnlaw.com
spershing@kcnlaw.com
akbarry@kcnlaw.com

Counsel for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was filed with the Court's case management / electronic case filing ("CM/ECF") system, through which it was transmitted on counsel of record for defendant Society for Human Resource Management as follows:

Lauren M. Bridenbaugh
Leslie P. Currie
Tanja L. Darrow (admitted pro hac vice)
Tiffany din Fagel Tse
LITTLER MENDELSON, P.C.
1800 Tysons Boulevard, Suite 500
Tysons Corner, VA 22102
lbridenbaugh@littler.com
lcurrie@littler.com
tdarrow@littler.com
ttse@littler.com

/s/ *Mary E. Kuntz*

Dated: July 27, 2026