# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| FIONA TORRES,<br><br>Plaintiff,<br><br>v.<br><br>SOCIETY FOR HUMAN RESOURCE MANAGEMENT,<br><br>Agency. | 1:25–cv–2360 (PTG/WBP) |

**PLAINTIFF'S STATEMENT OF FACTS DISPUTED AND UNDISPUTED**

**Background & Fiona Torres's history of diabetes**

1. Fiona Torres ("Ms. Torres") has type 1 diabetes ("T1D" or "diabetes"). Ex. 2, Jt. Stip. ¶ 2; Ex. 3, Def.'s Objs. & Resps. to Pl.'s RFAs at 2 (RFA No. 1). Ms. Torres was diagnosed with TID at the age of three. Ex. 4, Fiona Torres Deposition ("Torres Dep.") 101:6–8; Ex. 5, Carmen Torres Deposition ("Carmen Torres Dep.") 81:4–6. Ms. Torres's treating endocrinologist, Dr. Silpa P.K. Joshi, M.D., described Type 1 diabetes as a chronic condition requiring insulin and ongoing monitoring, as the body produces no insulin and blood sugar must be controlled through external means. Ex. 6, Silpa P.K. Joshi Deposition ("Joshi Dep.") 51:18–52:2; 53:10–15.

2. Between April 20, 2024, and June 3, 2024, Ms. Torres applied, was interviewed, and selected for employment by SHRM. Ex. 2, Jt. Stip. ¶¶ 4, 7–11. On June 3, 2024, Ms. Torres was offered employment, accepted SHRM's offer, and then requested that SHRM allow Ms. Torres's diabetic alert service dog to accompany her to work at SHRM as a workplace accommodation for her diabetes. *Id.* at ¶¶ 9–12. On June 17, 2024, SHRM declined Ms. Torres's request for her service dog to accompany her to work as an accommodation and subsequently rescinded the job offer to Ms. Torres. Ex. 7, SHRM_Torres_608–18 at SHRM_Torres_608.

3. Ms. Torres has a long history of suffering from severe hypoglycemic events caused by her diabetes, including at work. *See infra* ¶¶ 4–8, 10.

4. Ms. Torres has been hospitalized multiple times due to her diabetes. Ex. 4, Torres Dep. 101:9–102:1, 102:17–103:12; Ex. 5, Carmen Torres Dep. 87:20–88:23.

5. Ms. Torres has been in multiple car accidents as a result of hypoglycemia caused by her diabetes. *See infra* ¶¶ 6–7, 10.

6. In 2007, Ms. Torres was in a car accident due to a severe hypoglycemic event that caused her to lose control of her vehicle. Ex. 8, CONFIDENTIAL TORRES 796.

7. In 2014, Ms. Torres was in a severe car accident on her commute to the office at her then–employer Cvent due to a severe hypoglycemic event that led to her losing consciousness and control of her vehicle. Ex. 7 at SHRM_Torres_614; Ex. 4, Torres Dep. 145:20–146:2.

8. During her first two months at Cvent in 2014, Ms. Torres lost consciousness two separate times during her new hire training from hypoglycemic episodes. Torres Dep. 152:20–154:8; Ex. 7 at SHRM_Torres_614–16. In 2015, while working at Cvent, Ms. Torres again lost partial consciousness and complete mobility and required medical aid from co–workers from another hypoglycemic episode. *Id.* at SHRM_Torres_615; *see* Ex. 4, Torres Dep 152:20–154:8. From 2016 to 2017, Ms. Torres had approximately six hypoglycemic episodes while working in the office at her previous employer, Cvent, that required assistance from paramedics and co–workers. Ex. 7 at SHRM_Torres_615; Ex. 4, Torres Dep. 152:20–154:8, 155:2–157:2.

9. In May 2017, Ms. Torres obtained a diabetic alert service dog named Meechum from an organization called Diabetic Alert Dogs of America. Ex. 2, Jt. Stip. ¶ 3; Ex. 9, SHRM_Torres_52–53; Ex. 4, Torres Dep. 142:15–16, 144:9–12.

10. In October 2017, Ms. Torres was involved in a motor vehicle accident due to a rapid–onset of hypoglycemia that caused her to lose consciousness. *See* Ex. 10, SHRM_Torres_2054–64 at SHRM_Torres_2060, 2064; Ex. 4, Torres Dep. 101:17–102:1, 152:16–19. Meechum was with Ms. Torres at the time of the accident. Ex. 10, SHRM_Torres_2056. Hospital records show that "the PO [police officer] reported the patient's medical dog signaled low blood sugar." *Id.*

11. In December 2017, Ms. Torres began using a Dexcom continuous glucose monitor ("CGM") in addition to her service dog. Ex. 4, Torres Dep. 104:4–5 (testifying Ms. Torres has used a CGM since December 2017), 118:13–15 (testifying her endocrinologist recommended the Dexcom CGM), 112:22–113:15 (testifying she monitors her blood sugar using both her CGM and service dog); Ex. 5, Carmen Torres Dep. 91:12–14 (confirming that Ms. Torres "g[o]t the CGM after she got Meechum").

12. Since obtaining her service dog in May 2017 and, later that year, her CGM, Ms. Torres's treatment plan includes her service dog, continuous glucose monitor, and insulin pump. Ex. 4, Torres Dep. 112:22–113:15, 142:10–12; Ex. 7 at SHRM_Torres_610–611; Ex. 6, Joshi Dep. 164:18–165:4; Joshi Dep. 51:18–52:4 (testifying Ms. Torres uses an Omnipod insulin pump that is looped with a Dexcom CGM).

**Fiona Torres's diabetic alert dog provides her essential diabetes-management services**

13. Meechum holds a Certificate of Training as a Diabetic Alert Service Dog issued by Diabetic Alert Dogs of America, dated May 5, 2017. Ex. 9 at SHRM_Torres_51; *see also* Ex. 3, Def.'s Objs. & Resps. to Pl.'s RFAs at 9 (RFA No. 15). Meechum is registered with the United States Service Dog Registry. Ex. 9 at SHRM_Torres_49; *see also* Ex. 3, Def.'s Objs. & Resps. to Pl.'s RFAs at 9 (RFA No. 15).

14. Meechum is trained and able to alert Ms. Torres to dangerous blood sugar levels. Ex. 4, Torres Dep. 142:17–19, 199:18–22 (explaining Meechum most recently alerted her within the two days prior to her deposition); Ex. 3, Def.'s Objs. & Resps. to Pl.'s RFAs at 9 (RFA No. 15); Ex. 9 at SHRM_Torres_49 (registration confirming Meechum as a service dog performing diabetic alert functions). Meechum is not trained as an emotional support dog. Ex. 4, Torres Dep. 145:10–12.

15. Ms. Torres's former employer, Cvent, approved Ms. Torres's request to bring her service dog with her to work as an accommodation for her diabetes. Ex. 11, SHRM_Torres_1200–01 at SHRM_Torres_1200; Ex. 12, SHRM_Torres_1204. The office of Ms. Torres's treating endocrinologist at the time, Dr. Al–Zubaidi, Ex. 11 at SHRM_TORRES_1200 (listing Dr. Al-Zubaidi as Ms. Torres's physician on Ms. Torres's ADA RA request form), informed Cvent that Dr. Al-Zubaidi confirmed that the medical accommodation requested by Ms. Torres was appropriate, Ex. 13, SHRM_Torres_1202–03 at SHRM_TORRES_1202.

**Fiona Torres's diabetic alert dog, in conjunction with her medical devices, is essential to Ms. Torres's diabetes management:**

16. In May 2024, through July 31, 2024, Ms. Torres was using the Dexcom G6 CGM. Ex. 4, Torres Dep. 117:22–118:6; Ex. 6, Joshi Dep. 170:22–171:4 (testifying Ms. Torres was using the Dexcom 6 CGM when she wrote the letter in June 2024 for Ms. Torres).

17. Ms. Torres relies primarily on her diabetic alert dog to monitor her diabetes when her CGM is not functioning at all, when there are delays in the shipment of her CGM, when the CGM malfunctions or produces an error, when the CGM falls off or is ripped off accidentally, and when her CGM provides inaccurate or delayed readings. Ex. 4, Torres Dep. 134:14–21; Ex. 7 at SHRM_TORRES_609, 615; Ex. 5, Carmen Torres Dep. 147:7–17 (Carmen Torres has observed the CGM display inaccurate readings and "Meechum is there to check"); *see infra* ¶¶ 18–26.

18. The Dexcom G6 CGM had a warm–up period of two–hours. Ex. 4, Torres Dep. 125:18–21. During this warm–up period, it did not provide readings. *Id.* at 125:10–126:5. In the first twenty–four hours following the insertion of a CGM, its readings were unreliable. *Id.* at 118:19–119:16. During the CGM warm–up period, Ms. Torres relies on Meechum's alerts to monitor her glucose. *Id.* at 128:10–129:15.

19. When there are delays in the delivery of Ms. Torres's CGM due to insurance delays, Ms. Torres relies on Meechum's alerts to monitor her glucose. Ex. 4, Torres Dep. 130:13–22, 134:14–21; Ex. 7 at SHRM_Torres_609.

20. When Ms. Torres's CGM is delayed or inaccurate in providing glucose readings, Ms. Torres relies on Meechum's alerts to monitor her glucose. Ex. 7 at SHRM_Torres_614–15; Ex. 4, Torres Dep. 138:9–141:12 (testifying she knows her CGM is inaccurate when her dog, but not her CGM, alerts her to low blood sugar and she confirms her blood sugar level is low), Ex. 4, Torres Dep. 140:8–141:5 (testifying that she knows her CGM is delayed when her dog alerts her before her CGM does and that determining whether her CGM makes an error without her dog is difficult), *id.* at 105:12–107:13 (describing numerous circumstances when her CGM malfunctioned).

21. Ms. Torres's endocrinologist, Dr. Joshi confirmed that blood sugar can "drop faster than a CGM can report to a user," Ex. 6, Joshi Dep. 168:14–16, that CGM readings can be inaccurate by "20 to 40 points," *id.* at 19:7–9, and that when a CGM misreads a blood sugar drop, "they're not going to sense that by the alarm system on the CGM . . . their blood sugars could drop, and then they're not aware, and then they can pass out or have a seizure," *id.* at 168:8–12.

22. Dr. Joshi explained why she recommends a service dog for Ms. Torres, in addition to her CGM: "CGMs fail. Any form of blood sugar monitoring can fail. Even a finger stick can fail. So having multiple, you know, backups is helpful for patients to . . . lower the risk of something severe happening." Ex. 6, Joshi Dep. 141:12–143:12.

23. Meechum is trained to detect and alert Ms. Torres to dangerous blood sugar levels more rapidly than technology such as a continuous glucose monitor ("CGM") can do so. Ex. 7 at SHRM_Torres_612; Ex. 4, Torres Dep. 142:17–19, 138:9–139:8, 140:8–141:5; Ex. 5, Carmen Torres Dep. 85:9–20 ("the first one to alert is Meechum," and when Meechum alerts, "five or ten minutes later, the CGM is in agreement with Meechum").

24. Carmen Torres, Fiona Torres's mother, has personally observed, on multiple occasions, Meechum alerting Ms. Torres to dangerous glucose changes before Ms. Torres's CGM registers the same change. Ex. 5, Carmen Torres Dep. 84:10–85:20.

25. Prior to obtaining her service dog, Ms. Torres had blackouts "[a]t minimum ten times a year." Ex. 4, Torres Dep. 142:1–6. Ms. Torres's mother described Ms. Torres's diabetes as "all over the place" and "not under control" before Ms. Torres had Meechum. Ex. 5, Carmen Torres Dep. 90:14–21. Before Meechum, Carmen Torres personally observed Ms. Torres lose consciousness "multiple times" and on "too many" occasions and had to administer glucagon to her daughter "like once a month." *Id.* at 141:22–143:21.

26. Since obtaining Meechum in May 2017, Ms. Torres has had only one episode requiring assistance from medical professionals. Ex. 4, Torres Dep. 162:21–164:7, 167:5–168:20; Ex. 7 at SHRM_Torres_615. Ms. Torres has not lost consciousness due to abnormal

blood glucose levels since she began using both a CGM and her diabetic alert dog. Ex. 4, Torres Dep. 162:21–164:7, 167:5–168:20.

**The Society for Human Resource Management**

27. The Society for Human Resource Management ("SHRM") is a nonprofit professional association headquartered in Alexandria, Virginia. Ex. 2, Jt. Stip. ¶ 1; Ex. 14, Answer ¶ 12.

28. SHRM describes itself as "[t]he trusted authority on all things work" and "the foremost expert, researcher, advocate, and thought leader on issues and innovations impacting today's evolving workplaces." Ex. 3, Def.'s Objs. & Resps. to Pl.'s RFAs at 4 (RFA No. 6); *see also* Ex. 7 at SHRM_Torres_608 (the same language in the email signatures of SHRM's Director of Talent Acquisition and other SHRM personnel). SHRM's employees describe SHRM as "a member–driven catalyst for creating better workplaces where people and businesses thrive together." *See, e.g.*, Ex. 7 at SHRM_Torres_608 (email signature of Nicole Belyna, Director, Talent Acquisition & Inclusion).

29. SHRM provides its members access to materials, some of which generally provide guidance on requests for accommodation under the ADA. *See* Ex. 3, Def.'s Objs. & Resps. to Pl.'s RFAs at 4 (RFA No. 7).

30. SHRM provides its members access to materials, some of which generally provide guidance on requests for accommodation to have a service animal in the workplace. *See* Ex. 3, Def.'s Objs. & Resps. to Pl.'s RFAs at 5 (RFA No. 8).

**Ms. Torres's applied and was interviewed for employment at SHRM**

31. On April 20, 2024, Ms. Torres applied for employment at SHRM for the position of Senior ("Sr.") Specialist, Product Management. Ex. 2, Jt. Stip. ¶ 4.

32. The Sr. Specialist, Product Management position required Ms. Torres to work at SHRM's office in Alexandria, Virginia, three days per week, Ex. 3, Def.'s Objs. & Resps. to Pl.'s RFAs at 7 (RFA No. 12), on Tuesdays, Wednesdays, and Thursdays; Ex. 15, Jim Link 30(b)(6) Deposition ("Link 30(b)(6) Dep.") 113:9–11; Ex. 16, Katharine Panessidi Deposition ("Panessidi Dep.") 47:20–48:16. Mondays and Fridays were available as remote workdays. Link 30(b)(6) Dep. 113:11–14.

33. The position description explained that the job involved occasional business travel of 0% to 10% of the time. Ex. 17, SHRM_Torres_281–82 at SHRM_Torres_281. Ms. Torres accepted this requirement. Ex. 18, Nicole Belyna Deposition ("Belyna Dep.") 168:4–13 (Ms. Torres informed Ms. Belyna she could fulfill the travel requirement).

34. Ms. Torres was interviewed by Deborah Zoerkler, Senior Specialist, Talent Acquisition, on April 24, 2024. Ex. 2, Jt. Stip. ¶ 7; Ex. 19, SHRM_Torres_1115–20 at SHRM_Torres_1117–19. Ms. Zoerkler determined that Ms. Torres might be a good fit

for the Senior Specialist, Product Management position and recommended that she proceed to the next round of interviews. Ex. 20, SHRM_Torres_296–97 at SHRM_Torres_296; Ex. 21, Deborah Zoerkler Deposition ("Zoerkler Dep.") 73:11–75:10.

35. Between May 7 and May 31, 2024, Ms. Torres was interviewed by four other SHRM employees, all of whom were on the product team. Ex. 2, Jt. Stip ¶ 8; Ex. 22, SHRM_Torres_451–52 at SHRM_Torres_451. Ms. Torres was interviewed by: Melissa Turk, Associate Product Manager; Alison Sancinito, Manager, Enterprise Solutions Products; Katharine Panessidi, Director, Enterprise Solutions Products; and Kristen Howe, Vice President, Products. Ex. 2, Jt. Stip ¶ 8; Ex. 22 at SHRM_Torres_451. Ms. Howe conducted the final interview of Ms. Torres. Ex. 23, SHRM_Torres_274–76 at SHRM_Torres 274; Ex. 24, SHRM_Torres_294–95 at SHRM_Torres_294; Ex. 25, SHRM_Torres_513–14 at SHRM_Torres_513. Following Ms. Torres's interviews, Ms. Howe communicated to Ms. Zoerkler that she would like to make an offer to Ms. Torres. Ex. 26, SHRM_Torres_491–93 at SHRM_Torres_492.

36. The Sr. Specialist, Product Management role would have been within the product team at SHRM. Ex. 17 at SHRM_Torres_281–82; Ex. 27, SHRM_Torres_1129–39 at SHRM_Torres_1132. At the time SHRM extended its offer of employment to Ms. Torres, every member of the SHRM Product Management team, with the sole exception of Kristen Howe, worked exclusively remotely and did not work at SHRM's Alexandria headquarters. Ex. 16, Panessidi Dep. 41:3–45:3, 54:12–17. Ms. Howe worked in person at SHRM's Alexandria headquarters at 1800 Duke Street. Ex. 28, Kristen Howe Deposition ("Howe Dep.") 18:1–9; Ex. 16, Panessidi Dep. 24:9–14.

37. Ms. Torres would have reported to Ms. Panessidi. Ex. 22 at SHRM_Torres_451; Ex. 29, SHRM_Torres_544–45 at SHRM_Torres_544; Ex. 16, Panessidi Dep. 24:17–22. Ms. Panessidi confirmed that the Product Management team "would not be working in person with each other." Ex. 16, Panessidi Dep. 44:22–45:3.

**<u>Offer and Acceptance of SHRM's offer of employment</u>**

38. On June 3, 2024, Ms. Zoerkler emailed Nicole Belyna, Director, Talent Acquisition & Inclusion; Jim Link, Chief Human Resources Officer; Nick Schacht, Chief Commercial Officer; and George Rivera, Senior Vice President, Enterprise Solutions, requesting approval to extend an offer[1] of employment to Ms. Torres for the position of Sr.

---

[1] Defendant refers to the offer as a "conditional offer." However, the emails requesting approval for and approving Ms. Torres's offer do not describe the offer as conditional. Ex. 29 at SHRM_Torres_544. When asked, SHRM officials could not identify any "conditions" of the offer, other than: (1) the candidate agreeing to the terms and conditions; (2) the candidate's successful completion of a background check; and (3) the candidate "maintain[ing] [her] status as a candidate" by not taking any actions which would disqualify her as a candidate. Ex. 15, Link 30(b)(6) Dep. 60:9–61:17; *see* Ex. 18, Belyna Dep. 79:6–18, 86:21–87:7. Mr. Link also described SHRM's right to rescind the offer at any time and for any reason a "condition" of the offer. Ex. 15, Link 30(b)(6) Dep. 60:9–61:17. SHRM did not revoke Ms. Torres's candidate status based on any action she took. Ex. 15, Link 30(b)(6) Dep. 101:3–15; *infra* ¶ 114–115.

Specialist Product Management at a salary of $90,000. Ex. 2, Jt. Stip. ¶ 9; Ex. 29 at SHRM_Torres_544–45.

39. On June 3, 2024, Ms. Belyna, Mr. Link, and Mr. Schacht approved making the offer of employment to Ms. Torres. Ex. 2, Jt. Stip. ¶ 10; Ex. 29 at SHRM_Torres_544–45.

40. On June 3, 2024, Ms. Zoerkler called Ms. Torres by telephone and made a verbal offer of employment with SHRM to Ms. Torres for the position of Senior Specialist, Product Management, at a salary of $90,000.00 per year. Ex. 2, Jt. Stip. ¶ 11.

41. Ms. Torres verbally accepted the offer on June 3, 2024. Ex. 2, Jt. Stip. ¶ 11; Ex. 3, Def.'s Objs. & Resps. to Pl.'s RFAs at 5 (RFA No. 9); Ex. 22 at SHRM_Torres_451.

42. Ms. Torres's anticipated start date was June 17, 2024. Ex. 7 at SHRM_Torres_616; Ex. 26 at SHRM_Torres_491.

**<u>Ms. Torres's request for accommodation</u>**

43. During Ms. Torres's June 3, 2024, telephone call with Ms. Zoerkler, after Ms. Torres accepted SHRM's offer of employment at SHRM, Ms. Torres told Ms. Zoerkler she was requesting an accommodation from SHRM to have her service dog with her while working at SHRM's office in Alexandria, Virginia. Ex. 2, Jt. Stip. ¶ 12; Ex. 3, Def.'s Objs. & Resps. to Pl.'s RFAs at 8–9 (RFA No. 14).

44. After the June 3, 2024, phone call with Ms. Torres, Ms. Zoerkler called her supervisor, Ms. Belyna, to notify her that Ms. Torres was requesting an accommodation. Ex. 2, Jt. Stip. ¶ 14.

45. On June 3, 2024, after her phone call with Ms. Zoerkler, Ms. Belyna spoke on the phone with her supervisor, Jim Link, on the subject. Ex. 2, Jt. Stip. ¶ 16; Ex. 15, Link 30(b)(6) Dep. 70:5–11. Ms. Belyna notified Mr. Link that Ms. Torres was requesting an accommodation in the form of permission to bring her service dog with her to work at SHRM. Ex. 15, Link 30(b)(6) Dep. 70:5–11.

**<u>Ms. Torres's telephone call with Ms. Belyna</u>**

46. On June 4, 2024, Ms. Torres and Ms. Belyna spoke by phone regarding Ms. Torres's accommodation request. Ex. 18, Belyna Dep. 167:10–172:15; 204:15–205:8. During that call, Ms. Torres explained her need for Meechum to be present with her at work at SHRM. *Id.* at 167:10–172:15; 204:15–205:8.

47. During that call, Ms. Belyna informed Ms. Torres that there was some travel required and asked her if she could fulfill the travel requirement. Ex. 18, Belyna Dep. 168:4–8. Ms. Torres informed Ms. Belyna she could meet the travel requirements of the position of Sr. Specialist, Product Management and that she does not always bring her service dog with her when she travels. *Id.* at 167:10–172:15; 204:15–205:8.

**Submission of service dog documentation**

48. On June 4, 2024, Ms. Torres emailed Ms. Zoerkler photographs of Meechum's registration with the United States Service Dog Registry and Meechum's Certificate of Training issued by Diabetic Alert Dogs of America. Ex. 9, SHRM_Torres_48–53; *see also* Ex. 3, Def.'s Objs. & Resps. to Pl.'s RFAs at 9–10 (RFA Nos. 16–17). That same day, Ms. Torres emailed Ms. Zoerkler two pages of a Lifetime Training Agreement between Ms. Torres and Diabetic Alert Dogs of America. Ex. 9, SHRM_Torres_48–53; Ex. 3, Def.'s Objs. & Resps. to Pl.'s RFAs at 9–10 (RFA Nos. 16–17).

49. On June 4, 2024, Ms. Torres emailed Ms. Zoerkler a letter dated November 6, 2019, signed by Denise Armellini, M.D., on the letterhead of The Endocrine Center, stating that Ms. Torres "has been diagnosed with DMT1," that she "also has a service dog, which has been of help to alert the owner of low or high glucose readings in the event this could be life threatening for the patient," and containing the statement: "I recommend that she bring the service dog with her at all times." Ex. 30, SHRM_Torrs_1025–29 at SHRM_Torres_1025, 1029; Ex. 3, Def.'s Objs. & Resps. to Pl.'s RFAs at 10 (RFA No. 17).

50. Ms. Zoerkler forwarded all of the foregoing documentation to Ms. Belyna on June 4, 2024. Ex. 30, SHRM_Torres_1025–29; Ex. 18, Belyna Dep. 174:12–18. Ms. Belyna received and reviewed the documentation forwarded by Ms. Zoerkler on June 4, 2024. Ex. 18, Belyna Dep. 205:9–206:11 (discussing Belyna Dep., Ex. 3, SHRM_Torres_48–53 (attached hereto as Ex. 9)).

51. Ms. Belyna shared that documentation with Mr. Link the same day. Ex. 18, Belyna Dep. 174:12–22, 264:7. Mr. Link received and reviewed the documentation, including Dr. Armellini's letter and Meechum's training certification. *See* Ex. 31, Jimmy Ray Link Individual Deposition ("Link Indiv. Dep.") 166:16–167:14 (discussing Link Indiv. Dep., Ex. 5, SHRM_Torres_1924 (attached hereto as Ex. 32)).

52. Not until June 18, 2024, after Ms. Torres followed up SHRM regarding her request, did SHRM respond to Ms. Torres's medical and service dog documentation. Ex. 7 at SHRM_Torres_613–16.

**SHRM's initial communication and Ms. Torres's response**

53. On June 14, 2024, Ms. Torres followed up with Ms. Zoerkler regarding her anticipated June 17 start date. Ex. 7 at SHRM_Torres_616. Ms. Zoerkler referred Ms. Torres to Ms. Belyna. *Id.*

54. On June 16, 2024, Ms. Torres emailed Ms. Belyna to follow up on her job offer, start date, and accommodation request. Ex. 7 at SHRM_Torres_616.

55. On June 17, 2024, Ms. Belyna responded to Ms. Torres and informed her that "based on the existing documentation, it does not appear that [her] service dog is necessary for [her] performance of the essential duties of [her] position . . . ." Ex. 7 at SHRM_Torres_615. Ms. Belyna invited Ms. Torres to provide further information that may be relevant to SHRM's review of the matter. *Id.*

56. That same day, Ms. Torres responded with additional information, detailing her history of severe hypoglycemic episodes, including blacking out unconscious, prior to getting her service dog in May 2017. Ex. 7 at SHRM_Torres_614–15; *infra* ¶ 57.

57. Ms. Torres recounted a severe car accident in 2014 during her commute to Cvent due to a hypoglycemic event; two episodes of lost consciousness during her first two months at Cvent in 2014; partial consciousness loss in 2015; at least six episodes requiring paramedics and co–workers from 2016 to 2017; and a car accident in 2018. Ex. 7 at SHRM_Torres_614–15; *see also* Ex. 4, Torres Dep. 269:12–270:10 (Ms. Torres clarified in her deposition that the 2018 car accident she was referring to in her email to Ms. Belyna occurred in 2017—she wrote 2018 in her email to Ms. Belyna in error).

58. Ms. Torres explained that her service dog is "trained to catch blood sugar trends well in advance than any technology is able to capture (e.g. continuous glucose monitors)." Ex. 7 at SHRM_Torres_615. Ms. Torres further explained that her continuous glucose monitor has a delay and is unable to accurately capture fast moving trends that can lead to these hypoglycemic episodes. *Id.* Ms. Torres informed SHRM that since having her medical alert dog, she has only had one episode requiring assistance from medics. *Id.*

59. In closing, Ms. Torres asks Ms. Belyna to let her know if she needs more information. *Id.*

**<u>SHRM's follow–up questions and Ms. Torres's responses</u>**

60. On June 18, 2024, Ms. Belyna responded to Ms. Torres's June 17, 2024 email asking three follow up questions: 1) whether Ms. Torres relies on her service dog both in her personal and professional daily activities; 2) whether it is accurate that there are some circumstances that she does not have her dog with her and, if so, what those circumstances are and when they occur; and 3) whether she can provide current medical documentation supporting her current need for the service dog. Ex. 7 at SHRM_Torres_613–14.

61. Ms. Torres responded the next day, and answered Ms. Belyna's questions as follows:

1) Ms. Torres stated that she relies on her medical alert dog at all times (24/7) and that he is generally with her at all times, including in her personal and professional life. Ex. 7 at SHRM_Torres_612.

2) Ms. Torres stated that when her service dog is not with her, it is a medical risk. Ms. Torres provided several specific examples of times when her dog is not with her, including: when he is taken for grooming; rare circumstances in her previous

employment at Cvent when she was in long meetings and needed a colleague to walk her dog; and if she feels an environment is physically unsafe for him, such as an extremely loud or crowded environment. Ms. Torres stated that she may not bring Meechum with her on the first day of work at SHRM to ensure that she could evaluate the seating layout so that she was better prepared for what she will need to bring for his set up. Ex. 7 at SHRM_Torres_612–13.

3) Ms. Torres explained that, as of November 2019, the date of her endocrinologist's letter, there have been no changes to her treatment plan. Ex. 7 at SHRM_Torres_612.

4) Ms. Torres again asked Ms. Belyna to let her know if she needs any further information. Ex. 7 at SHRM_Torres_613.

**<u>Dr. Joshi's letter</u>**

62. On June 20, 2024, Ms. Torres followed up with Ms. Belyna to provide an updated letter from her current endocrinologist, Dr. Joshi, confirming her diabetic alert dog's medical necessity at all times. Ex. 7 at SHRM_Torres_610–11; Ex. 3, Def.'s Objs. & Resps. to Pl's RFAs at 11 (RFA No. 18).

63. Ms. Belyna forwarded Dr. Joshi's letter to Mr. Link. Ex. 7 at SHRM_Torres_610; Ex. 18, Belyna Dep. 174:12–22.

64. Dr. Joshi's letter stated: "I am Fiona Torres's endocrinologist and I am writing in support of her having her service dog given her type 1 diabetes history. She has a history of severe hypoglycemic reactions resulting in her passing out leading to more dangerous situations such as car accidents in the past. It is imperative out of medical necessity she has her service dog at all times for her safety in light of her type 1 diabetes history with labile blood sugars. Please contact me if you have any further questions." Ex. 7 at SHRM_Torres_617.

**<u>SHRM's failure to consult medical professionals</u>**

65. SHRM did not contact Dr. Joshi after receiving her June 19, 2024 letter, Ex. 3, Def.'s Objs. & Resps. to Pl.'s RFAs at 14 (RFA No. 24), notwithstanding Dr. Joshi's express invitation for further questions, Ex. 7 at SHRM_Torres_617.

66. SHRM never informed Ms. Torres that it had questions for her medical providers about her accommodation request. Ex. 3, Def.'s Objs. & Resps. to Pl.'s RFAs at 13 (RFA No. 22).

67. After receiving Dr. Joshi's June 19, 2024 letter, SHRM did not request any additional medical documentation from Ms. Torres. Ex. 3, Def.'s Objs. & Resps. to Pl.'s RFAs at 13 (RFA No. 23).

68. After receiving Dr. Joshi's June 19, 2024 letter, SHRM did not request or receive any additional input from any medical professional regarding Ms. Torres's requested accommodation. Ex. 3, Def.'s Objs. & Resps. to Pl.'s RFAs at 14 (RFA No. 25).

69. In evaluating Ms. Torres's accommodation request, SHRM did not consult any endocrinologist or other medical professional. Ex. 3, Def.'s Objs. & Resps. to Pl.'s RFAs at 14 (RFA No. 25).

**SHRM's internal review**

70. Jim Link, SHRM's Chief Human Resources Officer, was the decision–maker with respect to Ms. Torres's accommodation request. Ex. 18, Belyna Dep. 190:12–17; Ex. 15, Link 30(b)(6) Dep. 68:6–16.

71. On June 6, 2024, Ms. Belyna asked Ms. Zoerkler, at the urgent request of Mr. Link, to provide a "fact file" on the "candidate with the service dog request" with information on the role of Sr. Specialist, Product Management, the candidate pool, the number of candidates interviewed, interviewer feedback, facts on Ms. Torres's selection for the role, details of the offer of employment extended to Ms. Torres, and details on Ms. Torres's accommodation request. Ex. 32, SHRM_Torres_1924; Ex. 22 at SHRM_Torres_452. Ms. Zoerkler provided all of the foregoing information to Ms. Belyna. Ex. 22 at SHRM_Torres_452. Ms. Belyna forwarded this information to Mr. Link. Ex. 32, SHRM_Torres_1924.

72. Also on June 6, 2024, SHRM's third–party administrator, Flores & Associates, provided Sheri Martel, Lead, Total Rewards, who served as the point of contact for employee requests for accommodation at SHRM, Ex. 31, Link Indiv. Dep. 43:7–45:15, with information on accommodating service animals in the workplace from the JAN Network, as well as a template Service Animal Agreement. Ex. 33, SHRM_Torres_2617–23 at SHRM_Torres_2617–21; Ex. 18, Belyna Dep. 53:14–54:1. Ms. Martel forwarded these documents to Ms. Belyna. Ex. 33 at SHRM_Torres_2617.

73. Ms. Martel has the authority to ensure accommodations happen when she determines an accommodation is "easily addressable" by SHRM. Ex. 31, Link Indiv. Dep. 49:3–7. Yet, aside from providing information to Ms. Belyna on how to accommodate a service animal, which Mr. Link did not consider when making his decision, Ms. Martel did not give any input into the evaluation of Ms. Torres's request. Ex. 33 at SHRM_Torres_2617–2621; Ex. 15, Link 30(b)(6) Dep. 62:10–64:4; *see* Ex. 15, Link 30(b)(6) Dep. 72:2–74:17 (Mr. Link listed the facts considered by SHRM before declining Ms. Torres's request, which omitted the information Ms. Martel provided to Ms. Belyna).

74. Other than Ms. Torres's accommodation request, Mr. Link has only been involved in one other accommodation request. Ex. 31, Link Indiv. Dep 133:1–135:3. He was made aware of another "as a courtesy" because of the "unique nature of this particular request from the individual and that medical condition[.]" *Id.* at Link Indiv. Dep 133:1–135:3.

75. Mr. Link stated that SHRM did not follow its standard practices and procedures for Ms. Torres's accommodation request because it was "non–traditional," meaning one that hadn't been handled by SHRM in the past. Ex. 31, Link Indiv. Dep. 90:3–22, 91:21–92:11, 92:18–94:2. SHRM did not provide its ADA Reasonable Accommodation Request Form to Ms. Torres. *Id.* at Link Indiv. Dep. 131:19–132:14; Ex. 18, Belyna Dep. 141:18–20.

76. Ms. Martel was not consulted by Mr. Link as part of his evaluation of Ms. Torres's accommodation request. *See* Ex. 15, Link 30(b)(6) Dep. 62:10–66:1 (omitting Ms. Martel from list of individuals who gave input into the evaluation of Ms. Torres's accommodation request).

77. Mr. Link reviewed Ms. Torres's emails and supporting documentation when evaluating her reasonable accommodation request. Ex. 15, Link 30(b)(6) Dep 72:2–73:6.

78. After receiving and reviewing Dr. Joshi's June 19, 2024, letter, Mr. Link acknowledged the letter "supported [Ms. Torres'] argument that [the service dog] was a necessary accommodation." Ex. 15, Link 30(b)(6) Dep. 89:22–90:21.

79. Mr. Link, however, concluded that Dr. Joshi's letter was "inaccurate" in stating that "[i]t is imperative, out of medical necessity, she has her service dog at all times for her safety in light of her type one diabetes history." Ex. 15, Link 30(b)(6) Dep. 91:4–15. Mr. Link determined Dr. Joshi's letter to be "inaccurate" because Ms. Torres reported to SHRM "numerous circumstances where the service dog is not with her." *Id.*

**<u>SHRM's re–posting of the job vacancy</u>**

80. While Ms. Torres awaited a response from SHRM to the additional information she provided on June 19, 2024, and the additional medical documentation she provided on June 20, 2024, SHRM employees were already in the process of attempting to repost the Sr. Specialist, Product Management role. Ex. 34, SHRM_Torres_1764–66 at SHRM_Torres_1765 ("Spoke to Debbie yesterday and asked her to start sourcing again for Fiona's role, while we wait to hear back."). SHRM posted the role on July 17, 2024. *Id.* at SHRM_Torres_1764.

**<u>SHRM's failure to identify any hardship</u>**

81. In evaluating Ms. Torres's accommodation request, SHRM did not conduct any analysis to identify whether any negative impact on SHRM's operations or facilities may result from granting Ms. Torres's requested accommodation. Ex. 3, Def.'s Objs. & Resps. to Pl.'s RFAs at 15 (RFA No. 26); Ex. 31, Link Indiv. Dep. 99:15–100:2.

82. In evaluating Ms. Torres's accommodation request, SHRM did not conduct any analysis to identify any financial cost to SHRM that may result from granting Ms. Torres's

requested accommodation. Ex. 3, Def.'s Objs. & Resps. to Pl.'s RFAs at 15–16 (RFA No. 27).

83. In evaluating Ms. Torres's accommodation request, SHRM did not conduct any analysis to identify any danger to SHRM employees that may result from granting Ms. Torres's requested accommodation. Ex. 3, Def.'s Objs. & Resps. to Pl.'s RFAs at 16 (RFA No. 28).

84. Although Mr. Link was aware that a decision to grant Ms. Torres's accommodation request *might* impact his workforce, he did not know what that impact would be, and SHRM did not conduct any analysis on any impact on the workforce. Ex. 15, Link 30(b)(6) Dep. 76:12–77:22, 86:22–87:13, 115:7–13.

85. The only fact Mr. Link could point to relating to any hardship to SHRM was the novelty of the request itself: "The fact that such an accommodation with the dog was the first time we had ever experienced such a request, either by a job candidate or by an internal, already employed, person in our organization, the very fact that we would go through these processes represented a hardship on the organization." Ex. 15, Link 30(b)(6) Dep. 54:15–55:4; *id.* at Link 30(b)(6) Dep. 55:5–8 (When asked if that was the extent of the facts that Mr. Link is aware of with respect to the undue hardship defense, he answered "Yes.").

86. Mr. Link testified that, generally, when an accommodation request is "something that SHRM can do," the accommodation request is granted. Ex. 31, Link Indiv. Dep. 137:10–14.

87. Mr. Link further stated that there was no reason that SHRM could not have accommodated Ms. Torres's request. Ex. 15, Link 30(b)(6) Dep. 85:12–21.

**SHRM's Denial of Ms. Torres's Accommodation Request**

88. On July 3, 2024, Ms. Belyna informed Ms. Torres that SHRM declined her request to have her service dog at work at SHRM as an accommodation. Ex. 7 at SHRM_Torres_609; Ex. 3, Def.'s Objs. & Resps. to Pl's RFAs at 16–17 (RFA No. 29).

89. When asked why SHRM denied Ms. Torres's accommodation request, Mr. Link stated: "SHRM determined in its sole discretion the dog is not required for her to perform the essential duties of that particular job." Ex. 31, Link Indiv. Dep. 87:17–19; *see* Ex. 35, SHRM_Torres_24–40 at SHRM_Torres_27–28 (SHRM's position statement to the EEOC stating "…since Ms. Torres uses her service dog at home as at work, it is not considered a job–related reasonable accommodation as a matter of law.")

90. Mr. Link believed she could perform the essential functions of the job without the service dog because of his understanding that she does not always have the dog with her (*e.g.,* when the dog is being groomed, on business trips, and possibly on the first day of work at SHRM). Ex. 31, Link Indiv. Dep. 128:2–12.

91. While Mr. Link referred to Ms. Torres's "extended personal trips overseas" without her service dog, he admitted that he was not aware of that information at the time he denied her accommodation request and, therefore, it was not a fact that established his belief that she could perform the essential functions of the job without the service dog. Ex. 31, Link Indiv. Dep. 128:2–130:12.

92. Over the course of five years, Ms. Torres has taken four trips to Europe; on each of these trips, Ms. Torres was traveling with her mother, Carmen Torres, who has helped Ms. Torres manage her diabetes, including by administering glucagon to restore Ms. Torres's loss of consciousness due to severe hypoglycemia. Ex. 4, Torres Dep. 182:9–183:4, 185:19–186:22, 189:17–190:15, 192:4–193:13; Ex. 5, Carmen Torres Dep. 118:10–119:6.

93. Ms. Torres traveled to Las Vegas once without her service dog on a work trip for her previous employer, Cvent. Ex. 4, Torres Dep. 194:8–195:19. On this trip, Ms. Torres experienced a "difficult-to-work-with low blood sugar at least once" which caused Ms. Torres symptoms of "severe[] sweating…feel[ing] fuzzy…[and] weak[.]" *Id.* at 194:11–196:12.

**<u>The four offered "alternatives"</u>**

94. In Ms. Belyna's July 3, 2024, email denying Ms. Torres's accommodation request, SHRM offered four other accommodations to Ms. Torres: 1) facilitating the use of Ms. Torres's CGM; 2) breaks as needed for Ms. Torres to check her blood sugar level; 3) a flexible open leave program to take off when needed to manage her condition; and 4) placement of her insulin pump or any food or drink near Ms. Torres's workstation. Ex. 7 at SHRM_Torres_609; Ex. 15, Link 30(b)(6) Dep. 96:8–15; Ex. 3, Def.'s Objs. & Resps. to Pl's RFAs at 17 (RFA No. 30).

95. SHRM salaried employees are ordinarily eligible to take work breaks and do not need an accommodation to do so. Ex. 3, Def.'s Objs. & Resps. to Pl's RFAs at 18 (RFA No. 31); Ex. 18, Belyna Dep. 238:12–18.

96. SHRM employees may ordinarily have food and drink at their workstations and do not need an accommodation to have such items at their workstations. Ex. 3, Def.'s Objs. & Resps. to Pl's RFAs at 19–20 (RFA No. 32); Ex. 18, Belyna Dep. 237:17–11.

97. SHRM's baseline leave program for all employees is an open leave policy. Ex. 3, Def.'s Objs. & Resps. to Pl's RFAs at 19 (RFA No. 33); Ex. 18, Belyna Dep. 239:9–18.

98. Both Ms. Torres's CGM and insulin pump are attached to her body. Ex. 4, Torres Dep. 112:2–15, 120:1–10; Ex. 6, Joshi Dep. 51:18–52:4 (testifying Ms. Torres uses an Omnipod insulin pump that is looped with a Dexcom CGM).

99. SHRM admits that no accommodation was required for Ms. Torres to use her CGM at work: To the extent SHRM employees have used a CGM while working at SHRM, those

employees have done so without seeking a workplace accommodation from SHRM to do so. Ex. 3, Def.'s Objs. & Resps. to Pl's RFAs at 18 (RFA No. 31).

**Ms. Torres's response to SHRM on its denial of accommodation**

100. On July 6, 2024, Ms. Torres responded to Ms. Belyna's July 3, 2024, email denying Ms. Torres's accommodation request. Ex. 7 at SHRM_Torres_608–09.

101. In that email, Ms. Torres explains why the proposed alternative accommodations offered by SHRM are not effective for her. *See* Ex. 7 at SHRM_Torres_608–09. Ms. Torres explains specific, recurring circumstances under which her CGM is unable to provide readings: (1) the two–hour warm–up period that occurs every ten days; (2) pharmacy delays in shipment; (3) insurance delays in fulfilling prescription refills; (4) CGM malfunction or error; and (5) the CGM falling off or being accidentally removed, requiring a new CGM and a two–hour warm up period. Ex. 7 at SHRM_Torres_609.

102. Ms. Torres further explains why the CGM alone is not effective for her: "During the events above, there is no accommodation that could be made to prevent me from the life threatening events my service dog is trained to protect me from." Ex. 7 at SHRM_Torres_609. On July 7, 2024, Ms. Belyna acknowledged receipt of Ms. Torres's email. *Id.* at SHRM_Torres_608.

**SHRM's failure to engage with Ms. Torres's concerns about the "alternatives"**

103. SHRM's response to Ms. Torres's July 6, 2024, email did not address, or even acknowledge, any of Ms. Torres's concerns about SHRM's proposed "alternatives." Ex. 7 at SHRM_Torres_608. Instead, SHRM responded by rescinding the job offer to Ms. Torres. *Id.*

104. Mr. Link acknowledges that SHRM made no effort to ask Ms. Torres any questions it had about the CGM inadequacies she identified. Ex. 3, Def.'s Objs. & Resps. to Pl.'s RFAs at 20–21 (RFA No. 36); Ex. 15, Link 30(b)(6) Dep. 95:2–13.

105. Between Ms. Torres's July 6, 2024, e–mail and SHRM's July 15, 2024, rescission, SHRM did not propose any additional or different alternative accommodations to Ms. Torres. *See* Ex. 15, Link 30(b)(6) Dep. 94:19–95:1.

**SHRM's rescission of the offer**

106. Mr. Link made the decision to rescind Ms. Torres's offer of employment. Ex. 15, Link 30(b)(6) Dep. 66:17–67:6.

107. Mr. Link notified Ms. Belyna of the rescission decision by telephone: "I communicated to Nicole that I had determined that we were going to be unable to reach a reasonable accommodation request with Ms. Torres, and that we should rescind the offer." Ex. 15, Link 30(b)(6) Dep. 103:20–104:1.

108. On July 15, 2024, Ms. Belyna emailed Ms. Torres rescinding the offer of employment. Ex. 18, Belyna Dep. 212:20–213:22.

109. The rescission email stated: "Dear Fiona, We received your communication. Unfortunately, it does not appear there are any reasonable accommodations that would allow you to perform the essential functions of the role. We are unable to grant your request to have a service dog in the workplace. Should anything change regarding potential alternative accommodations that would allow you to perform the essential functions of the role, we remain open to having those discussions. At this stage, and based on the foregoing, we will need to rescind the offer. Thank you, Nicole." Ex. 7 at SHRM_Torres_608.

110. When asked why Ms. Torres's accommodation request was not reasonable, Mr. Link provided three reasons: 1) inconsistencies in Ms. Torres's request and her lived experience; 2) the use of the CGM as an alternative; and 3) Ms. Torres's "sheer entrenchment" regarding her need for the service dog. Ex. 15, Link 30(b)(6) Dep. 85:19–86:21.

111. The rescission of Ms. Torres's offer of employment was not based on the results of a background check. Ex. 3, Def.'s Objs. & Resps. to Pl.'s RFAs at 24 (RFA No. 44).

112. The rescission of Ms. Torres's offer of employment was not based on any assessment of Ms. Torres's qualifications for the position. Ex. 15, Link 30(b)(6) Dep. 106:2–6 (testifying Ms. Torres was a "qualified capable candidate" and "her own experiences met the essential duties of the job"); Ex. 31, Link Indiv. Dep. 153:8–14 (testifying Torres "appeared to meet all of the criteria for the successful completion of the job").

113. SHRM "did not determine that Ms. Torres was unable to perform all essential functions of the role." Ex. 36, Def.'s Objs., Answers, & Fourth Supp'l Resps. to Pl.'s Disc. Reqs. at 47 (ROG 11).

114. The rescission of Ms. Torres's offer of employment was not based on any conduct of Ms. Torres's. Ex. 15, Link 30(b)(6) Dep. 101:12–15 (testifying SHRM did not revoke Ms. Torres's employment offer based on any action that she took).

115. With respect to SHRM's Employee Code of Conduct, Mr. Link is not aware of any circumstance under which a person has been disciplined for behavior that was exhibited before they were an employee. Ex. 31, Link Indiv. Dep. 244:10–15; *see* Ex. 31, Link Indiv. Dep. 245:2–9 (SHRM's Code of Conduct does not apply to people who are not yet employees).