# Exhibit 15

V I R G I N I A:

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

ALEXANDRIA DIVISION

---------------------------x

FIONA TORRES, :

Plaintiff, :

vs. : Case No.:

SOCIETY FOR HUMAN RESOURCE : 1:25-CV-2360 (PTG/WBP)

MANAGEMENT, :

Defendant. :

---------------------------x

DEPOSITION OF JIM LINK 30(B)(6)

McLean, Virginia

Friday, June 12, 2026

9:20 a.m.

Job No.: 637566

Pages: 47 - 123

Recorded By: Samuel Pachon

Deposition of JIM LINK 30(B)(6), held at the offices of:

LITTLER MENDELSON P.C.
1800 Tysons Boulevard, Suite 500
McLean, Virginia 22102

Pursuant to Notice, before Samuel Pachon, Notary Public in and for the Commonwealth of Virginia.

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:

HECTOR F. RUIZ, ESQUIRE
ANNA KATHRYN BARRY, ESQUIRE
KALIJARVI, CHUZI, NEWMAN & FITCH, P.C.
818 Connecticut Avenue N.W., Suite 1000
Washington, DC 20006
202.331.9260

ON BEHALF OF THE DEFENDANT:

TANJA L. DARROW, ESQUIRE
LAUREN M. BRIDENBAUGH, ESQUIRE
LESLIE P. CURRIE, ESQUIRE
TIFFANY DIN FAGEL TSE, ESQUIRE
LITTLER MENDELSON, P.C.
633 West 5th Street, 63rd Floor
Los Angeles, California 90071
213.443.4300
HANTON WALTERS, ESQUIRE
SOCIETY FOR HUMAN RESOURCE MANAGEMENT
1800 Duke Street
Alexandria, Virginia 22314
703.535.6047

internal, already employed, person in our organization, the very fact that we would go through these processes represented a hardship on the organization.

Q Is that -- is that the extent of the facts that you're aware of with respect to the sixth affirmative defense?

A Yes.

Q Okay. Has the factual basis for this affirmative defense changed since the answer was filed in this in this -- in this action?

MS. BRIDENBAUGH: I'm going to object to the extent I think that calls for a legal conclusion. I'm not sure that he can answer that question, but -- or that it's within the parameters of the topic. But you can answer.

A I'm aware of no changes.

Q During the last -- or initial -- initial session of the 30(b)(6), we discussed the job duties and essential functions of the position to which Ms. Torres -- for which Ms. Torres was offered a conditional offer of employment. Do you

property requirements that we would not want to be exposed outside of the organization. So it would -- it would relate specifically to intellectual property, technology for which the risk of outside exposure would be great.

Q Sir, my understanding is that Ms. Torres was extended a conditional offer of employment. Is that correct?

A That is correct. She was extended a verbal offer of employment, and that was done on June 3rd.

Q What were the conditions that had to be satisfied with respect to that conditional offer of employment?

A There are several conditions which needed to be met. First, she needed to find the terms and conditions of the offer acceptable. Secondly, there is a background check which is required is clearly a condition of employment. And SHRM, in its right, also maintains the opportunity to pull back or withdraw or rescind -- rescind an offer at any given time, under any circumstances, for any

reason, or no reason at all. In this particular case, the -- the offer was eventually rescinded.

Q With respect to Ms. Torres's obligations, is it that she just had to pass a background check?

A Yes. Successfully completed background check would be a primary component of the conditional offer. During that time, Mr. Ruiz, she would also need to continue to maintain her status as a candidate. In other words, she could disqualify herself because of actions which she undertook or things that she did that could cause us, again, to withdraw or rescind that offer at any given time. So that also implies a conditional employment offer.

Q And that that last condition, that would apply to everybody, is that correct?

A Yes.

Q So I want to ask you about Topic 8, the identity -- I'm sorry. Let me -- (Indiscernible) find it. If you look at Exhibit 1, Topic 8, it's the identity of all individuals who, during the period of Ms. Torres's application and

accommodation request, were authorized to accept, deny, or offer alternatives in response to requests for medical or disability accommodations on behalf of SHRM, and all individuals who gave input into the evaluation of and decision on Ms. Torres's specific accommodation request, regardless of whether they held formal decision-making authority; do you see that, sir?

A I do.

Q Okay. Will you please identify each person that gave input into the evaluation of Ms. Torres's accommodation request?

A The notification of the request for accommodation came to Debbie Zoerkler, who was our lead of -- of recruiting or talent acquisition, terms we use synonymously at SHRM. That request was then sent to Nicole Belyna, who is our director of talent. Upon receipt of that notification, Nicole Belyna then notified me.

When I was notified, I -- of the request for accommodation, in a -- on the same day, but in a secondary conversation, I learned that the -- the

request for accommodation also involved the request for a service dog. Because we had not experienced that request before either for a service dog or for an applicant in our process, I immediately then notified our internal counsel of such request, as I knew that involvement would be necessary in order to reach an appropriate accommodation response -- the accommodation request -- after that point became involved with me, our internal counsel and our external counsel.

Q Thank you so much for that description. So with respect to actually giving input into the evaluation of Ms. Torres's accommodations, did Ms. Zoerkler provide input?

A No.

Q Did Ms. Belyna provide input?

A She did not.

Q So it was just the remainder of the of the persons after that that provided input?

A Correct.

Q Was there anyone else that provided input into the evaluation of Ms. Torres's accommodation

request?

A Other than myself, internal counsel and external counsel, and operations that we did within that those discussions, there was nobody.

THE REPORTER: Counsel, I -- I -- if I -- if I may just interrupt. My (indiscernible) just stopped responding, my keyboard, and nothing's (indiscernible). I may have to go off the record a the moment.

MS. BRIDENBAUGH: Hector, do you want to go off the record?

MR. RUIZ: Sure. Go ahead.

THE REPORTER: Going off the record. Stand by please.

(OFF THE RECORD)

THE REPORTER: We are back on the record.

BY MR. RUIZ:

Q All right, sir, we were discussing the persons that gave input into the evaluation of Ms. Torres's accommodation request before we went off the record. Do you recall that, sir?

A We were, yes.

Q You mentioned that in working with internal and external counsel, there were also operations we did within those discussions. What are those operations you're referring to?
A Collaborative discussions to determine the best outcome for Ms. Torres's reasonable accommodation request. It's an operating rhythm, collaborative process.
Q Were those collaborative discussions only with internal and external counsel?
A And me?
Q Okay.
A Yes.
Q Okay. Okay. This question is just slightly different, okay? Would you please identify each person that gave input into the decision on Ms. Torres's accommodation request?
A It would be the same group I just described to you. It would be internal counsel, external counsel, and myself.
Q Just internal counsel, external counsel, and yourself?

A That's correct.
Q Thank you so much. Sir, I'm going to ask you to look at Topic 9.
A Is that Exhibit 1?
Q Topic 9 would be on Exhibit 1, yes, sir -- the -- Fiona Torres's amended notice of Rule 30(b)(6) deposition. And Topic 9 is the identity and roles of all individuals involved in or contributing to the decision to rescind Ms. Torres's conditional offer of employment, including individuals who evaluated, recommended, or gave input into that decision, regardless of whether they held decision making authority, and the specific individuals who made or approved the final decision. Do you see that, sir?
A I do.
Q And would you please identify each person that had a role in the decision to rescind Ms. Torres's conditional offer of employment?
A Those individuals would be internal counsel, external counsel, and myself.
Q Did any person recommend that Ms. Torres

-- Ms. Torres's conditional offer of employment be rescinded?

MS. BRIDENBAUGH: Objection to the extent -- to the extent the answer would involve attorney advice. Otherwise, you can answer the question.

A I made the decision.

Q Yes, sir. Did anybody recommend to you that the -- that Ms. Torres's conditional offer of employment be rescinded?

MS. BRIDENBAUGH: Objection. To the extent that any recommendation relates to legal advice. You can otherwise answer.

A That would be under the privilege.

Q Okay. So are you declining to answer based on your attorney's instruction?

A I'm declining to answer that I know that that -- the answer to that question is under privilege.

Q Would you please turn to Topic 11? And topic 11 is identity and roles of all individuals involved in evaluating, deliberating upon, and deciding Ms. Torres's request for an accommodation

to bring her service dog to the workplace at SHRM in all meetings, in person or virtual, held to discuss or decide the request. Do you see that, sir?

A I do.

Q Mr. Link, who was involved in deciding. Ms. -- Ms. Torres's accommodation request to bring her service dog in the workplace?

A The answer to the question is internal counsel, external counsel, and myself.

Q What was your role in that process?

A As one person who was involved in the collaboration to reach an answer of -- related to Ms. Torres's request.

Q Did you play any other role?

A I eventually made the decision.

Q What was the role that external counsel held?

A Advisory.

Q And internal counsel, sir?

A Advisory.

Q Were there meetings held to address Ms.

that you've discussed, were there telephone calls held to address Ms. Torres's accommodation request to bring her service dog to the workplace at SHRM?

MS. BRIDENBAUGH: Objection vague.

A Only the two I just described to you in previous testimony where Ms. Belyna notified me via phone of the original request for accommodation, and then later that same day, a secondary phone call in the course of another conversation, where she advised me that that request for accommodation involved a request for a service dog.

Q Okay. And were there any (indiscernible)?

MS. BRIDENBAUGH: Objection? Asked and answered.

A No.

Q Thank you. Okay. Sir, I want you to direct your attention to Topic 12. Topic 12 is the facts considered by each individual involved in evaluating and rejecting Ms. Torres's accommodation request, including all information gathered, all factors weighed, and the reasons for the rejection. Do you see this, sir?

A I do.

Q Okay. What facts were gathered by SHRM before SHRM declined Ms. Torres's accommodation request to have her service dog with her at work?

A There were numerous facts that were obtained by SHRM. Those facts were primarily presented by Ms. Torres and has been presented as evidence in this particular case. It includes much of the email documentation which you have presented as part of this evidence pack here. And we also, at that point in time, had met in the collaborative process involving internal and external counsel, and myself in order to make the determination that the preferred accommodation request to have the service dog on site would be disallowed.

That decision was made because of the information that we received from Ms. Torres, which was inconsistent with what we knew to be the -- her -- her request at that time. She had requested to have the service dog on site with her. She had communicated to us at that time that the service dog was required to be with her 24/7, when, in

fact, according to her own testimony -- I'm sorry -- her own information presented here, that was not the case.

Q So when you're saying here, you mean Exhibit 5?

A Correct. In that case, that inconsistency and the fact that this position required travel of up to 10 percent of the time where that Ms. Torres had already reported to us, the service dog would not be accompanying her, that time amounted to 208 hours per year, assuming a 2080-hour work year cycle. In no circumstance whatsoever was it was it necessary for us to accommodate a service -- her preferred service request whenever she had already admitted to us that for at least 208 hours, assuming she traveled up to 10 percent of the time, the service dog would not be accompanying her.

In our offices, we work Tuesday, Wednesday and Thursday in the office. That is, obviously -- 24 hours a week in the office times four in a normal month, that's 96 hours. So, alone, when we look at the amount of time that Ms. Torres

a vacuum.
MR. RUIZ: Yeah.
THE REPORTER: One moment. Off the record.
(A DISCUSSION WAS HELD OFF THE RECORD.)
THE REPORTER: We are back on the record.
THE WITNESS: Counsel, could you repeat your last question to me?
BY MR. RUIZ:
Q Yes, sir. I was asking whether or not -- or -- the -- in your discussions with counsel, if any facts were provided to you?
A There was one fact of which I was aware of which my own cognizance prepared me to -- to consider a fact in this consideration, which was the impact that such a decision would have upon the rest of my 300-person workforce, not only the employees, but also the facility, the community, and any other factors that I needed to consider regarding how this accommodation would potentially impact that location, those employees in that group.
That is a fact, not that was presented to

in favor of granting Ms. Torres's request to have her service dog at work?

A Yes.

Q Which were those?

A I wanted to find an acceptable reason to accommodate the request. That was a primary factor -- when I began this process. I wanted this to have an outcome where we could accommodate the best solution set to hire Ms. Torres into our organization. That included considering the use of a service dog.

Q And Is there any reason that you -- that SHRM couldn't accommodate the request?

MS. BRIDENBAUGH: Objection calls for speculation. Beside the topic.

A No.

Q No, there's no reason it could not have accommodated the request?

A Had it been a reasonable accommodation request, absolutely, we could have accommodated that.

Q When you say reasonable -- when you say

if it had been a reasonable accommodation request, in your view, what made this not reasonable?

A The three reasons I just shared with you. One, hugely inconsistent in what she was telling us she needed and her lived experience to the point that it misrepresented facts; number two, the use of the continuous glucose monitor as an alternative, particularly along with others. But the continuous glucose monitor; and number three, her sheer entrenchment over the fact that nothing else would work.

She maintained that she could not perform the essential duties of this position without the use of a service dog, yet, she was willing to accept a job that involved at least up to 10 percent travel, where she told us, of her own use, she would not have the service dog accompanying her. That's inconsistent -- and there's -- and that compelled me to make a decision regarding this matter in considering those three categories in our response.

Q Other than those three categories, was

there anything else that, in SHRM's estimation, made this -- her request unreasonable?

MS. BRIDENBAUGH: Objection. Asked and answered.

A Other than the facts of consideration for the entirety of my workforce, my building, my employees, my community, the answer is no.

Q But for that -- that last -- those considerations, you didn't actually reach that evaluation, is that correct?

MS. BRIDENBAUGH: Objection. Vague calls for a hypothetical.

A I did not.

Q Sir --

A Counsel, may I add to a question answered earlier?

Q Absolutely.

A Yeah. You had asked me --

Q Okay. Go ahead, sir.

A You asked me how we knew about her use of the continuous glucose monitor before we made the decision on July 3rd. If you'll notice, on

Thursday, June 20th, on Page 610, she writes to Ms. Belyna, in the third paragraph, I've been a patient for four years, and my treatment plan, including my service dog, continuous monitor, and insulin pump is evaluated and reviewed by her regularly.

Q On what page was that?

A 610, 000 -- four zeros, 610.

MS. BRIDENBAUGH: Thank you. I think he means continuing onto the next page, but I won't --

A Yeah. So, Counsel, it's at the bottom. It -- I'm sorry; I'm not clear. It begins at the bottom of Page 610, it continues on to the top of 611, and it was actually from Page 611 that I was reading the paragraph.

Q Thank you sir.

A That is where I became aware, at least in writing, of these, the continuous glucose monitor, which had already been confirmed in a conversation I had with Nicole.

Q Sir, would you please turn, on Exhibit 5, to Page 00613. On the bottom, it's an email from Ms. Belyna to Ms. Fiona on June 18th, 2024, at 4:51

p.m. The paragraph at the bottom reads, Finally, it appears that the physician's note referencing your service dog is from 2019. Can you please provide any current medical documentation that you have supporting your current need for your service dog and any exceptions to use of the service dog? Do you see that, sir?

A I do.

Q Okay. Why was an updated doctor's note requested from Ms. Torres?

A As part of the evaluative process, five years is a long time, and we wanted to have the most recent and current information as part of the proper consideration of Ms. Torres's request.

Q And Ms. Torres provided that updated note, as requested, did she not?

A She did.

Q Okay. Was there -- how did the -- sir, would you please turn to the last page of Exhibit 5? It's 000618.

A Yes, sir. I'm there.

Q Okay. Do you recognize this as the

updated documentation from her provider that was requested?
A I do.
Q Okay. Did you consider this at the time that Ms. Torres's accommodation -- requested accommodation was evaluated?
MS. BRIDENBAUGH: Objection. Vague.
A This is one of the many things that we utilized in that consideration that you just asked me about.
Q But how did -- did -- this this note from Dr. Joshi, how did it factor into your decision with respect to evaluating Mrs. Torres's accommodation request.
MS. BRIDENBAUGH: Objection. Vague.
A It -- Counsel, it was one of many factors that we considered.
Q Did this weigh in favor of granting her accommodation request?
A I think it supported her argument that it was a necessary accommodation, yes.
Q Would there have been any -- was this --

this documentation that was provided by Ms. Torres, did you find it insufficient to support her, her requested accommodation?

A I found it inaccurate in the fact that the physician stated -- and I'm reading from the document -- It is imperative, out of medical necessity, she has her service dog at all times for her safety in light of her type one diabetes history. And it goes on. That is not the case. She herself reported to us that there are numerous circumstances where the service dog is not with her. So in this case, Counsel, it appears she's not following the advice of her own medical counselor in -- in -- at least as to what's written here and as to my interpretation.

Q Thank you sir. Sir, I want to turn your attention to Topic 13. Topic 13 is identity and roles of all individuals involved in developing, recommending, and offering the alternative accommodations presented to Ms. Torres in response to her service dog accommodation request. Do you see that, sir?

A I do.
Q Who was involved in developing the alternative accommodations offered to Ms. Torres?
A Internal counsel, external counsel, and myself.
Q Sir, what was your role in developing the alternative accommodations offered?
A Based upon advice I received, I made the ultimate decision of what accommodations would be offered to Ms. Torres.
Q Did you develop the specific accommodations that were offered to her?
MS. BRIDENBAUGH: Objection. Vague.
A Eventually, yes.
Q Did anyone recommend any of the alternatives that you ultimately decided to offer Ms. Torres?
MS. BRIDENBAUGH: Objection. Vague. And if the answer would disclose legal advice, I would advise you not to disclose the legal advice, but you can otherwise answer as to the alternative accommodations you considered.

when we presented those alternative accommodations to Ms. Torres, that she would have at least had the courtesy to ask us questions about those alternative accommodation requests. She didn't do that, and, instead, what she did was described to us all of the reasons that her continuous glucose monitor was not an alternative accommodation acceptable response for her.

I would have suspected and believed and have seen that whenever you talk to someone about an accommodation request, if they're actually considering it, they ask you questions. She did not. Instead, she told us every reason why something couldn't work rather than asking me any questions or proposing any other solution set to help me help her find an alternative accommodation that would be acceptable to both her and to us as the employer.

Q Thank you sir. My question was other than what was offered to her, did you consider any other accommodation?

A No, although I would have highly been

open to it.

Q In evaluating the accommodations to offer Ms. Torres was there any effort to ask -- on behalf of SHRM to ask Ms. Torres about any issues she's raised with the CGM?

A Not of which I'm aware, other than what has been produced as evidence here in writing.

Q Okay. I'm sorry. Let me make sure I understand. I want to know if SHRM asked Ms. Torres about the CGM issues that she's raised -- that she raised.

MS. BRIDENBAUGH: Objection. Vague.

A No.

Q Sir, would you turn to Topic 14, please? Topic 14 is the facts considered in proposing alternative accommodations, and -- I'm sorry -- it reads, The facts considered by those individuals in developing and proposing alternative accommodations, including the reasons why the specific accommodations were selected.

Okay. So when looking at Exhibit 5, sir, on Page 000612 -- I'm sorry; wrong page -- 000609,

the bottom -- the paragraph at the bottom beginning with this, At this time, we are declining your preferred accommodation request to have your service dog on site --

A Uh-huh.

-- there are other accommodations that are proposed. And the paragraph, third sentence, reads, These other accommodations include, but are not limited to, facilitating the use of your continuous glucose monitoring system (CGM) while on site, breaks as you may need to check your blood sugar level, a flexible open leave program to take off when you need to manage your condition, placement of your insulin pump or any food or drink you may require near your workstation, et cetera. Do you see that, sir?

A I do.

Q Okay. So in terms of you, what would facilitating the use of her CGM accomplish?

MS. BRIDENBAUGH: Objection. Vague.

A It would accomplish an outcome allowing her to do what we had already learned at this point

the decision, do you see that, sir?

A I do.

Q Earlier, sir, when we were discussing the conditional offer, you testified that one condition was that a person could revoke or -- like, their status -- or the conditional offer could be revoked based on any action that any applicant would take or could take. Do you remember that?

A I do.

MS. BRIDENBAUGH: Objection. Mischaracterizes the testimony.

Q Did -- did SHRM revoke Ms. Torres's status based on any action that she took?

MS. BRIDENBAUGH: Objection. Vague.

A No.

Q Okay. What facts were considered with respect to SHRM's decision to rescind the conditional offer to Ms. Torres?

A All of the information that we've presented thus far in -- in this, including all these emails and other exhibits which have been presented, are facts that were considered in the

rescission of the offer. In this matter regarding the rescission specifically, it was clear that of the three factors I described to you earlier, the third one being entrenchment, meant that we were not going to be able to meet Ms. Torres's request to bring a service dog into the workplace. And despite our ongoing iterative interactive efforts to find an alternative accommodation that would work for Ms. Torres and with us, I decided to rescind the offer based on that series of facts.

There's a secondary series of facts, which I also considered in the decision to rescind the offer to Ms. Torres, and those were business reasons. First, I had an open position which had been open at this point in time for 45 days, and I had a business which needed the advice, capability, and essential functions and skills of the person who successfully came into the job. It appeared, at that -- by that point in time, that Ms. Torres was entrenched on bringing her service dog into the location, and, at that point in time, I had to make a decision as a chief human resources officer in

the organization.

Had I reached the end of the active interactive -- of the interactive, iterative process with Ms. Torres? The answer to that question is no. We told her that if anything changed, in the final document that we sent to her regarding this, we would consider those things. She submitted nothing, as was characteristic of providing anything other to us than excuses as to why the CGM wouldn't work or the demand for her service dog. I had to, at some point in time, make a business decision to move on from Ms. Torres, and I made that, and it was communicated to her by Nicole Belyna.

Q When Nicole Belyna communicated the decision to Ms. Torres, had you communicated to Ms. Belyna that SHRM was moving on from Ms. Torres?

MS. BRIDENBAUGH: Objection. Mischaracterizes the testimony.

A I communicated to Nicole that I had determined that we were going to be unable to reach a reasonable accommodation request with Ms. Torres,

and that we should rescind the offer.
Q Sir, would you please look at 000608? I'm looking at the email from Ms. Belyna on July 15th, 2004 to Ms. Fiona.
A I see it, Counsel.
Q Okay. It begins with the sentence, We received your communication. Do you see that?
A I do.
Q Okay. It -- it -- the second to the last paragraph states, Should anything change regarding potential alternative accommodations that would allow you to perform the essential functions of the role, remain -- we remain open to having those discussions. Do you see that, sir?
A I do.
Q Did SHRM, like -- did SHRM remain open to hiring Ms. Fiona at this point?
A Absolutely.
Q Okay.
A At any time in this active, iterative, iterative process, she could have accepted the offer. She could have said, yes, I'm willing to

start work on X date. She never did that.

Q But I'm trying to understand. You just told me that you had communicated to Ms. Belyna that moving on from Ms. Torres.

A But with the -- with the expectation that should anything change regarding potential alternative accommodations that would allow you to perform the essential functions of the role, we would remain open to having those discussions. What I hoped that this would generate, in addition to me being able to move on and start looking at other candidates for this particular job, is that Ms. Torres would come back and say, here are some other things that might work. She never said that. As a matter of fact, after this communication, to my knowledge, there was never another word from her under any -- of which I'm aware.

Q But the next -- in the next sentence, the offer for the job is rescinded, isn't it?

A It is.

Q Okay. Did you expect her to come back to you with -- after a conditional offer was

rescinded?
A This was a qualified capable candidate -- that's honestly hard to find in the marketplace today -- and who met the essential functions and -- her own experiences met the essential duties of the job. Why would I, as a business leader, want to re-recruit someone? I wanted to find someone with her skills, competencies, and capabilities who would -- who would come into the workplace and perform that job effectively to help my business grow. So the answer to the question is I wanted to accommodate her, but with alternative accommodations that were acceptable to both the employee and the -- potential employee and the employer.
Q Well, despite the difficulties finding qualified individuals, you did -- SHRM did rescind the job offer?
A We did.
MR. RUIZ: Okay. And thank you sir.
Can we take a five-minute break here? Yeah.
THE REPORTER: Stand by one moment,

off the record.

(OFF THE RECORD)

THE REPORTER: We are back on the record.

EXAMINATION BY COUNSEL FOR THE DEFENDANT

BY MS. BRIDENBAUGH:

Q I just have a few questions. Mr. Link, what was SHRM's in-person work requirement in 2024?

A SHRM has a structure, hybridized workplace, and what that means is that Tuesdays, Wednesdays and Thursdays are fully in-office unless you're on business travel, and Mondays and Fridays are fully virtual as long as you have your technology and a wireless signal and can work. That -- that is our structure, and those were the in-office requirements then and today.

Q What kind of business do SHRM employees travel for?

A A variety of matters. Usually, it's events that are where we are hosting an event in a different city or a different location. For example, in this -- the Torres matter, one of the largest events that she would be -- it would be

whether it could accommodate Ms. Torres's request for a service dog at SHRM's office?

A Well, all of the actions that we took, we've talked about here over -- over the course of these events, these depositions, and it's inclusive of the evidence which -- which has been introduced as well. We -- we were prepared to further evaluate the impact on the workplace, on the workforce, employee allergic reactions, and other considerations that one must do if one is to have a service dog in the workplace; however, we never got to the point that the service dog would be accepted as the preferred accommodation, as Ms. Torres requested, because of the inconsistencies in her lived experience of when she had the service dog with her in the first place, including the fact that significant amounts of time, as I testified earlier, would be -- would have involved her being away from the dog, because she had already testified -- I'm sorry -- she had already indicated that she would not take the dog with her on business travel.

CERTIFICATE OF TRANSCRIBER

I, Karen M. Galvez, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding; that said proceedings were reduced to typewriting under my supervision; that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; and that I am neither counsel for, related to, nor employed by any of the parties to the case and have no interest, financial or otherwise, in its outcome.



KAREN M. GALVEZ
PLANET DEPOS, LLC
June 18, 2026

Planet Depos

June 18, 2026

Lauren M. Bridenbaugh, Esquire
Littler Mendelson P.C. (McLean)
1800 Tysons Blvd Suite 500
McLean, VA 22102

Re: Deposition of **Jim Link, Corporate Designee - Volume 2**
Date: 6/12/2026
Case: Torres -v- Society for Human Resource Management

Dear Sir/Madam,

Attached please find the above-referenced deposition transcript. If applicable, signature is required within 30 days from the date of this letter.

In accordance with the disposition of signature at the deposition or the pertinent jurisdictional rules, the deponent should follow these instructions to complete the Errata Sheet:

(1) Read the transcript and indicate any corrections or changes in ink on the enclosed Errata Sheet. Please include page and line numbers. If more space is needed for corrections, please use a blank sheet of paper. If no corrections or changes are necessary, please indicate "no corrections" or "no changes" on the Errata Sheet.

(2) Sign and date the Errata Sheet and Acknowledgement of Deponent/Affiant pages.

(3) Please return the executed Errata Sheet and Acknowledgement pages to the address indicated below, submit via fax (888-503-3767) or email (transcripts@planetdepos.com).

A copy of this letter and the returned signature pages, if any, will be distributed to counsel.

Sincerely,

Production Department
Planet Depos, LLC
451 Hungerford Drive
Suite 400
Rockville, Maryland 20850

No. 637566

No. 637566

Re: Deposition of **Jim Link, Corporate Designee - Volume 2**
Date: 6/12/2026
Case: Torres -v- Society for Human Resource Management
Return to: transcripts@planetdepos.com

| Page | Line | Correction/Change and Reason |
|---|---|---|
| 96 | 5-9 | Line 5 is an answer. Lines 6-9 |
| | | are a continuation of the same |
| | | question and should not be |
| | | bolded as a response. |
| 119 | 13 | The word "language" should be |
| | | "linkage." |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

8 July, 26
(Date)

Jim Link
(Signature)

No. 637566

Re: Deposition of **Jim Link, Corporate Designee - Volume 2**
Date: 6/12/2026
Case: Torres -v- Society for Human Resource Management
Return to: transcripts@planetdepos.com

ACKNOWLEDGMENT OF DEPONENT

I, Jim Link, Corporate Designee - Volume 2, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me and any corrections appear on the attached Errata sheet signed by me.

8 July '26 (Date) — [signature] (Signature)

Planet Depos

June 18, 2026

Lauren M. Bridenbaugh, Esquire
Littler Mendelson P.C. (McLean)
1800 Tysons Blvd Suite 500
McLean, VA 22102

Re: Deposition of **Jim Link, Corporate Designee - Volume 2**
Date: 6/12/2026
Case: Torres -v- Society for Human Resource Management

Dear Sir/Madam,

Attached please find the above-referenced deposition transcript. If applicable, signature is required within 30 days from the date of this letter.

In accordance with the disposition of signature at the deposition or the pertinent jurisdictional rules, the deponent should follow these instructions to complete the Errata Sheet:

(1) Read the transcript and indicate any corrections or changes in ink on the enclosed Errata Sheet. Please include page and line numbers. If more space is needed for corrections, please use a blank sheet of paper. If no corrections or changes are necessary, please indicate "no corrections" or "no changes" on the Errata Sheet.

(2) Sign and date the Errata Sheet and Acknowledgement of Deponent/Affiant pages.

(3) Please return the executed Errata Sheet and Acknowledgement pages to the address indicated below, submit via fax (888-503-3767) or email (transcripts@planetdepos.com).

A copy of this letter and the returned signature pages, if any, will be distributed to counsel.

Sincerely,

Production Department
Planet Depos, LLC
451 Hungerford Drive
Suite 400
Rockville, Maryland 20850

No. 637566

No. 637566

Re: Deposition of **Jim Link, Corporate Designee - Volume 2**
Date: 6/12/2026
Case: Torres -v- Society for Human Resource Management
Return to: transcripts@planetdepos.com

| Page | Line | Correction/Change and Reason |
|---|---|---|
| 96 | 5-9 | Line 5 is an answer. Lines 6-9 |
| | | are a continuation of the same |
| | | question and should not be |
| | | bolded as a response. |
| 119 | 13 | The word "language" should be |
| | | "linkage" |

8 July, 26
(Date)

Jim Link
(Signature)

No. 637566

Re: Deposition of **Jim Link, Corporate Designee - Volume 2**
Date: 6/12/2026
Case: Torres -v- Society for Human Resource Management
Return to: transcripts@planetdepos.com

ACKNOWLEDGMENT OF DEPONENT

I, Jim Link, Corporate Designee - Volume 2, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me and any corrections appear on the attached Errata sheet signed by me.

8 July '26 Jim Link

(Date) (Signature)