# Exhibit 31

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

FIONA TORRES, )
Plaintiff, )
v. ) 1:25-cv-2360 (PTG/WBP)
SOCIETY FOR HUMAN RESOURCE )
MANAGEMENT, )
Defendant. )

Rule 30(b)(1) Deposition of JIMMY RAY LINK

McLean, Virginia

Monday, May 11, 2026

9:03 a.m.

Job No.: 632710

Pages: 1 - 249

Transcribed by: Jerome E. Harris, Stenographer.

Rule 30(b)(1) Deposition of JIMMY RAY LINK, held at the offices of:

SOCIETY FOR HUMAN RESOURCE MANAGEMENT
1800 Duke Street
Suite 500
Alexandria, Virginia 22314
(703) 535-6047

Pursuant to notice, before Samuel Pachon, Notary Public in and for the Commonwealth of Virginia.

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:

HECTOR F. RUIZ, JR., ESQUIRE
ANNA KATHRYN BARRY, ESQUIRE
KALIJARVI, CHUZI, NEWMAN & FITCH, P.C.
818 Connecticut Avenue, NW
Suite 1000
Washington, D.C. 20006
(202) 331-9260

ON BEHALF OF THE DEFENDANT:

LAUREN M. BRIDENBAUGH, ESQUIRE
LESLIE P. CURRIE, ESQUIRE
TIFFANY DIN FAGEL TSE, ESQUIRE (ZOOM)
LITTLER MENDELSON, P.C.
1800 Tysons Boulevard
Suite 500
Tysons Corner, Virginia 22102
(703) 286-3142

TANJA L. DARROW, ESQUIRE (pro hac vice)
LITTLER MENDELSON, P.C.
633 West 5th Street
63rd Floor
Los Angeles, California 90071
(213) 443-4300

HANTON WALTERS, ESQUIRE
SOCIETY FOR HUMAN RESOURCE MANAGEMENT (SHRM)
1800 Duke Street
Suite 500
Alexandria, Virginia 22314
(703) 535-6047

MS. BRIDENBAUGH: Same objection. Asked and answered.

A When Sheri determines that the accommodation is easily addressable by the organization, she has authority to ensure that happens for that person requesting the accommodation.

Q Have you ever spoken with Ms. Martel about the types of requested workplace accommodations for disabilities that she should seek further guidance about?

MS. BRIDENBAUGH: Objection. Vague. And to the extent the answer would involve communications with counsel, I would direct the witness not to answer. Otherwise, you can answer.

A No.

Q No. Mr. Link, have you ever expressed an opinion to anyone other than counsel at SHRM or external counsel whether a request to have a service dog in the workplace for purposes of a disability is -- or let me explain -- let me back up. It's a bad question.

Have you ever expressed to someone at SHRM or other than internal counsel or to external counsel, your

to me, you referenced a process by which employees could submit request for workplace accommodations. Is Exhibit 2 the process you were referring to?

A It's one of the forms that are available to employees. This would be found at SHRMin, which is our internal portal that consists of knowledge and information where an employee would go and seek. For example, the Accommodation Request Procedure.

Q If an applicant sought this procedure or this process, would an applicant be able to access these steps?

A Not --

MS. BRIDENBAUGH: Objection. Vague. You can answer.

A Not as an applicant. Through the portal. The way this would happen is if during the process, the applicant made it known that they required an accommodation, then the recruiter would then notify most likely the director talent, who would ensure the applicant was made aware of what he or she needed to do in order to request an appropriate accommodation.

Q Is there any other process by which an

and to ensure that any requests are adjudicated to the right person or group in the organization.

Q Referring back to Exhibit 2, sir. The five steps here are -- and I'm not gonna read the entire document, but 1 is initiating request, number 2 is documentation, 3 is evaluation, 4 is implementation, and 5 is denial. Okay. Does this -- like do those five steps reflect the actual practice at SHRM for evaluating a requested accommodation?

MS. BRIDENBAUGH: Objection. Vague. The document speaks for itself. You can answer.

A Generally speaking, yes.

Q Under what circumstances do you know of where the practice would not adhere to these five steps?

MS. BRIDENBAUGH: Objection. Calls for speculation, hypothetical, vague.

A If the accommodation was a nontraditional accommodation, if the accommodation required input from additional experts, if the accommodation was one that involved multiple areas of responsibility within our organization, we would likely be more intense in the way that we reviewed it.

Q For the situations where -- situations that were nontraditional --
A Uh-hum.
Q -- in other words, circumstances where you needed expert -- did you say expert advice --
A Expert opinion or advice.
Q And the third situation is when there was multiple areas of responsibility?
A Sure, across multiple departments or functions within our own organization.
Q Okay. Is there any other circumstances under which the process listed in Exhibit 2 would need to vary?
MS. BRIDENBAUGH: Objection. Calls for speculation, hypothetical, vague.
A Not to my knowledge.
Q When -- when you are referring to nontraditional -- I'm sorry, did you say situation, sir, or nontraditional accommodations?
A Nontraditional requests.
Q Thank you very much. Nontraditional requests for accommodations, what do you mean by that?

MS. BRIDENBAUGH: Objection. Calls for speculation, but you can answer.
A Most likely it would be accommodations for which we did not have practical experience from accommodating in the past. So it would be unique or a different new type of accommodation we had just not experienced before. That's what I mean by nontraditional.
Q So you meant nontraditional with respect to what SHRM has handled; is that correct?
A Correct.
Q You didn't mean nontraditional with respect to what employers at large have been or have handled; is that correct?
MS. BRIDENBAUGH: Objection. Asked and answered.
A That's correct.
Q Now, did Ms. Torres' request to have her service dog allowed in the workplace fall into any of the three categories that would call for variance from the procedures set forth in Exhibit 2?
MS. BRIDENBAUGH: Objection. Mischaracterizes

the testimony, vague. You can answer.

A Yes.

Q Why did Mrs. -- Ms. Torres' request for accommodation require variance from the procedures set forth in Exhibit 2?

MS. BRIDENBAUGH: Objection. Mischaracterizes the testimony, vague.

A It required special attention and care for two primary reasons. First, it was the first time that we at SHRM had a request for a service dog in the workplace. And number 2, it was the first time, at least during my tenure at SHRM, at which we had had a request for an applicant for an accommodation. Those two unique circumstances alone required us to be acutely aware of our duty to ensure that we handled this particular accommodation request appropriately.

Q Was there any other reason that -- okay. So would you state that Ms. Torres' request fell under the area of being nontraditional?

MS. BRIDENBAUGH: Objection. Vague.

A It was both. It was nontraditional. It was the first time that we had experienced it, and it

certainly had the possibility of impacting our functions there at SHRM.

Q Mr. Link, why do you say it had the possibility of impacting the functions at SHRM?

A More than one function at SHRM. Because it would not just be -- the impact of the service dog present in the workplace would not just be regulated to the specific area where she worked. The dog would need to come into the facility, would need to exit the facility, we would need to find places for the dog to relieve itself. All of those types of things would require support from our administrative services function and our facilities organization. Not just the marketing and sales and enablement function in which she worked, but other functions as well, which is why I categorized that into the final category we discussed.

Q I'm sorry, sir, with respect to Ms. Torres' request for accommodation possibly impacting multiple functions at SHRM, other than those that you just listed, are there any other functions that you are concerned would be impacted?

MS. BRIDENBAUGH: Objection. Vague. Asked and

communication, I would direct you not to answer. Otherwise, you can answer. Also vague, asked and answered.

A I will not answer that.

Q Are you not answering it based on your attorney's instruction?

A Yes.

Q Is there any information that you have responsive to my request other than information that falls within the category of attorney private -- attorney-client communications?

MS. BRIDENBAUGH: Objection. Calls for legal conclusion.

A None of which I'm aware.

Q Did you conduct any independent analysis of why there was a facility based reason why SHRM could not accommodate Ms. Torres' request to allow her service dog with her at work?

MS. BRIDENBAUGH: Objection. Asked and answered. And to the extent the answer would involve attorney-client privileged communications, I would direct the witness not to answer. Otherwise, you can

without the presence of her service dog?

A There are several reasons why I believe that the essential functions of this function can be completed without the service dog. First and foremost, Ms. Torres does not always have the service dog in her presence when she's working. We know from Mrs. Torres' own declarations to us as part of this interactive ongoing process of accommodation that the dog is not with her when the dog is being groomed, that the dog is not with her when she's on personal business trips. She told us that she was not going to bring the dog with her on the first day of work at SHRM. And we have subsequently learned that Ms. Torres continues to take extended personal trips overseas for multiple days consecutively where the service dog is not with her.

So I believed then and have even had that confirmed more strongly now that indeed the essential functions of this role could be completed by Ms. Torres without the service dog.

Q Are there any other reasons you believe that the essential functions of the job could be completed by Ms. Torres without the presence of her service dog?

A Those are the primary ones.
Q Are there any secondary reasons?
A None of which immediately come to mind.
Q Do you actually remember having other reasons that you just cannot recall now?
A I don't recall.
Q You mentioned now knowing about extended trips that Ms. Torres has taken. Those extended trips that you mentioned did not factor into what you knew at the time; is that correct?
A That particular component you just described of extended trips after this event, I did not have that information at that time.
Q So you did not rely on that information in forming your own belief that they could be -- that the essential functions of the job could be completed by Ms. Torres without the presence of her service dog?
MS. BRIDENBAUGH: Objection. Form.
Q Is that correct?
MS. BRIDENBAUGH: Form.
A It confirmed my belief that the original indications that Ms. Torres had provided to us were

accurate, and indeed, the decision that she could perform the essential functions of this job without her service dog were indeed accurate.

Q Just to make sure I understand. You -- the extended trips that you've referenced that she has taken, that was not part of -- that was not the fact that established your belief in 2024 that the essential functions of the job could be completed by Ms. Torres without the presence of her service dog?

MS. BRIDENBAUGH: Objection. Asked and answered. Badgering.

A Correct.

Q Sir, returning to Exhibit 3. I want to know -- I want to focus again, sir, on the last paragraph, on page SHRM_Torres0000007.

A Okay.

Q And what I want to learn about is whether or not there are any established practices that are involved in human resources -- human resources working with a candidate to identify a reasonable accommodation.

MS. BRIDENBAUGH: Objection. Asked and answered. Vague.

Q You know --

MS. BRIDENBAUGH: Did you not want him to answer that question?

MR. RUIZ: No, I just --

MS. BRIDENBAUGH: Are you withdrawing it?

MR. RUIZ: -- told him I'm -- what I am going -- signalled what I'm going to ask about.

Q Now, are there any established practices that human resources follow when working with candidates to identify a reasonable accommodation?

MS. BRIDENBAUGH: Objection. Asked and answered, vague.

A Human resources as -- and the recruiters and others who are involved in the selection and identification of candidates, understand that the reasonable accommodation request is one that might come to them as -- as recruiters responsible for selecting people into our organization.

Because this was the very first time that anyone working at SHRM as a recruiter had experience with this, we attempted to follow the exact same procedure we would follow should a current employee

request a reasonable accommodation.

That procedure would be if Ms. Torres would not have already provided the information about her reasonable accommodation request, we would have done exactly what we do with internal already existing employees in the organization, and notify them of the existence of the reasonable accommodation form so that they could complete that document, supplying us in human resources with the information that we needed to begin that reasonable accommodation process.

Ms. Torres did that for us without us having to ask. She proactively put forth her ex -- her request for accommodation shortly after the verbal offer was extended to her.

Q Mr. Link, the process that was taken with Ms. Torres, is it the process that was -- that is envisioned to be taken under Exhibit 3 except for the fact that it was you that was brought into the process rather than handled by human resources?

MS. BRIDENBAUGH: Objection. Mischaracterizes the testimony, mischaracterizes the document, counsel is testifying. You can answer.

A As -- as the head of human resources, whenever a request accommodation arose, which was different than one we had dealt with in the past, I was then brought into that particular process. I'm not normally involved in accommodation processes within our organization, but because of the unique nature of this one, and the fact that it was the first time we had a candidate request an accommodation, I considered it the responsibility of my team to ensure that I was aware of that particular set of circumstances.

Q How many other situations involving accommodation requests for disabilities had you been brought into at SHRM?

MS. BRIDENBAUGH: Objection. Calls for speculation.

A One or two.

Q One or two. Do you recall what those situations -- situation or situations involved?

MS. BRIDENBAUGH: Objection. Form.

A I do.

Q Okay. Would you describe -- would you describe the situation or situations?

MS. BRIDENBAUGH: Objection. Compound. Form. You can answer.

A The first situation dealt with handicap parking spaces, and the fact that we would need to create one more in order to accommodate a reasonable request, because we ha d one more request that we had handicap parking spaces.

That was number 1. That required others to be involved in order to partition off that space and to make that happen. So yes, that was the first one of which I'm aware.

The second one, of which I did not need to get involved with but was made aware of, regarded an employee with a very specific request for a type of desk that would better facilitate the stature of that particular individual and that person.

Q Why do you say that you -- your involvement was not needed in that one?

A Primarily because the decision was easy for us to accommodate; we could get a different desk for the person. But because again, it was the first time we had been asked for that particular type of disability

accommodation, and because of the unique nature of this particular request from the individual and that medical condition, they made me aware as a courtesy.

Q Thank you so much.

Sir, I want to ask you to return to Exhibit 3.

A Okay.

Q And I understand that the situation with Ms. Torres was unique, and according to your testimony, and new, but what I want to learn about is you know, what happens in situations that are not unique and normal, okay, involving requests for workplace accommodations for disabilities. Okay?

A Yes.

Q Okay. When a request for a workplace accommodation for disability is submitted, and an evaluation is completed, what actions can be taken with respect to that request for accommodation?

MS. BRIDENBAUGH: Objection. Vague. Calls for speculation.

A The employee is notified of the reasonable accommodation answer, and then, action is -- assuming that it's something we can do, the action is then taken

to accommodate that employee. This is notified to the employee in writing. And we track and monitor the success of that accommodation to ensure it's working for both the employee and for us as the employer; that the employee is actually able to perform the essential functions of the job with that accommodation, and that we have reached an outcome which is comfortable and amenable to both the employer and the employee in this particular case.

Q You mentioned or stated that it is determined that it is something SHRM can do, what did you mean by that, by can do?

A For example, oftentimes employees will come to us wanting a very specific set of outcomes, and sometimes we talk with the employee, we engage in this back-and-forth dialogue, this interactive iterative process to arrive oftentimes at what the best accommodation is going to be for both the employee and the employer.

There are times when an employee walks in to us and says I want something very specific and very clear, what we do in that process is then to determine if that

something that's very specific and very clear is actually going to solve the problem so that the employee can do the essential functions of the job. The answer may be yes or no, but we go back-and-forth in this interactive, iterative process with the employee to make that determination.

We may not always give them exactly what they walk into, but as a result of that interactive process, we reach the conclusion.

Q If the accommodation request is something that SHRM can do, is the request granted?

MS. BRIDENBAUGH: Objection. Vague. Calls for speculation.

A Generally, yes.

Q If -- if there is a request for an accommodation that SHRM believes it's something SHRM can do for the employee, provide, would SHRM provide that accommodation even if it thinks that there is some lesser accommodation that can be granted instead?

MS. BRIDENBAUGH: Objection. Hypothetical, calls for speculation, vague.

A I'm not sure I can answer that -- that

own review of her r�sum� to confirm that?
A I always look at who we're bringing into the organization, what backgrounds they have. All those things are of interest to me, and so I review them as not just as a matter of quality control and checking, but also as part of my duties as the chief human resources officer.
Q And when you did review Ms. Torres' -- the attachments that were sent by Ms. Zoerkler with respect to Ms. Torres, what did you conclude?
MS. BRIDENBAUGH: Objection. Asked and answered. The document speaks for itself.
A I concluded that she appeared to meet all of the criteria for the successful completion of this job.
Q Thank you so much.
Mr. Link, I'm gonna hand to the court reporter what's going to be Plaintiff's Link Exhibit 5, okay.
(Plaintiff's Link Exhibit 5, Email Link Belyna Fact File 6/6/24, was marked for identification and is attached to the transcript.)
Q The Bates number on Plaintiff's Exhibit 5 is SHRM_Torres_0001924.

how -- or your personal idea on how to describe what you wanted from Ms. Belyna?

MS. BRIDENBAUGH: Objection. Asked and answered.

A Correct.

Q Now, prior to receiving the fact file from Ms. Belyna, had you would individually formed any view about whether Ms. Torres' request to have her service dog present with her at work should be granted?

MS. BRIDENBAUGH: Objection. Asked and answered.

A No. This was the absolute beginning of the interactive, iterative process that we started with Ms. Torres in an attempt to accommodate and meet her requests.

Q In addition to the document labeled Senior Specialist Product Management Position overview.x, Ms. Belyna also provided documents that she refers to as a doctor's note, a service dog ID and paperwork. Do you see that?

A I do.

Q Okay. And it states that it's here. Do you

recall if that was an attachment or a link?
A It was also a link.
Q Okay. Did you access that link?
A I did.
Q Okay. Do you recall the contents of or the information that was accessible through that link?
A It was what is listed here. There was a doctor's note, there was identification identifying paperwork indicating the service dog. And I think there was another piece of information which basically said that this dog was certified to provide services to Ms. Torres.
Q Do you recall reviewing those materials?
A I did look at them, yes.
Q Okay. Can you tell me why you reviewed those materials?
MS. BRIDENBAUGH: Objection. Vague.
A In an effort to ensure I had all of the information and knowledge which was available to us at that particular point in time, yes, that's why I looked at it.
Q Like in reviewing those materials, was part of

A Correct.
Q And on what basis would you have rescinded the offer of employment to Ms. Torres?
A That the willful violations of our Code of Conduct were not in line with what SHRM expects from its employees.
MS. BRIDENBAUGH: I have no further questions.
EXAMINATION BY COUNSEL FOR THE PLAINTIFF:
BY MR. RUIZ:
Q Mr. Link, with respect to the Employee Code of Conduct that was introduced as an exhibit, are you ever aware of any circumstances under which a person has been disciplined for behavior that was exhibited before they became an employee?
A No.
MS. BRIDENBAUGH: Objection. Vague.
A No.
Q Exhibits 9 through 13 were represented to you as texts made by Ms. Torres before she was a SHRM employee; is that correct?
A Yes, but also once she had been extended some of it is during the time in which she had been extended

an offer of employment to join our organization.
Q Does Employee Code of Conduct applies to persons who are not employees?
A It applies to people to whom we intend to employ, and Ms. Torres would have had to have signed that document in order to become a member of our staff.
Q But then, it does not apply to persons who are not yet employees; is that correct?
A That is true.
Q Thank you, sir.
MS. BRIDENBAUGH: One more question.
EXAMINATION BY COUNSEL FOR THE DEFENDANT:
BY MS. BRIDENBAUGH:
Q Can SHRM rescind a job offer at any point for any reason?
MR. RUIZ: Object to form.
A As I've already testified, the answer to that question is yes. We reserve the right to rescind an offer at any time. We're an at-will employment environment.
Q And that would be for any reason?
MR. RUIZ: Object to form.

CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC

I, Samuel Pachon, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings were fully sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

Notary Registration No.: 00278263
My Commission Expires: 02/29/2028

Samuel Pachon
________________________________
SAMUEL PACHON, NOTARY PUBLIC
FOR THE COMMONWEALTH OF VIRGINIA