# Exhibit 35

Holland & Knight

1650 Market Street, Suite 3300 | Philadelphia, PA 19103 | T 215.252.9600 | F 215.867.6070
Holland & Knight LLP | www.hklaw.com

Tara S. Param
+1 215-252-9556
Tara.Param@hklaw.com

March 6, 2025

*Via EEOC Respondent Portal and E-mail (Robert.hersey@eeoc.gov)*

Robert Hersey
United States Equal Employment Opportunity Commission
Washington Field Office
131 M Street, NE
Fourth Floor
Washington, DC 20507
Phone: (800) 669-4000
Email: washdc@eeoc.gov

**Re: *Fiona Torres v. SHRM*, Case No. 12K-2025-570-2023-02311**

Dear Mr. Hersey:

Respondent Society for Human Resource Management ("SHRM") respectfully submits this position statement in response to the Charge of Discrimination (the "Charge") of Claimant Fiona Torres ("Ms. Torres").

In the spring of 2024, SHRM interviewed Ms. Torres and extended her an offer to join SHRM as a Senior Specialist in the Product Management department. Immediately after accepting the offer, Ms. Torres disclosed that she had type 1 diabetes and requested to bring her medical alert service dog to work as her preferred accommodation to manage her diabetic condition. After being notified of Ms. Torres's disability, SHRM immediately engaged in the interactive process. After speaking with Ms. Torres and reviewing her medical documentation, SHRM determined that Ms. Torres's service dog was not a reasonable accommodation because – as a matter of law - her service dog is not job related because it is primarily for her personal benefit, as opposed to an accommodation that assists her in performing her duties at SHRM. In lieu of her preferred accommodation of the service dog, SHRM offered Ms. Torres four (4) alternative reasonable accommodations and continuously told Ms. Torres that SHRM was excited to have her join the organization. SHRM also told Ms. Torres that it was open to discussing additional alternative reasonable accommodations that would allow her to join the team. However, Ms. Torres flatly rejected all of SHRM's suggested alternatives and abruptly disengaged from the interactive process. Left with no further choice, SHRM rescinded its offer of employment to Ms. Torres.

Ms. Torres now claims that she was discriminated based on her disability and that SHRM failed to accommodate her. As explained in more detail below, Ms. Torres has not presented a shred of evidence to support her claims. Therefore, Ms. Torres's Charge is meritless and should be dismissed with prejudice.

## I. FACTUAL BACKGROUND

### A. SHRM's Policies and Programs.

SHRM is the world's largest human resource membership organization devoted to human resource management. SHRM prides itself on being a member-driven catalyst for creating better workplaces where people and businesses thrive together. SHRM provides tools, research, and recommendations to other organizations seeking to maintain well-run and legally compliant operations.

SHRM maintains a well-articulated and enforced equal employment opportunity policy. SHRM, by policy and practice, strictly prohibits all forms of unlawful discrimination. (*See* **Exhibit A**, Equal Employment Opportunity Policy). SHRM also provides reasonable accommodations to allow employees with disabilities to perform the essential functions of their jobs. Once SHRM becomes aware that an applicant or employee may require a reasonable accommodation, it provides relevant information and documents to the employee and engages in an interactive process to understand the nature and extent of the particular restrictions involved and the accommodations requested, and to determine whether a reasonable accommodation can be granted. (*See* **Exhibit B**, Accommodations Policy).

### B. Ms. Torres Interviews for Senior Specialist, Product Management, and Is Offered the Position.

SHRM interviewed Ms. Torres for the role of Senior Specialist, Product Management in the spring of 2024. A Senior Specialist, Product Management, primarily responsible for developing product strategies and addressing new ideas and concepts for new projects.

In June 2024, SHRM reached out to Ms. Torres over the phone to offer her the Senior Specialist, Product Management role. Ms. Torres verbally accepted the offer, and then mentioned for the first time that she would like to bring her medical alert service dog into the workplace as her preferred accommodation due to her diabetes.

### C. Ms. Torres Discloses Her Disability and SHRM Immediately Engages in the Interactive Process and Offers Ms. Torres a Number of Reasonable Accommodations.

As soon as Ms. Torres disclosed she had diabetes, SHRM took immediate steps to begin the interactive process and find a reasonable accommodation for Ms. Torres. Between June and July 2024, Nicole Belyna, Director, Talent Acquisition & Inclusion ("Ms. Belyna") communicated

back and forth with Ms. Torres to find a reasonable accommodation. Ms. Torres continued to maintain that her service dog was her preferred accommodation.

After reviewing Ms. Torres's medical documentation and speaking with Ms. Torres extensively regarding her disability, SHRM determined that Ms. Torres's request for a service dog was not job-related, as Ms. Torres relied on the service dog both at home and at work. Ms. Torres explained via email that her dog "is generally with me at all times, including my personal [life]." Ms. Belyna informed Ms. Torres that SHRM could not provide her with her preferred accommodation, but it could instead off her four (4) alternative reasonable accommodations, including:

(1) Facilitating the use of her continuous glucose monitoring system (CGM) while on site;
(2) Breaks as needed to check blood sugar levels;
(3) A flexible open leave program to take off when needed to manage her condition; and
(4) Placement of her insulin pump or any food or drink she may require near her workstation.

Ms. Belyna also offered to discuss with Ms. Torres whether any other reasonable accommodations would allow her to perform the essential functions of her position. Throughout these communications, SHRM continually emphasized to Ms. Torres that SHRM was eager to have her join the organization.

**D. Ms. Torres Rejects SHRM's Alternative Proposed Reasonable Accommodations, Refuses to Continue to Engage in the Interactive Process, and SHRM is Left With No Choice But to Rescind Ms. Torres's Offer.**

After receiving SHRM's list of potential alternative accommodations, Ms. Torres refused to consider any alternative accommodations except the one that she preferred, and completely disengaged from the interactive process. Ms. Torres responded to Ms. Belyna on July 6, 2025, letting her know that no other accommodation would be acceptable to her. *See* July 6, 2025 email from Torres to Belyna, attached hereto as **Exhibit C**. Accordingly, SHRM was left with no other option but to rescind its offer of employment to Ms. Torres on July 15, 2024.

## II. LEGAL ANALYSIS OF MS. TORRES'S CLAIMS

**A. Ms. Torres Cannot Establish that SHRM Failed to Accommodate Her.**

Ms. Torres cannot establish that SHRM failed to accommodate her under the ADA. SHRM offered Ms. Torres a number of different reasonable accommodations, but Ms. Torres insisted on her preferred accommodation and refused to engage in the interactive process. Moreover, since Ms. Torres requires her support dog at home as well as at work, her request for her service dog is not job related as a matter of law.

To prevail on her failure-to-accommodate claim under the ADA, Ms. Torres must establish both a *prima facie* case of discrimination based on disability *and* a failure to accommodate. *Moses*

*v. Dassault Falcon Jet-Wilmington Corp.*, 894 F.3d 911, 923 (8th Cir. 2018) (emphasis added). As outlined in detail below, Ms. Torres cannot establish a prima facie case of disability discrimination. Ms. Torres also cannot prove that SHRM failed to accommodate her disability.

To establish a *prima facie* case of failure to accommodate, a plaintiff must demonstrate the following elements: 1) the plaintiff has a disability within the meaning of the statute; 2) the employer had notice of the plaintiff's disability; 3) with reasonable accommodation, the plaintiff could perform the essential functions of the position; 4) the employer refused to make such accommodations. *Smith v. Strayer University Corp.*, 79 F.Supp.3d 591 (2015). Additionally, the ADA requires that the employer and employee engage in an interactive process to identify a reasonable accommodation. Failure to engage in this process can result in liability if it leads to the failure to identify an appropriate accommodation. *Williams v. Virginia Polytechnic Institute & State University*, 451 F.Supp.3d 467, 477 (2020). However, where it is the employee who refuses to engage in, or who causes the breakdown of, the requisite interactive process to determine a reasonable accommodation, the employer will not be liable for failure to accommodate. *See id.*

Here, Ms. Torres cannot establish that SHRM failed to offer her reasonable accommodations. Instead, it was Ms. Torres who caused the breakdown of the interactive process. While SHRM did not find that Ms. Torres's service dog was a reasonable accommodation, SHRM offered her four (4) alternative reasonable accommodations, including facilitating the use of her continuous glucose monitoring system (CGM) while on site, breaks as needed to check her blood sugar level, a flexible open leave program to take off when needed to manage her condition, placement of her insulin pump or any food or drink she may require near her workstation, in addition to any other reasonable accommodations SHRM could provide. Ms. Torres refused to entertain any of SHRM's suggested alternative accommodations and instead maintained that she must have her preferred accommodation – her service dog – even after SHRM determined that the service dog was not a reasonable accommodation.

Just because Ms. Torres preferred her service dog to the other alternative reasonable accommodations does not mean that she was entitled to it under the law. *Reyazuddin*, 789 F.3d at 415. The law is well settled that employers are not required to provide the exact accommodation that an employee requests and can provide an alternative reasonable accommodation at their discretion. *See Reyazuddin v. Montgomery Cnty., Maryland*, 789 F.3d 407, 415 (4th Cir. 2015) (holding that "[a]n employer may reasonably accommodate an employee without providing the exact accommodation that the employee requested … the employer may provide an alternative reasonable accommodation"); *see also Williams v. Virginia Polytechnic Inst. & State Univ.*, 451 F. Supp. 3d 467, 475 (E.D. Va. 2020) (holding same).

Moreover, since Ms. Torres uses her service dog at home as at work, it is not considered a job-related reasonable accommodation as a matter of law. Courts have found that an employer is not required to permit an employee with diabetes to bring her service dog to work in nearly identical situations to Ms. Torres's. *Howard v. City of Sedalia, Missouri*, 103 F.4th 536, 542 (8th Cir. 2024). In *Howard*, a diabetic employee requested that her service dog be permitted to accompany her at work to alert her of any changes in her blood sugar levels. Critical to the Court's

inquiry, the service dog provided the same duties at the employee's home as it would have provided at work. *Id.* Thus, because the dog was used at home in the same manner that it would be used at work, the Court held that the plaintiff's service dog was not job-related, and instead was more akin to a personal item that was primarily for the personal benefit of the individual with a disability (as opposed to an accommodation that assists the individual in performing the duties of her job). *Id.* The court explained:

> Under the controlling regulations, 'if an adjustment or modification assists the individual throughout his or her daily activities, on and off the job, it will be considered a personal item that the employer is not *required* to provide.' 29 C.F.R. Part 1630 App., § 1630.9 (emphasis added). Providing a service dog at work so that an employee with a disability has the same assistance the service dog provides away from work is not a cognizable benefit or privilege of employment

*Id.*

Other courts have reached similar conclusions. *See, e.g., Hopman v. Union Pac. R.R.*, 68 F.4th 394 (8th Cir. 2023), *cert. denied*, 144 S. Ct. 1003 (2024) (employer did not fail to accommodate disabled employee when it refused employee's request to allow his service dog to accompany him at work, as the service dog provided the same services to the employee away from work and thus was not a cognizable benefit or privilege of employment).

Like in *Howard* and *Hopman*, Ms. Torres's service dog provided the same duties at her home as the dog would have provided at work. Thus, SHRM correctly determined that the service dog was "more akin to a personal item that was primarily for the personal benefit of [Ms. Torres]" and was, therefore, not a reasonable accommodation. *Howard*, 103 F.4th at 542; *Hopman*, 68 F.4th at 394. Regardless, SHRM continued to engage in the interactive process in good faith and offered Ms. Torres four (4) alternative accommodations to consider – each of which she flatly refused. If an employer engages in the interactive process in good faith to discuss alternative reasonable accommodations, but the employee fails to cooperate, the employer cannot be held liable under the ADA for failure to provide reasonable accommodations. *Clark v. Sch. Dist. Five of Lexington & Richland Ctys.*, 247 F. Supp. 3d 734, 746 (D.S.C. 2017). Thus, Ms. Torres will be unable to show that SHRM failed to accommodate her.

**B. Ms. Torres Cannot Establish that She Experienced Disability Discrimination.**

Ms. Torres also cannot establish a *prima facie* case of discrimination under the Americans with Disabilities Act ("ADA") because she cannot demonstrate there was a causal connection between the revocation of her offer and her disability.

The ADA protects against discrimination "on the basis of disability." 42 U.S.C. § 12112(a). To establish a claim of disability discrimination, an applicant must prove that: 1) she has a disability; 2) she is a qualified individual for the position, with or without reasonable accommodation; and 3) the employer took an adverse employment action against her because of the disability. *Martinson v. Kinney Shoe Corp.*, 104 F.3d 683, 686 (4th Cir. 1997).

SHRM does not dispute that Ms. Torres is an individual with a disability based on her type I diabetes and that she was qualified for the role that she was offered. However, Ms. Torres's claim fails because she is unable to show that SHRM revoked her offer of employment because of her disability. In fact, the decision had nothing to do with her disability. SHRM revoked Ms. Torres's offer of employment because she refused to engage in the interactive process with SHRM. Instead, Ms. Torres rejected every reasonable accommodation offered by SHRM and continued to demand her preferred accommodation of her choice – her service dog.

As outlined above, SHRM is not required to provide Ms. Torres the accommodation of her choice, as long as it offers alternative reasonable accommodations – which it did. *See Reyazuddin*, 789 F.3d at 415 (holding that "[a]n employer may reasonably accommodate an employee without providing the exact accommodation that the employee requested … the employer may provide an alternative reasonable accommodation"). SHRM provided Ms. Torres with a laundry list of other potential reasonable accommodations, to which Ms. Torres refused to consider and flat out rejected. Based on Ms. Torres's refusal to continue engaging in the interactive process, SHRM was left with no choice but to rescind her offer.

Thus, SHRM rescinded Ms. Torres's offer not because of her disability, but because Ms. Torres refused to even consider any of SHRM's other reasonable accommodations, leading to the breakdown of the interactive process and requiring SHRM to rescind her offer. *Kohl's Dept. Stores, Inc.*, 774 F.3d at 132. Thus, Ms. Torres will not be able to show she was subjected to disability discrimination.

## III. <u>CONCLUSION</u>

For the foregoing reasons, SHRM respectfully requests that the Commission dismiss Ms. Torres's Charge in its entirety with prejudice and issue a no-cause finding.

Respectfully yours,

HOLLAND & KNIGHT LLP

*<u>/s/ Tara S. Param</u>*

Tara S. Param

# EXHIBIT A

**SOCIETY FOR HUMAN RESOURCE MANAGEMENT**

**POLICIES AND PROCEDURES**

| | | |
|---|---|---|
| DISTRIBUTION: All Staff | SUBJECT: EQUAL EMPLOYMENT OPPORTUNITY | |
| EFFECTIVE DATE: 1/3/84 | PAGE NO. 1 OF 2 PAGES | FILE UNDER SECTION 1 NO. 001 |
| REVISION DATE: 10/31/06; 01/2007; 6/4/2010; 8/2011 | APPROVED BY: CHRO | |
| | | |

1. POLICY:

   The Society selects the best qualified person for each position at SHRM. SHRM employees have been, and will continue to be, selected from all applicants on the basis of qualifications which are essential for effective performance. These qualifications include factors such as ability, availability, competencies, skills, experience, education, a willingness to work and a desire to succeed.

   SHRM offers equal employment opportunities to all persons without consideration of race, religion, color, gender, age, national origin, physical or mental disability, genetic information, veteran's status, marital status, gender identity and expression or sexual orientation, or any other protected status under applicable law. This policy applies to recruitment, employment, promotions, upgrades, layoffs, termination, training and development, wages, benefits and all other privileges, terms and conditions of employment. In addition, SHRM shall provide reasonable accommodations for religious or disability-related needs as required under applicable law.

2. PROVISIONS:

   a. Recruitment: All qualified applicants for all available positions will be considered, in conjunction with our established policy of promotion from within, on the basis of individual qualifications, potential and prior job performance. All public and private employment offices used will be advised in writing of our equal employment policy and will be urged to refer qualified applicants to us, without consideration to race, religion, color, gender, age, national origin, physical or mental disability, genetic information, veteran's status, marital status, gender identity and expression or sexual orientation, or any other protected status under applicable law. All advertisements in newspapers and other media will include the phrase "Equal Opportunity Employer."

All supervisors must ensure that they employ and use qualified staff at all job levels without consideration of race, religion, color, gender, age, national origin, physical or mental disability, genetic information, veteran's status, marital status, gender identity and expression or sexual orientation, or any other protected status under applicable law.

b. Training and Development:

All SHRM supported training and development programs are available for all employees, without consideration of race, religion, color, gender, age, national origin, physical or mental disability, genetic information, veteran's status, marital status, gender identity and expression or sexual orientation, or any other protected status under applicable law.

c. Compensation: All employees will be paid according to the current compensation plan which is designed to reward meritorious employees without consideration of race, religion, color, gender, age, national origin, physical or mental disability, genetic information, veteran's status, marital status, gender identity and expression or sexual orientation, or any other protected status under applicable law.
d. Benefits: All benefit programs sponsored by SHRM will be made available to employees without consideration of race, religion, color, gender, age, national origin, physical or mental disability, genetic information, veteran's status, marital status, gender identity and expression or sexual orientation, or any other protected status under applicable law.
e. Facilities: No facilities will be segregated, except that: (1) separate restroom and locker facilities will be provided for men and women; and (2) SHRM's lactation room only shall be available to women.
f. Layoffs and Terminations: If it becomes necessary to reduce staff through layoffs, or terminate an employee due to performance, such actions will be based on considerations other than race, religion, color, sex, age, national origin, physical or mental disability, genetic information, veteran's status, marital status, gender identity and expression or sexual orientation, or any other protected status under applicable law.
g. Communication: All staff members will be informed of our commitment to equal employment opportunity by the following:
   Bulletin board posters and notices.
   Policy
   Employee communications
h. The Chief Human Resources Officer is charged with ensuring that SHRM's EEO policy is being administered appropriately. This individual provides periodic progress reports to the President/CEO, and at least annual reports to the SHRM Board Compensation & Organization Committee. All department heads are responsible for full and complete compliance within departments.

# EXHIBIT B

# SHRM Internal Accommodations Policy

## Policy Statement

SHRM believes in providing equal opportunity for everyone. It is SHRM's policy to ensure that all qualified individuals have full and equal access to all live offerings and available online content by providing reasonable accommodations. In line with that goal, we provide standard organizational-wide Standard Accessibility Features and will review ad hoc requests for additional reasonable accommodations on a case-by-case basis.

This Policy is for internal use only, to assist SHRM employees in processing, implementing, and tracking accommodation requests by SHRM members and clients. This Policy is not to be circulated outside of SHRM, or relied upon by anyone outside of SHRM. This Policy does not govern accommodation requests by SHRM employees, which should always be directed to the appropriate Human Resources contact(s). This Policy is subject to change by SHRM at any time.

## Accommodations

An "accommodation" is an adjustment, change or addition to the way that SHRM's programming is regularly delivered in order to make that programming more accessible to people with disabilities. Accommodations for SHRM's programming may include, but are not limited to

- "Automated Speech Recognition ("ASR") Caption(s)" or "ASR Captioning", which means to overlay or externally embed synchronized visual text for speech into a video by using automatic speech recognition technology or other means designed to capture the content of verbal speech in a manner consistent with ASR industry standards regarding synchronicity, completeness, and proper placement.
- "CART", which stands for Computer-Assisted Real-time Transcription, a service in which a transcriptionist provides live captioning in real-time during an event.
- "Sign Language Interpretation", which is a service in which a trained individual interprets between a spoken and a signed language. The signed language may include, but is not necessarily limited to, American Sign Language ("ASL").
- "Transcript(s)" means a text version of the speech and non-speech audio information needed to understand the program content including speaker identification to the extent feasible under industry standards.
- "WCAG Caption(s)" or "WCAG Captioning" means: to overlay or externally embed synchronized visual text for speech, consistent with the Web Content Accessibility Guidelines ("WCAG") 2.1 level AA, at an accuracy rate equal to that offered by a vendor captioning service and in a manner consistent with industry standards regarding synchronicity, completeness, and proper placement.
- Preferred seating
- Testing time extensions
- Lactation rooms
- Dietary needs

When reasonable accommodations are provided by SHRM, such as auxiliary aids and services to ensure effective communication, for example ASR, CART, Sign Language Interpretation, Transcripts, or WCAG

Captioning, such accommodations shall be provided free of charge to SHRM members and customers.

## Accommodation Request Process

- All requests for accommodations must be submitted through SHRM's official accommodation request process. For **all requests** other than those pertaining to SHRM certification exams, the request must be submitted by use of SHRM's standard accommodation request form, which is accessible on the website at https://www.shrm.org/about-shrm/Pages/accessibility.aspx. For SHRM certification exams, requests for accommodations **must be** submitted by the exam-applicant as part of the exam application.

- Individuals can formally request accommodations for all SHRM programming (other than for SHRM Certification Exams) by directly submitting a request form through the SHRM website or by making a request to SHRM's customer experience team. If a request for accommodation is submitted to a SHRM team member, the team member should immediately submit the request through the required channel by submitting the accommodation request form through the SHRM website. All questions about the form or accommodations request process should be directed to SHRM's Accessibility Coordinator, Carolyn Barley, at carolyn.barley@shrm.org.

- Use of the accommodation request form allows SHRM to process all requests for accommodations in a uniform, prompt, and efficient manner. Requests are processed as follows:

    - Within 1 business day of receipt, and if a valid email address is provided, SHRM will send the requesting party an acknowledgement of the request.

    - Within 5 business days of receipt, SHRM will send the requesting party a further response that either confirms SHRM is granting the requested accommodation, indicates when the requested accommodation will be available, or provides a status update regarding the accommodation request.

- If an individual’s accommodation request is denied, then that individual will be able to request a refund for events and/or SHRM membership for consideration by SHRM by contacting the Customer Experience Team (“CX”).

- SHRM will document the receipt of requests for accommodation by retaining and tracking all accommodation request forms received, subject to SHRM's applicable document retention policies.

- SHRM's Accessibility Project Manager will document responses to requests for accommodation by tracking and indexing the final response and/or accommodation provided for a reasonable time after the date of the response or event, whichever is later, subject to SHRM's applicable document retention policies.

- **Specific Notes Regarding Accommodations for SHRM Programming:**

    - SHRM certification exams are subject to specific accreditation guidelines imposed by a third-party accreditation agency. Because applicants must apply, and be approved, to take a certification exam, all requests for accommodation pertaining to the requested

exam are made at the time of the application by use of a specific form that is linked to the exam application.

- Registrations for live events such as conferences or Education programs will include a standard question for purchasers to indicate if an accommodation is needed. For requested accommodations regarding live online or in-person events, SHRM will make reasonable efforts to provide accommodations for requests communicated at least 7 days prior to the event. For requests made less than 7 days until the event, SHRM shall still make efforts in good faith to provide reasonable accommodations.
- When SHRM provides Transcripts as an accommodation, if the requested accommodation is for Online Content that already has WCAG Captions, the Transcript will be provided within six (6) business days of receipt of the request. SHRM may require the registrant to attest that they will not share the Transcript(s) with other individuals prior to providing such transcripts.
- Any SHRM member who relies on transcripts and attends an event or program seeking Professional Development Credits will have the 30-day timeline of requesting those Professional Development Credits begin on the day that member receives such transcript.

## Accessibility Standards

### New Content

All new content must adhere to the requirements outlined in the table below. Please reach out to Jim Banks or Carolyn Barley with any questions. Recommended vendors for captioning and transcript needs are 3play and Rev.com. SHRM has a volume order with Rev.com which any department can get the pricing discounts.

SHRM content descriptions need to specify the standard accessibility features that are automatically provided for that content. SHRM's current standard accessibility features for new content are set forth in the chart below; SHRM will continue to evaluate and improve its standard accommodations as appropriate and as technology evolves.

| **SHRM's Standard Accessibility Features for New Content** | |
|---|---|
| **SHRM Product Offerings** | **New Online & Live Content** |
| SHRM Webcasts<br><br>Any SHRM produced and posted video should also follow these guidelines. | **ASR Captioning** for live and semi-live delivery<br><br>**WCAG Captioning** for all other Webcasts (at time of posting); for live and semi-live delivery (within 6 business days of original posting)<br><br>Descriptions/overview should indicate the type of captioning provided. |

| SHRM's Standard Accessibility Features for New Content | |
|---|---|
| **SHRM Product Offerings** | **New Online & Live Content** |
| SHRM eLearning Modules SHRM Learning System<br>SHRM On-demand<br>SHRM PMQ | **WCAG Captioning** (provided at time of posting) including indication in description |
| Tune-in-Tuesdays | **CART** (live) and **Transcripts** (within 6 days of posting) including indication in description |
| SHRM Podcasts | **Transcripts** (within 6 business days of posting) including indication in description |
| SHRM Virtual Education Programs including Certification Prep | **ASR Captioning** with option for CART and Transcripts if requested at least 5 business days before the program |
| SHRM Large Conferences:<br>• SHRM Annual Conference and Expo<br>• SHRM Employment Law and Compliance Conference<br>• SHRM Talent Conference and Expo<br>• SHRM Workplace Policy Conference<br>• SHRM Inclusion Conference<br>• NorCAL Annual Conference<br>• Visionaires<br>• RCBM<br>• VLBM<br>• Other conferences as they arise | **In person:**<br><br>**ASL Interpretation** and **CART** for general sessions on the main stage; **ASL Interpretation** for breakout sessions if requested at least 7 calendar days before the start<br><br>**Virtual:**<br><br>**CART** for the general sessions on the conference's main stage. |

## Existing Content

- SHRM is in the process of making accessibility edits to its existing content. Product Offerings that are covered in the standards described above for new content but that were first posted after June 24, 2021, or required for a SHRM certification, must adhere to these standards. Teams have until December 23, 2022 to update 50% of such content and until June 23, 2023 to update 100% of such content. Please coordinate with Carolyn Barley to keep updated on progress.
- SHRM seeks to provide reasonable accommodations for individuals who are d/Deaf or hard of hearing by providing auxiliary aids and services to ensure effective communication. Any aids and services shall be provided free of charge to all members and customers.
- For recorded online audio or video content first posted on or before June 23, 2021, **WCAG Captions** will be provided within 8 days in response to an accommodation request with a few

exceptions:

- For an individual requesting captions or transcripts for more than 15 hours of content, SHRM will work with the requesting party to evaluate the accommodation and develop a reasonable timeline.
- For accommodation requests that SHRM believes have not been submitted in good faith, SHRM will work with the requesting party to evaluate the requested accommodation and develop a reasonable response.

## Accessibility Generally

In addition to the specific accommodations described in this Policy, SHRM is committed to improving the accessibility of its Website and services over time as technology and industry standards evolve.

## Limitations

SHRM is committed to providing reasonable accommodations so long as the accommodations do not place an undue hardship on business operations or pose a direct threat to the health or safety of the individual or others in the workplace. SHRM is also not required to grant requests for accommodations that would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered. All questions regarding this Policy or whether a requested accommodation is reasonable should be referred to SHRM's Accessibility Project Manager, Carolyn Barley, at carolyn.barley@shrm.org.

# EXHIBIT C

**From:** Fiona Torres <torresfg3@gmail.com>
**Sent:** Saturday, July 6, 2024 2:42:00 PM
**To:** Belyna, Nicole <Nicole.Belyna@shrm.org>
**Subject:** Re: Offer status - Fiona Torres

Hi Nicole,

I have submitted the required details with the EEOC and will need to wait for an interview to be made available to me for next steps. They were fully booked and I was instructed to regularly check back, which I will do.

There are countless recurring timeframes where my CGM is unable to provide readings and/or I do have physical access to a CGM including, but not limited to:

- The 2 hour CGM warm up period that occurs every 10 days (no readings are provided for 2 full hours)
- My pharmacy has a delay in shipment and I do not have CGM for days (this regularly happens at least 2x per year).
- My insurance causes a delay in fulfilling CGM prescription refills, therefore I do not have CGM access for days, due to the regularly occurring re-evaluation of insurance coverage (this has happened to me, at minimum, once per year).
- My CGM malfunctions or produces an error for countless reasons. Glucose reading access therefore ends for a minimum of 2+ hours. This has occurred to me, at minimum, twice per year.
- My CGM falls off or is ripped off accidentally (this regularly occurs to me, at minimum, 4 times per year). I then need to change the CGM which then means I do not have readings for a minimum of 2 hours. In the event I do not have access to a backup CGM at the office, I would have to drive home or to a pharmacy to obtain one, which is incredibly dangerous for me specifically as I have totaled 4 vehicles from severe hypoglycemic episodes.

During the events above, there is no accommodation that could be made to prevent me from the life threatening events my service dog is trained to protect me from.

Fiona Torres