**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| FIONA TORRES,<br><br>Plaintiff,<br><br>v.<br><br>SOCIETY FOR HUMAN RESOURCE MANAGEMENT,<br><br>Defendant. | Civil Action No. 1:25-cv-2360-PTG-WBP<br><br>Hon. Patricia Tolliver Giles, J.<br>Hon. William B. Porter, M.J. |

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFF'S MOTION TO EXCLUDE TESTIMONY OF**
**DEFENDANT'S PROPOSED EXPERT**

## I. Introduction

This case concerns whether defendant Society for Human Resource Management ("SHRM") violated the Americans with Disabilities Act and the Virginia Human Rights Act when it rescinded a job offer to plaintiff Fiona Torres because she is a type 1 diabetic with an alert dog. Defendant SHRM has named an endocrinologist, Michael Cooperman, M.D., as a medical expert in this case. That designation, served on May 11, 2026, consisted of a brief description of Dr. Cooperman's proposed testimony signed by counsel (Attachment 1 hereto), and a two-and-a-half-page report signed by Dr. Cooperman (Attachment 2 hereto) with his resume (Attachment 3 hereto).[1]

[1] Dr. Cooperman is an endocrinologist living outside Philadelphia, Pa., who graduated from medical school in 1970. *See* Cooperman resume (Attachment 3) (listing last hospital affiliation

The disclosure and report by themselves fall so short of the mandates of our expert discovery rules that they are excludable in their entirety on procedural grounds. However, even if Dr. Cooperman is permitted to testify, he showed at deposition how sharply limited is his expertise in most of the topics SHRM listed for him. The present motion seeks to exclude from trial all of the promised testimony that goes beyond the extremely limited opinion evidence that his own report and deposition can support.

## II. Discussion

### A. *Dr. Cooperman's report is grossly deficient under Rule 26(a)(2)(B)*

SHRM's May 11 disclosure asserted that Dr. Cooperman may opine about (a) whether Ms. Torres "could perform the essential functions" of the Senior Specialist Product Management position; (b) whether a service dog was "medically necessary" or "medically require[d]"; (c) whether any of Ms. Torres's health care providers "prescribed or required Ms. Torres to obtain or use a service dog"; (d) whether "alternative" glucose-monitoring methods were "effective" and met "accepted medical standards of care"; (e) whether those methods "address[ed]" the "functional needs associated with diabetes"; and (f) whether Ms. Torres's "own conduct" showed that a service dog was not a necessary workplace accommodation. Expert Disclosure (Attachment 1) at 1-2. Dr. Cooperman testified at his deposition that he had not even seen the disclosure language. Cooperman Dep. (Attachment 4) at 24:15-25:7.

---

and department chairmanship as ending in 2013; giving no current practice information, home or practice address or telephone, or professional e-mail address). His medical license is listed by the Pennsylvania Licensing System, www.pals.pa.gov, as "active—retired." At deposition he testified that he had been in private practice until 2022 and that since then he has been doing "medical legal work." Cooperman Dep. (Attachment 4 hereto) at 11:15-12:8.

Fed. R. Civ. P 26(a)(2)(B) requires that a retained expert's report contain "a complete statement of all opinions the witness will express and the basis and reasons for them," the "facts or data considered," and exhibits that will be used to support the opinions, as well as the proposed expert's qualifications, prior expert testimony, and compensation. Fed. R. Civ. P. 26(a)(2)(B). Expert reports are designed to give the opposing party meaningful notice, before deposition, of what the expert will say, so that the deposing party may test the person's opinions, prepare cross-examination, and develop counter-testimony. *See Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 216-17 (4th Cir. 2017) (Wynn, J., concurring in part); *Sharpe v. United States*, 230 F.R.D. 452, 458-59 (E.D. Va. 2005).

Dr. Cooperman's report failed to meet any of these requirements. The report itself is only a set of raw conclusions without basis. It states that Ms. Torres is a woman with Type 1 diabetes seeking a workplace accommodation for a diabetes alert dog, then asserts in conclusory fashion that the records, submitted documentation, and "medical literature" do not "support" the necessity of the accommodation. Cooperman report (Attachment 2) at 1. It states that CGM "remains the standard for diabetes care," and even claims that the only benefits of alert dogs for diabetics are "psychosocial." *Id.* at 2. While the report references "medical literature," it does not explain how Dr. Cooperman searched or selected literature, what literature he considered, what facts or research he accepted or rejected and why, what standard he applied, or how he moved from facts to conclusions.[2] *Id.* The report identifies no sources and does not even identify any

[2] SHRM's expert disclosure and Dr. Cooperman's report were served Monday May 11, 2026, a day before the expert disclosure and report due date. Because the report's deficiencies were so glaring, Ms. Torres moved to strike SHRM's designation of Dr. Cooperman altogether (ECF No. 37). But when the Court indicated that it could hear that motion, at the earliest, on June 11, 2026—the morning of Dr. Cooperman's deposition and one day before the Court's discovery cutoff—the motion was withdrawn (ECF No. 49) pending a post-deposition assessment of Dr.

specific article or study.[3] Finally, neither the report nor Dr. Cooperman's resume describe any personal knowledge of the competence or performance of glycemia alert dogs for diabetics, either in absolute terms or relative to other devices or measures used for managing diabetes, and the report fails even to suggest the thought of reviewing the performance of Ms. Torres's dog specifically. *See* Cooperman report (Attachment 2). On the issues it purports to address, the report fails under Rule 26(a)(2).

Dr. Cooperman's deposition confirmed these deficiencies and more. Regarding "essential functions," Dr. Cooperman testified that he was not asked to evaluate, and had no opinion, whether Ms. Torres could perform the functions of the job she was offered at SHRM. Cooperman Dep. (Attachment 4) at 34:14-22, 36:5-12. On whether Ms. Torres's health care providers "prescribed" or "required" a service dog for her, Dr. Cooperman testified that he was not asked to look into the issue, and admitted that no such proposed testimony was in his

---

Cooperman's testimony and qualifications as an expert. The present motion sets forth that assessment, which if anything reflects still more poorly on the proposed expert's specific qualifications for this case.

[3] Dr. Cooperman identified some journal articles and a textbook chapter for the first time at his deposition. *See* Cooperman report (Attachment 2) at 1 (referring only generically to "medical literature"). When asked about those articles, he testified that "[t]here are more," but "these are the ones that support my position." Cooperman Dep. (Attachment 4) at 61:14-21. This impermissible cherry-picking is further addressed *infra*, as are Dr. Cooperman's mischaracterizations of even those pieces of literature he testified he had reviewed. After learning of these articles at Dr. Cooperman's deposition, Ms. Torres's counsel asked SHRM's counsel whether SHRM would produce Dr. Cooperman's written list of articles, along with copies of the medical literature he reviewed. *See* E-mail correspondence from Torres to SHRM re Cooperman medical literature production, June 11-12, 2026 (Attachment 5 hereto). SHRM produced these documents at 6:22 p.m. on June 12, 2026, the last day of discovery. *See* e-mail correspondence from SHRM to Torres, June 12, 2026 (Attachment 6 hereto); Order, ECF No. 13 (setting June 12, 2026, as discovery cutoff). Dr. Cooperman's list of medical articles is attached hereto as Attachment 7.

report—although he admitted discounting (though his report said he had read) the letters of Dr. Armellini and Dr. Joshi saying that the alert dog was a vital part of Ms. Torres' diabetes management. *Id.* at 84:21-85:15. On alternative glucose monitoring methods, he testified that his report addressed only CGM devices, and not insulin pumps, self-administered capillary punctures known as "finger sticks," or other devices or measures. *Id.* at 95:5-13.[4]

Indeed, at deposition Dr. Cooperman repeatedly retreated from SHRM's broader phrasing in counsel's disclosure paragraphs. He admitted that the phrase "not medically necessary" is "not specifically mentioned" in his report, Cooperman Dep. (Attachment 4) at 70:9-19; that "medically required" does not appear in his report either, *id.* at 76:3-5; that the assertion that no treating health care provider prescribed or required a service dog for Ms. Torres is "not in my report," *id.* at 85:6-15; and that he "did not say" Ms. Torres's "own conduct" demonstrated the dog was not a necessary workplace accommodation, *id.* at 126:1-6.

In short, Dr. Cooperman's report fails to meet the Rule 26(a)(2)(B) mandate of a "complete statement" of the expert's opinions and their bases, triggering the exclusion of evidence called for in Rule 37(c)(1): "A party that fails to provide information required by Rule 26(a) may not use that information or witness unless the failure was substantially justified or harmless." Fed. R. Civ. P. 37(c)(1). SHRM bears the burden to show justification or harmlessness. *Wilkins v. Montgomery*, 751 F.3d 214, 222 (4th Cir. 2014).

In deciding whether nondisclosure satisfies those tests, courts in our Circuit consider five factors: surprise to the opposing party, ability to cure that surprise, disruption of trial, importance

[4] On May 20, 2026, after Ms. Torres's counsel gave SHRM's attorneys an opportunity to revise their Rule 26(a)(2) expert disclosure, it was amended to specify the fees charged for Dr. Cooperman's services by Leidos, SHRM's third-party expert witness vendor. Defendant's Amended Disclosures, May 20, 2026 (ECF No. 43-2) (Attachment 8 hereto). The disclosure was otherwise unaltered, and the Cooperman report itself was not updated at all.

of the evidence, and the non-disclosing party's explanation. *Southern States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 596-97 (4th Cir. 2003). Importantly, the exclusion remedy may be imposed without proof of bad faith, as the *Southern States* factors focus the prejudice analysis on the nondisclosure's practical effect on the opposing party's preparation. *Southern States*, 318 F.3d at 596-97.

SHRM cannot carry its burden to show either justification or harmlessness under the *Southern States* factors. Rule 26(a)(2) requires pre-deposition disclosure so that the opposing party can examine the proposed expert's opinion for flaws, prepare rebuttal, and develop its own evidence at variance with those opinions. *See Bresler*, 855 F.3d at 216-17 (Wynn, J., concurring in part). Dr. Cooperman mentioned for the first time at his deposition that he had made a list of articles consulted, but even that list (attached hereto as Attachment 7) was not produced to Ms. Torres until June 12, 2026, after the deposition was over. *See supra* n.4.

Because Ms. Torres learned of Dr. Cooperman's sources only at deposition, she was deprived of the full exercise of her right to depose him about them. Had Dr. Cooperman's sources been disclosed in his report, as Rule 26(a)(2) requires, Ms. Torres and her counsel could have reviewed them, examined Dr. Cooperman's conclusions about them, compared them to contrary literature, consulted an appropriate rebuttal expert, and questioned Dr. Cooperman about the findings, methodologies, and limitations of the studies he relied on. That is precisely the kind of expert-discovery preparation Rule 26(a)(2) protects. *See Bresler*, 855 F.3d at 216-17. The deposition still produced useful admissions, but Rule 26(a)(2) is not satisfied by forcing the discovering party to improvise an expert examination in real time.

Given the substantial prejudice imposed on Ms. Torres by SHRM's non-compliance with Rule 26(a)(2) just described, the Court would be within its discretion under Rule 37(c)(1) and

*Southern States* to exclude Dr. Cooperman's testimony in its entirety. But even if not excluded for that reason, the bulk of Dr. Cooperman's deposition testimony fails to meet the admissibility standards of Fed. R. Evid. 702 under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), and their progeny in this Circuit. The balance of this memorandum will focus on the limitations of Dr. Cooperman's expertise and the consequent inadmissibility of most of his opinions.

### B. *Dr. Cooperman's deposition confirms that he has no opinion on most of SHRM's listed topics, and testimony on those topics should be excluded*

SHRM's disclosure claimed that Dr. Cooperman should be expected to testify about whether Ms. Torres could perform the essential functions of the job SHRM had offered her, *see* Disclosure (Attachment 1) at 2, but Dr. Cooperman testified that he did not perform that evaluation. Cooperman Dep. (Attachment 4) at 34:14-22. He then testified that he was "not commenting" on whether Ms. Torres could perform the functions of the position and was "not getting involved in that." *Id.* at 36:5-12. Therefore, any testimony on that subject should be excluded.

SHRM also claimed that Dr. Cooperman may testify that none of Ms. Torres's healthcare providers had "prescribed or required" her to obtain or use a service dog as part of her type 1 diabetes management. Disclosure (Attachment 1) at 2. Dr. Cooperman testified that SHRM did not ask him to address that question and admitted that no such opinion is in his report. Cooperman Dep. (Attachment 4) at 84:21-85:15. Also among SHRM's expected topics was that "Ms. Torres's own conduct demonstrates" that a service dog is not a necessary workplace accommodation. Disclosure (Attachment 1) at 2. Here again, Dr. Cooperman testified that SHRM did not ask him to evaluate the issue, that he had no opinion on it, and that his report said

nothing about it. Cooperman Dep. (Attachment 4) at 118:4-15, 126:1-6. Any testimony on the subject from Dr. Cooperman should therefore be excluded as unsupported and disclaimed.

In addition, SHRM's disclosure advised Ms. Torres to expect testimony about "alternative, effective and widely accepted methods of monitoring blood glucose that do not involve a service dog," and testimony that these methods "meet accepted medical standards of care" and "adequately address the functional needs associated with diabetes." Disclosure (Attachment 1) at 2. Dr. Cooperman testified at deposition that he could discuss finger sticks and implanted sensors if asked, but he admitted that his report did not mention them. Cooperman Dep. (Attachment 4) at 94:4-20. He confirmed that, among alternative methods, his report addressed only CGMs. *Id.* at 95:5-13.

The same is true of "functional needs." Again, SHRM's counsel-prepared disclosures show what counsel might have wished Dr. Cooperman to say, *see* Disclosure (Attachment 1) at 2, but at deposition he admitted that his report nowhere stated that any particular method "adequately addressed the functional needs associated with diabetes"—let alone the needs of Ms. Torres in particular. Cooperman Dep. (Attachment 4) at 113:8-22. If SHRM is allowed to call Dr. Cooperman at all, he should not be permitted to expand his conclusory opinion that "CGM remains the standard for diabetes care," *id.* at 89:14-16, 93:16-18, 161:6-18, into broader opinions at trial regarding multiple alternative methods, practical workplace needs, or the "adequacy" of SHRM's accommodation to "address the functional needs" of Ms. Torres on which his report was silent.

### C. *Any remaining diabetes alert dog opinion fails Rule 702 and* Daubert

Fed. R. Evid. 702, as construed by *Daubert* and its progeny and amended to codify those decisions, requires that expert testimony be both reliable and relevant if it is to be admissible;

that any expert opinion must be based on scientific, technical, or other specialized knowledge rather than speculation; that the reliability and relevance of proposed expert evidence be assessed by the court as a matter of admissibility, rather than by the jury as merely a matter of weight; and that the Court's reliability inquiry must test both the scientific principles employed and their application to the case at hand. *See* Fed. R. Evid. 702(d), 2023 advisory committee note (noting 2023 amendments requiring proponent of expert evidence to show it is "more likely than not" a reliable application of reliable facts, data, and scientific principles or other specialized knowledge to the case where the testimony is to be offered); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-94 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999); *Nease v. Ford Motor Co.*, 848 F.3d 219, 229-31 (4th Cir. 2017).

Even if an endocrinologist may be qualified to discuss diabetes care generally, Rule 702 requires a reliable basis for the specific opinion offered. As explained below, Dr. Cooperman's diabetes alert dog opinions fail Rule 702 twice over: they do not rest on reliable scientific principles and methods, and even the knowledge he professed was not reliably applied to the facts of this case.

1. Dr. Cooperman did not use reliable scientific principles or methods to form his diabetes alert dog opinions

*a. Cherry-picking.*

Dr. Cooperman's core opinion is that Ms. Torres's "medical records, documentation submitted, and the medical literature" do not support the "necessity" of a diabetes alert dog for her. Cooperman report (Attachment 2) at 1. However, his selective use of evidence and medical research is thoroughly, alarmingly unscientific. His outcome-driven "review" of Ms. Torres's medical records is discussed in subpart *b* below. But even as to "medical literature," Dr. Cooperman admitted that he had selectively cited only articles that he said "supported [the]

position" he was taking, and he did not indicate that he had even read any others. Cooperman Dep. (Attachment 4) at 59:17-62:12.

Our Circuit has recognized that the cherry-picking of data to fit a preferred conclusion is one of the cardinal transgressions against reliability under Rule 702. *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig.*, 892 F.3d 624, 634 (4th Cir. 2018) (holding that "[r]esult-driven analysis, or cherry-picking, undermines principles of the scientific method and is a quintessential example of applying methodologies (valid or otherwise) in an unreliable fashion"); *see also EEOC v. Freeman*, 778 F.3d 463, 469 (4th Cir. 2015); *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 202-03 (4th Cir. 2001) (deeming an expert unreliable who testified he had read two medical journal articles contrary to his opinion, rejected them, and would have rejected any such articles, because "they didn't affect my prior judgment, and they still haven't . . . So even if there were ten more articles, I'm not going to change my mind about it.").

*b. Overgeneralization.*

Dr. Cooperman's inference from the "medical literature" is generalized and is not specific to Ms. Torres. All he reviewed regarding Ms. Torres specifically was her medical records—and not all of those. Cooperman Dep. (Attachment 4) at 21:19-22:2 (saying he "perused" her medical records for "about an hour"); *but cf.* Cooperman report (Attachment 2) at 1 (stating he reviewed "[e]xcerpts" from four of the medical records listed in the report). Yet, based only on a handful of articles that "support [his] position," *id.* at 59:13-61:17, he purported to make the universal claim that "there is no convincing evidence of additional benefit" from a diabetes alert dog ("DAD") in addition to CGM, *id.* at 130:21-22, and that DADs serve only as "psychosocial reassurance." *Id.* at 131:7-8. In effect, he opines that diabetes alert dogs are no good to any diabetic, anywhere, at any time, regardless of the specifics of a particular patient.

Moreover, instead of giving any weight to the medical assessments of Ms. Torres by her treating endocrinologists, Dr. Joshi and Dr. Armellini, or considering whether the letters were written for non-medical readers, he simply dismissed them with a wave of the hand—the same treatment SHRM gave them when it took the actions at issue in the case. *See id.* at 129:12-22 (admitting to having reviewed the treating physicians' letters, but complaining that they "failed to document any distinct episodes where the diabetes alert dog played a role in preventing a diabetes ill effect" and should be discounted); *id.* at 124:13-16 (misrepresenting medical record of Ms. Torres's 2017 car accident) (further discussed *infra* n.5).

*c. No specific expertise.*

Dr. Cooperman was asked to review this case only four days before his report was submitted. Cooperman Dep. (Attachment 4) at 17:3-8. By his own admission he had never worked with a diabetic alert dog in his entire career, and had never encountered service dogs of any kind, apart from patients who brought vision-related service dogs to his office. *Id.* at 65:15-66:11. He had no formal training on diabetic alert dogs; no formal education on evaluating service-dog benefits; no authored or co-authored publications or prior research of his own on the subject; and no first-hand experience evaluating whether a person with diabetes could benefit from a diabetic alert dog. *Id*. at 66:12-67:17. He acquired his meager knowledge of diabetic alert dogs in a few short days solely for this litigation. *Id*. at 62:13-63:13.

Thus, while Dr. Cooperman may have decades of experience as an endocrinologist, he demonstrably lacks any expertise or specialized knowledge regarding diabetic alert dogs and their utility in the management of type 1 diabetes. See *Brainchild Surgical Devices, LLC v. CPA Glob. Ltd*., 144 F.4th 238, 254 (4th Cir. 2025) (holding that the purported expert must have "satisfactory knowledge, skill, experience, training [or] education *on the issue* for which the

opinion is proffered") (quoting *Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir. 1989)) (emphasis supplied); *Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 391 (D. Md. 2001) (stating that "[t]he fact that a proposed witness is an expert in one area[] does not *ipso facto* qualify him to testify as an expert in all related areas," and collecting cases supporting that proposition), *cited in Kadel v. Folwell*, 100 F.4th 122, 159 (4th Cir. 2024) (*en banc*) ("[m]erely reading literature" about a medical treatment does not qualify someone as an expert who had no practice experience with that treatment), *vacated on other grounds,* 145 S. Ct. 2838 (2025).

*d. Misreading of sources consulted.*

Most telling of all, Dr. Cooperman's literature review itself was unreliable—even as a matter of lay reading comprehension, let alone expert scientific analysis. Not only did he cherry-pick which materials he consulted, but he ignored important findings reported in the pieces of medical literature he did review.

In particular, he failed to report that some trained glycemia alert dogs, even in the studies he cited, performed extremely well in accuracy, predictive value, and consistency of their alerts: for instance, in the Rooney study he cited, four of the alert dogs showed a positive predictive value ("PPV") of 100%, well above the group median for all 27 dogs in the study (median hypoglycemia sensitivity of 83% and median PPV of 81%). Nicola J. Rooney *et al.*, "How Effective are Trained Dogs at Alerting Their Owners to Changes in Blood Glycaemic Levels? Variations in Performance of Glycaemia Alert Dogs," 14 PLOS One e0210092 (Public Library of Science) (2019) (Attachment 9 hereto). The Gonder-Frederick "variability" study reported sensitivity to low blood glucose ("low-BG sensitivity") up to 100%, and true positive rates up to 94.1%, emphasizing that individual dogs vary substantially and that the performance of some is superb. Linda A. Gonder-Frederick *et al.*, "Variability of Diabetes Alert Dog Accuracy in a Real-

World Setting," 11 J. Diabetes Sci. & Tech. 714, 717 (2017) (Attachment 10 hereto). The Los study found that dogs often alert to otherwise unknown hypoglycemia, and that their alerts may have been unfairly counted as false positives when correctly alerting to individualized thresholds or hyperglycemia. Evan A. Los *et al.*, "Reliability of Trained Dogs to Alert to Hypoglycemia in Patients with Type 1 Diabetes," 11 J. Diabetes Sci. & Tech. 506, 506-512 (2017) (Attachment 11 hereto). And the Lippi/Plebani study concluded that diabetes alert dogs may warn their owners of both hyper- and hypoglycemic episodes and "dangerous glucose fluctuations." Giuseppe Lippi & Mario Plebani, "Diabetes Alert Dogs: A Narrative Critical Overview," 57 Clin. Chem. & Lab. Med. 452, 457 (2019) (Attachment 12 hereto).

In sum, the literature Dr. Cooperman cited does not support his categorical opinion that diabetes alert dogs afford no advantage over CGM alone. At most, the cited studies support the much narrower proposition that DAD performance varies and must be evaluated dog-by-dog, in context, alongside the limitations of CGM technology. Yet, as discussed immediately below, Dr. Cooperman's report and deposition did not address the times when CGMs are inoperative or inaccurate, or the competence and performance of Meechum, the glycemia alert dog in this case, as questions even worth considering. Cooperman report (Attachment 2) at 2; Cooperman Dep. (Attachment 4) at 34:14-22, 36:5-12, 37:9-15, 44:9-14, 165:17-167:7 (confining comments to generic suppositions about office environments and need for "a dog").

2. Dr. Cooperman did not reliably apply his "standard of care" principle, or his general suppositions of DAD performance, to Ms. Torres or to this case

Dr. Cooperman's testimony fails to satisfy Rule 702 for the additional reason that he did not reliably apply any valid scientific principle to Ms. Torres's particular facts. First, by his own admission, even after reading studies showing that some DADs alerted with tremendous sensitivity, accuracy and consistency, he never considered the alerting performance of Meechum,

the particular service dog in this case, so he has no idea where Meechum fits on the distribution of such performance among dogs trained to alert to dangerous glycemic events. Cooperman Dep. (Attachment 4) at 151:9-21. He did not analyze Meechum's history of alerts, did not place Meechum on the performance curves reported in the literature, and did not explain why a dog trained to Ms. Torres's thresholds should be assumed no better at alerting, and perhaps worse, than some average that the studies themselves caution may misclassify useful alerts.[5]

Second, Dr. Cooperman's report and testimony effectively assert that simply because CGM is a standard diabetes-care tool, it is effective enough that no diabetic ever needs a glycemia alert dog in the workplace. Yet he did not account for CGM lag time, malfunctions, or other downtime, all of which can occur, or the limitations of CGM devices' indirect detection of

[5] As if this observation would cure rather than compound the shortcomings of his report and testimony in this regard, Dr. Cooperman testified that he was aware of Ms. Torres's 2017 car accident, and that it was caused by a glycemic event—but he suggested without basis that her service dog did not alert and then doubled down on his resulting supposition that this showed the dog was not effective. Cooperman Dep. (Attachment 4) at 117:20-118:3 (stating that "she had the alert dog with her"); *id.* at 124:13-16 (stating that Meechum "apparently didn't warn her"); *id.* at 138:4-13 (stating that "over the subsequent six years, there was . . . absolutely no mention in the records of the dog performing its task," and that it "strains my credulity" that if the dog had saved her, she would not have mentioned it to physicians). In fact, the post-accident emergency medical services report showed that Meechum did alert. *See* Inova Loudoun Hospital Emergency Department notes, Oct. 25, 2017 (ECF No. 86-10), at SHRM_Torres_2056 ("P[olice] O[fficer] reports medical dog sig[naled] low blood sugar"). While Dr. Cooperman reviewed "excerpts" of Ms. Torres' Inova records, the Bates number at which this record is found is omitted from the excerpts Dr. Cooperman's report says he reviewed. *Id.*; Cooperman report (Attachment 2). Dr. Cooperman's report provides no information regarding how these "excerpts" were selected. Cooperman report (Attachment 2). This incomplete treatment of the record should concern the Court regarding carelessness or bias in the report. Moreover, Dr. Cooperman did no investigation of the circumstances of the 2017 accident and cannot know whether Meechum's reported alert could have prevented it. His suppositions in this regard are utterly uninformed even for a lay person, and their vehemence, in the absence of evidence, should disqualify him from any expert testimony about the accident or Meechum's role in it.

blood glucose from subcutaneous tissue rather than from the bloodstream, which he acknowledged but discounted. Cooperman Dep. (Attachment 4) at 97:6-15 (further discussed in Part II(C)(3), *infra* at 17-19). These gross generalizations—particularly about the competence and performance of DADs in general rather than those of this dog for this individual, and about the "standard of care" as somehow preempting or foreclosing the ADA reasonableness inquiry—completely fail to engage with the person-specific accommodation question at the heart of this case. They thus directly violate the principle of *Daubert*, and of Rule 702 as amended in 2023, that for a proposed expert's testimony to be admissible, the expert must have reliably applied scientific principles to the case in which the testimony is offered.

The chief logical and legal flaw in Dr. Cooperman's "standard of care" argument, in his report and in his deposition testimony, is that it impermissibly assumes that whatever blood glucose monitoring methods meet a medical standard of care in the tort sense, *i.e.*, the generally applicable standard of care below which a physician may be liable for medical malpractice, are automatically sufficient workplace accommodations for Ms. Torres under the ADA and VHRA. Cooperman report (Attachment 2) at 2. Dr. Cooperman repeated this assertion explicitly at deposition. Cooperman Dep. (Attachment 4) at 95:14-17, 104:15-105:16, 112:4-13.

This formulation impermissibly mixes two different questions: what modalities physicians use to help patients manage diabetes generally, and what workplace accommodations the ADA and VHRA require an employer to consider for a particular qualified individual specifically. The two concepts are logically and legally independent, and to conflate them is to treat apples as if they were oranges. The ADA's accommodation provisions respond to the functional limitations of each individual person with a disability, given the need for equal employment opportunity, and do not necessarily follow what an employer or even a physician

would generally prescribe as standard treatment for the underlying condition. *See J.D. by Doherty v. Colonial Williamsburg Fdn.*, 925 F.3d 663, 673 (4th Cir. 2019) (construing ADA Title III) (even where a public restaurant had strict protocols for preparing gluten-free meals—which might suffice as an accommodation for most people with a gluten intolerance—that protocol did not necessarily satisfy the ADA for a particular child whose evident sensitivity was more severe); *cf. U.S. Airways v. Barnett*, 535 U.S. 391, 405 (2002) (for reassignment accommodations despite seniority systems, the ADA requires an individualized determination under the totality of circumstances, not a one-size-fits-all generalization about seniority systems' inviolability).

Meanwhile, Dr. Cooperman's generalizations regarding DAD performance set up a separate violation of Rule 702(b): they violate the requirement that an expert's opinion be based on "sufficient facts or data." Rule 702(d), as amended in 2023, requires the expert to have reliably applied his methods to the facts of the particular case where his testimony is offered. An opinion that CGM would be "effective" for a specific person is necessarily a claim about how that specific individual's physiology will interact with that regimen. The case-specific data that bear on that question are exactly what Dr. Cooperman admits he never gathered about Ms. Torres, including her experience with hypoglycemic episodes, their frequency and timing, any record of CGM's failure to catch dangerously high or low glucose levels for her, and—critically—her service dog's actual alert-performance record, which is direct evidence of exactly the comparative question at issue: whether Ms. Torres's dog catches alert-worthy glycemic events *in her* that a CGM device alone could miss. Yet SHRM proposes to induce a jury to accept Dr. Cooperman's broad, population-level generalization as the equivalent of the individualized determination that Rule 702 requires and that he did not make. "[N]othing in

either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

The Court should therefore exclude any testimony from Dr. Cooperman equating a medical standard of care with the legitimacy, necessity, reasonableness, or effectiveness of Ms. Torres's requested accommodation under the ADA and VHRA. He should likewise be precluded from testifying to any comparison of Ms. Torres's CGM and service dog aids, *i.e.*, whether or not Meechum, the particular service dog in this case, is meaningfully more effective in immediacy, accuracy or consistency of alerts than Ms. Torres's CGM apparatus, or whether or not he is effective at times when he is on duty and her CGM apparatus is inactive, malfunctioning, or otherwise unavailable.

3. The proposed testimony ignores the limitations of CGM in biased fashion.

Dr. Cooperman conceded that CGMs measure glucose in a diabetic's subcutaneous tissue, not her bloodstream. Cooperman Dep. (Attachment 4) at 97:6-9. He testified that for this reason CGM readings can lag behind blood glucose changes. *Id.* at 97:10-21. He testified that blood glucose could fall from normal to dangerous levels in less than 15 minutes, *id.* at 98:12-99:6, and that CGM readings from the Dexcom device Ms. Torres was using when she sought the SHRM job could lag that many minutes behind actual drops in blood glucose level. *Id*. at 97:22-98:10. He further testified that CGMs have warm-up periods, and that users cannot rely on accurate readings during those periods. *Id.* at 105:22-106:21. He also testified that sensors can detach unexpectedly, and that adhesion issues arise a "fair amount of the time." *Id.* at 108:5-109:11. He further admitted that he had not recently reviewed CGM accuracy data. *Id.* at 110:7-111:2.

Yet Dr. Cooperman testified that CGM was "effective" in general and was by extension an adequate substitute for Ms. Torres's service dog at SHRM in particular. His opinion discounted the CGM limitations he himself acknowledged and did not even consider Ms. Torres's particular medical circumstances. The record contains Ms. Torres's statements that her glucose changes include fast-moving trends, that her service dog catches those trends before CGM technology, and that her history includes severe hypoglycemic events causing blackouts. F. Torres Dep. (Attachment 13) at 142:17-19, 138:9-139:8, 140:8-141:5;142:1-9, 17-19, but Dr. Cooperman simply ignored that evidence. He also did not consider the sworn testimony of Ms. Torres's mother that, when both CGM and Meechum are being used together, "the first one to alert is Meechum," and "five or ten minutes later, the CGM is in agreement with Meechum," C. Torres Dep. (Attachment 14) at 85:9-20, or the sworn testimony of Dr. Joshi that blood sugar can "drop faster than a CGM can report to a user," Joshi Dep. (Attachment 15) at 168:14-16, and that CGM readings can be inaccurate by "20 to 40 points." *Id.* at 19:7-9. Cooperman Dep. (Attachment 4) at 34:14-22, 36:5-12. Dr. Cooperman thus failed to take account of facts that went against his belief that CGM by itself was adequate for Ms. Torres merely because it sufficed for most people. See *Doherty*, 925 F.3d at 673 (holding that an accommodation that "may suffice as an accommodation for the majority" cannot be deemed adequate for all individuals without individualized consideration).

Put another way, Dr. Cooperman's opinion about Ms. Torres did not account for the factual inputs he acknowledged would constrain any analysis of medical necessity for this patient. He testified that medical necessity may depend on patient history, physician experience, medical literature, controlled studies, and expert opinion. Cooperman Dep. (Attachment 4) at 47:10-48:2. He testified that physicians would ask patients about their history and may rely on

patient-reported history depending on the circumstances. *Id*. at 49:2-22. He testified that he would collect information from other treating medical professionals if possible. *Id.* at 51:16-22. Yet, in forming his opinion here, he did not inquire about the particular service dog in question, *id.* at 81:19-82:6. or review any of the sworn testimony of Ms. Torres or her supporting witnesses given prior to his own deposition. His opinions instead are mere generalizations from cherry-picked literature, and from a cursory review of records that in any event did not reflect all of Ms. Torres's experiences before and after she acquired her diabetes alert dog.

Dr. Cooperman's approach is not the reliable application of scientific principles, facts or data. He used a medical necessity concept that, by his own description, can require patient-specific history, treating-provider information, risk assessment, and clinical context. Cooperman Dep. (Attachment 4) at 47:10-48:2, 49:2-22, 51:16-22. But he applied it without interviewing Ms. Torres, without expertise in diabetes alert dogs, without a disclosed literature method, and without evaluating the workplace function the accommodation was meant to address. *Id.* at 66:12-67:17, 81:19-82:6, 34:14-22.

The Court should therefore exclude Dr. Cooperman's diabetes alert dog testimony completely under Rule 702. His opinions fail the first *Daubert* requirement because they do not rest on reliable scientific principles and methods. They fail the second because he did not reliably apply any such principles or methods to Ms. Torres, the SHRM workplace, or the individual accommodation issue the jury must decide.

### *D. Dr. Cooperman's proposed trial testimony would unacceptably prejudice and confuse the jury under Rule 403*

When applying the reliability and relevance test of Rule 702, the Court must also apply Fed. R. Evid. 403, which "permits exclusion of relevant evidence 'if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading

the jury.'" *Daubert*, 509 U.S. at 595 (quoting Fed. R. Evid. 403). In other words, every determination under *Daubert* must also consider whether the proposed evidence is more prejudicial than probative or would mislead the jurors or just confuse them.

Our Circuit is well aware of this danger under both Rule 403 and Rule 702. "[T]hroughout an admissibility determination, a judge must be mindful of other evidentiary rules, such as [Fed. R. Evid.] 403, which permits the exclusion of relevant evidence 'if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury'"). *United States v. Dorsey*, 45 F.3d 809, 815-16 (4th Cir. 1995), *citing Daubert*, 509 U.S. at 595; *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999) ("the court must recognize that due to the difficulty of evaluating their testimony, expert witnesses have the potential to 'be both powerful and quite misleading.' And, given the potential persuasiveness of expert testimony, proffered evidence that has a greater potential to mislead than to enlighten should be excluded."), *quoting Daubert*, 509 U.S. at 595; *United States v. Garcia*, 752 F.3d 382, 394 n.10 (4th Cir. 2014) ("It is bootstrapping of the worst kind to suggest to a jury that it should believe that everything a witness says is based on expertise gained from independent knowledge and experience in the absence of a record demonstrating as much.").

A prime example of undue prejudice is Dr. Cooperman's proposed testimony on "standard of care." Shown above to be fundamentally flawed, *see* discussion *supra*, Part II.C.2, at 14-16, it will likely lead the jury to the false belief that a general "standard of care" for a given medical condition equates to the threshold level of medical need that a particular individual must demonstrate to be entitled to an accommodation under disability law. Furthermore, because it is Dr. Cooperman's core opinion in this case, and will permeate virtually all his responses to

questioning from either party if allowed into evidence, no curative instruction can reasonably be expected to prevent the jury from accepting it, implicitly if not overtly, once they hear it.

The same problem infects Dr. Cooperman's inconsistent and likely misleading testimony purporting to define and apply the term "medical necessity," which he apparently believes is a touchstone for the legitimacy of requests for disability accommodations. *See* discussion *supra* at 14-16 (showing the critical legal distinction between the two).

Dr. Cooperman first said that a medication, device, procedure, operation, or therapy was "medically necessary" if it was "supported, approved, and recommended for a patient's condition." Cooperman Dep. (Attachment 4) at 45:19-22. That, of course, is exactly what Drs. Joshi and Armellini wrote in their medical letters to SHRM. Dr. Cooperman even clarified that a treatment or regimen need only "in some way meet at least some of those criteria," and that determining medical necessity depends on a combination of the treating physician's experience, the patient's prior medical history, recommendations from leaders in the field, medical literature, controlled studies and expert opinion. *Id.* at 47:10-48:17.

But Dr. Cooperman did not employ that individualized inquiry in forming his opinion that a service dog was unnecessary for Ms. Torres. When pressed for that opinion, he reduced "medical necessity" to the assertion that "there is no evidence or documentation in the record to suggest that Ms. Torres requires or necessitates a diabetes alert dog," which further reduced to the conclusion that the service dog in this case "is not medically necessary." Cooperman Dep. (Attachment 4) at 68:1-15. When asked where his report says "not medically necessary," he pointed only to the phrase "the need for a diabetes alert dog is not supported," admitted he did not use "medically necessary," and asked, "I use the word necessity. Does that count?" He

ultimately conceded that the phrase "is not specifically mentioned in my report." *Id.* at 69:4-70:19.[6]

Moreover, to reach his conclusion Dr. Cooperman had to reject the medical evidence he did have about Ms. Torres specifically: her treating physicians' letters that, to use his own words, "supported, approved, and recommended" that she have an alert dog. Cooperman Dep. (Attachment 4) at 45:19-22 (defining "medically necessary" as "supported, approved or recommended"); *id.* at 33:1-2 ("[t]he two [physicians'] letters supported the use of the diabetes alert dog"). This confusing tangle of terms (necessary, prescribed, required, supported, approved, recommended, some of which he used and then denied using) would impose on the jury precisely the burden of confusion and obfuscation that Rule 403 was designed to obviate. The prejudice is the risk that jurors will throw up their hands and defer to the expert rather than try to solve his riddles for themselves.

In all of these examples lurks the danger that a jury will accept Dr. Cooperman not just as a diabetes doctor, but as an expert on diabetes alert dogs, or on Ms. Torres's "own conduct," or on other facts he did not investigate and on which he has no independent knowledge or experience. That is precisely the harm to be expected here under both Rules 403 and 702, and why the Court's exercise of its *Daubert* gatekeeping function should exclude under both Rules

[6] The same problem infects Dr. Cooperman's testimony that glycemia alert dogs that were not "prescribed or required" must not be needed. Cooperman Dep. (Attachment 4) at 84:17-20 ("I never saw any recommendation by Dr. Joshi for a service alert – for a diabetes alert dog."). Yet Dr. Cooperman also testified that he does not know how individual diabetics obtain their service dogs, and that he doubts that prescriptions exist for them. *Id.* at 86:1-8. He also testified that physicians cannot "require" patients to obtain treatment of any kind, and that "required" is not a term physicians would use in medical records. *Id.* at 86:9-87:19, 75:3-15 ("I guess I never used the word "required").

the likely misleading and prejudicial testimony enumerated in this memorandum. *Dorsey*, 45 F.3d at 815-16, *citing Daubert,* 509 U.S. at 595.

### III. <u>Conclusion</u>

For the reasons stated above, the Court would be fully warranted in excluding Dr. Cooperman's testimony in its entirety under Rules 26(a)(2)(B) and 37(c)(1), given that Dr. Cooperman's report did not disclose the opinions and bases required by Rule 26(a)(2), and his deposition confirmed that the report was not a meaningful roadmap for expert discovery.

If the Court declines to exclude Dr. Cooperman's testimony entirely, it should preclude him under Rules 702 and 403 from giving any testimony about:

- Diabetes alert dogs, their capacities, training, competence or performance, including opinions that diabetes alert dogs provide no advantage over CGM alone, serve only a psychosocial function, or are generally ineffective.
- Comparisons between Meechum and Ms. Torres's CGM, including whether Meechum is more effective in immediacy, accuracy, or consistency of alerts, or whether Meechum is effective when the CGM is inactive, malfunctioning, or unavailable.
- Alternative glucose-monitoring methods other than CGM.
- Ms. Torres's 2017 automobile accident or Meechum's role or activity in it.
- Whether any provider "prescribed," "required," or "medically required" Ms. Torres to use a service dog, including any implication that the absence of such language means the dog was not needed.
- Whether Ms. Torres was qualified to perform the essential functions of the job she was offered at SHRM.

- Whether Ms. Torres's "own conduct" shows that her glycemia alert dog was not a necessary workplace accommodation.
- Whether CGM, or any other alternative method, adequately addressed Ms. Torres's functional or workplace needs, including any testimony that CGM alone was an adequate substitute for her glycemia alert dog Meechum, either by himself or in tandem with CGM.
- Whether, in what way or to what extent medical standards of care, medical "necessity," or medical "requirement" equate with the ADA/VHRA accommodation inquiry.
- Whether lack of mention in medical records about specific injury-preventing alerts by an alert dog, or by Meechum in particular, means those alerts did not occur.

Two proposed orders are submitted with this motion: one that would exclude Dr. Cooperman's testimony in its entirety from trial, and the other that would exclude each of the above categories of testimony. Ms. Torres is not conceding, by submitting a proposed order in the latter form, that SHRM should be excused from compliance with Rules 26(a)(2) and 37(c)(1), or that total exclusion of Dr. Cooperman's testimony is unwarranted.

Respectfully submitted,



______________________________

Stephen B. Pershing
Virginia Bar No. 31012
Mary E. Kuntz
Virginia Bar No. 76947
Anna Kathryn B. Barry
D.C. Bar No. 1719493
(Admitted *pro hac vice*)
Kalijarvi, Chuzi, Newman & Fitch, P.C.
818 Connecticut Ave. N.W., Suite 1000
Washington, DC 20006
(202) 331-9260
mkuntz@kcnlaw.com
spershing@kcnlaw.com
akbarry@kcnlaw.com

*Attorneys for plaintiff Fiona Torres*

Dated: August 12, 2026

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of August, 2026, a copy of the foregoing was filed with the Court's case management / electronic case filing ("CM/ECF") system, through which it was transmitted to counsel of record for defendant Society for Human Resource Management as follows:

Lauren M. Bridenbaugh
Leslie P. Currie
Tanja L. Darrow (admitted *pro hac vice)*
Tiffany din Fagel Tse
LITTLER MENDELSON, P.C.
1800 Tysons Boulevard, Suite 500
Tysons Corner, VA 22102
lbridenbaugh@littler.com
lcurrie@littler.com
tdarrow@littler.com
ttse@littler.com

______________________________
Stephen B. Pershing