# Attachment 4

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

---------------------------X

FIONA TORRES, :
PLAINTIFF, : CASE NUMBER
VS. : 1:25-CV-2360(PTG/WBP)
SOCIETY FOR HUMAN RESOURCE :
MANAGEMENT,
:
DEFENDANT.

---------------------------X

DEPOSITION OF MICHAEL COOPERMAN
CONDUCTED REMOTELY
THURSDAY, JUNE 11, 2026
10:00 A.M. EASTERN DAYLIGHT TIME

Job Number 636233
Pages 1 - 186
Transcribed by Sandra Ann Masterpole

Deposition of MICHAEL COOPERMAN, conducted remotely.

Pursuant to Notice, before Raechel Meyerowich, Notary Public in and for the Commonwealth of Massachusetts.

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:

HECTOR F. RUIZ, ESQUIRE
KALIJARVI, CHUZI, NEWMAN & FITCH, P.C.
818 Connecticut Avenue, Suite 1000
Washington, District of Columbia 20006
(202) 331-9260

ON BEHALF OF THE DEFENDANT:

TIFFANY DIN FAGEL TSE, ESQUIRE
LAUREN M. BRIDENBAUGH, ESQUIRE
LESLIE P. CURRIE, ESQUIRE
LITTLER MENDELSON, P.C.
1800 Tysons Boulevard, Suite 500
Tysons Corner, Virginia 22102
(703) 442-8425

ALSO PRESENT:

Fiona Torres - Plaintiff
Hanton Walters - Society for Human Resource Management, Vice President, Legal Affairs

I N D E X

PROCEEDINGS PAGE
WITNESS
MICHAEL COOPERMAN
Examination by Mr. Ruiz........................5
Examination by Ms. Tse........................169

E X H I B I T S

| NUMBERS | | MARKED |
| --- | --- | --- |
| 1 | Rule 26(a)(2) Disclosures | 23 |
| 2 | Amended Rule 26(a)(2) Disclosures | 25 |

P R O C E E D I N G S

(Proceedings began at 10:02 a.m. All parties appear remotely.)

COURT REPORTER: I am a notary authorized to administer oaths, and this deposition is being recorded by electronic means. All parties understand and agree that any certified transcript produced from this recording of this proceeding is intended for all uses permitted under applicable, procedural, and evidentiary rules and laws and shall constitute written stipulation. The parties stipulate to the use and certification of this testimony consistent with the applicable law of such. Hearing no objection, I will now swear in the witness.

Doctor, will you please raise your right hand? Do you solemnly swear or affirm, under the penalties of perjury, that the testimony you shall give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: Yes.

MICHAEL COOPERMAN,

called as a witness, having been first duly sworn to

testify or affirm to the truth, testified under oath as follows:

COURT REPORTER: We can begin.

MR. RUIZ: Thank you so much.

EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. RUIZ:

Q Good morning, Dr. Cooperman. Again, my name is Hector Ruiz, and I represent the Plaintiff, Fiona Torres in the matter of Fiona Torres v. Society for Human Resource Management, which is pending in the Eastern District of Virginia, docket number being 1:25-CV-2360. Would you please state and spell your full name?

A Michael, M-I-C-H-A-E-L, Cooperman, C-O-O-P-E-R-M-A-N.

Q Thank you, sir. And are you represented by counsel here today?

A Yes, I guess.

Q Do you know, would you tell me who you're being represented by here today?

A Tiffany Tse.

Q Thank you so much. Dr. Cooperman, is there any reason that might affect your ability to give complete

received?
A I graduated high school. I was in a six-year program between Rensselaer Polytechnic Institute and Albany Medical College, and graduated college and medical school in 1970. I then did an internship in medicine in the Bronx, New York. I then did a fellowship and residency in Boston. I then served two years in the U.S. Air Force. I am board certified in internal medicine. I'm board certified in endocrinology and metabolism.
Q Thank you, sir. Other than being board certified in internal medicine and endocrinology and metabolism, do you have any other certifications?
A No.
Q Would you please describe your work experience, including the positions held over the last ten years?
A When I left the Air Force in 1976, I moved to the Philadelphia area where I have been in private practice from 1976 to the end of 2022. During that period of time, I practiced some internal medicine, and then finally, totally endocrinology. I was the director of endocrinology at a Temple-affiliated hospital, Jeanes

Hospital, here in Philadelphia, from the early 1990s 'til around 2013. After that, I continued in private practice up until the end of 2022.

Q Did you say the end of 2022, sir?

A Yes.

Q And since the end of 2022, sir, what have you been doing professionally?

A I've been doing medical legal work.

Q What do you mean by medical legal work?

A Well, at the request of some agencies and some attorneys, I've done medical reviews, which encompasses the use of medications, individuals who have sustained injuries and may have diabetes or other complicating endocrine problems. And I've actually also done some reviews for malpractice cases.

Q Sir, have you been serving as an expert witness since 2022?

A Yes.

Q How many cases have you served as an expert witness in?

A For what time period?

Q From 2022 forward.

company called Leidos. And I was asked by Leidos to review this case.

Q When did Leidos ask you to review this case?

A If you want the exact date -- can I look at the date on my report?

Q I don't need an exact date, sir. Was it --

A I would say, three or four days before my written report.

Q So that's how you just gave me an estimate of the time, that's perfect. When I ask you for dates, approximate times, if you don't know the exact, are perfectly fine. Thank you so much.

A Fine. Fine, yes.

Q When you agreed to review materials for this case, had you spoken only with Leidos?

A Yes.

Q Did you ever speak with counsel for SHRM regarding your assignment?

A Yes.

Q When did you speak with counsel for SHRM?

A I would say a day or so after I reviewed the materials that were sent to me.

A Yesterday.
Q And how long did that take you?
A Just that, just to review my report?
Q Yes, sir.
A Twelve minutes.
Q Twelve minutes? Okay. And what else did you do to prepare for this deposition?
A I perused -- I read Dr. Joshi's deposition.
Q Okay. How long did it take you to review Dr. Joshi's deposition?
A About two hours.
Q Two hours? Okay. When you say Dr. Joshi's deposition, you're referring to Dr. Joshi's deposition transcript?
A Yes.
Q Am I correct that you did not have Dr. Joshi's deposition transcript when you drafted your report?
A Correct.
Q Was there anything else you did to prepare for this deposition?
A I perused the medical records that I had previously reviewed.

Q Thank you, sir. How long did that take?
A An hour.
Q Sir, you referenced developing a list of references. Did you provide that list of references to anyone?
A No.
Q Sir, in total, how much time did you spend preparing for this deposition?
A Would that include Dr. Joshi's deposition?
Q Yes. That took two hours. How much time did you spend combined?
A Just the -- not -- you're asking me just for the deposition, not for the initial review; is that correct?
Q Just preparing for this deposition.
A Well, two hours for Joshi, another 10, 15, another half-hour, another hour. So we're talking about maybe three or four hours.
Q Thank you. Sir, what I'm going to do is I'm going to drop into the chat, okay, a couple of documents. There's not going to be a lot of documents today. Okay? I'm going to drop two documents, and I'm

A I see one that says X1 SHRM Torres discs.
Q Yes. Correct. Now, can you open that document?
A Okay.
Q Okay. This is what I'm going to be marking as Exhibit 1 today, and it's Defendant's Rule 26(a)(2) Disclosures. I want you to review this document and let me know if you've seen it.
A (The witness reviews the document.) Okay. I'm sorry. Is there a question pending?
Q Yes, sir. I just want to know if you've seen this document before.
A No.
Q No. Okay.
MS. TSE: It's the ten-page document, right, we're looking at?
MR. RUIZ: We're looking at your disclosures, which also has his attached report.
MS. TSE: Dr. Cooperman, yeah, I would scroll through the entire document, not just the first page.
THE WITNESS:Oh, I'm sorry. I didn't see

my report attached to it. Okay. So, obviously, I've seen my report before.

BY MR. RUIZ:

Q Okay. You've seen your report, sir, but you have not seen the actual disclosures that come before the report; Is that accurate?

A Yes.

Q Okay. I'm going to drop another document into the chat. Okay.

A Okay. Let me see if I can get back here. Okay. I got back successfully.

Q Okay.

A Well, you want me to open X2?

Q Correct.

A Okay.

(Exhibit Number 2 was marked for identification.)

BY MR. RUIZ:

Q Okay. Now, what I've just brought out, it's going to be marked as Exhibit 2, is Defendant's Amended Rule 26(a)(2) Disclosures that were sent to us -- were sent to the Plaintiff's counsel on May 20, 2026. I'm

A The two letters supported the use of the diabetes alert dog, but failed to document any specific episodes, times, or necessity for the use of the dog.

Q So are you expressing an opinion that they don't support it, or are you just stating a fact?

A I'm stating a fact.

Q Okay. So for that last one regarding the two letters supportive of her use, it's not an opinion; you're just pointing out a fact that anyone can see?

MS. TSE: Objection; argumentative. You can answer, if you can.

THE WITNESS: Those letters were written in support of the diabetes alert dog. In my review, I require that there be more documentation in those letters to support the use of the diabetes alert dog. And I found that lacking.

Q Thank you, sir. Sir, I want to direct your attention to Exhibit 2.

A Okay.

Q Okay. Exhibit 2, on page -- top of Page 2. Do you see that, sir? I know you had not seen this document before.

A Is that the sentence that says, SHRM may call Dr. Cooperman to provide testimony, et cetera?

Q Yes, sir.

A Okay.

Q Okay. The first line reads, SHRM may call Dr. Cooperman to provide testimony regarding whether Ms. Torres could perform the central functions of the senior specialist product management position at SHRM with or without an accommodation, and whether it is medically necessary for Ms. Torres to have a service dog with her at all times due to Type 1 diabetes. Do you see that, sir?

A Yes.

Q Okay. Now, were you asked to evaluate whether Ms. Torres could perform the essential functions of the senior specialist product management position at SHRM with or without an accommodation?

A I was asked to comment on whether the accommodations for Ms. Torres, as stated by SHRM, was appropriate for Type 1. I did not evaluate whether or not Ms. Torres could perform the essential functions out of that context.

Q Okay. Well, let me ask you this: From what is written here as to what testimony you may be called to provide, okay, for this first sentence, is this possible testimony like documented in your report?

A I don't understand the question.

Q For the testimony that you may be called to provide that's described in the sentence that we just read, okay, can you point me to a location where that opinion would be contained in your report?

A May I look at my report?

Q Absolutely.

A Okay. On Page 2 of my report, I believe it's the one, two, three -- fourth paragraph, it says -- I wrote, SHRM has offered to make reasonable accommodations to meet Ms. Torres's diabetes care. Her job description does not entail physical exertion or frequent travel. It is sedentary in an office environment. Thus, there is no increased risk of Type 1 diabetes, hypoglycemia, or hyperglycemia.

Q Sir, you're saying that that part of your report is connected to any testimony you would provide regarding whether Ms. Torres could perform the essential

functions of the senior specialist product management position at SHRM with or without an accommodation, and whether it's medically necessary for Ms. Torres to have a service done with her at all times?

A Well, I don't want to parse this too much, but I'm not commenting on whether Ms. Torres could perform the functions of a senior specialist product management. I'm not getting involved in that. All I'm saying is that with regard to the diabetes and accommodations for the diabetes, that SHRM was appropriate in offering accommodations. But I'm not saying that I'm evaluating Ms. Torres, whether she could actually do the job.

Q Okay. Let me make sure I understand, sir. Do you know, like with respect to the possible testimony that you may be called to provide, do you know what essential functions means with respect to that testimony?

MS. TSE: Objection; calls for legal conclusion. Dr. Cooperman is not an attorney. You can answer, if you can.

THE WITNESS: Could you repeat the question, please?

Q Sir, with respect to that first sentence that we've been focusing on, what does essential functions mean with respect to any testimony that you may be called to provide?
A I don't know how to answer that. Again, I'm not commenting on whether Ms. Torres could actually do the actual work. My only comments were with regard to accommodations for her diabetes.
Q Sir, do you know what the essential functions of the senior specialist production management position are?
A Specifically, no, except that they involve -- from my memory, they involve reading, writing, answering the phone. But what other cerebral functions or background, I do not know.
Q Thank you. Do you have any training on evaluating essential functions of jobs?
A I'm sorry, say that again.
Q Do you have any training on evaluating essential functions of jobs?
MS. TSE: Objection; vague. You can answer, if you can.

A I'm looking at my report.
Q Thank you, sir.
A But you asked me not to look at anything.
Q Oh, I'm so sorry. When I do ask you -- I apologize, sir, you're right. When I asked, is there anywhere else in your report? I am actually asking you to go ahead and look at your report. I apologize. I'll be more clear about that.
A Yeah. On the last page, Page 3, the second paragraph I said, SHRM is willing to make accommodations for Ms. Torres. Her job is sedentary in an office environment where human observation and intervention is available. The need for a diabetes alert dog is not supported.
Q So are there any other locations in this report where you address that issue, whether it's medically necessary for Ms. Torres to have a service dog with her at all times due to Type 1 diabetes?
A I don't believe so.
Q Sir, with your proposed testimony, it states whether it is medically necessary for Ms. Torres to have a service dog with her at all times due to Type 1

diabetes. Do you see that, sir?
A Yeah, I'm sorry. You're referencing?
Q Exhibit 2, what your possible testimony --
A My report, yeah.
Q Okay. Not your report. The testimony that SHRM says you may be called to testify about.
A Oh, I'm sorry. Hold on a minute, please. Okay. SHRM may call Dr. Cooperman. Okay.
Q And specifically referring to the phrase, whether it was medically necessary for Ms. Torres to have a service dog with her at all times due to Type 1 diabetes.
A Okay.
Q Okay. You pointed me to places in your report where you state that that's contained. What does medically necessary mean?
MS. TSE: Objection; calls for legal conclusion; vague. You can answer, if you can.
THE WITNESS: Medically necessary means that there is either a medication, device, procedure, operation, therapy, that is supported, approved, and recommended for a patient's condition.

Q I'm sorry. In the absence of what, sir, would bring harm to the patient?
A In the absence of the procedure, medication, therapy, that would lead to untoward effects.
Q Okay. So let me make sure I understand. Medically necessary, in your view, is if in the absence of medication, a procedure, a treatment, or therapy, harm could come to the patient?
A Correct.
Q Sir, in your practice, how would you determine whether something was medically necessary?
A In the field of medicine, that's based upon experience, prior medical history. It's based upon recommendations by leaders in the field -- experts. It's based upon medical literature and controlled studies. And it's based upon the vast medical knowledge sphere.
Q That last one was vast medical knowledge sphere?
A Well, the sphere of medicine, in other words, it encompasses all those things that I've mentioned -- patient experience, physician experience, medical

literature, controlled studies, past history, expert opinion.

Q So the vast medical sphere includes patient experience and past history?

MS. TSE: Objection; mischaracterizes witness's testimony. You can answer, if you can.

THE WITNESS: Well, it includes all those things that I just mentioned.

Q Okay. I'm so sorry. So vast medical sphere included experience, patient medical history, recommendations by experts, literature, and controlled studies, and a patient's past history; is that correct?

MS. TSE: Objection; mischaracterizes his testimony. You can answer, if you can.

THE WITNESS: Yes. And I could probably maybe think of some more, if I had time. But it includes all those aspects.

Q Are there any others you can think of, sir?

A I think I'll just leave it at that for the moment.

Q Okay. If you think of any others, please let me know. Okay?

A Okay.

Q Okay. In your practice, I want to ask specifically about your practice, okay? In determining whether something, like a treatment, therapy, medication, so forth, was medically necessary, would you review a patient's past documentation?

A Yes.

Q Okay. Would you ask a patient about their history?

A Yes.

Q Would you rely on a patient's reported history?

A Under certain circumstances, but not all the time.

Q Under what circumstances would you rely on the patient's reported history?

A It would depend upon the nature of what that history is. If it's not germane or not necessary to know that for a patient's treatment, then I would not require documentation. If, however, it's related to the patient's current illness or ongoing therapy, then I would require more than just a patient's memory or information. I would request documentation. For

A You know, that -- I can't give you an answer. There are so many variables there that it really depends upon -- it's situational based.

Q Okay. Situational based. So it's up to the -- what's going on with the patient and, you know, how the doctor views it? Is that fair to say?

A I'm sorry. Repeat that.

Q Is it -- when you say it's situational based, is it really dependent on what's going on specific to the patient and how the doctor views the situation?

A Well, I think if a patient comes in and tells me that they've been having frequent hypoglycemic reactions, then I think it's germane. And I think one would want more documentation about that. But it's situational based. And I can't answer in a general way.

Q Okay. All right. Other than these other things I've asked, you know, reviewing past medication, reviewing past documentation, asking about a patient's history and relying on patient's history, would you collect information from other treating medical professionals, if possible?

A Yes.

hypoglycemia that was greater than chance. So the vast majority of dogs are unable to alert to hypoglycemia.

Q You mentioned statistical significance, sir. You're saying that three out of 14, they were able to calculate a statistical significance using that poll?

A I'm saying only three out of 14 dogs were able to reach a statistical significance in identifying hypoglycemia. And even that was variable and changed over time.

Q Do you know the sample size that was used to arrive at that statistical significance number?

A Well, it was 14 dogs.

Q Thanks. Do you have any other knowledge with respect to the diabetic alert dogs?

A No.

Q Okay.

A Excuse me. Only that there are other studies which confirm that diabetes alert dogs are extremely variable and have a low rate of accuracy.

Q Which studies are those, sir?

A Oh, again, I would have to give you -- cite you the citation.

Q Do you have that information in front of you?
A I can get that information, yes.
Q Do you have that information in front of you?
A Yes.
Q Okay. Go ahead and look and tell me what those studies are.
A Do you want me to give you the citations?
Q Yes. If you have that information in front of you, go ahead and tell me.
A You're allowing me to look at the --
Q Yes. I'm interested in learning what studies you're referring to.
A Okay. Let's see. One paper's title is, "Reliability of Trained Dogs to Alert to Hypoglycemia with Type 1 Diabetes." And that's the Journal of Diabetes Science Technology, 2017.
Another one is, "Diabetes Alert Dogs: An Assessment of Accuracy and Implications." That's Diabetes Research Clinical Practice, 2017.
Another one is, "How effective are trained dogs at alerting their owners to changes in blood glycemic levels? Variations in performance of glycemia alert

dogs." And that's PLoS, P-L-o-S, One 14(1).
Q What does PLoS One 14(1) mean?
A It's an online -- I believe it's an online citation.
Q Oh, thank you. The other two that you provided, you provided years of publication. Does that last one have a year?
A Yeah. It's 2017 for both of them.
Q Okay. Thank you so much. Are there any other -- I'm sorry. Go ahead, sir. Excuse me.
A "An Owner-Independent Investigation of Diabetes Alert Dog Performance." And that's also -- that's from Veterinary Science. And that looks like it's 2019. There are more, but these are the ones that I just --
Q Are those the ones that you relied upon?
A I didn't rely on anything, but these are the ones that support my position.
Q Oh, I'm sorry. You didn't rely on those reports that you --
A Well, when I say rely on, I -- that was part of my evaluation.
Q These reports that you just described to me, is

that how you developed your knowledge of diabetic dogs -- I'm sorry, of diabetic alert dogs, is that how you developed your knowledge?

A In addition to the other references that I mentioned before, the American Diabetes Association, UpToDate Medicine, et cetera.

Q Other than those sources, or all of these sources, is that how you developed your knowledge, sir?

A And I did look at other sources, but I thought that these -- I didn't look at other sources -- other papers, but I thought that these were the main papers that I read.

Q Okay. When did you develop this knowledge of diabetic alert dogs?

A When I reviewed the case.

Q Meaning back in May, is that when you developed your knowledge of diabetic alert dogs?

A Excuse me. Yes.

Q So did you develop your knowledge of diabetic alert dogs specifically for this case?

A Well, in the 50 years that I've been practicing medicine, I have never come across a patient who had a

diabetes alert dog. I had no training in diabetes alert dogs. No endocrinologist that I know uses diabetes alert dogs. In the -- in all my training programs, nobody has ever recommended diabetes alert dogs. In all the conferences I've ever been to -- medical conferences, diabetes conferences, endocrine conferences, nobody has ever recommended the use of diabetes alert dogs. So that was my understanding up until the time of this case. And then, after reviewing the case, I looked further into it.

Q So again, my question is, the knowledge that you developed, was it for this case?

A With -- yes.

Q Okay. Thank you so much. Do you know what a diabetic alert dog is trained to do?

A They are trained to discover hypoglycemia and hyperglycemia.

Q What does that mean, trained to discover hypoglycemia and hyperglycemia? Well, let me break it down. What does it mean when you say they're trained to discover hypoglycemia? What does that mean?

A Just what it says. They're trained to alert

their skin, and so the dog is able to, supposedly, recognize that change and then alert that individual. But whether that's an exact level, I suspect not. I suspect it has to do on the physiologic change of a given person.

Q When you say the physiologic change, are you referring to an increase or decrease in blood sugar level?

A I'm referring to whatever the dog is sensing.

Q So do you know what the dog is sensing?

A Again, the theory is that there may be organic compounds released in an individual's breath or through their skin, but I don't think anybody really knows for sure.

Q Okay. Thank you so much. Have you ever worked with a diabetic alert dog?

A No.

Q Okay. Have you ever worked with service dogs generally?

A No.

Q Okay. Do you have any other experience with service dogs generally?

A I've had individuals who have come to see me in my office who have brought service dogs with them.
Q When you say individuals, are you referring to patients?
A Yes.
Q And what type of service dogs would your patients bring to your office?
A The best of my memory, these were mainly individuals with vision problems.
Q Any other experiences with service animals?
A I don't believe so.
Q Okay. Do you have any training with respect -- or like formal training with respect to diabetic alert dogs?
A No.
Q Okay. Do you have any training on whether a person could benefit from use of a service dog?
A Personally?
Q Yes.
A No.
Q Do you have any formal education with respect to evaluating whether a person could benefit from a

service dog?
A No.
Q Have you conducted, or have you published any like written works on service dogs?
A No.
Q Other than the research that you described today that occurred when you reviewed this case, have you conducted any research on service dogs?
A No.
Q And do you have any firsthand experience in evaluating whether a person with diabetes could benefit from the use of a service -- a diabetes alert dog?
A I'm sorry. Repeat that again.
Q Do you have any firsthand experience evaluating whether a person with diabetes could benefit from a diabetic service dog?
A No.
Q Okay. This question is very precise, sir. Okay. I want to know whether -- what is your opinion on whether it was medically necessary for Ms. Torres to have a service dog with her at all times due to Type 1 diabetes?

A There is no evidence or documentation in the record to suggest that Ms. Torres requires or necessitates a diabetes alert dog for her Type 1 diabetes.

Q I'm really focusing on the phrase, medically necessary, because that is what is written as your proposed testimony. Okay. So I'm going to ask again, and I really want to know if this is your opinion, or what is your opinion on whether it was medically necessary for Ms. Torres to have a service dog with her at all times due to Type 1 diabetes?

MS. TSE: Objection; asked and answered. You can answer, if you can.

THE WITNESS: My opinion is that it is not medically necessary.

Q Can you point to your report where it states it's not medically necessary?

MS. TSE: Objection; asked and answered. You can answer, if you can.

THE WITNESS: I'm sorry. Repeat the question.

Q Will you please point to me like in your report

where you state your opinion that it was not medically necessary for Ms. Torres to have a service dog with her at all times due to Type 1 diabetes?

A At the end of my report I say, the need for a diabetes alert dog is not supported.

Q But you don't use the term, medically necessary there; is that correct?

A Correct.

Q Okay. Do you find yourself like anywhere in your report where you actually say that it was not medically necessary for Ms. Torres to have a service dog with her at all times?

A I was asked to give an opinion whether the diabetes alert dog was medically necessary in the workplace. And I stated that it was not medically necessary in the workplace.

Q Show me in your report --

(The parties are speaking simultaneously.)

A And that's what I said in my report. If you push me, I will -- I mean, you know, push me -- but do I think it was medically necessary out of the workplace? I think it's not medically necessary at all.

Q Okay. I'm just asking where in your report you actually state that it was not medically necessary?
MS. TSE: Objection; asked --
THE WITNESS: I cannot --
MS. TSE: Go ahead, Dr. Cooperman.
THE WITNESS: I'll just repeat what I said before. I didn't -- I wrote in the report that the need for a diabetes alert dog is not supported.
Q But you cannot point to me to a place where it says it was not medically necessary; is that correct?
MS. TSE: Objection; mischaracterizes witness's testimony; asked and answered.
THE WITNESS: I use the word necessity. Does that count?
Q No. I'm asking where you write that it's not medically necessary.
MS. TSE: Objection; asked and answered.
THE WITNESS: That phrase is not specifically mentioned in my report.
Q Thank you. Now, is it possible that a person with diabetes could better manage their condition with a service dog, a diabetic alert dog, even if there's no

medical literature did not support the necessity of this accommodation.
Q Is there any other place you can point to me in your report where you address that Ms. Torres does not medically require a service dog to manage Type 1 diabetes?
A No. My comments were directed to the workplace.
Q You actually don't use the term medically require in your report; is that correct, sir?
A Except on the second page where I say, the need for a diabetes alert dog is not supported.
Q My question was: You actually don't use the term, medically require; is that correct?
A I guess I didn't use the word required.
Q Or medically required.
A Okay.
Q Is that correct?
A Yes.
Q That term does not appear in your report; is that correct?
A (No verbal response.)

Q Sir, do you understand the question?
A I'm sorry. Was that directed to me?
Q Yes, sir. The term, medically required, do you find it in your report anywhere?
A I said no, I did not.
Q Okay. I apologize. I didn't catch it. Okay. With respect to any testimony that you may be called to provide with respect to Ms. Torres not medically requiring a service dog, what would, medically require, that term mean?
MS. TSE: Objection; asked and answered. You can answer, if you can.
THE WITNESS: You want me to describe what medically required means?
Q Correct.
A Well, I didn't use that term, so I'm not sure I want to define it.
Q Okay. So like with respect to any testimony that you may provide on whether or not Ms. Torres does not medically require a service dog to manage Type 1 diabetes, you don't have a definition for medically require?

A Well, the -- well, again repeating, the references that I've mentioned before.

Q Okay. Thank you so much. And then the last thing you mentioned was Ms. Torres's medical records; is that correct?

A Yes.

Q Okay. Can you tell me the date range of the medical records that you are basing this opinion on?

A From the best of my memory, it was approximately 2020 to 2026.

Q Sir, other than your experience, the medical literature we've discussed and Mrs. Torres's medical records, which according to the best of your recollections from '20 to 2026, was there anything else you considered in arriving at your opinion that Ms. Torres does not medically require a service dog to manage Type 1 diabetes?

A At the time of my report, no. No.

Q Sir, at the time of your report -- okay. Thank you so much. Appreciate it. Now, in forming this opinion, sir, you have not spoken with Ms. Torres about her experience with her service dog; is that correct?

A I have not spoken to her, correct.

Q Okay. And with respect to your opinion that Ms. Torres does not medically require a service dog to manage Type 1 diabetes, what is the degree of certainty about your conclusion on this?

A A hundred percent.

Q Sir, is it possible that a person with diabetes could better manage their condition with a service dog, even if there's no medical record showing that a service dog was medically required?

MS. TSE: Objection; asked and answered. You can answer, if you can.

THE WITNESS: Well, you know, in medicine we say that nothing is impossible. But looking at the medical literature, looking at the documentation of Ms. Torres's medical history, I would say that there is no evidence that the service dog has provided an advantage for Ms. Torres.

Q I understand. But I didn't ask specific to Ms. Torres. I'm asking, is it possible that a person with diabetes could better manage their condition with a service dog, even if there's no written history to show

person with diabetes could better manage their condition with a service dog, even if there's no written history to show a service dog was medically required?

THE WITNESS: I think it's distinctly unlikely.

Q Distinctly unlikely. Thank you, sir. So moving on to the next statement, it says -- following after that semicolon, that you may also be called to testify that none of Ms. Torres's healthcare providers ever prescribed or required Ms. Torres to obtain or use a service dog as part of her Type 1 diabetes treatment based on the records she provided to SHRM. Do you see that?

A Yes.

Q Okay. As part of your work for SHRM, were you asked to evaluate that?

A Well, I never saw any recommendation by Dr. Joshi for a service alert -- for a diabetes alert dog. As to records prior to about 2020, I can't comment.

Q My question, sir, is: Were you asked to evaluate whether Ms. Torres's providers ever prescribed

or required Ms. Torres to obtain or use a service dog as part of her Type 1 diabetes treatment based on the records she provided to SHRM?

A No.

Q You weren't asked to evaluate that?

A I wasn't asked whether she was prescribed or told that she was required to have a service dog.

Q As far as you know, sir, that statement, does that statement appear in your report anywhere? Does that proposed testimony, that none of Ms. Torres's healthcare providers ever prescribed or required Ms. Torres to obtain or use a service dog as part of her Type 1 diabetes treatment, based on her records she provided to SHRM?

A That's not in my report.

Q Oh, sir, do you know if service dogs are obtained by prescriptions through a provider?

A No.

Q I'm sorry. You're saying you don't know or they're not?

A I -- you're asking me -- I'm sorry. Repeat the question.

Q My question is: Do you know if service dogs are obtained by prescriptions through a provider?
A I'm not aware of how service dogs are obtained.
Q You don't know if there's like prescriptions actually exist for service dogs; is that correct?
A I -- I would doubt it. I would doubt that an insurance company would pay for a -- for a service dog, but I'm not aware.
Q Now, in your experience, can a provider require a patient to obtain any type of treatment or therapy?
A What do you mean by require?
Q Well, like the proposed testimony is that none of Ms. Torres's healthcare providers are prescribed or required Ms. Torres to obtain or use a service dog as part of her Type 1 diabetes treatment, based on records she provided to SHRM. As a medical doctor, can you require patients to obtain treatment?
A No.
Q Have you ever encountered an instance when a provider required a patient to obtain a specific type of treatment?
A Well, again, it depends on how you're using the

that Ms. Torres is diagnosed with diabetes and being managed with continuous glucose monitoring. Later on --

Q I'm sorry. I didn't -- you said the first paragraph of Page 2?

A Yes.

Q What sentence are you referring to, sir?

A Diabetes is being managed with an insulin pump, Omnipod, and continuous glucose monitoring, Dexcom.

Q Is there any other place?

A Yes. Hold on one minute, please. In the next to the last paragraph on Page 2, I write that the medical literature does not support routine use of diabetic alert dogs. Then I go on to say, Ms. Torres does not meet the criteria. And I say that continuous glucose monitoring remains the standard for diabetes care.

Q Is there any other place that you can point me to, sir?

A On Page 3 on the top I said, Ms. Torres utilizes CGM regularly. The medical literature has demonstrated only psychosocial benefits when DAD is added to CGM use.

Q Okay. Thank you so much. With respect to the testimony that you may provide on this issue, what does widely accepted mean?

A It means that the body of physicians who take care of people with diabetes utilize this on a regular basis; that it's not something that is remote. It's not something that's not available. It's not experimental. And that the vast medical community accepts this as the proper way to monitor the diabetes.

Q Okay. Can you point me to the place in your report where you discuss all of that?

A I don't think I went -- I don't think I went into that.

Q Okay.

A And I'll look and see if there's a sentence involved. Again, the only thing I did write in Page 2, fifth paragraph, continuous glucose monitoring remains a standard for diabetes care.

Q Okay. For everything you described to me, that sentence is what you're saying encapsulates all of that?

A Yes.

MS. TSE: Objection; vague.

Q With respect to this possible testimony, we just discussed one method and it's CGMs. Are there other methods that you would be testifying about?

A Well, if I'm asked, in the absence of CGM, there's the finger-stick glucose measurement where patients will prick their fingers, get a drop of blood, put it in a glucose meter, and measure blood sugar levels. And again, if I'm asked, I believe there is a, not widely used, but a technique where a sensor is implanted under the skin, and that transmits data to a phone or to a meter. So there are at least three methods of glucose monitoring.

Q Can you point me to the place in your report where you address finger-sticks?

A I don't mention finger-sticks.

Q Can you point me to the place in your report where you reference the sensors that are placed under skin?

A No. And I didn't mention those because Ms. Torres was using a CGM.

Q Of the different alternatives to service dogs, is it accurate to say that you've only mentioned CGMs in

your report?
A My report was related to Ms. Torres. So I didn't go into detail about glucose monitoring because Ms. Torres was using a CGM.
Q Again, let me make sure I -- the proposed testimony is that there are alternative, effective, and widely-accepted methods -- in the plural -- of monitoring blood glucose that do not involve a service dog. We've talked about CGMs; we've talked about finger-sticks, and we've talked about the sensors that are placed under the skin. Is it accurate to say that in your report you've only addressed CGMs?
A Yes.
Q So I want to learn more about CGMs. So you told me that CGMs are the standard of care; is that correct?
A Yes.
Q Can you tell me how CGMs work?
A CGMs are devices which are placed on the skin. There's a probe that penetrates the skin into the subcutaneous tissue. The probe measures the glucose in the subcutaneous tissue and measures that on a frequent

measures, I believe, about every five minutes.
Q And when you say the Dexcom, which Dexcom model are you referring to?
A The Dexcom 6 and 7, I think, but both were five minutes.
Q Sir, does the CGM -- when you say it measures glucose, does it measure glucose in the blood?
A No. It measures glucose in the subcutaneous tissues.
Q And can the glucose levels in the subcutaneous tissues differ from the glucose in the blood?
A Yes. There are times when there may be changes in the blood glucose level, and there may be what's called a lag for the subcutaneous tissue to reflect that blood glucose change.
Q You mean a lag in time, sir?
A Yes.
Q Okay. And what can the lag in time be, in terms of time?
A Well, it varies depending upon lots of factors, but generally five to ten minutes.
Q So if the lag time was ten minutes, and like

the Dexcom 6 and 7 measures measurement intervals at five minutes, there could be like a possible lag in time of 15 minutes between the difference in blood sugar measured by the blood and glucose measured by the subcutaneous tissue; is that right?

A Yeah, I suppose.

Q Could it be more than 15 minutes?

A Hard to say. It varies on the patient's subcutaneous fat. It depends on the rate of change of the glucose in the patient's blood. So I think it's a variable.

Q Sir, how quickly can blood glucose levels drop to a level where a person feels some sort of ill effects?

A How fast, you're asking me?

Q Yes, sir.

A I can't answer that -- too many variables. It depends where it's starting from. It depends why it's falling. It depends on the state of the patient, what the patient is doing. There are too many variables to answer that.

Q Could it fall in less than 15 minutes?

A Yes.
Q Could it fall in less than ten?
A I'm not sure.
Q But it could fall somewhere between 15 and ten minutes?
A It could -- not always, but could.
Q Could it fall in less than five minutes?
A I suppose, under experimental conditions, it could.
Q What do you mean by experimental conditions?
A Well, if I had a patient on the table and I gave them a massive intravenous dose of insulin, I could possibly cause it to do that, but I'm not sure.
Q Thank you so much, sir. Sir, do you have any particularized training on CGMs?
A On-the-job training.
Q And what do you mean, sir, when you say, "on-the-job training"?
A Well, I think when they first came out, I may have gone to some sponsored teaching sessions, sponsored by the manufacturers of the CGMs to prepare us for their use.

our world dramatically. So from a clinical point of view, there was clear-cut differences in our ability to take care of our patients.

Q Any other basis for, if you were to be called to testify on this issue that, testifying that CGMs are effective?

A I think it's my experience, the experience of all diabetologists, and the overwhelming amount of data in the literature.

Q Anything else?

A I'll stick with that.

Q Okay. Just to make sure, I mean, you wouldn't really be able to testify about the experience of all other physicians on this, would you?

A Not every physician in the world, but again, knowing many diabetologists, going to meetings, going to conferences -- this is not something that's discussed on a regular basis, because it's become standard of care, and it's become the way we manage diabetes.

Q Thank you so much, sir. The studies that you referenced as a basis, when was the last time you reviewed those studies?

A Now, which studies are you referring to, the dog studies or the CGM studies?

Q We're discussing your basis for testifying that CGMs are effective. And you referred to numerous studies. Okay? I'm asking when you last reviewed those studies.

A I don't recall.

Q Would it have been in the last year?

A Oh, no. Again, CGMs have become standard of care, so there was no reason for me to keep reviewing the same studies over and over again.

Q Okay. So you didn't review those studies as part of your work on this case?

A Correct. Only at -- but I should clarify that by saying CGMs were frequently mentioned in all the sources that I've given to you.

Q Thank you, sir. Now, are there times when a CGM cannot provide a reading of blood glucose levels to its user?

A If a CGM is working properly, then I don't know of any reason why it would not work.

Q Have you heard of a warm-up period for CGMs?

A Yes. There is a lag -- there is a lag phase for CGMs to work, and it can vary up to an hour or so. So we --
Q I'm sorry. Go ahead, sir.
A So we can compensate for that.
Q Let me ask, though, about -- during this lag phase during the warm-up period, is it able to provide readings to the user?
A During the warm-up phase on a new meter, I would say that there is -- we don't utilize those results in a significant way.
Q Okay. Does it provide readings to the user?
A It may supply some data. I think it's variable, but again, that's built into the system, and we just accept that as a -- something to overcome.
Q Okay. I understand. So but during the warm-up time, a user can't rely on the CGM to provide accurate readings; is that fair?
A That's fair, but so -- that's why we tell patients to put the new meter on before taking the old meter off.
Q Sir, I understand that CGMs have a sensor that

Q Okay. So if a sensor is changed, and we're talking about the same warm-up period that we had just previously discussed; is that correct?
A Yes.
Q Okay. Now, can a CGM or a sensor become unexpectedly detached from a user's body?
A Yes.
Q Okay. How can that happen?
A Well, it's like -- how can it happen? A patient can roll over, a patient could not put it in properly. In most cases, it's the adhesive, actually, that's the issue. And we've been able to overcome that as well. So, in my experience -- in my experience, there are ways to handle sensors falling out.
Q Okay. You said that there are ways to handle sensors falling out. Can you describe those ways?
A Some patients, due to sweat or other skin issues, the sensor doesn't adhere properly. And there is actually an industry, which I discovered many years ago, where there is a hypogenic adhesive that you can buy -- there are a number of them. The one that I use is called Skin Tac, S-K-I-N, dash, T-A-C. It's very

inexpensive, sold on Amazon. And you can put that on the skin, and that makes the sensor adhere to the skin much better.

Q How often do you recommend that to patients?

A I can't give you a number. I don't know. I don't recall.

Q Okay. Like adhesion to the skin, or issues relating to adhesion to the skin, how often does that become an issue?

A I would say a fair amount of the time, but I can't give you a number.

Q The Skin Tac that could be used to address adhesion issues, is that something that has to be prescribed to a patient?

A No. They can buy it without a prescription.

Q Sir, when we began talking about different times that a CGM cannot provide a reading to its user, you said that if a CGM is working properly, you can't think of times that it wouldn't be able to provide a reading. But are there times that a CGM isn't working properly?

A Sure. I mean, it's a mechanical device. It's

like anything else. But the good news is, with these new sensors, it's rare. But, I mean, it's like anything else, you know. It's a mechanical device, and sometimes they don't work or sometimes the patient doesn't use it properly. So these things can occur. But in our -- in my experience, that's a relatively rare event.

Q Can CGMs provide inaccurate reads?

A I think that the accuracy rate approaches 90 percent.

Q Why do you say you "think"?

A Well, I haven't reviewed that topic recently. When I looked at that data a number of years ago, the number 90 percent sticks in my mind. But I haven't re-reviewed that data.

Q Okay. So is it fair to say that sitting today, you cannot testify to what the accuracy rate is of a CGM?

A I can testify to what the rate -- what the accuracy rate was several years ago. I don't have the updated numbers without looking it up.

Q Okay. And just to the best of your testimony, or the best of your recollection, you believe it was 90

percent?
A Correct.
Q Okay. Sir, I'm going to continue with this sentence, sir, on the testimony that you may be called to provide. And the next clause is that you be called to testify that these methods meet accepted medical standards of care and adequately address the functional needs associated with diabetes. Do you see that, sir?
A Yes.
Q Okay. Were you asked to address that issue?
A Not specifically, but it plays into how one monitors the diabetes.
Q Sir, I'm going to -- for that clause, that these methods meet the accepted medical standards of care and adequately address the functional needs associated with diabetes. Okay. Did you develop an opinion on that issue?
A Well, I certainly have an opinion that the methods meet accepted medical standards of care. And I do believe, in addition, if asked, that they address the functional needs of diabetes management.
Q You've pointed me to the place in your report

where you've -- regarding the medicals, like the standard of care, with respect to glucose monitors. Okay. And I'm going to like go ahead and --

A Yeah. On Page 2, the second paragraph from the bottom, continuous glucose monitoring remains the standard of poor diabetes care.

Q Now, just so that we're clear, the standard of care that you referred to here is only with respect to the glucose monitoring -- or, I'm sorry -- glucose -- continuous glucose monitors; is that correct?

A In the context of glucose monitoring, yes, continuous glucose monitoring meets the standard of care.

Q Okay. But you haven't addressed any other methods in your report and stated that those meet the standard of care; is that correct?

MS. TSE: Objection. Objection; vague. Objection; asked and answered. You can answer, if you can.

THE WITNESS: I was referring to CGMs.

Q And you were not referring to any other method of monitoring when you referenced standard of care in

your report; is that correct?
A I didn't eliminate them. I didn't -- I didn't -- it wasn't pertinent to the report.
Q But your report, you did not state that any other method of monitoring glucose met the standard of care; is that correct?
A Correct.
Q Okay. Sir, with respect -- okay. Also, in your report, sir, you did not state that any of these methods that we've discussed adequately address the functional needs associated with diabetes?
MS. TSE: Objection; vague.
Q Sir, with respect to the phrase that these methods adequately address the functional needs associated with diabetes, you do not state that anywhere in your report, do you?
MS. TSE: Objection; vague.
THE WITNESS: I didn't use those words.
Q Can you point me to any location in your report where you say, these other methods adequately address the functional needs associated with diabetes?
A No. I did not address the other methods.

Q Thank you so much. I want to direct your attention back to Exhibit 2, where the different issues with regard to testimony that you may provide are set forth. I want to direct your attention to the line that states, Dr. Cooperman is -- I'm sorry. Further, SHRM may call Dr. Cooperman to testify that Ms. Torres's own conduct demonstrates that a service dog is not a necessary workplace accommodation for her Type 1 diabetes condition. Do you see that, sir?

A Yes.

Q Okay. As part of your work for SHRM, were you to evaluate whether Mrs. Torres's own conduct demonstrates that a service dog is not a necessary workplace accommodation for her Type 1 diabetes condition?

A Well, there were several things in the record that I think relate to that. One relates to the fact that Ms. Torres, I believe, had stated that she only gets low blood sugar episodes if she takes her insulin and eats late or fails to eat. And the second was the car accident that she sustained, I believe it was 2017, where she again stated that she had taken her insulin,

she failed to eat. It was reported that that accident was related to a hypoglycemic episode; and that she had the alert dog with her.

Q Sir, thank you so much. But my question was, as part of your work for SHRM, were you to evaluate whether Mrs. Torres's own conduct demonstrates that a service dog is not a necessary workplace accommodation for her Type 1 diabetes condition?

A Not directly, no.

Q Well, indirectly, were you asked --

A No.

Q -- to evaluate that?

A No.

Q No? Do you have any opinion on that matter?

A No.

Q No? And just to wrap this up, sir, is there any place in your report where you address Mrs. Torres's own conduct?

A Yes. On Page 2, first paragraph, she has experienced one significant hypoglycemic episode in 2017 when she failed to eat, despite taking her insulin, and was involved in an automobile accident.

Mrs. Torres -- I missed the last part of that.
Q You did not opine in your report that Mrs. Torres's own conduct demonstrates that a service dog is not a necessary workplace accommodation?
A Other than what I mentioned before about the hypoglycemia and skipping a meal or a delayed meal after taking insulin.
Q Okay. Now, I see in the report where you mentioned that she failed to eat, despite taking her insulin. I don't see in the report where you state that because she did that, that demonstrates a service dog is not a necessary workplace accommodation.
A No, that's correct. But, in fact, the service dog -- the alert dog was there and apparently didn't warn her. But, no, I did not literally state that in the report.
Q I just want to make sure, sir. So in your report, you do not opine that it's her conduct -- that her conduct demonstrates a service dog is not a necessary workplace accommodation; is that correct?
MS. TSE: Objection; asked and answered; mischaracterizes this witness's testimony. You can

Q Sir, that's not the answer to my question. I'm asking, where in your report, or if in your report you actually state that her own conduct demonstrates that a service dog is not a necessary workplace accommodation?
A I did not say that specifically. I did not say that.
Q Thank you, sir. Sir, I want you to turn to your actual report, sir.
A Okay.
Q Would you please direct me to the opinions you have in your report?
A Which opinion?
Q I want to know every single opinion that you've contained in your report.
A At the bottom of Page 1, Ms. Torres is currently a 35-year-old woman with a history of diabetes Type 1, who is seeking a workplace accommodation for a diabetes alert dog. A review of the medical records, documentation submitted, and the medical literature did not support the necessity of this accommodation.
Q Let me break that down, sir. That first sentence, are you saying that Ms. Torres being a

A Ms. Torres had a DAD -- diabetes alert dog -- since 2017, but the medical records failed to comment on its usefulness or activity. Fact.

There is no documentation of a DAD preventing any diabetes-adverse reaction, and I could not find any significant mention of its use in all her medical visits. Fact.

There is no history of hypoglycemic unawareness or seizures. Fact.

Q Okay. That was Paragraph 2 on Page 2. Would you please proceed to Paragraph 3 on Page 2?

A Drs. Silpa P.K. Joshi and Denise Armellini failed to document any distinct episodes where the diabetes alert dog played a role in preventing a diabetes ill effect. Fact.

They discussed generalities without specific instances cited. Fact.

Dr. Joshi refers to severe hypoglycemic reactions in car accidents, in the plural, with no supporting documentation. Fact.

Dr. Joshi also references passing out with no supporting medical evidence. Fact.

Q Would you Proceed to Paragraph Number 4 on Page 2?

A SHRM has offered to make reasonable accommodations to meet Mrs. Torres's diabetes care. Fact.

Her job description does not entail physical exertion or frequent travel. Fact.

It is sedentary in an office environment. Thus, there is no increased risk of diabetes, hypoglycemia, or hyperglycemia. Fact.

Q Okay.

A The medical literature does not support routine use of diabetic alert dogs. Fact.

Their role is mainly psychosocial. Fact.

Ms. Torres does not meet the criteria of hypoglycemic unawareness, and she has not sustained any seizures, which are the accepted indications for possible DAD use. Fact.

Continuous glucose monitoring remains a standard for diabetes care. Fact.

There is no convincing evidence of additional benefit from DAD use with CGM monitoring. Fact.

Accuracy with DADs is variable, and some dogs become less reliable over time. Fact.

While some individual DADs perform well and the psychosocial benefits are meaningful, the evidence does not support DADs as a reliable method of glucose monitoring. Fact.

They may serve as a complementary tool for psychosocial reassurance. Fact.

Q And then the last paragraph on Page 2?

A Ms. Torres has failed to demonstrate a level of hypoglycemia that qualifies as hypoglycemic unawareness. She has had no documented hospital, emergency room, or EMS calls for hypoglycemia or seizures. Fact.

Q Sorry -- I'm sorry, sir. You read two sentences there, but you only said fact for the second one.

A Okay. I'll go back. First sentence is fact, second sentence is fact.

Q Thank you.

A There is no documentation in the medical record of DAD intervention or successful interaction. Fact.

Ms. Torres utilizes CGM regularly, and admits

diabetes?

A Well, it's interesting. I mean, in 2017 when she had her car accident, she had the dog in the car. And apparently, she still had the car accident. And then, over the -- over the subsequent six years, there was no -- absolutely no mention in the records of the dog performing its task. And it strains my credulity to understand that if the dog had, in fact, saved her, that she would have mentioned it at some point to her physicians. I mean, that -- that's a striking -- that's a striking, blaring episode. Gee, Doc, my dog saved my life. And yet, in those six years, there's not even a mention of the diabetes alert dog.

So I don't -- and, of course, the literature supports the idea that if you have a CGM, adding a dog, that -- that doesn't change anything or doesn't give you any excess advantage. So putting that whole story together, I see no -- no evidence that the diabetes alert dog was of any value.

Q Okay. Thank you so much. So just -- it's based on the lack of mentions in her medical reports and the medical literature that you've discussed earlier

Q Sir, even if neither doctor documented episodes where the diabetic alert dog played a role in preventing a diabetes ill effect, does that mean that the dog did not play any role?

MS. TSE: Objection; form. You can answer, if you can.

THE WITNESS: You're saying even if they documented --

Q I'll ask you again, sir. Even if neither doctor documented episodes where the diabetic alert dog played a role in preventing a diabetes ill effect, does that mean the dog did not play a role?

MS. TSE: Objection; form. Answer if you can.

THE WITNESS: It means that there is no documentation, that the dog played a role.

Q So that's all it means, right, sir?

MS. TSE: What did you say?

Q That's all it means is that there was no documentation of it; is that correct?

A Yes.

Q Okay. In your next paragraph, sir, you state,

investigate, was the person using a CGM? What the circumstances would be, but there might be an opening there for a diabetes alert dog. If this -- if -- but it would depend upon the situation, again, regarding what led -- what led to that process.

Q Thank you so much. In the next sentence you write, continuous glucose monitoring, CGM, remains the standard for diabetes care. Do you see that, sir?

A Yes.

Q Okay. Pretty sure I know -- well, let me just ask, what did you mean by standard?

A The same thing I said before, that it's the accepted treatment or monitoring protocol for managing diabetes.

Q Okay. And just making sure, when you say standard here, you meant standards of care; is that correct?

A Yes.

Q Thank you so much. Okay. Now, sir, you write in the next paragraph -- I'm sorry, in the next sentence, there's no convincing evidence of additional benefit from DAD use with CGM monitoring. Do you see

BY MR. RUIZ:
Q Dr. Cooperman, we're back on the record from the last break. Do you realize you are still under oath?
A Yes.
Q Okay. Sir, I want you to turn to Page 3 of your report. I'm going to turn your attention to where you write, SHRM is willing to make accommodations for Ms. Torres. Do you see that?
A Okay.
Q Okay. In that paragraph, in the second sentence, you write -- sorry, I need my glasses again. Her job is sedentary in an office environment where human observation and intervention is available. Do you see that, sir?
A Yes.
Q Okay. How do you know that human observation is available where she would have worked?
A Well, it was an office setting in an office building.
Q Okay. And is that the only reason you say that human observation is available?

A Yes.
Q Do you know if she was actually going to work close to anyone?
A I don't -- I don't know the exact -- where her desk was or the exact situation.
Q Do you have any understanding of what the physical layout of the office was?
A No.
Q Okay. Do you have any understanding of whether actually she would work with anybody?
A I thought I had read that she was, again, in an office environment with other people, but I can't recall.
Q Okay. You state that intervention is available. Do you see that, sir?
A Yes.
Q What do you mean by intervention is available?
A Well, because it was an office environment, I believe that there were other people around. so that if she didn't feel well, that there were other people there who might be able to help her.
Q Okay. What do you mean by might be able to

help her?

A Well, I can't speak for other people, so if somebody's mean and doesn't want to help her, I don't know. I can't guarantee that.

Q You don't know that she'd be able to get help from other people; is that correct?

A I can't guarantee that. Of course not.

Q Okay. And if there were people willing to help her, what would intervention look like?

A Depends what the problem is.

Q Can you give me any like -- say Ms. Torres had dropped to a low of 50, in terms of glucose, and was experiencing severe diabetes adverse reaction. Like what type of intervention may be necessary?

A Well, she might ask a coworker to go to the kitchen or kitchenette or refrigerator or where Ms. Torres may be able to keep some snacks at her desk and say, please help me ingest a snack or a food or a liquid.

Q Okay. Is that the only type of intervention that you can see necessary?

A I can't speculate on every possible

CERTIFICATE OF COURT REPORTER -- NOTARY PUBLIC

I, Raechel Meyerowich, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness in the foregoing proceedings was duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

Raechel Meyerowich
__________________________

RAECHEL MEYEROWICH, NOTARY PUBLIC,

FOR THE COMMONWEALTH OF MASSACHUSETTS

CERTIFICATE OF TRANSCRIBER

I, Sandra Ann Masterpole, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding; that said proceedings were reduced to typewriting under my supervision; that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; and that I am neither counsel for, related to, nor employed by any of the parties to the case and have no interest, financial or otherwise, in its outcome.

*Sandra Ann Masterpole*

_____________________

SANDRA ANN MASTERPOLE

PLANET DEPOS, LLC

JUNE 17, 2026

June 18, 2026

Tiffany Din Fagel Tse
Littler Mendelson P.C. (McLean)
1800 Tysons Blvd Suite 500
Mclean, Virginia 22102

Re: Deposition of **Michael Cooperman, M.D.**
Date: 6/11/2026
Case: Torres -v- Society for Human Resource Management

Dear Sir/Madam,

The above-referenced transcript has been finalized for review. If applicable, signature is required within 30 days from the date of receipt of this letter.

In accordance with the disposition of signature at the deposition or the pertinent jurisdictional rules, the deponent should follow these instructions to complete the Errata Sheet:

(1) Read the transcript and indicate any corrections or changes in ink on the enclosed Errata Sheet. Please include page and line numbers. If more space is needed for corrections, please use a blank sheet of paper. If no corrections or changes are necessary, please indicate "no corrections" or "no changes" on the Errata Sheet.

(2) Sign and date the Errata Sheet and Acknowledgement of Deponent/Affiant pages.

(3) Please return the executed Errata Sheet and Acknowledgement pages to the address indicated below, submit via fax (888-503-3767) or email (transcripts@planetdepos.com).

A copy of this letter and the returned signature pages, if any, will be distributed to counsel.

Sincerely,

Production Department
Planet Depos, LLC
451 Hungerford Drive
Suite 400
Rockville, Maryland 20850

No. 636233

No. 636233

Re: Deposition of **Michael Cooperman, M.D.**
Date: 6/11/2026
Case: Torres -v- Society for Human Resource Management
Return to: transcripts@planetdepos.com

| Page | Line | Correction/Change and Reason |
| --- | --- | --- |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

_____________________ (Date)

_______________________________ (Signature)

No. 636233

Re: Deposition of **Michael Cooperman, M.D.**
Date: 6/11/2026
Case: Torres -v- Society for Human Resource Management
Return to: transcripts@planetdepos.com

| | | |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

______________________ (Date)

________________________________________ (Signature)

Re: Deposition of **Michael Cooperman, M.D.**
Date: 6/11/2026
Case: Torres -v- Society for Human Resource Management
Return to: transcripts@planetdepos.com

ACKNOWLEDGMENT OF DEPONENT

I, Michael Cooperman, M.D., do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me and any corrections appear on the attached Errata sheet signed by me.

___07/16/26 ____________________
(Date) (Signature)