**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| **FIONA TORRES,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**SOCIETY FOR HUMAN RESOURCE MANAGEMENT,**<br><br>**Defendant.** | **Civil Action No. 1:25-CV-02360** |

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S
MOTION TO EXCLUDE TESTIMONY OF DEFENDANT'S PROPOSED EXPERT**

Defendant Society for Human Resource Management ("Defendant" or "SHRM"), by and through counsel, respectfully submits this Opposition to Plaintiff Fiona Torres' ("Plaintiff" or "Ms. Torres") Motion to Exclude Testimony of Defendant's Proposed Expert (the "Motion"), *see* Dkt. 99 ("Mot."), and states as follows:

Plaintiff's Motion is nothing more than an attempt to exclude expert testimony that undermines her claims. *See id.*; *see also* Dkt. 100 ("Mem."). Having failed to identify any expert witness to rebut the opinions of SHRM's expert, Dr. Michael Cooperman ("Dr. Cooperman"), Plaintiff now seeks to prevent the jury from hearing those opinions altogether. In so doing, Plaintiff repeatedly conflates disagreement with admissibility. Rather than identifying any legitimate deficiency in Dr. Cooperman's methodology, qualifications, or the reliability of his opinions, Plaintiff attacks the substance of his conclusions, mischaracterizes his report and testimony, and advances arguments that go solely to the weight of the evidence. These are not sufficient grounds for exclusion, and the Fourth Circuit has consistently rejected similar attempts to exclude simply because a party disagrees with an expert's conclusions.

Plaintiff's Motion is further undermined by her fundamental misunderstanding of the disclosure requirements under Rule 26(a) of the Federal Rules of Civil Procedure (the "Rules"). Throughout her Motion, Plaintiff improperly conflates the distinct requirements of Rule 26(a)(2)(A), which governs a party's disclosure of expert witnesses, with those of Rule 26(a)(2)(B), which governs the contents of an expert's written report. Specifically, Plaintiff treats counsel's Rule 26(a)(2)(A) disclosure identifying the subject matters on which Dr. Cooperman ***may*** testify as though it were the expert report itself. Plaintiff then criticizes Dr. Cooperman for failing to mirror, word-for-word, the language used in counsel's disclosure. The Rules impose no such requirement. Indeed, SHRM fully complied with its disclosure obligations when it timely disclosed Dr. Cooperman as an expert witness, produced his expert report, and made him available for deposition. Plaintiff's counsel had a full and fair opportunity to examine Dr. Cooperman on his qualifications, methodology, opinions, and the bases supporting those opinions. Plaintiff received precisely the disclosures and discovery contemplated by Rule 26.

Since Plaintiff fails to establish any violation of Rules 26 or 37, and because she likewise identifies no basis for exclusion under Federal Rules of Evidence 403 or 702, her Motion falls far short of the showing required to strike SHRM's expert or preclude his expert testimony at trial. Accordingly, Plaintiff's Motion should be denied in its entirety.

## I. RELEVANT PROCEDURAL BACKGROUND

On February 20, 2026, the Court issued its Rule 16(b) Scheduling Order, which set forth the Parties' Rule 26(a) expert disclosure deadlines. *See* Dkt. 15 ¶ 6. Plaintiff did not designate an expert witness. SHRM timely served its Rule 26(a)(2) Disclosures on May 11, 2026, designating Dr. Cooperman as its expert. *See* Dkt. 100-1. Defendant's Rule 26(a)(2) Disclosures also enclosed a three-page report drafted by Dr. Cooperman, along with his curriculum vitae ("CV") detailing

his 50 years of experience as a board-certified endocrinologist. *See* Dkt. 100-1 to 100-3. Despite having an opportunity to disclose a rebuttal expert, Plaintiff did not do so.

On May 18, 2026, Plaintiff moved to strike SHRM's expert designation, arguing it failed to comply with Rule 26(a)(2)(B). *See* Dkt. 37-38. On May 20, 2026, Defendant served its Amended Rule 26(a)(2) Disclosures, which was amended to provide Dr. Cooperman's final costs for his time as of that date. *See* Dkt. 100-8. On June 3, 2026, Plaintiff voluntarily withdrew her Motion to Strike SHRM's Expert Designation and chose to proceed with Dr. Cooperman's deposition on June 11, 2026. *See* Dkt. 49; *see also* Dkt. 100-4.

On July 7, 2026, the Parties met and conferred on the instant Motion. The Parties then exchanged emails on a mutually agreeable hearing date for Plaintiff's Motion. **Exhibit 1:** Declaration of Lauren M. Bridenbaugh ("Bridenbaugh Decl.") ¶ 5 at Ex. A. On July 10, 2026, SHRM advised Plaintiff that it was not available on her proposed hearing dates and requested alternative dates. *Id.* ¶¶ 5-6. Meanwhile, on July 9, 2026, Plaintiff's counsel contacted SHRM's counsel requesting another meet and confer on Plaintiff's intent to file a motion adding an exhibit to her trial exhibit list. *See* Dkt. 83. On July 16, 2026, the Parties held another meet and confer. *See* Bridenbaugh Decl. ¶ 7. At this time, the Parties discussed a hearing date for Plaintiff's Motion and their call concluded with Mr. Pershing suggesting that he intended to get back to SHRM's counsel on additional hearing date options. *Id.* at ¶¶ 7-15. Mr. Pershing never did so. Plaintiff then filed her Motion, noticing it for a hearing on September 3, 2026, without further discussion with SHRM's counsel. *Id.* Contrary to Plaintiff's claim that during the July 16 meet and confer call, SHRM refused to agree to a hearing date "until it had seen the [M]otion[,]" (Mot. at 4), ***at no time*** did counsel for SHRM make such statement. *See* Bridenbaugh Decl. ¶ 15. Rather, SHRM simply requested that Plaintiff work with SHRM to identify mutually agreeable hearing dates. *Id.*

## II. STANDARDS OF REVIEW

### A. Expert Disclosures under Rules 26 and 37

Pursuant to Rule 26(a)(2)(A), "a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." Rule 26(a)(2)(B) further requires that disclosures of witnesses who are "retained or specially employed to provide expert testimony" "must be accompanied by a written report – prepared and signed by the witness – . . . and must contain" the following:

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
>
> (ii) the facts or data considered by the witness in forming them;
>
> (iii) any exhibits that will be used to summarize or support them;
>
> (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;
>
> (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
>
> (vi) a statement of the compensation to be paid for the study and testimony in the case.

*Id.* When a party "fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1). Courts exercise "broad discretion to determine whether a nondisclosure of evidence is substantially justified' or 'harmless'" under Rule 37(c)(1). *S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003). To determine whether nondisclosure of evidence is substantially justified or harmless, courts evaluate the following five factors:

> 1) the surprise to the party against whom the evidence would be offered;

> 2) the ability of that party to cure the surprise;
>
> 3) the extent to which allowing the evidence would disrupt the trial;
>
> 4) the importance of the evidence; and
>
> 5) the nondisclosing party's explanation for its failure to disclose the evidence.

*Id.*

**B. Expert Witness Qualifications under Federal Rule of Evidence 702**

Rule 702 of the Federal Rules of Evidence states as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Where, as here, a district court is "faced with a proffer of expert scientific testimony," it "must conduct 'a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'" *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993)). A list of "neither definitive [] nor exhaustive" factors for courts to consider includes whether: (1) a theory or technique can be or has been tested; (2) it has been subjected to peer review and publication; (3) a

technique has a high known or potential rate of error and whether there are standards controlling its operation; and (4) the theory or technique enjoys general acceptance within a relevant scientific community. *Id.* (citing *Daubert*, 509 U.S. at 592-94). These factors "'may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony.'" *Touchcom, Inc. v. Berreskin & Parr*, No. 1:07cv114 (JCC), 2010 WL 4393282, at *1 (E.D. Va. Oct. 29, 2010) (quoting *Cooper*, 259 F.3d at 200).

"At the end of the day, [] a district court's decision with respect to the admissibility of expert scientific testimony 'is always a flexible one, and the court's conclusions necessarily amount to an exercise of broad discretion guided by the overarching criteria of relevance and reliability.'" *Id.* at *2 (quoting *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999)); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 158 (1999) ("In sum, Rule 702 grants the district judge the discretionary authority . . . to determine reliability in light of the particular facts and circumstances of the particular case.").

## III. ARGUMENT

### A. Plaintiff's Motion Must Be Denied Because Dr. Cooperman's Report Sufficiently Complies with Rule 26(a)(2)(B)

#### 1. <u>Dr. Cooperman's Report Satisfies Rule 26(a)(2)(B)'s Requirements</u>.

In her Motion, Plaintiff argues that SHRM's Rule 26(a)(2)(A) disclosure and Dr. Cooperman's expert report "fall so short of the mandates of our expert discovery rules[,]" that they should be excluded. Mem. at 2. That argument rests on a fundamental misunderstanding of Rule 26(a) and the distinct purposes served by Rule 26(a)(2)(A) disclosures and Rule 26(a)(2)(B) expert reports. *Compare* FED. R. CIV. P. 26(a)(2)(A) *with* FED. R. CIV. P. 26(a)(2)(B). Although Plaintiff characterizes Dr. Cooperman's Rule 26(a)(2)(B) report as "grossly deficient," her analysis focuses almost exclusively on SHRM's Rule 26(a)(2)(A) disclosure, which was prepared by counsel, ***and***

***not on*** Dr. Cooperman's actual report. Mem. at 2-8; *see also id.* at 8 (conceding SHRM's disclosures are "counsel-prepared"). Specifically, Plaintiff claims Dr. Cooperman's report fails to meet Rule 26(a)(2)(B)'s requirements, but then repeatedly cites to SHRM's disclosures. *See id.*

Plaintiff's assertion that Dr. Cooperman's report offers only "a set of raw conclusions without basis" is demonstrably false and ignores the contents of his report. Mem. at 3; *but see* Dkt. 100-2. In actuality, Dr. Cooperman's report specifically indicates that he reviewed excerpts of Plaintiff's medical records, summarizes pertinent information in those records, and explains his opinion that Ms. Torres' accommodation request to bring a diabetic alert dog ("DAD") to SHRM's office is unsupported. Dkt. 100-2 at 1-3. In compliance with Rule 26(a)(2)(B), Dr. Cooperman's report further includes: (i) the facts or data he considered, *see id.* at 1 (listing thirteen documents he reviewed to form his opinions, which included, *inter alia*, excerpts of Plaintiff's medical records); (ii) exhibits he will use to summarize or support his opinions, *see id.*; (iii) his qualifications, including a list of all publications authored in the previous ten years, *see* Dkt. 100-3 at 2 (demonstrating his qualifications and publications in his CV); (iv) a list of other cases from the last four years in which he has testified, *see* Dkt. 100-2 at 3 ("I have participated in one oral deposition in the past 4 years."); and (v) a statement of compensation to be paid, *see* Dkt. 100-8 at 2 ("Dr. Cooperman has been compensated $4,000 for his time in this matter."). In his report, Dr. Cooperman further opined that Ms. Torres' medical history and the medical literature "does not support routine use of [DADs]" and "the need for a [DAD] is not supported." Dkt. 100-2 at 2-3. The facts he enumerated in his report (and expanded upon at his deposition) directly underpin his expert medical opinion that Ms. Torres does not need a dog.[1]

---

[1] Plaintiff also claims that Dr. Cooperman's report "does not explain how [he] searched or selected [medical] literature, what literature he considered, what facts or research he accepted or rejected and why, what standard he applied, or how he moved from facts to conclusions." Mem. at 3.

Plaintiff also contends that "neither the report nor Dr. Cooperman's resume describe any personal knowledge of the competence or performance of glycemia alert dogs for diabetics … and the report fails even to suggest the thought of reviewing the performance of Ms. Torres's dog specifically."[2] Mem. at 4. Contrary to the foregoing assertions, Dr. Cooperman's qualifications are listed in his CV, which outlines his 50 years of experience practicing as a board-certified endocrinologist and, specifically, treating diabetic patients. *See* Dkt. 100-3 at 1-3 (demonstrating his expertise in endocrinology, including an endocrinology fellowship in 1972, certifications in endocrinology and metabolism in 1975, a fellowship with the American College of Endocrinology in 1994, and teaching experience at "Endocrine/Diabetes Conferences at multiple hospitals extending over 35 years[,]" among other qualifications). Moreover, Plaintiff misses the point. As Dr. Cooperman indicated in his report and at his deposition, while DADs are not supported for routine use in the medical literature, Ms. Torres in particular lacks the criteria that are "accepted indications for possible DAD use." Dkt. 100-2 at 2; *see also* Dkt. 100-4 at 62:21-63:10 (testifying, in his 50 years of practice as an endocrinologist, he has "never come across a patient who had a [DAD,] [n]o endocrinologist that [he] know[s] uses [DADs,]" and "in all [his] training programs, nobody has ever recommended [DADs]"). In other words, Dr. Cooperman's report and testimony address why he does not consider DADs to be competent for monitoring diabetes based on his endocrinology practice and review of medical literature; and, even in some instances where DADs

---

However, Plaintiff points to ***no requirement*** that Dr. Cooperman explain how he went about examining the medical literature or even explain what "standard" they expect him to articulate. *See id*. (citing nothing). And, indeed, Plaintiff questioned Dr. Cooperman extensively on his review of the medical literature at his deposition and received copies of all medical literature he reviewed in the course of preparing his expert report. *See infra* **Section III(C)(1)**.

[2] Plaintiff inexplicably refers to "glycemia alert dogs" throughout her Motion. *See e.g.*, Mem. at 4. SHRM disputes that "glycemia alert dogs" are at issue in this case and believes Plaintiff's reference to be a typo. Nevertheless, out of an abundance of caution, SHRM addresses Plaintiff's incorrect label as if it were an appropriate alternative name for "diabetic alert dogs."

may be considered a benefit, Ms. Torres does not meet that criteria. *Id.* The particular performance of Ms. Torres' dog, therefore, is irrelevant. While Plaintiff may disagree with those opinions, it does not undermine Dr. Cooperman's expertise, nor does it equate to any purported failure to comply with Rule 26(a)(2)(B).

Finally, Plaintiff's claim that Dr. Cooperman's deposition "confirmed these deficiencies" is a red herring and is premised on Plaintiff's continued mischaracterizations and misrepresentations of the record and Dr. Cooperman's deposition testimony. Mem. at 4. Here, Plaintiff represents that Dr. Cooperman stated he "had no opinion" on "whether Ms. Torres could perform the essential functions of the job she was offered at SHRM." *Id.* (citing Dkt. 100-4 at 34:14-22). This is false. Instead, Dr. Cooperman testified: "I was asked to comment on whether the accommodations for Ms. Torres, as stated by SHRM, was appropriate for Type 1 [diabetes]. I did not evaluate whether or not Ms. Torres could perform the essential functions ***out of that context***." Dkt. 100-4 at 34:14-22 (emphasis added).

In another misrepresentation, Plaintiff claims Dr. Cooperman "discount[ed]" the letters of Drs. Joshi and Armellini and suggests he did not read the letters at all. Mem. at 5 (citing Dkt. 100-4 at 84:21-85:15). This is another false statement. Dr. Cooperman expressly testified: "I received those two letters, and I reviewed them. And then I was critical of the two letters." **Exhibit 2**: Excerpts from Dr. Cooperman's Deposition Transcript ("Cooperman Tr.") at 32:15-20. Indeed, Dr. Cooperman's report specifically addresses Dr. Armellini and Dr. Joshi's letters and why he found them lacking. *See* Dkt. 100-2 at 2. And while Plaintiff argues that Dr. Cooperman's report is somehow lacking because it "addressed only CGM devices," *see* Mem. at 5, this is misleading. Instead, Dr. Cooperman's discussion of CGMs was in the context of whether DADs provided any added benefit when used in conjunction with CGMs, which is what Ms. Torres does. *See* Dkt.

100-4 at 95:2-5 (testifying, "I didn't go into detail about glucose monitoring because Ms. Torres was using a CGM").[3] Plaintiff again ignores Dr. Cooperman's testimony, wherein he explains why only CGMs are mentioned in his report, and in doing so, intentionally omits Dr. Cooperman's explanation. *Id*.

In sum, Plaintiff has no basis to contend that either Defendant's Rule 26(a)(2)(A) disclosures or Dr. Cooperman's report under Rule 26(a)(2)(B) failed to comply with the Rules. Accordingly, Plaintiff's Motion must be denied. *See e.g., Washington v. McKee*, No. 4:06cv6, 2006 WL 2252064, at *5 (E.D. Va. Aug. 3, 2006) (denying motion to strike expert disclosure because the at-issue expert "provided a brief, but reasonably complete summary of his opinions").

**2. <u>Any Alleged Non-Disclosure Was Substantially Justified or Harmless</u>.**

Assuming *arguendo* the Court finds that Defendant's Rule 26(a)(2)(A) disclosures or Dr. Cooperman's report under Rule 26(a)(2)(B) failed to comply with the Rules (they did not), any alleged non-disclosure was substantially justified or harmless under the *Southern States* factors. *See Wilkins v. Montgomery*, 751 F.3d 214, 222 (4th Cir. 2014) (stating, courts are "not *required* to tick through each of the *Southern States* factors") (emphasis in original) (internal cites omitted).

Here, Plaintiff suffered no surprise as to Dr. Cooperman's opinions because SHRM timely served its Rule 26(a)(2)(A) disclosures by the May 11 deadline, wherein it designated Dr. Cooperman as its expert in compliance with Rule 26(a). *See* Dkt. 100-1; *see also id.* at 2 ("Dr. Cooperman is also available to respond to any issues within his expertise that may be raised by Ms. Torres in this case."). Indeed, SHRM attached Dr. Cooperman's report, which outlined his

---

[3] Further, Plaintiff's contention that Dr. Cooperman did not address "alternative glucose monitoring methods" such as "insulin pumps[,]" (Mem. at 5) is misplaced because insulin pumps are not used to ***monitor*** diabetes. *See* Cooperman Tr. 96:10-16 (testifying an insulin pump communicates with a CGM and releases insulin based on the CGM readings).

opinion and bases for those opinions, to its Rule 26(a)(2)(B) disclosures, along with his CV. *See* Dkt. 100-2 to 100-3. Moreover, after disclosing Dr. Cooperman on May 11, Plaintiff noticed and took his deposition on June 11. *See* Dkt. 100-4 at 1. Plaintiff had ample opportunity to identify a rebuttal expert and prepare for and examine Dr. Cooperman regarding his report. While Plaintiff claims that the "surprise" was the particular medical literature Dr. Cooperman reviewed while preparing his expert report, *see* Mem. at 6, Dr. Cooperman disclosed this information promptly and within 24 hours of his deposition. If Plaintiff genuinely lacked sufficient information to prepare a rebuttal expert or conduct an effective deposition, she could have brought a discovery motion to extend deadlines, reopen the deposition, or supplement expert discovery. Plaintiff sought none of those remedies. In fact, Plaintiff did not even leave Dr. Cooperman's deposition open to depose him further regarding the medical literature he reviewed. *See* Cooperman Tr. at 168:14-16, 183:6-8; *see also Mistee Robbins v. Boston Scientific Corp.*, No. 2:12-CV-01413, 2016 WL 3189248, at *23 (S.D.W. Va. June 7, 2016) (noting, "the omission related to support for [the at-issue expert's] opinions rather than the opinions themselves" and denying plaintiffs' motion as to the unclosed basis for certain opinions). It, therefore, follows that she cannot now claim "surprise" or that she could not cure any purported "surprise," meaning the first and second *Southern States* factors weigh in SHRM's favor. *See Bresler v. Wilmington Trust Co.*, 855 F.3d 178, 194 (4th Cir. 2017) (finding defendant had the ability to cure purported surprise but did not "take any [] steps to mitigate the purported surprise caused by the plaintiffs' delayed disclosure").

Plaintiff also cannot establish that allowing Dr. Cooperman to testify at trial would be disruptive. *See S. States*, 318 F.3d at 596. Again, SHRM disclosed its expert on May 11 and Plaintiff deposed Dr. Cooperman on June 11. As to the disclosure of Dr. Cooperman's literature sources, such alleged delay is harmless as the sources were provided within 24 hours of Dr.

Cooperman's deposition and prior to the close of discovery. *See supra*. Moreover, trial in this matter is set for October, by which time, Plaintiff's counsel will have had four months to review and analyze Dr. Cooperman's cited sources. While Plaintiff claims that SHRM failed to make a "pre-deposition disclosure so that [she could] examine [Dr. Cooperman's] opinion for flaws, prepare rebuttal, and develop [her] own evidence at variance with those opinions[,]" Mem. at 6, any alleged failure is harmless. Indeed, Plaintiff cannot contend that she suffered any incurable surprise when Dr. Cooperman's report references his review of medical literature that formed his opinions. *See e.g., Small v. WellDyne, Inc.*, No. 5:16-CV-62-BO, 2019 WL 13174144, at *2 (E.D.N.C. Oct. 10, 2019) (declining to exclude expert opinions based on lack of scientific literature) (internal cites omitted); Plaintiff cannot demonstrate any failure, surprise, or prejudice sufficient to trigger application of Rule 37(c)(1), and her Motion should be denied.

**B. Dr. Cooperman's Trial Testimony Will Be Consistent with His Report and Deposition Testimony.**

Plaintiff further asserts that Dr. Cooperman's deposition "confirms that he has no opinion on most of SHRM's listed topics[,]" arguing that "any testimony on those topics should be excluded." Mem. at 7-8. Specifically, Plaintiff claims that Dr. Cooperman testified that: (i) he did not evaluate whether Ms. Torres could perform the essential functions of the role at SHRM; (ii) "SHRM did not ask him to address" whether "Ms. Torres' healthcare providers had 'prescribed or required' her to obtain or use a service dog as part of her type 1 diabetes management[;]" (iii) "SHRM did not ask him to evaluate" and he has no opinion on whether Ms. Torres' own conduct demonstrates that a service dog is not a necessary workplace accommodation; (iv) his report only addressed CGMs and did not speak to other alternative methods for monitoring blood glucose levels; and (v) "his report nowhere stated that any particular method 'adequately addressed the

functional needs associated with diabetes' - let alone the needs of Ms. Torres in particular." ***Id.*** Plaintiff again misrepresents Dr. Cooperman's testimony.

Contrary to Plaintiff's assertions, Dr. Cooperman specifically testified that he "was asked to comment on whether the accommodations for Ms. Torres, as stated by SHRM, was appropriate for Type 1 [diabetes]" and "did not evaluate whether or not Ms. Torres could perform the essential functions ***out of that context***." Dkt. 100-4 at 34:14-22 (emphasis added); *see also id.* at 35:10-19 (testifying, his report states that Ms. Torres' "job description does not entail physical exertion or frequent travel" and that her role "is sedentary in an office environment" to form his opinion that "there is no increased risk of Type 1 diabetes, hypoglycemia,, or hyperglycemia"). And while Dr. Cooperman acknowledged that SHRM did not specifically ask him to evaluate whether Ms. Torres was prescribed or told by any healthcare provider that she was required to have a service dog, he also clarified during his deposition that based on his review, he "saw no evidence in [Ms. Torres'] medical records that there was a recommendation for a [DAD]." Cooperman Tr. at 181:15-182:1; *see also* Dkt. 100-4 at 84:15-19 ("... I never saw any recommendation by Dr. Joshi for a service alert - for a [DAD]."). Moreover, to the extent Dr. Cooperman's "deposition testimony undercuts the conclusion he has disclosed in his report, that testimony merely creates a credibility issue." *N.O. v. Alembik*, 160 F. Supp. 3d 902, 908 (E.D. Va. 2016), *aff'd sub nom. N.O. by Orwig v. Alembik*, 694 F. App'x 895 (4th Cir. 2017); *see also id.* ("The question of whether [an expert's] opinion is accurate in light of his use of . . . data goes to the weight of the evidence, not to its admissibility.") (internal quotations and citations omitted).

As for whether Ms. Torres' own conduct demonstrates the necessity of a dog as a workplace accommodation, Dr. Cooperman's report specifically provides that Ms. Torres "has experienced one significant hypoglycemic episode in 2017 when she failed to eat, despite taking

her insulin, and was involved in an automobile accident." Dkt. 100-2 at 2. At his deposition, Dr. Cooperman clarified that the 2017 car accident is the extent of his knowledge as to this opinion in his report regarding Ms. Torres' own conduct. *See* Cooperman Tr.118:16-119:3. Moreover, Plaintiff's contention that Dr. Cooperman testified that his report does not mention finger sticks or other alternative blood glucose monitoring methods and "addressed only CGMs" is misplaced. Mem. at 8. As discussed above, Dr. Cooperman's discussion of CGMs was in the context of whether DADs provided any added benefit when used in conjunction with CGMs, which is what Ms. Torres does. *See* Dkt. 100-4 at 95:2-5 ("My report was related to Ms.. Torres. So I didn't go into detail about glucose monitoring because Ms. Torres was using a CGM.").

Finally, whether Dr. Cooperman's report addressed the "functional needs associated with diabetes" or "the needs of Ms. Torres in particular" does not mean his opinion should be excluded. Mem. at 8. Indeed, Fourth Circuit courts have found similar arguments "irrelevant to the analysis under Rule 26, which merely requires disclosure" and Plaintiff's "objection is essentially an argument that Dr. [Cooperman's] conclusion is incorrect, but whether [he] drew the correct inferences from generalized statistical evidence is a question of weight for the jury." *Alembik*, 160 F. Supp. 3d at 907-08. Accordingly, Dr. Cooperman's report satisfies Rule 26(a)'s requirements and Plaintiff's request to exclude testimony on such "topics" should be denied.

### C. Dr. Cooperman is Amply Qualified to Opine on the Topics Addressed in His Expert Report under Federal Rule of Evidence 702 and *Daubert*.

As a threshold matter, Plaintiff's argument that Dr. Cooperman's opinions on DADs should be excluded under Federal Rule of Evidence 702 and *Daubert* is premised on her own disagreement with his expert opinions. *See* Mem. at 8-19. Such "challenge amounts to a disagreement with" Dr. Cooperman's opinions, which is a matter of weight that is properly left to the jury. *Bresler*, 855 F.3d at 195 ("[Q]uestions regarding the factual underpinnings of the [expert

witness'] opinion affect the weight and credibility of the witness' assessment, not its admissibility.") (internal quotes and cites omitted); *see also Kumho*, 526 U.S. at 141–42 (stating, testing of reliability should be flexible and that *Daubert*'s five factors neither necessarily nor exclusively apply to every expert).

#### 1. **Dr. Cooperman's Opinions are Based on Over Five Decades of Clinical Experience as a Board-Certified Endocrinologist, Relevant Medical Literature, and Plaintiff's Medical Records.**

In an attempt to discredit Dr. Cooperman, Plaintiff repeatedly misstates or mischaracterizes Dr. Cooperman's deposition testimony in an attempt to classify his opinions as "cherry-picked," "overgeneralized," and "unreliable." Mem. at 8-19.

To start, Plaintiff falsely claims that "Dr. Cooperman admitted that he had selectively cited only articles that he said 'supported [the] position' he was taking, and he did not indicate that he had even read any others." *Id*. at 9-10. This is not true. Instead, Dr. Cooperman testified that he reviewed "medical textbooks" and "medical literature" to form his report opinions, including a "medical textbook called UpToDate Medicine[,]" which he described as "a state-of-the-art medical textbook which covers much of medicine, and each chapter is written by an expert in that particular field." Cooperman Tr. at 55:1-22. Dr. Cooperman also testified that he reviewed guidance from the American Diabetes Association, who "do not recommend the use of [DADs][,]" along with standards for diabetes care recommended by American Pediatrics and the American Association of Clinical Endocrinologists. *Id.* at 55:1-56:7; *see also id.* at 60:5-62:6, 80:1-81:2, 156:10-157:7 (testifying other articles, studies, resources, and references Dr. Cooperman reviewed on the standard of care for diabetes, including treatment, diagnosis, therapies, and monitoring methods). In fact, Plaintiff conveniently omits Dr. Cooperman's testimony that medical literature "does not support" the use of DADs and that he "***could not find any*** medical literature that supported the use of [DADs]." *Id.* at 156:10-157:21 (emphasis added). This is not cherry picking. To the contrary,

Dr. Cooperman actively sought out medical literature reaching a different conclusion and found none. *See e.g., Mistee Robbins*, 2016 WL 3189248, at *4 ("To the extent the defendant challenges the reasons [the at-issue expert] offers for not relying on certain studies, such challenges go to the weight of [the at-issue expert's] opinions, not their admissibility.").

Moreover, Plaintiff's reliance on "cherry-picking of data" case law is misplaced. *See* Mem. at 10. In *EEOC v. Freeman*, the Fourth Circuit affirmed the district court's decision to exclude an expert witness' testimony because it was "rife with analytical errors" and therefore unreliable. 778 F.3d 463, 466 (4th Cir. 2015). This is not the case here, where Dr. Cooperman did not "cherry pick" data or medical literature and instead, formed his opinions based on his 50 years of experience practicing medicine; discussions with peers in the endocrinology practice; attendance at medical, diabetes, and endocrinology conferences; and reviewing Plaintiff's medical records and relevant medical textbooks and literature. *See e.g.*, Cooperman Tr. at 55:1-63:10; Dkt. 100-4 at 82:13-18; *see also Small*, 2019 WL 13174144, at *2 (denying motion to exclude and stating, the at-issue experts' "theories appear based on methodologies regularly used in diagnosing patients, and the Court will not exclude them on this ground") (citing *Benedi v. McNeil-P.P.C., Inc*., 66 F.3d 1378, 1384 (4th Cir. 1995)).

As for *Cooper v. Smith & Nephew, Inc.*, the at-issue expert "categorically dismissed" articles that his position did not support – a position that "conflict[ed] with that of the FDA and the majority of his colleagues in the American Academy of Orthopedic Surgeons[.]" 259 F.3d 194, 200-01, 202 (4th Cir. 2001); *see also id*. at 203 (finding, plaintiff's designated expert "admitted that his evaluation of [plaintiff] was not consistent with the diagnostic methodology he employs in his own medical practice"). In contrast, Dr. Cooperman testified extensively that his opinion was based on and is consistent with other medical practitioners in endocrinology and their opinions

on DADs and effective monitoring methods for patients with diabetes. *See e.g.,* Dkt. 100-4 at 63:2-10 ("No endocrinologist that I know uses [DADs]. . . . In all the conferences I've ever been to – medical conferences, diabetes conferences, endocrine conferences, nobody has ever recommended the use of [DADs[]"). Despite searching for contrary resources, Dr. Cooperman testified that he "could find any medical literature that supported the use of [DADs]." Cooperman Tr. at 157:3-7; *see also id.* at 157:18-21 (confirming he looked for medical literature that supported the use of DADs but did not find any). As such, Plaintiff's reliance on *Cooper* is misplaced.

Plaintiff also argues that Dr. Cooperman's opinions are "overgeneralization[s]" and "not specific to Ms. Torres." Mem. at 10. However, a simple review of his report shows this is false because he extensively discussed ***Ms. Torres*** and her medical history. *See* Dkt. 100-2. Again, simply because Plaintiff disagrees with Dr. Cooperman's opinion, does not mean his testimony should be excluded at trial. *See* Mem. at 11 (acknowledging Dr. Cooperman "reviewed the treating physicians' letters," but disagreeing with his interpretation and conclusions formed based on his review); *see also Bresler*, 855 F.3d at 195.[4] Plaintiff is free to try and dispute the weight and credibility a jury should give Dr. Cooperman's opinions at trial, but this is not a basis to deem his opinions inadmissible. *Id.*

Plaintiff once again distorts Dr. Cooperman's testimony by claiming he "misrepresent[ed] [the] medical record of Ms. Torres's 2017 car accident." Mem. at 11. According to Plaintiff, Dr.

[4] Plaintiff grossly mischaracterizes Dr. Cooperman's testimony in support of her assertion that his opinions are "generalized." Specifically, Plaintiff argues in her Motion that Dr. Cooperman "'perused' [Ms. Torres'] medical records 'for about an hour'" before forming his opinions. Mem. at 10 (citing Dkt. 100-4 at 21:19-22:2). Contrary to Plaintiff's representations, the testimony cited in her Motion pertains to Dr. Cooperman's response to counsel's question regarding what he "did *to prepare for [his] deposition*[;]" and in response, Dr. Cooperman stated that he "perused the medical records *that [he] had previously reviewed*." Dkt. 100-4 at 21:19-22 (emphasis added). Plaintiff should not be awarded for these continuous misrepresentations of the record.

Cooperman "misrepresent[ed]" the record by observing that Ms. Torres was involved in a car accident in 2017 despite the fact that her DAD was in the car with her and "apparently didn't warn her[.]" *Id.*; *see also id.* at 14 n.5. To support her assertion, Plaintiff relies on a stricken exhibit, which should not be considered by the Court. *See id.* at 14 n.5 (citing Dkt. 86-10, which was stricken from the record pursuant to the Court's Order in Dkt. 94). Moreover, even if Dr. Cooperman made a factual mistake, and the dog did signal Ms. Torres prior to the 2017 car accident, the overarching point he was making stands: the dog's alert did not prevent her from having a car accident due to her diabetes.

Plaintiff also contends that because Dr. Cooperman "never worked with a [DAD] in his entire career" and "had no formal training on [DADs,]" he is not qualified to opine on their use to monitor a diabetic's glucose levels. Mem. at 11. But that is the point: Dr. Cooperman's testimony makes clear that, over the course of his 50 years of practicing medicine, he has not, and he is not aware of any endocrinologist that has used DADs when treating diabetic patients. *See* Dkt. 100-4 at 62:19-63:10. That does not mean he does not understand their abilities (or lack thereof). Dr. Cooperman testified that the use of DADs as a means of monitoring glucose levels is unsupported by medical literature, is not endorsed within the field of endocrinology, and is not recognized as an accepted method of diabetes management. *See id.* at 62:21-63:10; *see also* Cooperman Tr. 157:1-7, 172:17-173:3 (testifying, he does not "know of any endocrinologists that have recommended" the use of a DAD), 176:9:-177:5 (testifying, he is unaware of "medical studies that support [DADs] for individuals with diabetes as their sole method of monitoring" and has "never encountered" a situation where a physician "prescribed a patient with diabetes a [DAD]"), 180:12-16 (testifying, he is "not aware of any" "scientific organization that endorses [DADs] as a sole use of monitoring diabetes"). Again, if Plaintiff wanted to discredit Dr. Cooperman and the weight his

opinions are entitled to, she can do so at trial. However, disagreeing with him is not disqualifying. Further, Dr. Cooperman is not required to have the exact expertise that ***Ms. Torres*** claims is required to have any opinion at all in this matter. *See e.g., Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 392 (D. Md. 2001) ("[T]he fit between an expert's specialized knowledge and experience and the issues before the court need not be exact.").[5] Here, Dr. Cooperman's decades of experience treating patients with diabetes and evaluating diabetes-related medical literature plainly qualify him to assess whether the use of DADs to monitor glucose levels is supported by scientific evidence or accepted within the field of endocrinology. *See Trauernicht v. Genworth Fin., Inc.*, No. 3:22-cv-532, 2024 WL 3996019, at *6-7 (E.D. Va., Aug. 9, 2024) (denying plaintiffs' motion to exclude defendant's expert because, among other things, the expert demonstrated "specialized knowledge and experience" and "applie[d] that knowledge" to the issues of the case, finding plaintiffs' challenge ultimately went "to the weight, rather than admissibility, of his testimony").

[5] Plaintiff relies on several cases that are readily distinguishable from the issues here. *See* Mem. at 12 (citing *Kadel v. Folwell*, 100 F.4th 122, 159 (4th Cir. 2024)). For example, in *Kadel v. Folwell*, the Fourth Circuit observed that merely reading literature about gender dysphoria did not qualify an expert to opine on that condition. *Kadel*, 100 F.4th at 159. Plaintiff mischaracterizes that holding in her Motion by presenting a medical condition as a treatment modality. More importantly, the Fourth Circuit ultimately affirmed the admission of the expert's testimony regarding hormone therapy based on his experience treating patients and researching hormone treatments. *Id.* Thus, *Kadel* supports, rather than undermines, the admissibility of Dr. Cooperman's opinions regarding whether the medical literature and accepted endocrinology practice support the use of DADs to monitor diabetes.

In addition, Plaintiff improperly relies on *Brainchild Surgical Devices, LLC v. CPA Glob. Ltd.* 144 F.4th 238, 254 (4th Cir. 2025). The court in *Brainchild* found that an individual who "had experience with international business and contracts" improperly relied on legal conclusions and was unqualified to testify on "patent renewal services," with which he had no experience. *Id.* at 254. In contrast, Dr. Cooperman is a board-certified endocrinologist with 50 years of experience and extensive expertise in treating diabetes. As such, *Brainchild* is readily distinguishable.

Finally, in yet another misrepresentation, Plaintiff claims Dr. Cooperman "misread[]" the medical literature that supports his opinions. *See* Mem. at 12-13. Yet, each and every source referenced by Dr. Cooperman that Plaintiff takes issue with in her Motion concluded that performance of DADs is variable, at best. *See* Dkt. 100-10 at SHRM_Torres_03937 (concluding "variability across DADs is evident"); *see also* Dkt. 100-11 at SHRM_Torres_0324) (concluding "dog alert alone is unlikely to be helpful" in monitoring blood glucose levels, and "CGM often detects hypoglycemia before a trained dog by a clinically significant margin."); Dkt. 100-12 at SHRM_Torres_03558) (concluding DAD "efficiency for detecting harmful, even life-threatening, blood glucose variations remains questionable"); Dkt. 100-9 at SHRM_Torres _03960, 03966 (finding, "dogs vary greatly in measures of their performance" and concluding "optimal performance" of DADs depends on several factors). Indeed, Dr. Cooperman explained that variability meant "not consistent. [S]ometimes the dogs are able to recognize hypoglycemia or hyperglycemia, and many times they're not. So there's great variability there." Cooperman Tr. 163:3-14; *see also id.* at 164:2-4 (explaining, "less reliable" means "you can't accept the results on a consistent basis.").

Moreover, the data points that Plaintiff cites in her Motion as evidence of "some trained glycemia alert dogs" performing "extremely well" are entirely misrepresentative of the studies Dr. Cooperman reviewed as a whole. Mem. at 12. For example, Plaintiff claims that one study showed "sensitivity to low blood-glucose ('low-BG sensitivity') up to 100%, and true positive rates up to 94.1%, emphasizing that individual dogs vary substantially and that the performance of some is superb." *Id.* (citing Dkt. 100-10). However, this particular study found that DADs showed "low BG sensitivity *from 33.3%* to 100%" and "true positive rate[s]" that "*ranged from 37.5%* to 94.1%[.]" Dkt. 100-10 at SHRM_Torres_0003940 (emphasis added); *see also id.* at

SHRM_Torres_0003942 (concluding, "some DADs are relatively accurate at detecting [blood glucose] fluctuations[.] . . . In contrast other DADs showed very poor accuracy. . . . In the current market and industry of medical detection dogs, there are no regulatory guidelines for determining DAD accuracy"). Indeed, these studies highlight Dr. Cooperman's point: at best, DADs can sometimes be accurate in their alerts, but it is extremely variable and, therefore, not reliable for someone who needs consistently accurate information on their blood glucose levels, such as a diabetic. *See Sommerville v. Union Carbide Corp.*, 149 F.4th 408, 426 (4th Cir. 2025) (finding abuse of discretion where district court improperly excluded expert testimony by determining the weight to give the expert's "choice of [] background data" because it "waded into credibility determinations"). Accordingly, the Court should deny Plaintiff's Motion.

**2. Any Remaining Arguments Raised by Plaintiff in Her Motion Reflect Her Own Disagreements with Dr. Cooperman's Opinions.**

Plaintiff improperly asserts that Dr. Cooperman made a "'standards of care' argument" in his deposition, which she contends "impermissibly assumes that whatever blood glucose monitoring methods meet the standard of care in the tort sense . . . are automatically sufficient workplace accommodations." Mem. at 15 (citing Dkt. 100-2); *see also* Cooperman Tr. at 78:20-80:19 (testifying, his opinion that Plaintiff "does not need a [DAD] to adequately manage her Type 1 diabetes" is "based on" his 50 years of experience working in the field of diabetes treatment, medical literature and associated standards of care for diabetes, and Plaintiff's medical records). Plaintiff's assertion is incorrect.

Here, Plaintiff contends that Dr. Cooperman "impermissibly mixes . . . what modalities physicians use to help patients manage diabetes generally, and what workplace accommodations the ADA and VHRA require an employer to consider." Mem. at 15. This is not the law. *CureVac SE CureVac AG v. Biontech Se*, No. 2:23-cv-222, 2025 WL 502745 at *10 (E.D. Va. Feb. 14,

2025) (holding expert was only required to "explain how [his] experience leads to the conclusion reached, why [his] experience is sufficient basis for the opinion, and how [his] experience is reliably applied to the facts") (quoting *United States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007)). Moreover, Plaintiff misconstrues Dr. Cooperman's testimony — he expressly stated that he would not make any legal conclusions because he is not a lawyer or testifying as an expert in legal requirements. *See* Cooperman Tr. at 153:2-18 ("I'm not using anything in a legal sense. . . . I'm using the term as is used by nonlawyers in this medical situation."). At no point in his deposition did Dr. Cooperman "equat[e] a medical standard of care with the legitimacy, necessity, reasonableness, or effectiveness of Ms. Torres's requested accommodation under the ADA and VHRA." Mem. at 17. Once again, Plaintiff's discontent with Dr. Cooperman's medical opinions is irrelevant to whether his testimony should be excluded at trial under Federal Rule of Evidence 702 and *Daubert*. *See also Bresler*, 855 F.3d at 195 (finding "challenges to the accuracy of [an expert's] calculations" as "affect[ing] the weight and credibility" of the expert's opinion).

Plaintiff's attempt to exclude Dr. Cooperman's testimony due to purported "bias" shown toward CGMs is illustrative of another fundamental misunderstanding of his opinion. Mem. at 17. As he explained repeatedly during his deposition, CGMs are the most widely accepted mechanisms to monitor glucose and treat Type 1 diabetes. *See* Cooperman Tr. at 88:4-89:22, 92:9-22, 93:1-9, 114:1-15. Further, Dr. Cooperman's report expressly addresses Ms. Torres' diabetes history or what Plaintiff calls "Ms. Torres's particular medical circumstances."[6] Mem. at 18; *see also* Dkt.

---

[6] Plaintiff asserts that Dr. Cooperman "did not inquire about the particular service dog in question, . . . or review any sworn testimony of Ms. Torres or her supporting witnesses given prior to his own deposition." Mem. at 19. However, Dr. Cooperman's opinions were properly based on *Plaintiff's own medical records*. *See* Dkt. 100-2 at 1. Plaintiff's assertion that medical opinions should be based on testimony from a patient's "supporting witnesses," without citing any source to support such a contention, is without merit. Mem. at 19.

100-2 (indicating review of several medical record excerpts, summarizing Plaintiff's medical history, and applying knowledge of diabetes treatment to Plaintiff's specific medical circumstances); *see also* Cooperman Tr. 126:13-132:20. At bottom, Plaintiff's arguments go to weight alone and are not grounds to strike or exclude Dr. Cooperman's testimony.

### D. Dr. Cooperman's Expert Testimony Satisfies Federal Rule of Evidence 403, Posing No Risk of Undue Prejudice or Confusion of the Issues.

Plaintiff's Federal Rule of Evidence 403 argument falls with her failed Federal Rule of Evidence 702 challenge. *See* Mem. at 19-23. Dr. Cooperman's testimony is highly probative of a central issue in this case: Plaintiff's contention that her DAD was the only accommodation she could use to manage her diabetes in the workplace. *See* Compl. ¶ 50. As a board-certified endocrinologist with decades of experience treating diabetic patients, Dr. Cooperman is uniquely qualified to assist the jury in understanding diabetes treatment and management, including whether the use of a DAD for glucose monitoring is supported by accepted medical practice and relevant medical literature. And contrary to Plaintiff's claims, introducing Dr. Cooperman's testimony at trial poses no risk of prejudice or confusing the jury.

Nor can Plaintiff satisfy Federal Rule of Evidence 403's demanding standard. As Plaintiff acknowledges in her Motion, Federal Rule of Evidence 403 "permits the exclusion of relevant evidence 'if its probative value is *substantially outweighed* by the danger of unfair prejudice, confusion of the issues, or misleading the jury[.]'" Mem. at 19-20 (citing *Daubert*, 509 U.S. at 595) (emphasis added). Plaintiff comes nowhere close to meeting that standard because her argument depends on the speculative and incorrect premise that jurors will somehow be confused by Dr. Cooperman's medical opinions with legal conclusions that he never offered. *See id.* at 20-21 (characterizing Dr. Cooperman's "core opinion" as his "proposed testimony on 'standard of care'" in diabetes management and arguing that such "core opinion" will mislead the jury to

believe "that a general 'standard of care' for a medical condition equates to the threshold level of medical need that a particular individual must demonstrate to be entitled to an accommodation under disability law"); *but see* Cooperman Tr. at 153:2-18 (testifying, he did not "us[e] anything in a legal sense[,]" and that his testimony reflected his opinion as a "nonlawyer[] in this medical situation"). They will not. Indeed, Dr. Cooperman did not opine on whether Plaintiff was entitled to an accommodation under disability law or any disputed legal issue. *See* Dkt. 100-2. Rather, Dr. Cooperman offers opinions squarely within his field of endocrinology expertise regarding diabetes management, the medical support for DADs as a glucose-monitoring tool, and the information reflected in Ms. Torres' medical records. *Id.* Plaintiff repeatedly attempts to transform those medical opinions into legal conclusions, but her own conflation of the issues does not establish a genuine risk of jury confusion.

As for Plaintiff's argument that Dr. Cooperman's testimony will confuse a jury because it contradicts "what Drs. Joshi and Armellini wrote in their medical letters to SHRM[,]" this argument is the entire point of trial. Mem. at 21. Dr. Cooperman testified that neither Dr. Joshi's nor Dr. Armellini's letters identified any specific medical basis as to why Ms. Torres required a DAD to accompany her at all times in the workplace. *See* Dkt. 100-4 at 33:1-3 (testifying, "[t]he two letters supported the use of the [DAD], but failed to document any specific episodes, times, or necessity for the use of the dog."). According to Dr. Cooperman, that lack of supporting rationale was likewise not reflected in Ms. Torres' medical records, which he reviewed alongside the relevant medical literature, including publications from leading authorities in diabetes care, and in light of his extensive experience in diabetes management. *See* Dkt. 100-4 at 47:10-48:8 (testifying, medical necessity "is based upon experience, prior medical history[,] . . . recommendations by leaders in the field—experts[,] medical literature and controlled studies[,] [a]nd the vast medical

knowledge sphere"), 68:1-4 (testifying he found "no evidence or documentation in the [medical] record to suggest that Ms. Torres requires or necessitates a [DAD] for her Type 1 diabetes"), 82:13-18 (testifying, "looking at the medical literature, looking at the documentation of Ms. Torres's medical history, I would say there is no evidence that the [DAD] has provided an advantage for Ms. Torres"); *see also* Mem. at 22 (claiming Dr. Cooperman "reject[ed] the medical evidence he did have") (citing Dkt. 100-4 at 45:19-22, 33:1-2). Plaintiff's disagreement with Dr. Cooperman's medical opinion does not mean his opinion will confuse the jury.

Ultimately, Plaintiff's Federal Rule of Evidence 403 argument is little more than that she disagrees with Dr. Cooperman's conclusions and her concerns that the jury may find them persuasive. That is not unfair prejudice. Because Dr. Cooperman's testimony is highly probative, grounded in his expertise and review of the relevant materials, and presents no meaningful risk of confusion or misleading the jury, Federal Rule of Evidence 403 provides no basis for exclusion. Plaintiff's remedy, if she disagrees with his opinions, is cross-examination and the presentation of contrary evidence, not exclusion of otherwise admissible expert testimony.

## IV. CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court enter an Order denying Plaintiff's Motion and awarding Defendant such other relief as the Court deems just and proper.

Dated: August 26, 2026

Respectfully submitted,

*/s/ Tiffany din Fagel Tse*

Lauren M. Bridenbaugh, Bar No. 90586
Tiffany din Fagel Tse, Bar No. 92958
Leslie P. Currie, Bar No. 101060
LITTLER MENDELSON, P.C.
1800 Tysons Boulevard, Suite 500
Tysons Corner, Virginia 22102
Telephone: 703.442.8425
Facsimile: 703.662.6178
lbridenbaugh@littler.com
ttse@littler.com
lcurrie@littler.com

Tanja L. Darrow (admitted *pro hac vice)*
LITTLER MENDELSON, P.C.
633 West 5th Street, 63rd Floor
Los Angeles, California 90071
Telephone: 213.443.4300
Facsimile: 800.715.1330
tdarrow@littler.com

*Counsel for Defendant Society for Human Resource Management*

**CERTIFICATE OF SERVICE**

I hereby certify that, on the 26th day of August 2026, I caused the foregoing **Defendant's Opposition to Plaintiff's Motion to Exclude Testimony of Defendant's Proposed Expert** to be served through the Court's Electronic Case Filing (ECF) system on the following counsel of record:

Stephen B. Pershing (VSB No. 31012)
Mary E. Kuntz (VSB No. 76947)
Anna Kathryn Barnes Barry (admitted *pro hac vice*)
KALIJARVI, CHUZI, NEWMAN & FITCH, P.C.
818 Connecticut Ave. NW, Suite 1000
Washington, DC 20006
Telephone: 202.331.9260
spershing@kcnlaw.com
mkuntz@kcnlaw.com
akbarry@kcnlaw.com

*Counsel for Plaintiff*

*/s/ Tiffany din Fagel Tse*
Tiffany din Fagel Tse