# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

---------------------------X

FIONA TORRES, :
PLAINTIFF, : CASE NUMBER
VS. : 1:25-CV-2360(PTG/WBP)
SOCIETY FOR HUMAN RESOURCE :
MANAGEMENT,
:
DEFENDANT.

---------------------------X

DEPOSITION OF MICHAEL COOPERMAN
CONDUCTED REMOTELY
THURSDAY, JUNE 11, 2026
10:00 A.M. EASTERN DAYLIGHT TIME

Job Number 636233
Pages 1 - 186
Transcribed by Sandra Ann Masterpole

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:

HECTOR F. RUIZ, ESQUIRE
KALIJARVI, CHUZI, NEWMAN & FITCH, P.C.
818 Connecticut Avenue, Suite 1000
Washington, District of Columbia 20006
(202) 331-9260

ON BEHALF OF THE DEFENDANT:

TIFFANY DIN FAGEL TSE, ESQUIRE
LAUREN M. BRIDENBAUGH, ESQUIRE
LESLIE P. CURRIE, ESQUIRE
LITTLER MENDELSON, P.C.
1800 Tysons Boulevard, Suite 500
Tysons Corner, Virginia 22102
(703) 442-8425

ALSO PRESENT:

Fiona Torres - Plaintiff
Hanton Walters - Society for Human Resource Management, Vice President, Legal Affairs

P R O C E E D I N G S

(Proceedings began at 10:02 a.m. All parties appear remotely.)

COURT REPORTER: I am a notary authorized to administer oaths, and this deposition is being recorded by electronic means. All parties understand and agree that any certified transcript produced from this recording of this proceeding is intended for all uses permitted under applicable, procedural, and evidentiary rules and laws and shall constitute written stipulation. The parties stipulate to the use and certification of this testimony consistent with the applicable law of such. Hearing no objection, I will now swear in the witness.

Doctor, will you please raise your right hand? Do you solemnly swear or affirm, under the penalties of perjury, that the testimony you shall give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: Yes.

MICHAEL COOPERMAN,

called as a witness, having been first duly sworn to

testify or affirm to the truth, testified under oath as follows:

COURT REPORTER: We can begin.

MR. RUIZ: Thank you so much.

EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. RUIZ:

Q Good morning, Dr. Cooperman. Again, my name is Hector Ruiz, and I represent the Plaintiff, Fiona Torres in the matter of Fiona Torres v. Society for Human Resource Management, which is pending in the Eastern District of Virginia, docket number being 1:25-CV-2360. Would you please state and spell your full name?

A Michael, M-I-C-H-A-E-L, Cooperman, C-O-O-P-E-R-M-A-N.

Q Thank you, sir. And are you represented by counsel here today?

A Yes, I guess.

Q Do you know, would you tell me who you're being represented by here today?

A Tiffany Tse.

Q Thank you so much. Dr. Cooperman, is there any reason that might affect your ability to give complete

my report attached to it. Okay. So, obviously, I've seen my report before.

BY MR. RUIZ:

Q Okay. You've seen your report, sir, but you have not seen the actual disclosures that come before the report; Is that accurate?

A Yes.

Q Okay. I'm going to drop another document into the chat. Okay.

A Okay. Let me see if I can get back here. Okay. I got back successfully.

Q Okay.

A Well, you want me to open X2?

Q Correct.

A Okay.

(Exhibit Number 2 was marked for identification.)

BY MR. RUIZ:

Q Okay. Now, what I've just brought out, it's going to be marked as Exhibit 2, is Defendant's Amended Rule 26(a)(2) Disclosures that were sent to us -- were sent to the Plaintiff's counsel on May 20, 2026. I'm

documentation.
A Yes.
Q What is that opinion?
A I'm sorry. I didn't hear.
Q What is that opinion that you're expressing with respect to the medical documentation?
A The opinion is that there is no documentation in the medical records to support the use of a diabetes alert dog.
Q Sir, you also referenced an opinion regarding a supportive letter, sir; is that correct?
A Yes.
Q Okay. What did you mean with respect to an opinion relating to a supportive letter?
A Well, I -- two letters were submitted to me from -- one was Dr. Joshi, and the other, a physician, I don't remember. I believe it was a woman physician. I don't remember her name. But I received those two letters, and I reviewed them. And I was critical of the two letters.
Q What specific opinions do you hold with respect to the two letters?

Q Do you know anything else about diabetic alert dogs?
A Well, I've understood that there are academies that will approve diabetes alert dogs, but there's no universal standard for comparing one academy to the other. There's no accepted criteria for certifying diabetes alert dogs. Diabetes alert dogs have been used, but they are not recommended by any professional society. And most experts, if not all experts, do not recommend their routine use.
Q Which experts are you referring to, sir?
A Excuse me?
Q Which experts are you referring to?
A Medical textbooks, medical literature.
Q Can you tell me which textbooks and medical literature you're referring to?
A One is a medical textbook called UpToDate Medicine. UpToDate Medicine is a state-of-the-art medical textbook which covers much of medicine, and each chapter is written by an expert in that particular field. And in the section on the care and monitoring of patients with diabetes, diabetes alert dogs are not even

mentioned. The American Diabetes Association, on their recommendations for diabetes, do not recommend the use of diabetes alert dogs. American Pediatrics, likewise, and the American Association of Clinical Endocrinologists and their standards for diabetes, likewise, do not recommend the use of diabetes alert dogs.

Q When you say that these different organizations do not recommend the use, are you saying that they have not recommended the use or they recommend against it?

A They do not recommend it.

Q So they just have not made a recommendation to use them. You're not saying that they recommend it against them?

A Well, they're saying that there are better options.

Q They affirmatively say there are better options?

A Yes.

Q You mentioned one medical text, sir. Was there any other text that you can refer me to?

A No, that's the only one that I referenced.

Q And that one was referred to as UpToDate Medicine. Each has a chapter, but your understanding is that diabetic alert dogs aren't even mentioned in the text?
A Correct.
Q And with respect to that text, the fact that it's -- diabetic alert dogs are not mentioned, you know, to you, what does that tell you?
A That tells me that it's not recommended, and that there are better options.
Q For that UpToDate Medicine text, sir, do you know what edition that was?
A Well, it's an online textbook, so to speak. So it's constantly changing.
Q Okay. Which one are you referring to?
A Which what?
Q Which version are you referring to?
A The latest.
Q The latest. When was that latest version published?
A I don't have the citation in front of me.
Q Do you have an approximate date of when it was

published?

A Well, it changes constantly. So every section is updated on a yearly or biyearly or six-month or semi-yearly basis. So I didn't look at the exact date that it was updated.

Q Does each version of the medical text contain the same subject matter as the last?

A The same general topics, yes.

Q Okay. Sir, you were telling me what you knew about diabetic alert dogs. Is there anything else you can tell me about your knowledge regarding diabetic alert dogs?

A Yes. Diabetic alert dogs are extremely variable. Their ability to find hypoglycemia or hyperglycemia is extremely variable and decreases over time and is very dependent upon the individual dog. Diabetes alert dogs can assess hypoglycemia in less than a third of the documented low blood sugar episodes. And, in fact, one study showed that only three of 14 alert dogs actually showed a statistically -- only -- let me put this -- let me retrace. Only three of 14 dogs showed a statistically significant measurement of

hypoglycemia that was greater than chance. So the vast majority of dogs are unable to alert to hypoglycemia.

Q You mentioned statistical significance, sir. You're saying that three out of 14, they were able to calculate a statistical significance using that poll?

A I'm saying only three out of 14 dogs were able to reach a statistical significance in identifying hypoglycemia. And even that was variable and changed over time.

Q Do you know the sample size that was used to arrive at that statistical significance number?

A Well, it was 14 dogs.

Q Thanks. Do you have any other knowledge with respect to the diabetic alert dogs?

A No.

Q Okay.

A Excuse me. Only that there are other studies which confirm that diabetes alert dogs are extremely variable and have a low rate of accuracy.

Q Which studies are those, sir?

A Oh, again, I would have to give you -- cite you the citation.

Q Do you have that information in front of you?
A I can get that information, yes.
Q Do you have that information in front of you?
A Yes.
Q Okay. Go ahead and look and tell me what those studies are.
A Do you want me to give you the citations?
Q Yes. If you have that information in front of you, go ahead and tell me.
A You're allowing me to look at the --
Q Yes. I'm interested in learning what studies you're referring to.
A Okay. Let's see. One paper's title is, "Reliability of Trained Dogs to Alert to Hypoglycemia with Type 1 Diabetes." And that's the Journal of Diabetes Science Technology, 2017.
Another one is, "Diabetes Alert Dogs: An Assessment of Accuracy and Implications." That's Diabetes Research Clinical Practice, 2017.
Another one is, "How effective are trained dogs at alerting their owners to changes in blood glycemic levels? Variations in performance of glycemia alert

dogs." And that's PLoS, P-L-o-S, One 14(1).
Q What does PLoS One 14(1) mean?
A It's an online -- I believe it's an online citation.
Q Oh, thank you. The other two that you provided, you provided years of publication. Does that last one have a year?
A Yeah. It's 2017 for both of them.
Q Okay. Thank you so much. Are there any other -- I'm sorry. Go ahead, sir. Excuse me.
A "An Owner-Independent Investigation of Diabetes Alert Dog Performance." And that's also -- that's from Veterinary Science. And that looks like it's 2019. There are more, but these are the ones that I just --
Q Are those the ones that you relied upon?
A I didn't rely on anything, but these are the ones that support my position.
Q Oh, I'm sorry. You didn't rely on those reports that you --
A Well, when I say rely on, I -- that was part of my evaluation.
Q These reports that you just described to me, is

that how you developed your knowledge of diabetic dogs -- I'm sorry, of diabetic alert dogs, is that how you developed your knowledge?

A In addition to the other references that I mentioned before, the American Diabetes Association, UpToDate Medicine, et cetera.

Q Other than those sources, or all of these sources, is that how you developed your knowledge, sir?

A And I did look at other sources, but I thought that these -- I didn't look at other sources -- other papers, but I thought that these were the main papers that I read.

Q Okay. When did you develop this knowledge of diabetic alert dogs?

A When I reviewed the case.

Q Meaning back in May, is that when you developed your knowledge of diabetic alert dogs?

A Excuse me. Yes.

Q So did you develop your knowledge of diabetic alert dogs specifically for this case?

A Well, in the 50 years that I've been practicing medicine, I have never come across a patient who had a

diabetes alert dog. I had no training in diabetes alert dogs. No endocrinologist that I know uses diabetes alert dogs. In the -- in all my training programs, nobody has ever recommended diabetes alert dogs. In all the conferences I've ever been to -- medical conferences, diabetes conferences, endocrine conferences, nobody has ever recommended the use of diabetes alert dogs. So that was my understanding up until the time of this case. And then, after reviewing the case, I looked further into it.

Q So again, my question is, the knowledge that you developed, was it for this case?

A With -- yes.

Q Okay. Thank you so much. Do you know what a diabetic alert dog is trained to do?

A They are trained to discover hypoglycemia and hyperglycemia.

Q What does that mean, trained to discover hypoglycemia and hyperglycemia? Well, let me break it down. What does it mean when you say they're trained to discover hypoglycemia? What does that mean?

A Just what it says. They're trained to alert

A Can we -- can I intercept for one second? There's somebody at the doorbell -- ringing my doorbell like crazy. Can we hold for one second?

MR. RUIZ: Absolutely, sir. We'll go off the record.

MS. TSE: Yes.

THE WITNESS: Hold on, please.

(Off the record at 12:00 p.m.)

(Proceedings resumed at 12:01 p.m.)

COURT REPORTER: We're back on the record.

BY MR. RUIZ:

Q All right. Sir, thank you so much.

A Thank you for indulging me, by the way.

Q Absolutely, sir. Back to my question, sir. Are there any times when a service dog would be medically required to manage Type 1 diabetes?

MS. TSE: Objection; asked and answered. Answer, if you can.

THE WITNESS: No.

Q Okay. With respect to this proposed testimony that you may be called to provide that Ms. Torres does not medically require a service dog to manage Type 1

diabetes, what is your opinion on that?
A My opinion is that Ms. Torres does not need a diabetes alert dog to adequately manage her Type 1 diabetes.
Q Okay. With respect to that specific statement, is your opinion that she does not medically require a service dog to manage Type 1 diabetes?
A Yes.
Q Okay. And what is that opinion based on?
A It's based upon my experience, the medical literature, and Ms. Torres's medical record.
Q Is it based on anything else, sir?
A No.
Q You said it's based on your experience, sir?
A Yes.
Q Based on your experience with what, sir?
A Well, the fact that I have managed diabetes for 50 years; I've been at multiple hospitals and medical schools; that I have gone to multiple conferences; teaching; I've had interaction with multiple diabetes experts in the care of diabetes; and diabetes alert dogs has never been promoted or required or recommended.

Q Thank you, sir. You stated that it's also based on medical literature. Is the medical literature you're referring to the medical literature we discussed earlier today?

A Yes. The American Diabetes Association, the UpToDate Medicine, the American Association of Clinical Endocrinologists, and the references that I gave you.

Q When you mentioned the ADA and the American Association of Endocrinologists, those are organizations, but you're not referencing specific literature with those; is that correct?

A No. I'm mentioning that they all put out what's called standard care for diabetes, which they go through treatment, diagnosis, therapies, monitoring.

Q Okay. And it's when you're referencing medical literature with respect to the ADA and the American Association of Endocrinologists, you're referring to the standard of care that they put out?

A Correct.

Q Okay. Thank you so much. Was there any other literature that you're referring to as the basis for your opinion on this issue?

A Well, the -- well, again repeating, the references that I've mentioned before.
Q Okay. Thank you so much. And then the last thing you mentioned was Ms. Torres's medical records; is that correct?
A Yes.
Q Okay. Can you tell me the date range of the medical records that you are basing this opinion on?
A From the best of my memory, it was approximately 2020 to 2026.
Q Sir, other than your experience, the medical literature we've discussed and Mrs. Torres's medical records, which according to the best of your recollections from '20 to 2026, was there anything else you considered in arriving at your opinion that Ms. Torres does not medically require a service dog to manage Type 1 diabetes?
A At the time of my report, no. No.
Q Sir, at the time of your report -- okay. Thank you so much. Appreciate it. Now, in forming this opinion, sir, you have not spoken with Ms. Torres about her experience with her service dog; is that correct?

widely-accepted methods of monitoring blood glucose that do not involve a service dog. Do you see that?
A Yes.
Q And I want to stop right there. Okay. Sir, as part of your work for SHRM, were you asked to evaluate whether there were alternative, effective, and widely-accepted methods of monitoring blood glucose that do not involve a service dog?
A Yes. That was part of my overall evaluation.
Q And were you asked to evaluate that?
A I was asked to consider that. That is automatically considered when you're looking at measuring blood glucose levels for possible control of diabetes. That's part and parcel of the evaluation.
Q Okay. Now, did you develop an opinion on that issue?
A Yes.
Q Okay. Would you please point me to the location in your report where you address whether there are alternative, effective, and widely-accepted methods of monitoring that do not involve a service dog?
A The first sentence on Page 2 where I mentioned

that Ms. Torres is diagnosed with diabetes and being managed with continuous glucose monitoring. Later on --

Q I'm sorry. I didn't -- you said the first paragraph of Page 2?

A Yes.

Q What sentence are you referring to, sir?

A Diabetes is being managed with an insulin pump, Omnipod, and continuous glucose monitoring, Dexcom.

Q Is there any other place?

A Yes. Hold on one minute, please. In the next to the last paragraph on Page 2, I write that the medical literature does not support routine use of diabetic alert dogs. Then I go on to say, Ms. Torres does not meet the criteria. And I say that continuous glucose monitoring remains the standard for diabetes care.

Q Is there any other place that you can point me to, sir?

A On Page 3 on the top I said, Ms. Torres utilizes CGM regularly. The medical literature has demonstrated only psychosocial benefits when DAD is added to CGM use.

remains a standard for diabetes care.
Q So where is that?
A That's on Page 2. That's the one, two, three, four -- fifth paragraph.
Q Is there any other place in your report where you address the effectiveness or reliability or helpfulness of all their alternate methods?
A No.
Q Just because something is a standard of care, does that mean that it's effective?
A Yes.
Q Thank you.
A It means more than that, but it means it's effective.
Q So standard of care equates to being effective?
A Well, it's not only -- it means more than that. It means that it's widely used and it's accepted by the medical community as being the best available.
Q Okay. Does best available mean that it's actually effective?
A Again, those are separate terms. So it is effective and the additional points that I made.

Q Okay. Thank you so much. With respect to the testimony that you may provide on this issue, what does widely accepted mean?

A It means that the body of physicians who take care of people with diabetes utilize this on a regular basis; that it's not something that is remote. It's not something that's not available. It's not experimental. And that the vast medical community accepts this as the proper way to monitor the diabetes.

Q Okay. Can you point me to the place in your report where you discuss all of that?

A I don't think I went -- I don't think I went into that.

Q Okay.

A And I'll look and see if there's a sentence involved. Again, the only thing I did write in Page 2, fifth paragraph, continuous glucose monitoring remains a standard for diabetes care.

Q Okay. For everything you described to me, that sentence is what you're saying encapsulates all of that?

A Yes.

MS. TSE: Objection; vague.

basis. That information is then transposed or transmitted to a phone or a sensor. That data is then stored, and can be read immediately or can be analyzed at a later time. The sensor has the ability to have alerts on it; and that is that you can set so that if the glucose level goes above a certain level or below a certain level, it gives you an alert -- an alert on the transmitting box or on your phone, it gives you a warning.

In many cases -- and I believe this was true of Ms. Torres -- the insulin pump, the Omnipod, talks to the sensor, and the sensor talks back, so that insulin can be released based on the glucose levels.

Q I'm sorry. For that last one, sir, you said the insulin pump talks to the sensor?

A Right.

Q Okay. Sir, thank you so much. You said that the CGM measures on a frequent basis blood glucose?

A Right.

Q Okay. How frequent are the measurements taken?

A Well, the Libre, I think, used to measure continuously -- almost continuously. The Dexcom

Q Sir, we've talked about medical standards of care. Okay. With respect to this testimony that is provided, that there are widely-accepted methods of monitoring blood glucose that do not involve a service dog, and that these methods meet the accepted medical standards of care. Okay. What would you be meaning by accepted medical standards of care?

A Accepted medical standards of care mean what the -- what is accepted in the medical community as being a proven, state-of-the-art, widely-accepted documentation and literature, with controlled studies and backup, and are considered by professional organizations, such as the American Diabetes Association, Association of Clinical Endocrinologists, as being appropriate care for any condition.

Q Okay. What are medical standards of care in place for?

A To help physicians pick the best therapy treatment approach for any given situation.

Q And like to your understanding, who is held to medical standards of care?

MS. TSE: Objection; vague. You can

she failed to eat. It was reported that that accident was related to a hypoglycemic episode; and that she had the alert dog with her.

Q Sir, thank you so much. But my question was, as part of your work for SHRM, were you to evaluate whether Mrs. Torres's own conduct demonstrates that a service dog is not a necessary workplace accommodation for her Type 1 diabetes condition?

A Not directly, no.

Q Well, indirectly, were you asked --

A No.

Q -- to evaluate that?

A No.

Q No? Do you have any opinion on that matter?

A No.

Q No? And just to wrap this up, sir, is there any place in your report where you address Mrs. Torres's own conduct?

A Yes. On Page 2, first paragraph, she has experienced one significant hypoglycemic episode in 2017 when she failed to eat, despite taking her insulin, and was involved in an automobile accident.

Q Is that the extent of conduct that you know of regarding Mrs. Torres?
A That's the only one, yes.
Q Okay. Thank you. Sir, the testimony that's described here, with respect to this last sentence, also references necessary workplace accommodation for her Type 1 diabetes condition. Do you see that, sir?
MS. TSE: Where are you talking about?
MR. RUIZ: Last -- in that same sentence. Further, SHRM may call Dr. Cooperman to testify that Mrs. Torres's own conduct demonstrates that a service dog is not a necessary workplace accommodation for her Type 1 diabetes condition.
Q Do you see that?
A Yes. Yes.
Q Do you have any training on evaluating the necessity of workplace accommodations?
A Specifically, no.
Q How about not specifically?
A Well, what do you mean by training?
Q I'm just asking you, I mean, if you were called to talk about -- to testify about workplace

Q Sir, that's not the answer to my question. I'm asking, where in your report, or if in your report you actually state that her own conduct demonstrates that a service dog is not a necessary workplace accommodation?

A I did not say that specifically. I did not say that.

Q Thank you, sir. Sir, I want you to turn to your actual report, sir.

A Okay.

Q Would you please direct me to the opinions you have in your report?

A Which opinion?

Q I want to know every single opinion that you've contained in your report.

A At the bottom of Page 1, Ms. Torres is currently a 35-year-old woman with a history of diabetes Type 1, who is seeking a workplace accommodation for a diabetes alert dog. A review of the medical records, documentation submitted, and the medical literature did not support the necessity of this accommodation.

Q Let me break that down, sir. That first sentence, are you saying that Ms. Torres being a

current -- that first sentence is your opinion?
A What -- the first sentence says, Ms. Torres is currently a 35-year-old woman with a history of diabetes Type 1, who is seeking a workplace accommodation for a diabetes alert dog.
Q I want to know if that's -- you're claiming that that is one of your opinions, that sentence?
A It's not an opinion; it's a fact.
Q Okay. Thank you. All right. The next sentence. Okay. A review of the medical records, documentation submitted, and the medical literature do not support the necessity of this accommodation.
A That's my opinion.
Q Okay. Thank you so much. Okay. So what I'm trying to do is understand where in your report you have opinions versus where in the report you're stating facts. Okay? Please point me to those places in your opinion or in your report where you state your opinions, not where you're simply stating facts.
A Okay. Let's go sentence -- if you want to go sentence by sentence?
Q Yes, sir, if we need to.

A Ms. Torres -- top of Page 2, Ms. Torres was diagnosed with diabetes in childhood. That's a fact.

She's also being treated for hypothyroidism and hyperlipidemia. Fact.

Diabetes is being managed with an insulin pump and continuous glucose monitoring. Fact.

Laboratory records reveal good to fair diabetes control as measured by A1C levels. Fact.

She has experienced one significant hypoglycemic episode in 2017 when she failed to eat, despite taking her insulin, and was involved in an automobile accident. Fact.

There were no reports of diabetic ketoacidosis, emergency room visits for hypoglycemia, hyperglycemia, or diabetic complications in adulthood. Fact.

Ms. Torres has not suffered seizures. Fact.

There is no evidence of emergency medical services being called for a diabetic urgent situation. Fact.

Q Okay. That is Paragraph 1 on page 2. Thank you so much. Would you proceed to Paragraph 2 on Page 2 of your report?

A Ms. Torres had a DAD -- diabetes alert dog -- since 2017, but the medical records failed to comment on its usefulness or activity. Fact.

There is no documentation of a DAD preventing any diabetes-adverse reaction, and I could not find any significant mention of its use in all her medical visits. Fact.

There is no history of hypoglycemic unawareness or seizures. Fact.

Q Okay. That was Paragraph 2 on Page 2. Would you please proceed to Paragraph 3 on Page 2?

A Drs. Silpa P.K. Joshi and Denise Armellini failed to document any distinct episodes where the diabetes alert dog played a role in preventing a diabetes ill effect. Fact.

They discussed generalities without specific instances cited. Fact.

Dr. Joshi refers to severe hypoglycemic reactions in car accidents, in the plural, with no supporting documentation. Fact.

Dr. Joshi also references passing out with no supporting medical evidence. Fact.

Q Would you Proceed to Paragraph Number 4 on Page 2?
A SHRM has offered to make reasonable accommodations to meet Mrs. Torres's diabetes care. Fact.
Her job description does not entail physical exertion or frequent travel. Fact.
It is sedentary in an office environment. Thus, there is no increased risk of diabetes, hypoglycemia, or hyperglycemia. Fact.
Q Okay.
A The medical literature does not support routine use of diabetic alert dogs. Fact.
Their role is mainly psychosocial. Fact.
Ms. Torres does not meet the criteria of hypoglycemic unawareness, and she has not sustained any seizures, which are the accepted indications for possible DAD use. Fact.
Continuous glucose monitoring remains a standard for diabetes care. Fact.
There is no convincing evidence of additional benefit from DAD use with CGM monitoring. Fact.

Accuracy with DADs is variable, and some dogs become less reliable over time. Fact.

While some individual DADs perform well and the psychosocial benefits are meaningful, the evidence does not support DADs as a reliable method of glucose monitoring. Fact.

They may serve as a complementary tool for psychosocial reassurance. Fact.

Q And then the last paragraph on Page 2?

A Ms. Torres has failed to demonstrate a level of hypoglycemia that qualifies as hypoglycemic unawareness. She has had no documented hospital, emergency room, or EMS calls for hypoglycemia or seizures. Fact.

Q Sorry -- I'm sorry, sir. You read two sentences there, but you only said fact for the second one.

A Okay. I'll go back. First sentence is fact, second sentence is fact.

Q Thank you.

A There is no documentation in the medical record of DAD intervention or successful interaction. Fact.

Ms. Torres utilizes CGM regularly, and admits

to mild hypoglycemic events when she skips a meal or is late in eating. Fact.

Medical literature has demonstrated only psychosocial benefits when DAD is added to CGM use. Fact.

SHRM is --

Q I'm sorry. We're on Page 3 now, beginning with the first full paragraph.

A SHRM is willing to make accommodations for Ms. Torres. Fact.

Her job is sedentary in an office environment where human observation and intervention is available. Fact.

The need for diabetes alert dog is not supported. Opinion.

The opinions expressed are to a reasonable degree of medical certainty. Fact.

Q So in the entire report, there are two opinions that you put forth; is that correct, sir?

A Yes.

Q Okay. Sir, I want you to, I want to turn to -- which would be Page 2, sir.

diabetes.
Q I just want to make sure, you're not using the word unreasonable or reasonable to suggest that SHRM met a legal standard, are you?
MS. TSE: Objection; calls for legal conclusion. You can answer, if you can.
THE WITNESS: You're asking me if I'm using that term in a legal sense?
Q Yes, sir. Are you using it --
A No, I'm not. I'm not using anything in a legal sense, no.
Q Okay. So just to be clear, when you use the term, reasonable accommodation, you're not opining that SHRM met any type of applicable legal standard; is that right?
MS. TSE: Same objection. Go ahead.
THE WITNESS: I'm using the term as is used by nonlawyers in this medical situation.
Q Okay. Thank you so much. Sir, in that same paragraph, you then refer to her job description. Okay. And you write that her job description does not entail physical exertion or frequent travel. Do you see that,

statement, you referenced increased risk. Okay. Is there -- did Ms. Torres have any risk at all of hyperglycemia or hypoglycemia in that position?

A A patient with Type 1 diabetes on insulin is at risk for hypoglycemia or hyperglycemia in every situation.

Q Going to the next paragraph. It begins with the medical literature.

A Okay.

Q Okay. You write, the medical literature does not support routine use of diabetic alert dogs. What literature are you referring to there?

A American Diabetes Association, UpToDate Medicine, American Association of Clinical Endocrinologists -- actually, the Pediatric Society, also, does not recommend routine use. So all these standard of cares. And the medical literature does not support it either.

Q When you reference the medical literature there, is it the medical literature that we have discussed earlier today?

A Correct.

Q Is there anything other -- any other medical literature that you're referring to there?
A Yes. There's a whole host of -- there are a number of papers that have been published. I only selected a few, but I could not find any medical literature that supported the use of diabetic alert dogs.
Q In stating the medical literature does not support the routine use of diabetic alert dogs, were you referencing only the medical literature that we've discussed today?
A No. I -- I referenced -- I -- I saw a number of (indiscernible) that basically said the same thing. I just didn't list them all.
Q Okay. Do you remember the others?
A No. I mean, I suppose I can look them up somehow, but the answer is no.
Q No? Okay. Sir, you said that you looked for medical literature that supported the use of diabetic alert dogs, but didn't find any; is that correct?
A Correct.
Q Okay. Like the research you did for medical

said that you had made earlier?
A Yes.
Q Okay. Sir, in the next sentence you write, accuracy with DADs is variable and some dogs become less reliable over time. Do you see that?
A Yes.
Q Okay. What do you mean by variable, sir?
A The accuracy is variable. That is, that it's not consistent. sometimes the dogs are able to recognize hypoglycemia or hyperglycemia, and many times they're not. So there's great variability there.
Q Okay. The basis for your statement there, what's the basis for your statement?
A The medical literature.
Q And it's the medical literature we've been discussing earlier today?
A Correct.
Q And you say that some dogs become less reliable over time?
A Correct.
Q Do you know what percentage of dogs become less reliable over time?

A I don't think that number is available.
Q And what did you mean by less reliable?
A Just what it says. You can't -- you can't accept the results on a consistent basis.
Q Sir, the facts that you state with respect to dogs in this paragraph, do they all come from the medical literature that you read specifically for this case?
A Yes.
MR. RUIZ: Dr. Cooperman, I'm going to take a five-minute break. I may be very close to the end. Okay?
THE WITNESS: Whoa.
MR. RUIZ: Yeah. You know what? Because I think it's very close to the end, let me go ahead and let's take a ten-minute break, and we'll be right back. Okay?
THE WITNESS: Okay.
(Off the record at 2:40 p.m.)
(Proceedings resumed at 2:48 p.m.)
COURT REPORTER: Okay. We're back on the record.

possibility, but that would seem the most common and most likely.

Q Okay. Do you know of any more severe like situations where more intense intervention would be required?

A Well, you've opened up a gamut. I mean, I can't -- I mean, hopefully -- hopefully not, but, I mean, Ms. Torres could have a stroke. She could have a heart attack. I mean, you've opened up a world there of possibilities.

Q You mean, she could have a stroke or a heart attack in connection with her diabetes?

A Yes.

MR. RUIZ: Okay. So, Dr. Cooperman, those are the questions I have for you. Thank you so much for answering my questions.

THE WITNESS: You're welcome.

MS. TSE: I do have a few questions, but so that we can go smoothly. Can we get another five -- maybe another five, ten-minute break?

MR. RUIZ: Sure. Which would you like?

MS. TSE: Let's do it until three.

THE WITNESS: Yes.
Q Does it include monitoring a patient with diabetes and their glucose levels?
MR. RUIZ: Object to form.
THE WITNESS: Yes.
Q Does your experience as an endocrinologist include what monitoring devices to recommend to a patient with diabetes?
MR. RUIZ: Object to form?
THE WITNESS: Yes.
Q Does your experience as an endocrinologist include whether to recommend a diabetic alert dog to a patient with diabetes?
MR. RUIZ: Object to form?
THE WITNESS: Well, if we thought it was indicated, then yes, it would include that.
Q If a patient has diabetes and is looking for a physician for a diabetic alert dog recommendation, would they go to an endocrinologist?
MR. RUIZ: Objection.
THE WITNESS: Actually, I'm not sure because I don't know of any endocrinologists that have

recommended that. So that might be something that a patient would pick up on social media or through other means.

Q You testified earlier that you charge Leidos a $450 per hour rate for your work related to this case; is that correct?

A Correct.

Q Is the 450 per hour your rate for depositions?

A No.

Q What is your hourly rate for depositions?

A I charge a standard fee of $2,500, and that includes up to five hours of deposition. After that, it's $550 per hour.

Q Were you in possession of Dr. Joshi's deposition transcript when you prepared your report?

A No.

Q Did you review Dr. Joshi's deposition transcript to prepare for your report today -- I'm sorry -- to prepare for your deposition today?

A Yes, I did.

Q Did anything from Dr. Joshi's deposition transcript change the opinions that you formed in your

MR. RUIZ: Object to form.
THE WITNESS: I'm not aware of any.
Q Are you aware of any medical disciplines that establish an expertise in diabetic alert dogs?
MR. RUIZ: Object to form.
THE WITNESS: I don't believe there are any.
BY MS. TSE:
Q Are you aware of any medical studies that support diabetic alert dogs for individuals with diabetes as their sole method of monitoring?
MR. RUIZ: Object to form. Oh, sorry.
THE WITNESS: I'm not aware of any such studies or recommendations.
Q How many years have you been practicing in the field of endocrinology?
A Since -- well, in private practice, about 46 years, but I did two years in the service, so I guess that's 48, so at least 48 years.
Q In your 48 years of practice, have you ever recommended a patient with diabetes a diabetic alert dog?

A No.

MR. RUIZ: Object to form.

Q Are you aware of any physician who has prescribed a patient with diabetes a diabetic alert dog?

A No. I've never encountered such a situation.

Q And are you aware of any physician who specializes in whether diabetic alert dogs are effective?

MR. RUIZ: Object to form.

THE WITNESS: I'm not aware of any.

Q We also talked about your report. Does your report comprehensively speak to whether Ms. Torres required a diabetic alert dog to manage her diabetes condition?

MR. RUIZ: Object to form.

THE WITNESS: I believe it does.

Q Is it your medical opinion that Ms. Torres does not require a diabetic alert dog?

MR. RUIZ: Object to form.

THE WITNESS: Yes, that's my opinion.

Q And because we went over require versus need, I will ask, is it your medical opinion that Ms. Torres

there's a date 2013 to 2018. Does that refresh your recollection, in terms of the date range of the medical records you reviewed regarding Ms. Torres?

A I -- to be -- I don't recall the exact date. If that's what's written there, then that's what I reviewed.

Q So would that mean that you reviewed records as early as 2013 to present?

A Yes.

MR. RUIZ: Object to form.

THE WITNESS: Yes.

Q Are you aware of any scientific organization that endorses diabetic alert dogs as a sole use of monitoring diabetes?

MR. RUIZ: Object to form.

THE WITNESS: No, I'm not aware of any.

Q Are you aware of any medical literature that has endorsed diabetic alert dogs as a sole use of monitoring diabetes?

MR. RUIZ: Object to form.

THE WITNESS: No, I'm not aware of any.

COURT REPORTER: Please try to leave a

gap, Mr. Cooperman, after the question is asked, in case there's an objection.

THE WITNESS: Certainly.

COURT REPORTER: I'm sorry, Doctor.

BY MS. TSE:

Q What would a Type 1 diabetic use to monitor their glucose levels today?

MR. RUIZ: Objection; calls for -- withdrawn.

THE WITNESS: We recommend the use of CGMs. And in the absence of CGMs, then finger-stick monitoring.

Q Is there a scientifically -- withdraw that, actually.

Did you review any medical records that show that Ms. Torres's healthcare providers prescribed her to obtain a diabetic alert dog to manage her diabetes condition?

MR. RUIZ: Objection; vague, as to the term "medical records."

THE WITNESS: I saw no evidence in the records that there was a recommendation for a diabetes

alert dog.

Q Okay. And similarly, in Ms. Torres's medical records that you reviewed, did any healthcare provider comment on the effectiveness of a diabetic alert dog for Ms. Torres?

A I saw no evidence in the medical records that referenced to the use of a diabetic alert dog in any situation.

Q Are you aware of any sort of scientifically established explanation for how a diabetic alert dog would detect glucose changes?

MR. RUIZ: Object to form.

THE WITNESS: Only my previous comments regarding the possibility of organic compounds released in the breath or the skin that the dog may be sensitive to.

Q Other than that, are you aware of any other explanation of how diabetic alert dogs work, based on your review of literature?

A I'm not aware of any other explanations.

Q As an expert in endocrinology, are you able to evaluate whether a diabetic alert dog's detection of

glucose changes is scientifically valid?

MR. RUIZ: Object to form.

THE WITNESS: I don't have enough information to -- there isn't enough information out there to definitively answer that question.

MS. TSE: I believe that is all of my questions. Hector, I'm not sure if you have any more.

MR. RUIZ: No, I do not. Thank you.

COURT REPORTER: All right. Would anyone like to order any transcripts on the record?

MR. RUIZ: We'll take a transcript, regular delivery.

COURT REPORTER: And same for you?

MR. RUIZ: With the two attachments -- the two exhibits attached.

COURT REPORTER: Absolutely.

MS. TSE: What's your standard turnaround time?

COURT REPORTER: Five days.

MS. TSE: Okay. We'll do standard as well. Electronic is fine. We'll be reading and signing.

CERTIFICATE OF COURT REPORTER -- NOTARY PUBLIC

I, Raechel Meyerowich, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness in the foregoing proceedings was duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

Raechel Meyerowich

_______________________________

RAECHEL MEYEROWICH, NOTARY PUBLIC,

FOR THE COMMONWEALTH OF MASSACHUSETTS

CERTIFICATE OF TRANSCRIBER

I, Sandra Ann Masterpole, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding; that said proceedings were reduced to typewriting under my supervision; that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; and that I am neither counsel for, related to, nor employed by any of the parties to the case and have no interest, financial or otherwise, in its outcome.

Sandra Ann Masterpole

_____________________

SANDRA ANN MASTERPOLE

PLANET DEPOS, LLC

JUNE 17, 2026