**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| FIONA TORRES,<br><br>Plaintiff,<br><br>v.<br><br>SOCIETY FOR HUMAN RESOURCE MANAGEMENT,<br><br>Defendant. | Civil Action No. 1:25-cv-2360-PTG-WBP<br><br>Hon. Patricia Tolliver Giles, J.<br>Hon. William B. Porter, M.J. |

**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO EXCLUDE TESTIMONY OF DEFENDANT'S PROPOSED EXPERT**

Defendant Society for Human Resource Management's opposition brief (ECF No. 104) strives impressively, but in vain, to make a successful proffer of expert evidence out of the weak material supplied by Dr. Cooperman. This memorandum sets forth realities of the record that SHRM's best efforts on its expert's behalf cannot overcome.

## I. SHRM's accusations of misrepresentation are refuted by the transcript

SHRM repeatedly accuses Ms. Torres of misrepresenting Dr. Cooperman's deposition testimony, but the transcript of that deposition shows otherwise. Ms. Torres correctly identified gaps in Dr. Cooperman's report, facts he did not investigate, and limits he placed on his own opinions. SHRM's opposition either confirms those limits in the course of protesting against them, or tries without success to recast them as questions of weight rather than expert

qualification under Rule 702. Several of these misplaced accusations are addressed in turn below.

**A. *Dr. Cooperman's report and counsel's disclosure of its scope were not "conflated."***

Contrary to SHRM's characterization, Opposition Memorandum (ECF No. 104) at 10 & n.8, Ms. Torres's opening brief does not "conflate" SHRM's disclosure and Dr. Cooperman's report; it merely compares them and exposes the deficiencies of both. Ms. Torres cited SHRM's counsel-prepared disclosure for exactly what it is: SHRM's notice of the subjects on which it may call Dr. Cooperman. Memorandum Supporting Motion to Exclude (ECF No. 100) at 1, 5. 8. She then measured those promised subjects against the report Dr. Cooperman actually signed and the testimony he actually gave, and found them both wanting: the disclosure for over-promising, and the report and deposition testimony for under-delivering. Memorandum Supporting Motion to Exclude at 2-3. That is not conflation, but proper exposure of the procedural and evidentiary defects in the disclosure, the report, and the proposed expert's testimony.

**B. *Opinion about Ms. Torres's service dog was not supported by expertise or effort warranting expert qualification.***

SHRM answers Ms. Torres's critique of Dr. Cooperman's proffered opinion on diabetes alert dogs by citing his general endocrinology credentials. Ms. Torres does not dispute that Dr. Cooperman is an endocrinologist who has treated diabetics. But Rule 702 and *Daubert* require asking not whether he is an endocrinologist, but whether he had any clinical, experiential, or case-specific basis to opine about the competence, performance, or usefulness of Ms. Torres's service dog. He did not. Dr. Cooperman testified that he developed whatever knowledge he had of diabetic alert dogs in four short days for this case alone. Cooperman Dep. 62:13-20, 63:1-13. He further testified that in his decades of practice he had "never come across a patient who had a

diabetes alert dog," had "no training in diabetes alert dogs," and knew of no endocrinologist who uses them. *Id.* at 63:1-3. The dog-related factual assertions in his report came from the few pieces of medical literature he said "supported his view" about diabetes alert dogs. *Id.* at 164:5-9. And he proffered his anecdotal lack of acquaintance with physicians who worked with their diabetic patients' service dogs as if it were an affirmative, blanket statement that service dogs went against the practice of the entire universe of U.S. endocrinologists, some 11,224 of whom have been board certified in that subspecialty since its certification was first offered in 1972. *See* American Board of Internal Medicine, Endocrinology, Diabetes and Metabolism Subspecialty Board, Spring 2025 statistical report (June 4, 2025), *available at* https://blog.abim.org/endocrinology-diabetes-and-metabolism-board-meeting-summary-spring-2025/#DIPL. Logical fallacies of this sort rise above the level of mere mistakes, and impugn the qualifications of this proposed expert to address the issues at hand in a manner proper under Rule 702.

### C. *Dr. Cooperman declined to opine on essential functions of the job Ms. Torres was offered.*

Ms. Torres did not misstate Dr. Cooperman's testimony on essential functions. He testified that he was asked to comment on whether SHRM's proposed accommodations were appropriate for Type 1 diabetes, but he "did not evaluate whether or not Ms. Torres could perform the essential functions out of that context." *Id.* at 34:14-22. Even assuming that Dr. Cooperman was qualified to opine, as his report stated, that the job SHRM offered Ms. Torres was sedentary office work, did not involve physical exertion or frequent travel, and therefore posed no increased diabetes risk in and of itself, *id.* at 35:12-19, that is not an opinion about Ms. Torres's personal qualifications for the position or ability to perform its essential functions. Nor is it an expert opinion that Ms. Torres could, or could not, perform the job SHRM offered her.

### D. *Dr. Cooperman discounted the letters from Ms. Torres's treating physicians.*

Ms. Torres did not misrepresent Dr. Cooperman's treatment of the physician letters. He testified: "I received those two letters, and I reviewed them. And I was critical of the two letters." Id. 32:15-20. He admitted the letters "supported the use of the diabetes alert dog," but criticized them because they did not document specific episodes or times when Ms. Torres's service dog provided alerts beyond those of her CGM alone. *Id.* at 33:1-16. He said nothing of substance beyond this to justify his discrediting of his fellow endocrinologists' reports, nor did he explain why he would have expected Drs. Joshi and Arminelli to report chapter and verse of Ms. Torres's history of glycemic episodes stretching back long before either of them began treating her. His rather casual rejection of the treating doctors' letters suggests that he was reasoning backward from a desired result, not performing a scientific investigation based on reliable, apposite expertise.

### E. *Lack of opinion on whether diabetes alert dogs are "prescribed or required."*

Dr. Cooperman testified that he was not asked to evaluate whether Ms. Torres's providers prescribed or required a service dog, and that the testimony proposed for him to that effect in SHRM's counsel-drafted disclosure was not in his report. *Id.* at 84:15-22, 85:2-15. He also testified that he was not aware how service dogs are obtained, doubted that prescriptions for diabetes service dogs even exist, and agreed that physicians cannot require patients to obtain treatment in the sense used in SHRM's disclosure. *Id.* at 86:1-18, 87:6-19. His later statement that he saw no recommendation for a service dog in Ms. Torres's medical records—beyond the treating physicians' letters of strong support—permits, at most, a narrow observation about the specific records he reviewed other than those letters. *Id.* at 181:15-22, 182:1-8. It does not

convert his report into a disclosed opinion that no provider "prescribed or required" a service dog for Ms. Torres.

**F. *Testimony on Ms. Torres's "own conduct" deserved criticism.***

Ms. Torres's motion to exclude accurately described Dr. Cooperman's testimony on her "own conduct." He testified that he was not asked, directly or indirectly, to evaluate whether her conduct showed that the service dog was unnecessary as a workplace accommodation. He specifically said he had no opinion on that issue. *Id.* at 118:4-15. When asked what "conduct" his report did address, he identified only the 2017 hypoglycemia episode and resulting automobile accident. *Id.* at 118:16-22. *See* discussion infra at 7; Memorandum Supporting Motion to Exclude at 14 n.5 (pointing out that Dr. Cooperman erroneously assumed that Ms. Torres's dog did not alert in that incident). He then confirmed that was the entire "extent of [her] conduct" that he knew of. *Id.* at 119:1-3. He even admitted that his report did not say—meaning that he cannot testify—that any aspect of Ms. Torres's "conduct" demonstrated that a service dog was unnecessary as a workplace accommodation. *Id.* at 126:1-6. In other words, SHRM's proposed expert was unable to agree in this respect with counsel's theory of the case, and did not accept their suppositions in this regard as fact.

**G. *Testimony on relative effectiveness of alternatives to CGM was absent.***

Dr. Cooperman mentioned "finger-stick" glucose testing, and implanted sensors, only as items he could discuss at trial "if asked." *Id.* at 94:1-12. Regardless of whether he knew his report defined the outer limits of his trial testimony, he admitted that his report did not opine on the adequacy of those or other means of human blood glucose monitoring. *Id.* at 94:13-20. When asked whether, among alternatives to service dogs, his report addressed only CGMs, he answered: "Yes." *Id.* at 95:5-13. He further admitted that his report did not state—meaning he

cannot testify—that other methods met the standard of care or adequately addressed the functional needs associated with diabetes. *Id.* at 113:4-22. SHRM's explanation for why he addressed only CGMs does not make Ms. Torres's statement in this regard any less true.

**H. *Testimony on functional need or effectiveness of service dogs and other alternatives was likewise absent.***

Dr. Cooperman admitted at deposition that his report did not disclose—meaning that he could not give at trial—any meaningful opinion concerning "functional need" for, or absolute or relative "effectiveness" of, any particular glucose monitoring method. When asked what "effective" meant, Dr. Cooperman defined it as reliable and helpful in managing diabetes, then pointed only to the sentence in his report that "continuous glucose monitoring remains a standard for diabetes care." *Id*. 91:12-22, 92:1-4. In other words, in response to this question, Dr. Cooperman retreated to a standard-of-care answer rather than anything directly relevant to the reasonableness of Ms. Torres's requested accommodation. Asked whether his report addressed the effectiveness, reliability, or helpfulness of all alternate methods, he answered "No." *Id.* at 92:5-8. Asked where his report discussed the term "widely accepted," he again pointed only to the same sentence about standard of care. *Id.* at 93:10-18.

**I. *Dr. Cooperman admitted cherry-picking his sources from medical literature.***

Ms. Torres fairly characterized the cherry-picking problem and properly called the Court's attention to it. After listing a few research papers at his deposition, Dr. Cooperman said there were "more," but that "these are the ones that support my position." *Id*. at 61:14-21, 164:5-9. He also said he "only selected a few" papers and did not remember the others. *Id.* at 157:1-17. That testimony supports, rather than refutes, Ms. Torres's cherry-picking concern.

**J. *Dr. Cooperman's record review was abbreviated.***

SHRM is correct that Dr. Cooperman said he "perused" certain medical records for "an hour" as deposition preparation, not necessarily the total time he spent reviewing records for his report. Cooperman Dep. at 21:19-22, 22:1-2. Ms. Torres did not misrepresent this fact. But SHRM's clarification is beside the point: Dr. Cooperman's report still rested on selected excerpts, he did not interview or examine Ms. Torres, and he performed no inquiry whatever into the alert performance of her service dog. He also testified that he did not have Dr. Joshi's deposition transcript when he drafted the report. *Id*. at 21:16-18. The fact remains that his report was based on selected records, not a patient-specific investigation of Ms. Torres's actual experience with her dog.

The transcript also supports Ms. Torres's criticism of Dr. Cooperman's assumptions about her 2017 car accident. He testified, evidently on speculation, that "the alert dog was there and apparently didn't warn her." Cooperman Dep. at 124:13-15. He dug his own hole deeper by volunteering, based on that mistake, that the dog must have contributed nothing. *Id.* at 138:2-19. Yet, in somewhat self-contradictory fashion, he also admitted that a Type 1 diabetic on insulin is at risk for hypoglycemia or hyperglycemia "in every situation," *id*. 156:1-6, and that as to the SHRM job in question, his "human observation" (a phrase whose fair import refers to lay or inexpert opinion) was without knowledge of any particulars of Ms. Torres's physical job situation: her desk location, the surrounding physical layout, or whether help would actually be available if she experienced a sudden glycemic episode. *Id.* at 165:17-22, 166:1-8, 166:14-22, 167:1-7.

SHRM's opposition therefore does not establish any misrepresentation on Ms. Torres's part, but only confirms the gap between SHRM's broad expert disclosure, Dr. Cooperman's sparse report, and the narrower testimony he can actually support.

**II. <u>The defects of the expert report are not cured by deposition</u>**

The two-and-a-half-page report served on May 11, 2026, named not a single academic or research publication as a source for Dr. Cooperman's opinions. This glaring deficiency was among those raised in the motion to strike SHRM's expert designation, filed on May 15, 2026, which was withdrawn only because the Court made known that it would not hear the motion until June 11, 2026, the day of Dr. Cooperman's deposition. By the time of that deposition, still not a single such source for the proffered opinions had been disclosed. Deposition questioning elicited the names of a few articles, but even those were not produced until the day after the deposition, the final day of discovery. To call that disclosure "prompt," Opposition at 11, is to distort the term beyond recognition. "[N]otice in deposition testimony does not render a failure to disclose in the expert report unsurprising or curable, even when that deposition testimony completely covers the material that should have been disclosed." *Samsung Electronics Co., Ltd. v. Nvidia Corp.*, 314 F.R.D. 190, 198 (E.D. Va. 2016), *citing Perkins v. United States*, 626 F. Supp. 2d 587, 591–92 (E.D. Va. 2009); *Zaklit v. Global Linguist Solutions, LLC*, No. 1:14-cv-314, 2014 WL 4925780, at *3 (E.D. Va. Sept. 30, 2014) ("[t]he 1993 amendment to Rule 26 . . . intended an expert's written report to be so detailed and complete that it would 'dispense[ ] with the need to depose the expert,' unlike the former version of the rule"), *citing* Fed. R. Civ. P. 26(a)(2)(B), advisory committee's note to 1993 amendments.

**II. <u>Dr. Cooperman lacks the specific expertise he would need for this case</u>**

Try as it might, SHRM cannot disguise the fact that this expert was retained with mere days left until the expert report and disclosure deadline in this case, and that he acquired

whatever knowledge of diabetes alert dogs he now possesses in the four days it took him to prepare his report. It is no wonder, then, that he could not adequately demonstrate expertise on the issue presented here. Even SHRM's chosen excerpts from Dr. Cooperman's deposition show he stammered through his response to the key question of what studies he relied on. Cooperman Dep. (ECF No. 104-2) at 61:11-21.

The law in our Circuit is clear that expertise must be tied reasonably closely to the issues in the case. *Brainchild Surgical Devices, LLC v. CPA Glob. Ltd*., 144 F.4th 238, 254 (4th Cir. 2025) (holding that the purported expert must have "satisfactory knowledge, skill, experience, training [or] education *on the issue* for which the opinion is proffered"), *quoting Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir. 1989) (emphasis supplied). In *Brainchild,* the court upheld the exclusion of an expert in information technology development—who presumably would have come across plenty of patent matters in his work—because that experience was deemed insufficiently close to patent renewals specifically. Dr. Cooperman's general expertise as a diabetes physician is no closer to the service dog issues before us than the IT development professional's expertise was to patent renewals in *Brainchild.* In short, our Circuit has sent its district courts the clear message that litigation-retained generalists should not simply be presumed to possess the level of particularized knowledge that will aid the jury, rather than confuse or prejudice it, under Rules 702 and 403. *See* Memorandum Supporting Motion to Exclude (ECF No. 100) at 12, *citing Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 391 (D. Md. 2001) (stating that "[t]he fact that a proposed witness is an expert in one area[] does not *ipso facto* qualify him to testify as an expert in all related areas," and collecting cases supporting that proposition), *cited in Kadel v. Folwell*, 100 F.4th 122, 159 (4th Cir. 2024) (*en banc*) ("[m]erely reading literature" about a medical treatment does not qualify someone as an expert

who had no practice experience with that treatment), *vacated on other grounds,* 145 S. Ct. 2838 (2025).

### III. Dr. Cooperman's want of particularized expertise shows in his inappropriate and misleading generalizations of fact

A particularly telling argument in SHRM's opposition is that "the particular performance of Ms. Torres' dog . . . is irrelevant" because Ms. Torres allegedly did not meet Dr. Cooperman's "criteria" for possible DAD use. Opposition Memorandum (ECF No. 104) at 8-9. The argument is circular. Dr. Cooperman did not disclose any such "criteria" in a reliable way. He did not disclose a standard, guideline, protocol, or method for determining when an alert dog is medically indicated for a given diabetes patient. He admitted that the phrases "not medically necessary" and "medically required" are not mentioned in his report, and that he did not want to define "medically required" because he did not use that term. Cooperman Dep. 69:4-70:19, 75:3-76:17.

More basically, however, SHRM's "criteria" argument addresses the wrong question. Ms. Torres does not contend that alert dogs are necessary for all diabetics, or that diabetes alert dogs should replace CGM as any individual's sole method of glucose monitoring. Ms. Torres uses her service dog in conjunction with CGM, as Dr. Cooperman acknowledged. Cooperman Dep. 137:20-138:19. Thus the relevant question is whether Dr. Cooperman is qualified to opine that Meechum, the service dog in this case, provided no functional advantage to Ms. Torres beyond CGM alone—which he claimed, *id.,* even though he did not examine Meechum's alert performance or Ms. Torres's personal experience with diabetes and her own symptoms stretching back to childhood.

Instead, Dr. Cooperman has chosen to generalize about all service dogs for all diabetics, in effect saying no alert dog is ever appropriate for any diabetic, despite his lack of any

experience with or prior knowledge about diabetic alert dogs. He recognizes that performance varies among service dogs, *see* Opposition Memorandum at 20, but misapplies that fact in a hopeless generalization. His acknowledgment that alert effectiveness varies from dog to dog does not prove that any individual dog is ineffective; on the contrary, it forecloses that conclusion as a matter of common sense, and requires knowledge of the individual dog and human-dog pairing. This misuse of the evidence speaks directly to the requirement of *Daubert* that a proposed expert's principles and methods, if any, must apply logically to the facts of the particular case. Fed. R. Evid. 702(d) (requiring that "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case"); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993) (holding that a trial court must assess "whether the reasoning or methodology underlying the testimony is scientifically valid and ... whether that reasoning or methodology properly can be applied to the facts in issue").

## IV. Expert conclusions about the wrong issues must not be permitted to confuse or prejudice the jury

Dr. Cooperman is being introduced to opine on a medical standard of care for diabetics, not a legal opinion about reasonable accommodation. Opposition Memorandum (ECF No. 104) at 23-24. But SHRM argues that Dr. Cooperman's testimony is "highly probative" on the accommodation issue. *Id.* at 23. In other words, SHRM wants to present "standard of care" testimony to persuade the jury that the accommodation Ms. Torres requested was not reasonable. SHRM does not deny that Dr. Cooperman's testimony will be offered precisely to equate one with the other in the jury's mind.

That gives rise to a confusion problem under Fed. R. Evid. 403. A medical standard of care is a measure of physician negligence in the tort sense. An accommodation for disability, to be reasonable in the run of cases, is not limited to the base level of protection that a doctor would

be negligent not to prescribe or recommend, and medical standards of care do not determine whether an ADA failure to accommodate has occurred. *See Bone v. U.N.C. Health Care System,* 678 F. Supp. 3d 660, 690-91 (M.D.N.C. 2023) (effectiveness of an accommodation under the ADA is not measured by medical standards of care); *see also Freilich v. Upper Chesapeake Health, Inc*., 313 F.3d 205, 215 (4th Cir. 2002) (medical malpractice under state tort law does not raise a claim of failure to accommodate under the ADA, since the two are assessed under fundamentally different legal standards).

Indeed, a clinician who testifies that an accommodation is unreasonable because it exceeds a medical standard of care commits two errors: (1) he states a legal conclusion, unhelpful to the trier of fact under Rule 702, *see United States v. McIver*, 470 F.3d 550, 562 (4th Cir. 2006) (testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible), and (2) he states it with regard to the wrong legal standard—a medical negligence test in tort, not a reasonableness test for disability accommodations under the ADA. *Bone*, 678 F. Supp. 3d at 691; *Freilich*, 313 F.3d at 215.

These errors are disqualifying to Dr. Cooperman's trial testimony under both Rule 702(a) and Rule 704. Dr. Cooperman testified that CGM was the "standard of care," that "standard of care equates to being effective," and that it is "widely used and accepted by the medical community as being the best available." Cooperman Dep. 92:9-22, 95:14-17, 161:7-18. He also used the phrase "reasonable accommodation" in his report, although he later claimed he was not using it in a legal sense, but only "as is used by nonlawyers in this medical situation." *Id.* at 153:2-18. He is unwilling and unable to opine on the use of a service dog *or* a CGM *in the workplace* or in the specific role Ms. Torres was selected to perform. This refusal to address how a CGM or a service dog, or in Ms. Torres's case both, would function *in the workplace,* makes

his exclusive focus on a generalized medical "standard of care" even less relevant and more confusing to a jury.

In short, SHRM disclaims any equivalence between the medical negligence question Dr. Cooperman addresses and the employment discrimination issue in the case, but depends on it in substance: by offering his standard-of-care testimony as "probative" of the central accommodation issue. Cooperman Dep. at 23. The testimony at issue would invite the jury to treat the generalized medical standard as the measure of whether Ms. Torres's requested accommodation was reasonable. That is exactly the purpose, impermissible under our cases, for which SHRM would attempt to smuggle it in at trial, and is exactly the reason it should be excluded.

Once those undisclosed, disclaimed, and legally irrelevant opinions are removed, virtually nothing remains of Dr. Cooperman's proposed expert testimony beyond the uncontroversial facts that he treats patients with diabetes and that CGM, despite its known limitations, is one accepted modality for diabetes management. That limited remainder does not justify presenting him to the jury as an expert on Ms. Torres's requested workplace accommodation, her service dog, her ability to perform the job, or the reasonableness of SHRM's response.

## V. <u>Conclusion</u>

The Court's cleanest and fairest choice is to exclude Dr. Cooperman's testimony in its entirety. At a minimum, he should be precluded from testifying about diabetes alert dog performance, the alert effectiveness of the particular service dog in this case, any comparisons between this or any service dog and CGM in detecting abnormal blood glucose levels, any alternative monitoring methods beyond CGM, Ms. Torres's ability to perform essential job

functions, whether her providers prescribed or required a service dog, Ms. Torres's "own conduct," and any equation of medical standard of care or medical necessity with the individualized inquiry that a factfinder must undertake in ADA and VHRA accommodation cases.

Respectfully submitted,



______________________________

Stephen B. Pershing
Virginia Bar No. 31012
Mary E. Kuntz
Virginia Bar No. 76947
Anna Kathryn B. Barry
D.C. Bar No. 1719493
(Admitted *pro hac vice*)
Kalijarvi, Chuzi, Newman & Fitch, P.C.
818 Connecticut Ave. N.W., Suite 1000
Washington, DC 20006
(202) 331-9260
mkuntz@kcnlaw.com
spershing@kcnlaw.com
akbarry@kcnlaw.com

*Attorneys for plaintiff Fiona Torres*

Dated: September 1, 2026

**CERTIFICATE OF SERVICE**

I hereby certify that on this 1st day of September, 2026, a copy of the foregoing was filed with the Court's case management / electronic case filing ("CM/ECF") system, through which it was transmitted to counsel of record for defendant Society for Human Resource Management as follows:

Lauren M. Bridenbaugh
Leslie P. Currie
Tanja L. Darrow (admitted *pro hac vice)*
Tiffany din Fagel Tse
LITTLER MENDELSON, P.C.
1800 Tysons Boulevard, Suite 500
Tysons Corner, VA 22102
lbridenbaugh@littler.com
lcurrie@littler.com
tdarrow@littler.com
ttse@littler.com

________________________________
Stephen B. Pershing