**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

**FIONA TORRES,**

**Plaintiff,**

**v.**

**SOCIETY FOR HUMAN RESOURCE MANAGEMENT,**

**Defendant.**

**Civil Action No. 1:25-CV-02360**

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR NEW TRIAL OR IN THE ALTERNATIVE, MOTION TO ALTER OR AMEND THE JUDGMENT**

Defendant Society for Human Resource Management ("Defendant" or "SHRM"), by and through undersigned counsel, and pursuant to Federal Rule of Civil Procedure 59 ("Rule 59") and Local Civil Rule 7, respectfully submits this Memorandum of Points and Authorities in Support of its Motion for New Trial, or in the Alternative, Motion to Alter or Amend the Judgment because the amount of damages awarded to Plaintiff Fiona Torres ("Plaintiff" or "Ms. Torres") is excessive and not supported by the evidence at trial.

## I. INTRODUCTION

On October 9, 2026, the jury returned its verdict, finding that Defendant violated Plaintiff's rights under the Americans with Disabilities Act ("ADA") and the Virginia Human Rights Act ("VHRA") by discriminating against her based on disability and failing to provide her with a reasonable accommodation. *See* ECF No. 175. With respect to damages, the jury awarded Plaintiff $400,000 in compensatory damages. The Court entered final judgment on October 13, 2026. *See* ECF No. 177. As set forth in detail below, Defendant respectfully moves the Court for an Order granting a new trial under Rule 59(a) because: (1) the entire trial was poisoned by the

introduction of inadmissible evidence and the exclusion of testimony from SHRM's expert witness, Dr. Cooperman, which the Court had previously permitted and went directly to the contested issues of whether Ms. Torres' service dog was a necessary or effective accommodation; and (2) the Court failed to properly instruct the jury on certain requested instructions, which seriously impaired SHRM's ability to conduct its defense. The inconsistency of the verdict, with the jury finding that Ms. Torres had not proven that SHRM failed to engage in "a timely, good faith interactive process," while also finding she had proven that SHRM had failed to "provide her a reasonable accommodation," demonstrates that the errors at the trial were prejudicial and merit a reversal of the verdict and a new trial. In the alternative, Defendant requests the Court alter or amend the judgment under Rule 59(e) because the amount of damages the jury awarded is excessive and not supported by the evidence.

## II. <u>STANDARDS OF REVIEW</u>

### A. <u>Federal Rule of Civil Procedure 59(a)(1)</u>

Following a jury trial, a court "may, on motion, grant a new trial on all or some of the issues . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]" FED. R. CIV. P. 59(a)(1)(A). In the Fourth Circuit, Rule 59 requires district courts to grant a new trial "if (1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Federico v. Mid-Atl. Mil. Fam. Cmty., LLC*, No. 2:12-CV-80, 2016 WL 4472961, at *1 (E.D. Va. Aug. 23, 2016) (quoting *Cline v. Wal–Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998)) (internal quotes omitted). Factors one and two require the Court to make factual determinations. *Id.* (citing *Fairshter v. Am. Nat'l Red Cross*, 322 F. Supp. 2d 646, 650 (E.D. Va. 2004)). The final prong "requires a policy

analysis under which the judge's unique vantage point and day-to-day experience with such matters lend expertise." *Id.* (internal quotes omitted). "Under Rule 59(a) of the Federal Rules of Civil Procedure, a court may order a new trial nisi remittitur if it 'concludes that a jury award of compensatory damages is excessive.'" *Jones v. Southpeak Interactive Corp. of Del.*, 777 F.3d 658, 672 (4th Cir. 2015) (quoting *Sloane v. Equifax Info. Servs., LLC*, 510 F.3d 495, 502 (4th Cir. 2007)). Although there is no specific provision for remittitur under the Federal Rules of Civil Procedure, "it is well established that a remittitur should be ordered when a jury award will result in a miscarriage of justice." *Warren v. Main Indus. Inc.*, No. 4:16-CV-181-RAJ-LRL, 2018 WL 10562387, at *7 (E.D. Va. June 19, 2018)(citing *Cline*, 144 F.3d at 305), *aff'd*, 770 F. App'x 85 (4th Cir. 2019). Accordingly, if a court concludes that a verdict is excessive, "it is the court's duty to require a remittitur or order a new trial." *Id.*

### B. Federal Rule of Civil Procedure 59(e)

Rule 59(e) allows a party to file a motion asking a district court "to alter or amend a judgment . . . no later than 28 days after entry of the judgment." FED. R. CIV. P. 59(e). While the rule itself provides no standard for when a district court may grant such a motion, courts interpreting Rule 59(e) have recognized three grounds for amending an earlier judgment, one of which is "to correct a clear error of law or prevent manifest injustice." *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 378 (4th Cir. 2012); *Warren*, 2018 WL 10562387, at *2.

## III. ARGUMENT

### A. Evidentiary Rulings Warrant a New Trial

Evidentiary rulings are subject to harmless error review, involving a holistic review of the case, to include the error, and finding that "the judgment was not substantially swayed by the

error." *United States v. Cone*, 714 F.3d 197, 219 (4th Cir. 2013) (citing *United States v. Johnson*, 617 F.3d 286, 292 (4th Cir. 2010)). The Court "must be able to 'say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'" *United States v. Ibisevic*, 675 F.3d 342, 350 (4th Cir. 2012) (quoting *United States v. Byers*, 649 F.3d 197, 211 (4th Cir. 2011)). The factors weighing into this determination include: "'(1) the centrality of the issue affected by the error; (2) the steps taken to mitigate the effects of the error; and (3) the closeness of the case.'" *Id.* (quoting *United States v. Ince*, 21 F.3d 576, 583 (4th Cir. 1994)).

### 1. Dr. Armellini's 2019 Note Constitutes Inadmissible Hearsay

Under Federal Rule of Evidence 802, hearsay is inadmissible unless a federal statute, the Federal Rules of Evidence, or other rules prescribed by the Supreme Court provide otherwise. *See* FED. R. EVID. 802. And where an exhibit contains multiple layers of hearsay, each layer must independently satisfy a hearsay exception. *See* FED. R. EVID. 805 ("Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule.").

Under Federal Rule of Evidence 803(6) ("FRE 803(6)"), records that are "kept in the course of a regularly conducted activity of a business," or "business records," may be admissible under an exception to the rule against hearsay. *Cone*, 714 F.3d at 219. "For a record to be admitted as a business record, it must be '(1) made by a regularly conducted business activity, (2) kept in the 'regular course' of that business, (3) 'the regular practice of that business to make the memorandum,' (4) ***and*** made by a person with knowledge or from information transmitted by a person with knowledge.'" *Id.* (citing *Clark v. City of L.A.*, 650 F.2d 1033, 1036-37 (9th Cir. 1981), in turn quoting FED. R. EVID. 803(6)) (emphasis added). FRE 803(6) further requires that each of

the foregoing requirements be "shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification." FED. R. EVID. 803(6)(D); *see also United States v. Bacas*, 662 F. Supp. 2d 481, 486 (E.D. Va. 2009) ("Either 'the custodian or other qualified witness' may lay the foundation for the records' admission" under FRE 803(6)). A "qualified witness" must have "sufficient knowledge of the record-keeping system and the creation of the contested record to establish their trustworthiness." *Rambus, Inc. v. Infineon Techs. AG*, 348 F. Supp. 2d 698, 702 (E.D. Va. 2004) (quoting *United States v. Hernandez*, No. 98-4378, 1998 WL 841504, at *2 (4th Cir. 1998)); *see also United States v. Jacobs*, No. 94–5055, 1995 WL 434827, at *1-2 (4th Cir. 1995) (finding records inadmissible where the witness "did not testify that he was familiar with the creation and maintenance of the records").

Plaintiff did not establish that foundation for Dr. Armellini's purported 2019 note. Instead, she introduced the note as the last page of Plaintiff's Exhibit 46, an email exchange between Ms. Torres and Debbie Zoerkler, SHRM's recruiter. *See* **Exhibit A**, Relevant Excerpts from Oct. 7, 2026 Trial Tr. (AM) 47:2–49:6; *see also* **Exhibit B**, Relevant Excerpts from Oct. 8, 2026 Trial Tr. (AM) 24:7–13. Before offering the exhibit, Ms. Torres testified only that she recognized the exhibit as her "direct exchange with Debbie Zoerkler" and that it was a "true and accurate copy" of their emails. **Ex. A** at 47:2-8. However, when Plaintiff offered the entire exhibit, SHRM specifically objected that it contained "hearsay within hearsay, particularly with respect to the last page." *Id.* at 47:9-12. The Court overruled that objection and admitted the entire exhibit without identifying a hearsay exception applicable to the separately attached medical note. *Id.* at 47:13. But Ms. Torres' testimony established only that the emails were her communications with Ms. Zoerkler; it did not establish that Dr. Armellini's separate statements in the attached note satisfied

a hearsay exception. Indeed, only after the exhibit had already been admitted did Ms. Torres identify the last page as a letter she obtained from Dr. Armellini in November 2019. *Id.* at 48:16–49:4. She further testified that Dr. Armellini had been her endocrinologist in 2019, was no longer her endocrinologist when she applied to SHRM, and that she submitted the letter to SHRM because "[i]t is what I had in my records." *Id.* at 49:1-6. Nothing in that testimony established when or how Dr. Armellini created the note, whether the Endocrine Center (Dr. Armellini's practice) maintained it in the ordinary course of its regularly conducted activity, whether creating such a note was a regular practice of the Endocrine Center, or any other facts concerning the practice's recordkeeping system.

Nor did Plaintiff supply that foundation at trial through testimony from a custodian or other witness familiar with Dr. Armellini's recordkeeping practices, and no Federal Rule of Evidence 902(11) certification from the Endocrine Center was offered as the basis for admission. Rather, Ms. Torres testified only that Dr. Armellini was her endocrinologist in 2019, that she obtained the letter in November 2019, and that she later provided it to SHRM because it was what she "had in [her] records." **Ex. A** at 48:10–49:6; *see also* **Exhibit C**, Pl.'s Ex. 134. The absence of such foundation is particularly significant because the Parties subpoenaed Dr. Armellini's practice, the Endocrine Center, for Ms. Torres' medical records, yet the records produced by the Endocrine Center did not include the 2019 note. *See* **Ex. C**. Instead, the evidence at trial established that Ms. Torres herself possessed the document and later transmitted it to SHRM as an attachment to her email requesting an accommodation. *See* **Ex. A** at 47:2–49:6.

The foundational deficiency was also not cured by Dr. Joshi's testimony. Dr. Joshi testified that she never communicated with Dr. Armellini concerning Ms. Torres' care, that the 2019 letter was the only record from Dr. Armellini that she reviewed, and that she reviewed what Ms. Torres

provided to her, including the 2019 letter. *See* **Exhibit D**, Relevant Excerpts from Oct. 7, 2026 Trial Tr. (PM) 46:17–47:12, 55:16–57:4. Thus, Dr. Joshi likewise could not establish how Dr. Armellini's 2019 note was created or maintained, or whether it constituted a regularly maintained business record of the Endocrine Center.

The distinction is critical. Ms. Torres could testify that Plaintiff's Exhibit 46 accurately reproduced an email exchange that she personally sent and received. However, authenticating that email exchange did not render the separate out-of-court statements contained in Dr. Armellini's attached note admissible for their truth. Indeed, Federal Rule of Evidence 805 requires each layer of hearsay to independently satisfy an exception to the hearsay rule. *See* FED. R. EVID. 805 ("Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule."). Because Plaintiff offered Dr. Armellini's statements as medical evidence concerning Ms. Torres' diabetes and purported need for a service dog, Plaintiff was required to establish a hearsay exception applicable to that separate layer of out-of-court statements. *See id.*

The error was prejudicial. Dr. Armellini's purported note was repeatedly presented to the jury as medical support for Ms. Torres' position that her service dog was necessary to manage her diabetes. *See e.g.*, **Ex. A** at 48:18–49:4; **Ex. D** at 12:4–6, 13:10–17, 47:4–7, 53:6–9, 55:16–20; **Exhibit E**, Relevant Excerpts from Oct. 8, 2026 Trial Tr. (PM) at 19:25–20:7, 81:13–19. Permitting Plaintiff to introduce those medical statements through Ms. Torres allowed the jury to consider purported medical evidence concerning the necessity and effectiveness of her preferred accommodation without the reliability safeguards necessary to establish that the statements fell within an exception to the hearsay rule. SHRM specifically identified this problem when the exhibit was offered, objecting to the "hearsay within hearsay" contained "particularly" in the

attached medical note, but the Court nevertheless admitted the exhibit in full. *See* **Ex. A** at 47:9-12. Because those issues were central to the jury's determination whether SHRM failed to provide a reasonable accommodation, the erroneous admission of the note was not harmless and supports a new trial under Rule 59(a).

#### 2. Dr. Cooperman's Expert Testimony Was Impermissibly Limited to Issues Outside the Scope of the Court's September 24th Order

At trial, the Court erred by excluding important testimony from SHRM's expert, Dr. Cooperman, who SHRM offered as an expert witness in the field of endocrinology. Most troubling, when ruling on Plaintiff's Motion to Exclude Testimony of Defendant's Proposed Expert (ECF No. 99) ("Plaintiff's Motion to Exclude"), the Court found that Dr. Cooperman ***could*** testify about his review of Ms. Torres' medical records and whether an office environment had any impact on Ms. Torres' health as a Type 1 diabetic, per his review of her medical records and the job description for the position SHRM offered Ms. Torres. *See* ECF No. 131; *see generally* **Exhibit F**, Relevant Excerpts from Sept. 22, 2026 Hearing Tr. At trial, however, the Court significantly limited Dr. Cooperman's expert testimony on a number of topics vital to SHRM's case. This was a clear error because the testimony went directly to contested issues about Ms. Torres' medical status as a Type 1 diabetic, the risks associated with the position SHRM offered her, and whether that position provided an environment in which she could safely manage her diabetes without a service dog. *See* **Exhibit G**, Dr. Cooperman's Report.

SHRM's expert report specifically discussed a number of topics important to SHRM's defenses. *Id.* To start, the report provided that Ms. Torres' medical records showed "no history of hypoglycemic unawareness or seizures." *Id.* at 2. Next, Dr. Cooperman reported that he reviewed SHRM's Senior Specialist Product Management job description and that, per his review, "her job description does not entail physical exertion or frequent travel" and "is sedentary in an

office environment[,]" meaning "there is no increased risk of diabetes hypoglycemia or hyperglycemia." *Id.* at 1-2; *see also id.* at 3 ("Her job is sedentary in an office environment where human observation and intervention is available."). This was relevant to SHRM's defense because it demonstrated that Ms. Torres' diabetes could be managed through a range of accommodations, not only a service dog. *See id.*

Ahead of trial, on August 12, 2026, Plaintiff moved to exclude Dr. Cooperman's testimony in full. *See* ECF No. 99. At the September 22, 2026 hearing on Plaintiff's Motion to Exclude, the Court ruled that Dr. Cooperman ***could*** testify about his review of Ms. Torres' medical records, including whether there was any indication that she suffered from hypoglycemia or hypoglycemic unawareness. *See* **Ex. F** at 21:5-22:22. Specifically, the Court expressly ruled that Dr. Cooperman could testify at trial concerning his disclosed opinion that "[t]here are no reports of diabetic ketoacidosis, emergency room visits for hypoglycemia, hyperglycemia, or diabetic complications in adulthood. Ms. Torres has not suffered seizures." *Id.* at 22:12-22; *see also* **Ex. G** at 2. During the hearing, the Court also clarified that Dr. Cooperman ***could*** also testify about his review of the job description at issue, as he identified the job description in his report as a document he reviewed to form his opinions, including whether the Senior Specialist "job is sedentary in an office environment where human observation and intervention is available." **Ex. F** at 43:19-44:13; *see also id.* at 44:10-11 ("What's on this paper he can say: Her job is sedentary in an office."). With this ruling in hand, SHRM prepared its trial defense expecting to rely on Dr. Cooperman's testimony to establish that a service dog was not the only way Ms. Torres could safely manage her diabetes in the workplace, including his opinions regarding her successful use of a continuous glucose monitor and the availability of adjustments to that device to provide earlier warnings of falling glucose levels. *See e.g.,* **Ex. E** at 60:18–61:25, 67:14–74:10, 91:14–93:13. That testimony

was particularly relevant because Dr. Cooperman identified that activities with restrictions on food or water and with increased physical activity as circumstances that could increase the risks associated with Type 1 diabetes, while the position SHRM offered Ms. Torres was a sedentary office position. *Id.* at 83:10–20; *see also* **Ex. F** at 43:19–44:13.

But then, at trial, the Court contradicted its prior ruling, and barred Dr. Cooperman from testifying about two key inquiries that it previously ruled as permissible: (1) what hypoglycemic unawareness was and his observations about whether Ms. Torres' medical records reflected that she had experienced it, *see* **Ex. E** at 66:1-17; and (2) his understanding of the position SHRM offered Ms. Torres and the impact, if any, a sedentary office position may have on the management of her Type 1 diabetes, per his review of the job description, *see id.* at 83:5-20, 84:7-10. The exclusion of this testimony was particularly prejudicial to SHRM because both subjects address Ms. Torres' own testimony concerning the risks associated with her diabetes and the measures available to address those risks. *See Graves v. Lioi*, 930 F.3d 307, 318 (4th Cir. 2019) ("The law-of-the-case doctrine recognizes that 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'") (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)).

First, by precluding any testimony concerning Dr. Cooperman's findings on whether he reviewed any medical records demonstrating Ms. Torres experienced hypoglycemic unawareness, the Court prevented Dr. Cooperman from offering medical testimony that would have directly addressed Ms. Torres' description of her alleged severe hypoglycemic episodes. Although Ms. Torres did not use the medical term "hypoglycemic unawareness," she testified during her examination that a "life-threatening event caused by low blood sugar" occurs when she is "blacked out unconscious from hypoglycemic or low blood sugar which requires emergency glucagon[.]"

*See* **Exhibit H**, Relevant Excerpts from Oct. 6, 2026 Trial Tr. (PM) at 86:3-12; *see also id.* at 87:10-21 (testifying that she has to administer emergency glucagon "at minimum ten times a year" or "at least 30 times a year" when she "would face these severe hypoglycemic episodes"). Those symptoms are consistent with severe hypoglycemia, and the ability to perceive warning symptoms of an approaching hypoglycemic episode bear directly on whether a patient experiences hypoglycemic unawareness. Thus, Dr. Cooperman's review of whether Ms. Torres' medical records documented hypoglycemic unawareness was directly relevant to evaluating her testimony concerning the nature and severity of her hypoglycemic episodes. By preventing Dr. Cooperman from offering that testimony, the Court deprived SHRM of medical evidence bearing on whether Ms. Torres' medical history was consistent with her trial testimony and, in turn, SHRM's assessment of the accommodation she requested.

Second, the Court likewise prevented Dr. Cooperman from explaining the significance of the position SHRM offered Ms. Torres based on his review of the job description and her medical records. His report specifically opined that "[h]er job is sedentary in an office environment where human observation and intervention is available." **Ex. G** at 3. That opinion was directly relevant to SHRM's defense that Ms. Torres could safely manage her diabetes in the offered position without her preferred accommodation. Indeed, SHRM's decisionmaker testified that the Company proposed alternative accommodations intended to create an environment in which Ms. Torres could effectively manage her diabetes, including unrestricted use of her CGM, breaks as needed to monitor her blood sugar, flexible leave, and ready access to food, drink, insulin, and refrigeration. *See* **Ex. E** at 31:16–34:4, 45:17–46:14.

Dr. Cooperman's medical testimony would have provided further context for why the nature of that work environment mattered. He testified that activities that could increase the risks

associated with Type 1 diabetes include activities with restrictions on access to food or water and increased physical activity. *See* **Ex. E** at 83:10–15. But when SHRM immediately asked Dr. Cooperman to explain the impact of a sedentary office position on the management of Type 1 diabetes, the Court sustained Plaintiff's objection and prevented him from answering. *Id.* at 83:16–20; *see also id.* at 83:25-84:6.

That testimony also would have complemented Ms. Torres' own testimony that one precaution she takes in her personal life is ensuring another person is present who could detect and respond if she became unconscious from hypoglycemia. *See* **Ex. H** at 86:3-12. Dr. Cooperman's disclosed opinion that the offered position was both sedentary and located in an office where human observation and intervention were available therefore bore directly on SHRM's defense that Ms. Torres could safely manage her diabetes through accommodations other than her preferred accommodation of a service dog. *See* **Ex. G** at 2; *see also* **Ex. F** at 43:19–44:13 (ruling, Dr. Cooperman could testify concerning the job description, including that "[h]er job is sedentary in an office").

These exclusions were not peripheral; they went to the heart of SHRM's defense. Ms. Torres was permitted to present the jury with her own account of the severity and frequency of her hypoglycemic episodes and the measures — including workplace accommodations — she believed necessary to manage those risks. *See e.g.*, **Ex. H** at 86:3-12, 87:10-21. Yet, at trial, after an objection from Ms. Torres, SHRM was prevented from presenting its properly disclosed medical expert's opinions addressing those very same issues, including whether Ms. Torres' medical records corroborated her account and whether the position SHRM offered provided an environment in which those risks could be safely managed. The result was a fundamentally one-sided presentation of critical medical evidence: the jury heard Ms. Torres' description of the risks

posed by her diabetes but was denied the expert testimony SHRM relied on to test, contextualize, and directly rebut that account. Given that these issues bore directly on a central question in the case — whether SHRM offered Ms. Torres a reasonable accommodation — excluding Dr. Cooperman's testimony, particularly after the Court previously ruled that he could testify concerning these disclosed opinions, substantially impaired SHRM's ability to present a full and fair defense. That prejudice was neither harmless nor collateral to the verdict and warrants a new trial under Rule 59(a).

### B. <u>Specific Jury Instructions Warrant a New Trial</u>

In the Fourth Circuit, district courts "'commit[] reversible error in refusing to provide a proffered jury instruction only when the instruction (1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired the defendant's ability to conduct [its] defense.'" *Worldwide Network Servs., LLC v. Dyncorp Int'l, LLC*, 365 F. App'x 432, 439 (4th Cir. 2010) (quoting *United States v. Passaro*, 577 F.3d 207, 221 (4th Cir. 2009)).

#### 1. The Court Failed to Properly Instruct the Jury with Respect to Qualified Individual and the Good Faith Interactive Process

According to the Fourth Circuit, "[t]o plead a claim of disability discrimination under the ADA, a plaintiff must allege that[:] (1) she had a disability as defined in the ADA; (2) she was a 'qualified individual,' i.e., able to perform the essential functions of her job with or without reasonable accommodation; and (3) her employer took an adverse action against her on account of her disability." *Craddock v. Lincoln Nat. Life Ins. Co.*, 533 F. App'x 333, 336 (4th Cir. 2013).

Regardless of the theory of disability discrimination alleged, a plaintiff must first establish that she is a "qualified individual." *Hall Haggins v. Wilson Air Ctr., LLC*, 163 F.4th 872, 877 (4th Cir. 2026). Thus, "whether characterized as a failure to accommodate or general disability

discrimination, an ADA claimant . . . must be someone 'who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.'" *Id.* (quoting 42 U.S.C. § 12111(8)). If a plaintiff cannot make that threshold showing, the ADA's protections do not apply. *Id.* at 880 ("That means she is not a qualified individual, rendering the ADA's protections inapplicable."). Relatedly, "implied in the definition of a 'qualified individual' is a reciprocal obligation between the employee and employer to engage in a good faith, collaborative search for a reasonable accommodation." *Id.* at 878; *see also Martin v. Networks Presentations, LLC*, No. ELH-25-3473, 2026 WL 2103589, at *29 (D. Md. July 21, 2026).

Despite the foregoing, the Court failed to properly instruct the jury on an essential, threshold element of Plaintiff's claims under Counts I and II: that Plaintiff needed to prove that she was a "qualified individual" ***before*** she could prevail on either (1) her disability-discrimination theory that SHRM rescinded her job offer because of its need to accommodate her disability; or (2) her failure-to-accommodate claim. *See* ECF No. 173-5 at 13 (Jury Instruction No. 11); *see also id.* at 19 (Jury Instruction No. 17). The Fourth Circuit has made unmistakably clear that "[n]o matter the type of discrimination alleged, the employee must show first that she is a 'qualified individual.'" *Hall Haggins*, 163 F.4th at 877 (quoting *Sieberns v. Wal-Mart Stores, Inc.*, 125 F.3d 1019, 1022 (7th Cir. 1997)).

The jury instructions created reversible error because they did not instruct the jury to first make that threshold finding of whether Ms. Torres had proven her claims. Neither Jury Instruction No. 11, which enumerated the elements of Plaintiff's disability-discrimination claim, nor Jury Instruction No. 17, which enumerated the elements of Plaintiff's failure-to-accommodate claim, instructed the jury that Plaintiff first had to prove that she was a "qualified individual." *See* ECF

No. 173-5 at 13, 19. Although the Court separately provided the jury with a definition of "qualified individual" in Jury Instruction No. 13, that instruction did not tell the jury that satisfying that definition was a prerequisite to liability under Counts I and II. *See id.* at 15. Thus, nothing in the instructions required the jury to first determine that Plaintiff satisfied this essential element of her claims before finding SHRM liable on either theory.

The instructions were further deficient because they divorced the "qualified individual" inquiry from Plaintiff's own reciprocal obligations in the accommodation process. The Fourth Circuit has explained that "implied in the definition of a 'qualified individual' is a reciprocal obligation between the employee and employer to engage in a good faith, collaborative search for a reasonable accommodation." *Hall Haggins*, 163 F.4th at 878 (quoting *Anderson v. Diamondback Inv. Grp., LLC*, 117 F.4th 165, 181 (4th Cir. 2024)). That obligation matters because an employee cannot place the entire burden of identifying and implementing an accommodation on the employer. *See Tarquinio v. Johns Hopkins Univ. Applied Physics Lab*, 141 F.4th 568, 575 (4th Cir.) ("Neither the employer nor the employee can rest on a breakdown in the interactive process without connecting that breakdown to an element of failure-to-accommodate liability."), *cert. denied sub nom. Tarquinio v. Johns Hopkins Univ. Applied Physics Lab.*, 146 S. Ct. 367 (2025). In *Hall Haggins*, for example, the Fourth Circuit emphasized the employee's failure to cooperate and communicate during the interactive process showed that she fell outside the ADA's definition of a qualified individual. *Hall Haggins*, 163 F.4th at 888. Yet, Jury Instruction No. 13 (defining a "qualified individual") failed to explain that Plaintiff's own good-faith participation bore on whether she qualified for the ADA's protection in the first instance.

The resulting error went to the heart of the verdict. The jury was permitted to impose liability on SHRM for disability discrimination without being required to find that Plaintiff

satisfied the threshold statutory requirement necessary to invoke the ADA's protections. A stand-alone definition of "qualified individual" could not cure that omission when the instructions identifying the elements that Ms. Torres had to prove to establish liability failed to instruct the jury that Ms. Torres needed to prove her status as a qualified individual before making a finding on SHRM's actions. Nor did the instructions permit the jury to assess Plaintiff as a qualified individual under the complete Fourth Circuit standard, including her reciprocal obligation to participate in good faith in the interactive process to find a reasonable accommodation. That error substantially prejudiced SHRM and warrants a new trial under Rule 59(a).

**2. The Court Failed to Properly Instruct the Jury with Respect to Business Judgment**

The ADA provides that "in any determination of a position's essential functions, 'consideration shall be given to the employer's judgment,'" which is "the judgment of the entity that defined the employee's role in the first place." *Elledge v. Lowe's Home Ctrs., LLC*, 979 F.3d 1004, 1009 (4th Cir. 2020) (quoting 42 U.S.C. § 12111(8)); *see also Hannah v. United Parcel Serv., Inc.*, 72 F.4th 630, 636 (4th Cir. 2023) ("[T]he inquiry into essential functions is not intended to second guess an employer's business judgment with regard to production standards, whether qualitative or quantitative, nor to require employers to lower such standards[.]"). In fact, it is the employer's judgment — and not that of the Court's or jury's — that governs, as long as the employer's decision was not "motivated by discrimination." *Deines v. Tex. Dep't of Protective & Regul. Servs.*, 164 F.3d 277, 281 (5th Cir. 1999); *see also DeJarnette v. Corning Inc.*, 133 F.3d 293, 298-99 (4th Cir. 1998) (noting, courts do not sit as "super-personnel department[s] weighing the prudence of employment decisions made by firms charged with employment discrimination").

With this backdrop in mind, district courts have found the inclusion of a business judgment jury instruction to be proper in ADA employment discrimination cases. *See e.g., Hancock v. Wash.*

*Hosp. Ctr.*, 13 F. Supp. 3d 1, 14 (D.D.C. 2014) (denying plaintiff's motion for new trial on her ADA claim and holding the trial court's jury instruction on an employer's business judgment, which was derived from Third Circuit Pattern Jury Instructions for Employment Claims under the ADA, was not prejudicial to the plaintiff or inappropriate), *aff'd*, 618 F. App'x 4 (D.C. Cir. 2015). District courts have also held "that employers have the right to have juries instructed on the business judgment rule in employment discrimination cases and that such instructions do not prejudice the employee." *Haffke v. Signal 88, LLC*, 947 N.W.2d 103, 114 (Neb. 2020) (collecting cases). In fact, courts have "held that in employment discrimination cases, a business judgment instruction is 'crucial to a fair presentation of the case.'" *Id.* (*Stemmons v. Mo. Dep't of Corr.*, 82 F.3d 817, 819 (8th Cir. 1996)).

SHRM requested instructions addressing both principles. First, in its Second Revised Proposed Instruction No. 18, SHRM requested an instruction explaining that, in determining whether a particular job function was essential, the jury should consider, among other factors, "[t]he employer's judgment as to which functions are essential[.]" ECF No. 169 at 20. SHRM supported that requested instruction with, among other authorities, *Elledge*, Fourth Circuit cases addressing reasonable accommodation, the Eleventh Circuit Pattern Civil Jury Instructions, and an instruction previously given in the Eastern District of Virginia. *Id.*

Second, SHRM separately requested a standalone business-judgment instruction. Its Second Revised Proposed Instruction No. 36 would have instructed the jury that "SHRM's business judgment is not on trial," that federal antidiscrimination laws "are not intended to be vehicles for second-guessing an employer's business decisions," and that the jury should not "substitute [its] own judgment for SHRM's judgment." ECF No. 169 at 40. Notably, the proposed instruction explained that even if the jury believed SHRM "exercised poor or questionable business

judgment," or would have made a different decision itself, it could not find for Ms. Torres unless she proved that SHRM's decision violated the law. *Id.* SHRM supported that instruction with Fourth Circuit authority, including *DeJarnette & Staley v. Gruenberg*, 575 F. App'x 153, 156 (4th Cir. 2014), as well as decisions from other circuits applying the same principle. *Id.*

The Court's refusal to give SHRM's Second Revised Proposed Instruction No. 36 was particularly prejudicial because SHRM's exercise of business judgment was woven throughout the liability issues the jury was asked to decide. SHRM maintained that it offered Ms. Torres alternative accommodations that would enable her to manage her diabetes in the offered position, engaged her in the interactive process, and remained willing to discuss additional alternatives, but ultimately rescinded the offer after waiting approximately a week and a half without receiving a response to its latest proposals and because it had a business need to fill the position. *See* **Ex. E** at 31:16-34:4, 39:14-42:11, 45:17-47:17. Indeed, in requesting the business-judgment instruction, SHRM expressly explained its concern that the jury might substitute its own judgment for SHRM's merely because it believed SHRM could have allowed the service dog or disagreed with whether SHRM's decisions were "fair or the right decision." *Id.* at 128:25-129:3. Without the proposed instruction, however, the jury was never told that it could not impose liability merely because it disagreed with SHRM's business decisions or believed SHRM should have handled the circumstances differently.

That omission was consequential. Instead of following the law as provided by the Fourth Circuit, the jury was left free to evaluate SHRM's conduct through the lens of what it believed SHRM *should* have done, rather than the legally relevant question of whether SHRM's decisions violated the ADA. In other words, without the requested business-judgment instruction, the jury could effectively substitute its own judgment for SHRM's regarding the reasonableness of the

accommodations SHRM offered. And the omission struck directly at SHRM's ability to present its theory of defense. Instruction No. 36 would have properly focused the jury's scrutiny on the question the jury had to decide: did SHRM violate the law, instead of whether the jurors themselves would have made a different decision? By refusing that instruction, the Court deprived SHRM of an instruction supported by Fourth Circuit law and necessary to prevent precisely the type of second-guessing prohibited by *DeJarnette*. Because that omission permitted the jury to impose liability based on its disagreement with SHRM's business judgment rather than a proper application of the governing discrimination standards, it seriously impaired SHRM's defense and warrants a new trial under Rule 59(a).

### C. <u>**The Jury's Findings Regarding the Interactive Process Confirm the Prejudicial Effect of the Errors at Trial**</u>

The jury's findings further demonstrate the prejudicial effect of the evidentiary and instructional errors discussed above. Although the jury ultimately found that SHRM failed to reasonably accommodate Ms. Torres under the ADA (Count II), it separately found that Ms. Torres had not proven that SHRM failed to participate in "a timely, good faith process" to identify a reasonable accommodation (Count IV). ECF No. 175 at 1–2. Those findings are significant because the interactive process is the mechanism through which an employer and employee work to identify an appropriate reasonable accommodation. *See* 29 C.F.R. § 1630.2(o)(3) ("To determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the individual with a disability in need of the accommodation."); *see also Tarquinio*, 141 F.4th at 575 ("Neither the employer nor the employee can rest on a breakdown in the interactive process without connecting that breakdown to an element of failure-to-accommodate liability."). Indeed, the Fourth Circuit has characterized the interactive process as a collaborative mechanism for determining whether an effective

accommodation exists, while recognizing reciprocal obligations on the part of the employee and employer. *See id.*

The jury's finding on the interactive process therefore bears directly on the central dispute underlying Ms. Torres' ADA failure-to-accommodate claim: whether SHRM acted reasonably in responding to Ms. Torres' request for a service dog and proposing alternative accommodations that SHRM believed would effectively permit her to manage her diabetes at work. The evidence showed that SHRM considered Ms. Torres' request, proposed multiple alternative accommodations, sought additional information and input from Ms. Torres, and remained willing to continue the interactive process. *See* **Ex. E** at 29:1-34:4, 39:14-42:11, 45:17-47:17. As SHRM's decisionmaker explained, the proposed accommodations were intended to provide Ms. Torres an environment in which her continuous glucose monitor could work more effectively and included unrestricted use of that device, breaks as needed to monitor her blood sugar, flexible leave, and ready access to food, drink, insulin, and refrigeration. *Id.* at 31:16-34:4, 45:17-47:17. SHRM remained willing to continue discussing potential accommodations even after the process stalled but ultimately rescinded the offer after waiting approximately a week and a half without receiving a response to its latest proposals and because it had a business need to fill the position. *Id.* at 39:14-42:11. Consistent with this evidence, the jury expressly found that Ms. Torres failed to prove that SHRM did not participate in that process in a timely, good-faith manner. ECF No. 175 at 2.

That finding is particularly significant because the ADA did not give Ms. Torres the unilateral right to select her preferred accommodation simply because she requested it. *See Redding v. Noem*, 168 F.4th 203, 207 (4th Cir. 2026), *cert. denied*, 2026 WL 2976631 (Oct. 5, 2026). An employee's dissatisfaction with an effective accommodation does not itself establish

the employer failed to accommodate the employee, and an employee may not dictate which accommodation an employer must provide. *Id.*; *see also* EEOC Interpretive Guidance on Title I of the Americans with Disabilities Act, 29 C.F.R. pt. 1630 app. (providing, the employer has the "ultimate discretion to choose between effective accommodations" and "may choose the less expensive accommodation or the accommodation that is easier for it to provide"). The interactive process instead contemplates "some give and take among the parties" and "some mutual recognition that the perfect may be the enemy of the good." *Redding*, 168 F.4th at 207; *see also Adams v. Anne Arundel Cnty. Pub. Schs.*, 789 F.3d 422, 433 (4th Cir. 2015) (explaining, the ADA requires a "'reasonable' accommodation, not a perfect one").

The jury's finding that SHRM participated in a timely, good-faith interactive process is powerful evidence supporting SHRM's defense and must be considered in assessing whether the evidentiary and instructional errors described above substantially affected the jury's verdict on Ms. Torres' ADA failure-to-accommodate claim. The jury accepted that SHRM participated in a good-faith interactive process designed to identify an effective accommodation yet found SHRM liable for failing to accommodate Ms. Torres after the Court prevented SHRM from presenting important medical evidence bearing on whether Ms. Torres could safely manage her diabetes through accommodations other than a service dog. *See* **Ex. E** at 60:18–61:25, 67:14–74:10, 83:10–84:6, 91:15–93:12. The jury likewise reached that conclusion without SHRM's requested business-judgment instruction, despite SHRM expressly warning that, absent such an instruction, the jury could substitute its own judgment for SHRM's merely because it believed SHRM could have allowed the service dog or disagreed with whether SHRM's decisions were "fair or the right decision." *Id.* at 128:25–129:3.

Viewed together, the jury's divergent findings reinforce that these errors were not harmless. The jury accepted that SHRM participated in the interactive process in a timely and good-faith manner, yet SHRM was prevented from presenting evidence explaining why it believed its proposed alternatives would effectively accommodate Ms. Torres, and the jury was therefore unable to consider that evidence in evaluating the reasonableness of SHRM's response to her accommodation request. The jury was also not given SHRM's requested business-judgment instruction addressing the risk that it could impose liability based merely on disagreement with SHRM's business decisions. Particularly given the centrality of the reasonable-accommodation issue, those circumstances provide substantial reason to conclude that the errors affected the jury's resolution of Ms. Torres' accommodation claim. *See Cone*, 714 F.3d at 219 (harmless-error analysis considers whether "the judgment was not substantially swayed by the error"); *Ibisevic*, 675 F.3d at 350 (identifying "the centrality of the issue affected by the error," mitigation of the error, and "the closeness of the case" as relevant considerations). Accordingly, the jury's findings provide additional confirmation that the evidentiary and instructional errors substantially prejudiced SHRM and warrant a new trial under Rule 59(a).

**D. <u>Excessive Damages Warrant a New Trial or Remittitur</u>**

At the close of trial, the jury awarded Plaintiff $400,000 in compensatory damages for emotional distress damages. Even if the jury correctly found SHRM liable under the ADA and/or the VHRA (it did not), this award was not supported by the evidence presented at trial and far exceeds what courts have deemed permissible, given that the award was untethered from the facts adduced at trial and far exceeds damages awards that courts have found excessive in the Fourth Circuit. To determine whether a jury award should stand, a "comparison of the factual record and the verdict" is required "to determine their compatibility." *Cline*, 144 F.3d at 305.

Accordingly, the damages award warrants a new trial or, at a minimum, remittitur.

**1. Ms. Torres Did Not Provide Sufficient Evidence to Support Her Emotional Damages Award**

The Fourth Circuit has held that a jury award should not stand if "no substantial evidence is presented to support it . . . ." *Barber v. Whirlpool Corp.*, 34 F.3d 1268, 1279 (4th Cir. 1994) (internal cites omitted). "Compensatory damages for emotional distress must be proven by competent, sufficient evidence." *Saleh v. Upadhyay*, 11 F. App'x 241, 261 (4th Cir. 2001). Indeed, the Fourth Circuit has found the need for a new trial, or reconsideration of the jury award, where the evidence is not "proportional to the actual injury incurred" by a plaintiff. *Hetzel v. Cnty. of Prince William*, 89 F.3d 169, 171, 173 (4th Cir. 1996); *see also Cline*, 144 F.3d at 305-06 (reducing jury award for compensatory damages where there was "no evidence" that plaintiff's emotional trauma was persistent, affected his job performance, required him to seek counseling, or caused any physical symptoms). "A plaintiff seeking compensatory damages for emotional injuries cannot rely on 'conclusory statements that the plaintiff suffered emotional distress [or] the mere fact that a constitutional violation occurred,' but, rather, 'the testimony must establish that the plaintiff suffered demonstrable emotional distress, which must be sufficiently articulated.'" *Knussman v. Md.*, 272 F.3d 625, 640 (4th Cir. 2001) (quoting *Price v. City of Charlotte*, 93 F.3d 1241, 1254 (4th Cir. 1996)). This is because emotional distress is "essentially subjective," *Carey v. Piphus*, 435 U.S. 247, 264 n.20 (1978), but when that subjective assessment is excessive, it may be cause for a new trial, or a reduction of the award.

Here, the jury's award of $400,000 in compensatory damages was excessive and untethered to the evidence presented. Ms. Torres cannot dispute that she did not present any independent or corroborating testimony to support her assertion of emotional suffering and failed to "reasonably and sufficiently explain the circumstances of [the] injury and not resort to mere conclusory

statements." *Sloane*, 510 F.3d at 503 (quoting *Price*, 93 F.3d at 1251). To the contrary, the only evidence Plaintiff offered regarding her purported emotional distress "consisted almost exclusively of [her] own brief, conclusory statements." *Hetzel*, 89 F.3d at 171; *see e.g.*, **Ex. A** at 79:24-81:17. At trial, Ms. Torres presented no corroborating testimony or medical or psychological records that would support a compensatory damages award of $400,000. The absence of such supporting evidence stands in contrast to the size of the award and confirms that the verdict was driven by emotion rather than proof.

In cases where the Court has found a plaintiff offered sufficient evidence to support the jury's compensatory damages award, plaintiffs testified to the "specific nature of [their] 'emotional pain, suffering, inconvenience, mental anguish, [and] loss of enjoyment of life,'' and often corroborated their claims with testimony and evidence from "medical professionals." *See e.g.*, *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 180 (4th Cir. 2001). For example, in *Fox*, the plaintiff testified that he "suffered anxiety, severe depression, and a worsening of his already fragile physical condition as a result of the constant harassment and humiliation he experienced at the hands of his supervisors at GM." *Id.* Further, both of the *Fox* plaintiff's neurologist and psychiatrist "offered testimony that supported these claims." *Id.* Other cases make clear that "[t]he plaintiff must also 'show a causal connection between the violation and her emotional distress.'" *Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 547 (4th Cir. 2003) (internal cites omitted). In *Bryant*, the Court upheld a compensatory damages award of "$50,000," in part, because in addition to testifying specifically about her emotional state, the plaintiff "also testified that this distress inflicted a series of specific physical ailments on her: frequent headaches, insomnia, irregular menstrual cycles, nausea, [and] vomiting," and the plaintiff "was herself a medical professional whose opinion as to her own condition the jury was entitled to consider." *Id.* at 547 (internal cites

omitted). And in *Sloane*, the Court determined that emotional distress damages of $245,000 should be remitted to $150,000 because the plaintiff "presented almost no evidence at trial to suggest that [defendant's actions] resulted in harm to her reputation, and it appears that few people beyond [the plaintiff's] family" knew of the emotional harm the plaintiff suffered. 510 F.3d at 506. But, the $150,000 award was proper because the plaintiff presented "extensive corroboration . . . concerning the many months of emotional distress, mental anguish, and humiliation [she] suffered." *Id.* at 506–07.

Ms. Torres, on the other hand, presented no such specific or corroborating testimony at trial. Her evidence cannot therefore sustain the excessive compensatory damages award.

**2. A New Trial Is Required Because the Compensatory Damages Award Was So Excessive That It Shocks Judicial Conscience, As Shown by Awards in Similar Cases**

The Fourth Circuit has also held that a jury award will not stand if it is "grossly excessive or shocking to the conscience." *Fox*, 247 F.3d at 180. "In practice, our evaluation of what a jury could have awarded is tied to awards in cases with similar injuries. This comparison is limited to cases in the relevant jurisdiction." *Salinas v. O'Neill*, 286 F.3d 827, 831 (5th Cir. 2002) (internal cites omitted); *Hetzel*, 89 F.3d at 172 ("That this award is outrageous is confirmed by even a cursory analysis of the impressive array of cases cited by the appellee in support of the jury verdict."); *Scala v. Moore McCormack Lines, Inc.*, 985 F.2d 680, 684 (2d Cir. 1993) ("In determining whether a particular award is excessive, courts have reviewed awards in other cases involving similar injuries, bearing in mind that any given judgment depends on a unique set of facts and circumstances.") (internal cites omitted); *Wulf v. City of Wichita*, 883 F.2d 842, 875 (10th Cir. 1989) ("[W]hile comparisons with other cases are not dispositive, . . . [o]ur review of the

record, informed by a review of awards granted in other comparable cases, indicates that the award [was excessive].").

Moreover, Plaintiff's $400,000 compensatory-damages award parallels the types of compensatory damages awards the Fourth Circuit has historically found excessive. For example, in *Bennett v. Fairfax County*, this Court remitted the plaintiff's jury award for compensatory damages from $540,000 to $50,000, reasoning the original award was not proportional to the plaintiff's actual injury. 432 F. Supp. 2d 596, 605-06 (E.D. Va. Apr. 25, 2006). Furthermore, in *Cline*, the Fourth Circuit reduced a plaintiff's compensatory damages award from $117,500 to $10,000, granting a new trial *nisi* remittitur at the plaintiff's option. 144 F.3d at 306. Similarly, the *Hetzel* Court set aside the plaintiff's jury award of $500,000 in compensatory damages on the basis that it found the award "grossly excessive when compared to the limited evidence of harm presented at trial[,]" which "consisted almost exclusively of [plaintiff's] own brief, conclusory statements." *Hetzel*, 89 F.3d at 171, 173. Indeed, the Fourth Circuit remanded "the case to the district court for recalculation of the award of damages for emotional distress." *Id.* at 173. Moreover, in *Saleh*, the Fourth Circuit found the jury award of $150,000 in compensatory damages for emotional distress to be excessive where the plaintiff "presented no medical evidence to corroborate his testimony about the emotional distress he endured." *Saleh*, 11 F. App'x at 263. The *Saleh* Court also found that where a plaintiff relies solely on her own testimony to support an award of compensatory damages, "that testimony must competently demonstrate a 'genuine injury.'" *Id.* Because the Court found the *Saleh* plaintiff failed to do so, it reduced the award for compensatory damages for emotional distress from $150,000 to $75,000 and granted a new trial *nisi* remittitur at the plaintiff's option. *Id.*

In light of the foregoing and given the excessiveness of this verdict, the Court should vacate the verdict and order a new trial.

### E. <u>This Court May, As an Alternative to a New Trial, Offer a Remittitur</u>

Although Defendant moves for a new trial in this matter, as the compensatory damage award is excessive and unsupported by the evidence, this case easily meets the standard for substantial remittitur. Under these circumstances, Defendant respectfully requests, in the alternative to granting a new trial outright, that this Court order a new trial conditioned on Plaintiff's acceptance of a substantial remittitur of the damages awarded.

## IV. <u>CONCLUSION</u>

For these reasons, Defendant requests that the Court grant its Motion for New Trial or, in the alternative, substantially remit the compensatory damages awarded.

Dated: November 10, 2026

Respectfully submitted,

*/s/ Tiffany din Fagel Tse*

Lauren M. Bridenbaugh, Bar No. 90586
Tiffany din Fagel Tse, Bar No. 92958
Leslie P. Currie, Bar No. 101060
LITTLER MENDELSON, P.C.
1800 Tysons Boulevard, Suite 500
Tysons Corner, Virginia 22102
Telephone: 703.442.8425
Facsimile: 703.552.7679
lbridenbaugh@littler.com
ttse@littler.com
lcurrie@littler.com

Tanja L. Darrow (admitted *pro hac vice)*
LITTLER MENDELSON, P.C.
633 West 5th Street, 63rd Floor
Los Angeles, California 90071
Telephone: 213.443.4300
Facsimile: 800.715.1330
tdarrow@littler.com

*Counsel for Defendant Society for Human Resource Management*

## CERTIFICATE OF SERVICE

I hereby certify that, on the 10th day of November 2026, I caused a copy of the foregoing **Defendant's Motion for New Trial or In the Alternative, Motion to Alter or Amend the Judgment,** to be served through the Court's Electronic Case Filing (ECF) system on the following counsel of record:

Stephen B. Pershing (VSB No. 31012)
Mary E. Kuntz (VSB No. 76947)
Anna Kathryn Barnes Barry (admitted *pro hac vice*)
Thomas O. Walker II (admitted *pro hac vice*)
KALIJARVI, CHUZI, NEWMAN & FITCH, P.C.
818 Connecticut Ave. NW, Suite 1000
Washington, DC 20006
Telephone: 202.331.9260
spershing@kcnlaw.com
mkuntz@kcnlaw.com
akbarry@kcnlaw.com
twalker@kcnlaw.com

*Counsel for Plaintiff*

*<u>/s/ Tiffany din Fagel Tse</u>*
Tiffany din Fagel Tse